## UNITED STATES DISTRICT COURT
### DISTRICT OF MINNESOTA

---

In re: EpiPen Direct Purchaser Litigation          File No. 20-cv-0827 (ECT/TNL)

THIS DOCUMENT RELATES TO:          **OPINION AND ORDER**
ALL ACTIONS

---

Noah Silverman, Bruce E. Gerstein, and Joseph Opper, Garwin Gerstein & Fisher LLP, New York, NY; David F. Sorenson, Caitlin Coslett, Andrew C. Curley, Aurelia Chaudhury, E. Michelle Drake, and Nicholas Urban, Berger & Montague PC, Philadelphia, PA; David S. Golub and Steven Bloch, Silver Golub & Teitell LLP, Stamford, CT; Susan C. Segura and David C. Raphael, Jr., Smith Segura & Raphael, LLP, Alexandria, LA; Russell Chorush, Eric Enger, and Christopher M. First, Heim Payne & Chorush LLP, Houston, TX; Joseph T. Lukens and Peter Kohn, Faruqi & Faruqi, LLP, Philadelphia, PA; Stuart Des Roches, Andrew Kelly, Amanda Leah Hass, Chris Letter, Dan Chiorean, and Thomas Maas, Odom & Des Roches, LLC, New Orleans, LA, for Plaintiffs Rochester Drug Co-Operative, Inc., and Dakota Drug, Inc.

Adam K. Levin, Carolyn A. DeLone, Christine A. Sifferman, Justin Bernick, Kathryn Marshall Ali, Charles A. Loughlin, and David M. Foster, Hogan Lovells US LLP, Washington, DC; Peter H. Walsh, Hogan Lovells US LLP, Minneapolis, MN; and Katherine Booth Wellington, Hogan Lovells US LLP, Boston, MA, for Defendants Mylan Inc. and Mylan Specialty L.P.

John W. Ursu and Isaac B. Hall, Faegre Drinker Biddle & Reath LLP, Minneapolis, MN; Daniel M. Dockery and Enu A. Mainigi, Williams & Connolly, LLP, Washington, DC, for Defendants CVS Health Corporation, CaremarkPCS Health LLC, Caremark LLC, and Caremark Rx LLC.

Donald G. Heeman, Jessica J. Nelson, and Randi J. Winter, Spencer Fane LLP, Minneapolis, MN; Jonathan G. Cooper, Carolyn L. Hart, Michael J. Lyle, and Eric C. Lyttle, Quinn Emanuel Urquhart & Sullivan LLP, Washington, DC, for Defendants Express Scripts Holding Company, Express Scripts Inc., and Medco Health Solutions, Inc.

Kadee J. Anderson and Andrew Glasnovich, Stinson LLP, Minneapolis, MN; Elizabeth Broadway Brown, D. Andrew Hatchett, and Bradley Harder, Alston & Bird LLP, Atlanta, GA; and Brian D. Boone, Alston & Bird LLP, Charlotte, NC, for Defendants United Health Group Incorporated, United Healthcare Services Inc., Optum, Inc., OptumRx Holdings, LLC, and OptumRx Inc.

This is a case about prescription-drug prices.  Plaintiffs Rochester Drug Co-Operative, Inc., and Dakota Drug, Inc., are drug wholesalers.  On behalf of a proposed class, Plaintiffs claim that Defendants Mylan Inc. and Mylan Specialty L.P. (collectively, "Mylan"), the manufacturers of a device called the "EpiPen," paid bribes and kickbacks to a group of pharmacy benefit managers—referred to collectively as CVS Caremark, Express Scripts, and OptumRx (or "PBM Defendants")[1]—to ensure that Mylan could raise the price of the EpiPen with impunity while also keeping a monopoly share of the market.  In doing so, Plaintiffs claim, all Defendants violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c), and Mylan violated the Sherman Antitrust Act, 15 U.S.C. § 2.  Mylan and the PBM Defendants have filed separate motions to dismiss for failure to state a claim.  The PBM Defendants argue that Plaintiffs have not alleged plausible RICO claims, that the claims are time-barred, and that the claims against the PBMs' corporate parent entities should be dismissed.  Mylan raises substantially similar arguments about the RICO claims and adds that Plaintiffs have not alleged a timely or plausible antitrust monopoly claim.

Both motions to dismiss will be denied in substantial part.  The PBM Defendants' motion will be granted only as to the PBMs' corporate parents because Plaintiffs have not alleged a plausible basis for holding those entities liable.  In all other respects, both motions will be denied.  Plaintiffs have stated plausible claims under RICO and the Sherman Act,

---

[1]      Each of these three sets of PBM Defendant groups consist of PBMs and their corporate parents.

and while discovery may reveal that the statute of limitations has run on those claims, it would be inappropriate to dismiss them as untimely at this stage.

I[2]

A

To understand the specific allegations in this case, it is necessary to start with the basic structure of the prescription-drug market and to describe how drugs make it to patients. The process begins with pharmaceutical companies, who "develop, manufacture, market, and sell prescription drugs." Consolidated Class Action Compl. ("Compl.") ¶ 44 [ECF No. 76]. The manufacturer sells the drugs to a wholesaler, like the Plaintiffs in this case, for a "published list price" known as the "Wholesale Acquisition Cost" ("WAC"). *Id.* ¶ 45.[3] The wholesaler then sells the drugs to a pharmacy, and the pharmacy dispenses them to individual patients. *Id.* ¶ 44.

Sometimes, a patient simply pays cash out of pocket for a prescription drug. *Id.* ¶ 47. More frequently, however, a third party—usually a health plan—pays some or all of the cost on the patient's behalf. *Id.* ¶ 47. The net cost that the health plan pays is determined by offsetting the gross cost of the drug with the patient's co-pay, if any, and any rebates or discounts to which the manufacturer has agreed. *Id.* ¶ 49. So, while multiple

---

[2]     In accordance with the standards governing a motion under Rule 12(b)(6), the facts are drawn entirely from Plaintiffs' complaint. *See Gorog v. Best Buy Co.*, 760 F.3d 787, 792 (8th Cir. 2014).

[3]     Plaintiffs assert that wholesalers generally pay the full WAC, but they "may obtain a small percentage discount" if they pay off their invoices early. *Id.* ¶ 45.

3

factors affect the amount that patients and plans actually pay, the list price is certainly one of them; if the list price goes down, patients and insurers usually pay less. *Id.* ¶¶ 49–50.

An insurer will only pay for drugs that it covers. *See id.* ¶ 49. Covered drugs appear on a published list called a "formulary." Formularies define both "which drugs are covered by an insurer or health plan, and the scope or restrictions for such coverage." *Id.* ¶ 48. And they typically contain "multiple tiers of coverage," which determine the amount of a patient's copay or conditions that must be met to obtain coverage. *Id.* In effect, these tiers can favor some drugs over others.

This background sets the stage for PBMs. PBMs generally do not purchase or sell drugs themselves,[4] but instead are "hired by various types of entities to design, manage, and administer prescription drug benefit programs." *Id.* ¶ 51. Health plans and other third-party payors hire PBMs for a variety of functions, but two are especially relevant to this case: (1) negotiating with manufacturers to obtain rebates that offset the list prices of drugs; and (2) "designing, developing and managing formularies and formulary compliance programs." *Id.* ¶ 52.

Health plans wield substantial "collective purchasing power" because of all the individual patients they cover, and manufacturers, unsurprisingly, want to tap into this business. *Id.* ¶ 54. To do so, they need to secure favorable placement on insurers' formularies, which "can be used to steer patients toward certain drugs over others." *Id.* ¶ 64. In order to achieve this, manufacturers may be inspired to make two types of

---

[4]     Some PBMs operate "mail-order pharmacy" businesses, but these do not factor into Plaintiffs' allegations. *Id.* ¶ 51.

concessions.  First, they might simply lower (or stop raising) the list prices of their drugs. Second, even if the list price remains unchanged, a manufacturer may offer rebates that effectively lower a drug's cost for the individual health plans that cover it.  *See id.* ¶¶ 49–50.

PBMs market their services as a means of lowering costs for their health plan clients. *Id.* ¶¶ 93–97.  "[I]t is typical to have a large PBM negotiating with several drug manufacturers on behalf of a large number of relatively small health plans," *id.* ¶ 59, and rather than negotiate a separate agreement for each of its individual clients, a PBM will often seek a "master agreement" that applies to many or all of its clients, *id.* ¶ 60.  The result is that health plans' already substantial collective purchasing power becomes even more "highly concentrated" in the hands of PBMs.  *Id.* ¶ 60.  PBMs, in other words, are often in a better negotiating position than their clients would be as individuals.

PBMs wield this leverage through their control over their health plan clients' formularies.  Although health plans retain "nominal control" over their formularies, PBMs have "substantial day-to-day control" over them.  *Id.* ¶¶ 66, 70.  For example, Plaintiffs cite a form contract for Express Scripts, a major PBM and a Defendant in this case, providing that its health plan client will presumptively "adopt" the PBM's formulary choices unless the health plan affirmatively opts out of them.  *Id.* ¶ 67.  Some contracts also contain provisions that allow PBMs to "penalize" their clients with rebate reductions if the client "override[s] the PBM's formulary decisions."  *Id.* ¶ 69.  In practice, then, health plans typically just rely on their PBMs' formulary recommendations.  *Id.* ¶ 68.

Recent industry changes have raised the stakes of formulary negotiations even further.  Until the 2010s, PBMs generally used "open formularies," which "offer[ed] varying degrees of plan coverage and benefits for virtually all available FDA-approved drugs."  *Id.* ¶ 74.  In the 2010s, PBMs began a shift to "closed formularies," which not only provide varying degrees of coverage but also "restrict the overall number of drugs" that receive coverage in the first place.  *Id* ¶ 74.  In the last several years, PBMs have also begun to publish "annual lists of drug exclusions."  *Id.* ¶ 75.  These changes give PBMs even greater power to "drive health and insurance plan participants and beneficiaries to (or away from) specific drugs."  *Id.* ¶ 75.  Favorable placement on a closed formulary can substantially increase a drug's sales, while placement on an exclusion list can "dramatically hobble" them.  *Id.* ¶ 75 (quoting Johanna Bennett, *CVS Health Takes "an Audacious Step" With 2017 Drug Formularies*, Barron's (Aug. 2, 2016), https://www.barrons.com/articles/cvs-health-takes-an-audacious-step-with-2017-drug-formularies-1470169569).  Unsurprisingly, formulary and exclusion placements are a "major factor" in negotiations and can result in substantial rebates.  *Id.* ¶ 76.

Finally, there is the manner in which PBMs are paid.  Generally, at least as relevant to this case, PBMs receive payments from drug manufacturers.[5]  These payments fall into several buckets.  Some are the rebates that PBMs negotiate on behalf of their clients; PBMs take a cut of these rebates and pass on the rest to clients.  *Id.* ¶¶ 79, 89.  Others are more amorphous "administrative" or "service fees."  *Id.* ¶¶ 79, 81–82.  PBMs are not very

---

[5]    The Complaint does not detail whether PBMs solely receive payments from drug manufacturers or whether they also receive direct payments from their clients.

transparent about these payments. *Id.* ¶ 89. Most notably, PBMs often have the power to "classify payments they receive from manufacturers as 'rebates' or 'fees' or some other classification." *Id.* ¶ 91. And they "generally retain discretion and control over the timing of any rebate-sharing remittances to their clients." *Id.* ¶ 80. As described below, Plaintiffs believe that these industry practices are ripe for abuse.

B

This case involves the EpiPen,[6] an auto-injector device that "allow[s] a patient to quickly self-administer a prescribed amount of the drug epinephrine through a spring-loaded needle." Compl. ¶¶ 2, 41. Epinephrine auto-injectors ("EAIs") like the EpiPen are used as "an emergency treatment for severe allergic reactions." *Id.* ¶¶ 2, 40–41. Patients who are especially prone to such reactions "are recommended to always carry an EAI and to be trained in its use." *Id.* ¶ 41.

Mylan acquired the right to sell the EpiPen in 2007, and it soon began to "dominate[] the EAI market." *Id.* ¶¶ 42–43. By 2012, Mylan itself claimed that the EpiPen accounted for 99% of the market. *Id.* ¶ 43. During this time, Mylan typically did not offer rebates on the EpiPen device, and when it did, the rebates were relatively low—often below 10% of the list price. *Id.* ¶ 114. Beginning in 2013, however, Mylan faced new competition from two other EAI products: (1) the Auvi-Q, sold by Sanofi; and (2) the Adrenaclick, sold as a generic product by Impax. *Id.* ¶¶ 43, 111, 113. Sanofi in particular hoped to break

---

[6]    The term "EpiPen" will refer collectively to a group of Mylan products that encompasses the EpiPen, EpiPen Jr., EpiPen 2-Pak, and EpiPen Jr. 2-Pak. *See* Compl. ¶ 1. Defendants have not argued that there is any reason to differentiate among these specific products.

7

EpiPen's hold on the market, spending "tens of millions of dollars" to promote Auvi-Q and hiring a "large sales force to compete with Mylan." *Id.* ¶¶ 111–12. Around the time that these competing devices were introduced, over 85% of EAI sales were covered by health plans. *Id.* ¶ 117. In order to "enter and compete vigorously" in the market, then, Sanofi and Adrenaclick had to secure favorable formulary placements.[7] *Id.* ¶ 117.

According to Plaintiffs, Mylan's concerns over the new competition prompted it to devise a bribery-and-kickback scheme with the three PBM Defendants—Express Scripts, Optum, and CVS Caremark—among others. *Id.* ¶ 116. Rather than try to compete with the newly introduced products by lowering its prices, Mylan began to pay the PBM Defendants increased rebates and other fees. In exchange, the PBM Defendants agreed to maintain the EpiPen's preferred formulary status and to exclude competing EAIs. *See id.* ¶¶ 3, 116. Two of the PBM Defendants—Express Scripts and OptumRx—"excluded or restricted" Auvi-Q and Adrenaclick from their clients' formularies entirely. Compl. ¶ 116. The third PBM Defendant—CVS Caremark—gave Auvi-Q formulary coverage, but in a less favorable tier than the EpiPen. *Id.* ¶ 116.

If the PBMs had abided by industry standards, Plaintiffs seem to say, then there would have been nothing unlawful about these increased payments. After all, PBMs are supposed to negotiate rebates on their clients' behalf in exchange for favorable formulary status. What made the scheme unlawful, according to Plaintiffs, was that the PBM

---

[7]     According to the Complaint, the Adrenaclick was sold at a lower price than the EpiPen for "much of the period from 2013-2016." *Id.* ¶ 125. Plaintiffs do not say anything about the price of Auvi-Q. *See* Mylan Defs.' Mem. in Supp. at 8 [ECF No. 92].

Defendants abandoned any effort to use their clout to control the EpiPen's price. *Id.* ¶¶ 5–6, 99, 103. This alleged abdication ran counter to the promises that the PBM Defendants had made in marketing materials and other public statements to protect their clients' interests. *See id.* ¶¶ 93–97. And it led to "aggressive[]" price increases on the EpiPen. *Id.* ¶ 118. At the end of 2012, the list price was below $240; by May 2016, it was $609. *Id.* ¶¶ 9, 119. Despite these price increases, Mylan was able to maintain a stable market share because of the EpiPen's favorable formulary status. *Id.* ¶ 119.

The resulting EpiPen price increases benefitted the PBM Defendants, too. This is because the rebates and administrative fees that they received were generally calculated as a percentage of the EpiPen's WAC. *Id.* ¶ 100. So as the list prices increased, so did the amounts that the PBM Defendants received from Mylan. *Id.* ¶¶ 100, 120. And whereas PBMs had historically passed savings like these on to their clients, the PBM Defendants began to keep more of the increased fees for themselves. *Id.* ¶ 99. Mylan, in turn, was able to use its list-price increases to recoup the costs of its increasing payments to the PBMs. *Id.* ¶ 121. Even after accounting for the costs of its alleged bribes, Mylan's operating profit per EpiPen device increased 148% between 2012 and 2016. *Id.* ¶ 123. This cycle of mutual benefit allowed both Mylan and the PBM Defendants to maintain or increase their profits and, according to Plaintiffs, resulted in EpiPen prices that were "artificially inflated." *Id.* ¶ 255. Plaintiffs, as drug wholesalers who pay the list price for EpiPens, were left to bear the burden. *See id.* ¶ 45.

C

Plaintiff Rochester Drug Co-Operative originally brought this action against Mylan and the PBM Defendants in March 2020, claiming that the bribery-and-kickback scheme between Mylan and the PBM Defendants violated RICO, *see* 18 U.S.C. § 1964(c), and that Mylan had violated the Sherman Antitrust Act by unlawfully maintaining monopoly power with respect to the EpiPen, *see* 15 U.S.C. § 2. ECF No. 1. It asserted these claims on behalf of itself and a proposed class of other direct purchasers of EpiPen products. *See id.* In June 2020, Plaintiff Dakota Drug, represented by the same counsel as Rochester Drug Co-Operative, filed a similar complaint raising the same claims against the same Defendants. *See Dakota Drug, Inc. v. Mylan Inc.*, No. 20-cv-1334 (ECT/TNL) (D. Minn. June 9, 2020) [ECF No. 1]. The two cases were consolidated in August 2020, ECF No. 70, and Plaintiffs thereafter filed the operative Consolidated Class Action Complaint, ECF No. 76. Mylan and the PBM Defendants have now filed separate motions to dismiss the operative Complaint in its entirety. ECF Nos. 85, 90.

II

In reviewing a motion to dismiss for failure to state a claim under Rule 12(b)(6), a court must accept as true all of the factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *Gorog v. Best Buy Co.*, 760 F.3d 787, 792 (8th Cir. 2014) (citation omitted). Although the factual allegations need not be detailed, they must be sufficient to "raise a right to relief above the speculative level . . . ." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted). The complaint must "state a claim to relief that is plausible on its face." *Id.* at 570. "A claim has facial plausibility

when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

When a RICO claim depends on allegations of fraud, the plaintiff must also "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b); *see Crest Constr. II, Inc. v. Doe*, 660 F.3d 346, 353 (8th Cir. 2011). "To satisfy the particularity requirement of Rule 9(b), the complaint must plead such facts as the time, place, and content of the defendant's false representations, as well as the details of the defendant's fraudulent acts, including when the acts occurred, who engaged in them, and what was obtained as a result." *U.S. ex rel. Joshi v. St. Luke's Hosp., Inc.*, 441 F.3d 552, 556 (8th Cir. 2006). But "[t]he level of particularity required depends on the nature of a case." *E-Shops Corp. v. U.S. Bank Nat'l Ass'n*, 678 F.3d 659, 663 (8th Cir. 2012). Courts must read Rule 9(b) "in the context of the general principles of the Federal Rules, the purpose of which is to simplify pleading. Thus, the particularity required by Rule 9(b) is intended to enable the defendant to respond specifically and quickly to potentially damaging allegations." *U.S. ex rel. Costner v. United States*, 317 F.3d 883, 888 (8th Cir. 2003). "To determine whether a party has satisfied Rule 9(b), courts look to 'the complexity or simplicity of the transaction or occurrence, the relationship of the parties and the determination of how much circumstantial detail is necessary to give notice to the adverse party and enable him to prepare a responsive pleading." *Corval Constructors, Inc. v. Tesoro Refin. & Mktg. Co.*, No. 19-cv-1277 (ECT/BRT), 2019 WL 5260483, at *7 (D. Minn. Oct. 17, 2019) (quoting *Payne v. United States*, 247 F.2d 481, 486 (8th Cir. 1957)).

III

Although Plaintiffs have raised only three substantive claims—RICO, RICO conspiracy, and Sherman Act—the issues are voluminous, and Defendants attack the claims on many fronts. The timeliness of Plaintiffs' claims—potentially a threshold issue—will be addressed first, followed by the merits of each claim in turn.

Both sets of Defendants assert that Plaintiffs' claims should be dismissed as untimely. *See* Mylan Defs.' Mem. in Supp. at 45–47; PBM Defs.' Mem. in Supp. at 24–27 [ECF No. 87]. RICO claims and Sherman Act claims are both subject to a four-year statute of limitations. *See* 15 U.S.C. § 15(b); *Varner v. Peterson Farms*, 371 F.3d 1011, 1019 (8th Cir. 2004) (Sherman Act); *see also Rotella v. Wood*, 528 U.S. 549, 552 (2000) (RICO).

A statute of limitations "is an affirmative defense that defendants bear the burden to plead and prove." *Roiger v. Veterans Affs. Health Care Sys.*, No. 18-cv-591 (ECT/TNL), 2019 WL 572655, at *7 (D. Minn. Feb. 12, 2019) (citing *John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 133 (2008)). It is therefore "not ordinarily a ground for Rule 12(b)(6) dismissal unless the complaint itself establishes the defense." *Jessie v. Potter*, 516 F.3d 709, 713 n.2 (8th Cir. 2008). This means that the plaintiff's own allegations must "clearly indicate[]" that the claims are untimely. 5B Arthur R. Miller, Mary K. Kane, & A. Benjamin Spencer, *Federal Practice and Procedure* § 1357 (3d ed. Oct. 2020 Update). If the complaint "reasonably may be understood to assert a claim for relief plausibly within the limitations period," it survives. *Int'l Decision Sys., Inc. v. JDR Sols., Inc.*, No. 18-cv-2951 (ECT/DTS), 2019 WL 2009249, at *3 (D. Minn. May 7, 2019). And even when a complaint does establish that a plaintiff's claims are untimely, a plaintiff may avoid

12

dismissal by plausibly alleging a basis to toll the statute of limitations.  *See Joseph v. Wal-Mart Corp.*, No. 20-cv-1255 (ECT/TNL), 2020 WL 5995261, at *3 (D. Minn. Oct. 9, 2020) (collecting cases).  The question, then, is whether the Complaint "clearly indicate[s]" that Plaintiffs' claims are untimely.  5B Miller et al., *supra*, § 1357.  To answer it, the RICO and Sherman Act claims will need to be addressed separately, because different rules govern the statute of limitations for each.

A

Start with the RICO claim.  Although the Supreme Court has not definitively resolved when the statute of limitations begins to run on civil RICO claims, it has said that the clock starts at one of two moments: either when the plaintiff's injury occurs or when the plaintiff should reasonably be able to discover its injury.  *See Rotella*, 528 U.S. at 554–55 & n.2.  The Eighth Circuit and courts in this District appear to follow the latter approach—*i.e.*, the injury-discovery rule.  *Hope v. Klabal*, 457 F.3d 784, 790–91 (8th Cir. 2006); *see, e.g.*, *Schreier v. Drealan Kvilhaug Hoefker & Co. P.A.*, __ F. Supp. 3d __, No. 18-cv-2310 (DSD/KMM), 2020 WL 1442004, at *8 (D. Minn. Mar. 24, 2020); *accord Sidney Hillman Health Ctr. v. Abbott Labs., Inc.*, 782 F.3d 922, 926 (7th Cir. 2015).  What matters under this rule is "discovery of the injury, not discovery of the other elements of a claim."  *Rotella*, 528 U.S. at 555.  In other words, when a plaintiff exercising reasonable diligence can discover its injury, the limitations period begins to run even if there is "confusion as to what the actual source of the injury was."  *Robert L. Kroenlein Tr. ex rel. Alden v. Kirchhefer*, 764 F.3d 1268, 1278–79 (10th Cir. 2014).  Whether a plaintiff could have discovered its injury with reasonable diligence is a "fact-specific" question.  *ARP*

13

*Wave, LLC v. Salpeter*, No. 18-cv-2046 (PJS/ECW), 2020 WL 881980, at *8 (D. Minn. Feb. 24, 2020).

Defendants argue that, at the latest, Plaintiffs should have reasonably discovered their RICO injury in 2013, as soon as the bribery-and-kickback scheme was underway and Mylan began increasing the price of EpiPens. Mylan Defs.' Mem. in Supp. at 45; PBM Defs.' Mem. in Supp. at 25; *see also* Compl. ¶ 119. For support, Defendants point to articles cited in (and therefore embraced by) the Complaint. The articles, which were published as early as 2004 and as late as 2015, generally describe the role PBMs play in the prescription-drug industry and highlight the risk that a lack of transparency in rebate payments from manufacturers could lead PBMs to favor higher-priced drugs. *See* Compl. ¶¶ 128–30; Mylan Defs.' Mem. in Supp. at 46–47. Plaintiffs respond that these articles— which only concern PBM practices generally—did not put them on notice that there was anything unlawful about price increases on the EpiPen specifically. Pls.' Mem. in Opp'n at 91 [ECF No. 101]. According to Plaintiffs, they had "little if any interaction" with the PBM Defendants, Compl. ¶ 138, and they could not have known that they were overcharged for EpiPens until September 2016, when Mylan's CEO testified before Congress that Mylan's payments to PBMs were the reason for the increased prices. Pls.' Mem. in Opp'n at 90–91; *see* Compl. ¶ 121.

Under these circumstances, the timeliness of Plaintiffs' RICO claims cannot be resolved at the pleading stage. *See Joyce v. Armstrong Teasdale, LLP*, 635 F.3d 364, 368 (8th Cir. 2011) (applying Missouri's discovery rule and deciding that a timeliness question should not have been resolved on a motion to dismiss); *cf. Varner*, 371 F.3d at 1016, 1020

14

(upholding a Rule 12(b)(6) dismissal for untimeliness where it was "undisputed" that the plaintiffs' claims were time-barred unless they had sufficiently alleged a basis to toll the statute of limitations).  Defendants have not shown that Plaintiffs should have discovered their injury based on EpiPen price increases alone.[8]  After all, prices increase all the time for all sorts of reasons.  And the alleged injury here is an unlawfully *inflated* price, not just a higher price.   Nothing in Plaintiffs' allegations establishes that a reasonable drug wholesaler would immediately have realized that it was paying more for EpiPens than it should have been.  *See Sidney Hillman Health Ctr.*, 782 F.3d at 929.  Nor are the articles Plaintiffs cite in their Complaint (and which Defendants cite as support for their argument) sufficient by themselves to conclude that Plaintiffs had a duty to investigate the cause of EpiPen price increases.   True enough, the articles might reasonably be understood to provide breadcrumbs that might lead one to investigate the behavior of PBMs and drug manufacturers—and perhaps an unusually eager person to investigate the relationship between the PBMs and Mylan specifically—but it would stretch both the standards governing Rule 12(b)(6) motions and the Complaint's allegations too far to conclude that these sources triggered a duty of reasonable diligence as a matter of law here.  The articles

---

[8]     Defendants cite *Levy v. BASF Metals Ltd.*, 917 F.3d 106 (2d Cir. 2019), in which the Second Circuit held that a plaintiff claiming the manipulation of commodities prices had actual knowledge of her injury when she alleged that the prices began to fall "for no apparent reason" and that there was "no explanation for this sudden drop in price, other than market distortion due to manipulation."  *Id.* at 109.  *Levy* is not binding on a district court in Minnesota, but in any event, this case seems different, since the EpiPen prices had already been increasing before the alleged scheme; the increases just accelerated.  *See* Compl. ¶ 119.

were not specific to the EpiPen; they identified general prescription drug market conditions susceptible to potential abuse. And if followed in other cases, reaching the opposite conclusion at this stage would have odd consequences: those who might be RICO plaintiffs would be expected to monitor scholarship and like resources and promptly and thoroughly investigate a universe of possible circumstances when presented with any reasoned suggestion that some aspect of the market is susceptible to abuse. No authority supports such a broad rule or duty. All of this is not to say that discovery won't reveal that Plaintiffs' RICO claims are untimely. It may. It's just that dismissing Plaintiffs' RICO claims as untimely at this point would be premature. *See* 5B Miller et al., *supra*, § 1357 ("[T]he district court in its discretion may decide that a motion for summary judgment . . . is a more appropriate procedural device to deal with [a] built-in defense than a motion to dismiss under Rule 12(b)(6).").

## B

Now move to the antitrust claim. In contrast to RICO claims, the limitations period on an antitrust claim begins to run when "the wrongdoer commits an act that injures the business of another," regardless of the plaintiff's awareness of the injury. *Varner*, 371 F.3d at 1019 (citing *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971)); *see Granite Falls Bank v. Henrikson*, 924 F.2d 150, 153 (8th Cir. 1991), *abrogated on other grounds by Rotella*, 528 U.S. at 555.[9] Plaintiffs allege that Mylan unlawfully

---

[9] Plaintiffs assert that the "injury-discovery rule" applies to both RICO and antitrust claims because "Congress consciously patterned civil RICO after the Clayton Act." Pls.' Mem. in Opp'n at 90 n.100 (quoting *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997)). The Seventh Circuit follows this approach, *see In re Sulfuric Acid Antitrust Litig.*, 703 F.3d

maintained monopoly power in the EAI market, leading Plaintiffs to pay "artificially inflated prices" for the EpiPen. Compl. ¶¶ 253–75. According to the Complaint, the bribery-and-kickback scheme—the means by which Mylan allegedly maintained its monopoly—"began by 2012, if not earlier." Compl. ¶ 9. And because Plaintiffs' actual or constructive awareness of their injury does not come into play here, as it does for the RICO claims, *see Granite Falls Bank*, 924 F.2d at 153, it seems apparent on the face of the Complaint that at least the initial antitrust injury—*i.e.*, the first time Mylan charged Plaintiffs an artificially inflated price—occurred outside the statute of limitations. For the reasons discussed below, however, this does not entitle the Mylan Defendants to dismissal of the antitrust claims in their entirety.

First, Plaintiffs argue that the limitations period should be tolled because the Mylan Defendants fraudulently concealed their conduct. Pls.' Mem. in Opp'n at 90–91. This would require Plaintiffs to show that "(1) Defendants concealed the conduct complained of and (2) despite the exercise of due diligence, Plaintiffs failed to discover the facts that form the basis of their claim." *In re Potash Antitrust Litig.*, 159 F.R.D. 682, 688–89 (D. Minn. 1995); *see Klehr*, 521 U.S. at 195–96 (explaining that reasonable diligence is required for tolling based on fraudulent concealment because the antitrust laws "seek not only to compensate victims but also to encourage those victims themselves diligently to investigate and thereby to uncover unlawful activity"). "[A]llegations of fraud, including

---

1004, 1014 (7th Cir. 2012), but most other circuits, including the Eighth Circuit, do not. *See Granite Falls Bank*, 924 F.2d at 153; *see also In re Animation Workers Antitrust Litig.*, 87 F. Supp. 3d 1195, 1209–10 (N.D. Cal. 2015) (collecting cases).

fraudulent concealment for tolling purposes, [must] be pleaded with particularity" under Rule 9(b). *Int'l Decision Sys., Inc.*, 2019 WL 2009249, at *6 (quoting *Great Plains Tr. Co. v. Union Pac. R.R. Co.*, 492 F.3d 986, 995 (8th Cir. 2007)).

Defendants do not seem to dispute that there was some concealment here. Plaintiffs allege that Defendants "refuse[d] to disclose the real reason behind Mylan's increased list prices for EpiPens" and "falsely and affirmatively mischaracterized" payments that Mylan received from the PBM Defendants by "repeatedly referring to them as 'discounts' that benefit health plans and their patient members." Pls.' Mem. in Opp'n at 92 (quoting Compl. ¶¶ 139, 135). Plaintiffs also identify a number of marketing statements that the PBM Defendants made describing themselves as working to reduce costs for their clients. Compl. ¶¶ 92–98.

Nonetheless, Plaintiffs have not sufficiently alleged reasonable diligence. All they say, without elaboration, is that they "could not have discovered, through the exercise of reasonable diligence, that Mylan was concealing" its conduct. *Id.* ¶ 140. Especially given Plaintiffs' apparent awareness of Mylan's large market share and increasing prices, this conclusory statement does not satisfy Rule 9(b)'s requirement to plead reasonable diligence with particularity. *See Great Plains Tr. Co.*, 492 F.3d at 996; *In re Milk Prods. Antitrust Litig.*, 84 F. Supp. 2d 1016, 1022–25 (D. Minn. 1997).[10]

---

[10]    At first glance, concluding that Plaintiffs have not adequately pleaded reasonable diligence seems to be in tension with the conclusion, reached above, that Plaintiffs were not on reasonable notice of their RICO injury. *See TCF Nat'l Bank v. Mkt. Intel., Inc.*, 812 F.3d 701, 711 (8th Cir. 2016) (applying Minnesota law and describing fraudulent concealment as "very similar to the discovery rule"). These conclusions are reconcilable for two reasons: the applicable burdens of proof and the stage of the proceedings. Because

Second, Plaintiffs argue that, even if some of their antitrust claims are untimely, they have pleaded "continuing violations" that extend into the limitations period. Pls.' Mem. in Opp'n at 93–95. When an antitrust case involves a "continuing violation" rather than a single act, "each overt act that is part of the violation and that injures the plaintiff, *e.g.*, each sale to the plaintiff, starts the statutory period running again." *Klehr*, 521 U.S. at 189 (internal quotation marks and citation omitted). "[A] monopolist commits an overt act each time he uses unlawfully acquired market power to charge an elevated price." *In re Wholesale Grocery Prods. Antitrust Litig.*, 752 F.3d 728, 736 (8th Cir. 2014). This does not mean that a plaintiff can use a purchase occurring within the limitations period as a bootstrap to recover for purchases occurring outside the limitations period, *see Klehr*, 521 U.S. at 189–90, but the plaintiff can recover those damages that arose during the limitations period. *See Wholesale Grocery Prods.*, 752 F.3d at 736; *see also* 8 Julian O. von Kalinowski et al., *Antitrust Laws and Trade Regulation* § 162.02[3] (2d ed. Aug. 2020 Update); *see generally In re Pre-Filled Propane Tank Antitrust Litig.*, 860 F.3d 1059, 1064–68 (8th Cir. 2017) (en banc).

At this early stage, assuming Plaintiffs have plausibly alleged an antitrust violation at all, they have also plausibly alleged a continuing violation. They claim that Mylan began

---

Defendants had the burden to show, based only on the facts in the Complaint, that the RICO claims were untimely, *see John R. Sand & Gravel Co.*, 552 U.S. at 133, the absence of facts on that issue cuts in Plaintiffs' favor. But with respect to the antitrust claim, the facts in the Complaint establish that Plaintiffs injuries began more than four years before they filed their lawsuit. This means that the burden shifted to Plaintiffs to show—using only the facts in or embraced by the Complaint—that they *could not have* discovered the existence of their antitrust cause of action. Now, the absence of facts in the Complaint cuts the other way.

unlawfully using its monopoly power to inflate the price of the EpiPen in about 2013, that it continued raising its prices through at least May 2016, and that Plaintiffs directly purchased EpiPens "from January 1, 2013 forward."  Compl. ¶¶ 9, 13–14, 119, 123, 144–45.  Whether Plaintiffs can actually prove continuing violations, and the extent to which the statute of limitations places outer bounds on the damages available to Plaintiffs, are questions better left for summary judgment.  For now, it suffices to conclude that the statute of limitations does not provide a basis to dismiss Plaintiffs' antitrust claims in their entirety.

## IV

Now to the merits of Plaintiffs' claims, beginning with the RICO claim.  As relevant here, RICO makes it "unlawful for any person employed by or associated with any enterprise engaged in . . . interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."  18 U.S.C. § 1962(c).  A party who violates this provision faces both criminal and civil consequences.  *See id.* §§ 1963 (providing for criminal penalties), 1964(c) (authorizing a private civil action).  To establish a civil RICO claim, a plaintiff must show that that the defendant "engaged in '(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.'"  *H & Q Props., Inc. v. Doll*, 793 F.3d 852, 856 (8th Cir. 2015) (quoting *Nitro Distrib., Inc. v. Alticor, Inc.*, 565 F.3d 417, 428 (8th Cir. 2009)).  Even if the plaintiff adequately pleads that the defendant violated RICO, however, the claim will fail if the plaintiff has not "1) sustained an injury to business or property 2) that was caused by [the] RICO violation."  *Gomez v. Wells Fargo Bank, N.A.*, 676 F.3d 655, 660 (8th Cir.

2012) (quoting *Asa-Brandt, Inc. v. ADM Inv. Servs., Inc.*, 344 F.3d 738, 752 (8th Cir. 2003)); *see also* 18 U.S.C. § 1964(c) (authorizing a civil action by "[a]ny person injured in his business or property *by reason of* a violation" (emphasis added)).

A

Defendants first argue that Plaintiffs fail to plausibly allege the existence of an enterprise. *See* PBM Defs.' Mem. in Supp. at 5–8; Mylan Defs.' Mem. in Supp. at 11–15. The statute defines the term "enterprise" to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals *associated in fact* although not a legal entity." 18 U.S.C. § 1961(4) (emphasis added). As this definition suggests, an "association-in-fact" enterprise need not have many formal "structural features." *Boyle v. United States*, 556 U.S. 938, 947–48 (2009).

> Such a group need not have a hierarchical structure or a "chain of command"; decisions may be made on an ad hoc basis and by any number of methods—by majority vote, consensus, a show of strength, etc. Members of the group need not have fixed roles; different members may perform different roles at different times. The group need not have a name, regular meetings, dues, established rules and regulations, disciplinary procedures, or induction or initiation ceremonies.

*Id.* at 948. Only three features are required: "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Id.* at 946.

Plaintiffs claim that there are three separate enterprises at play here, each consisting of Mylan and one of the PBM Defendant groups: Mylan-CVS Caremark, Mylan-Express Scripts, and Mylan-OptumRx. Compl. ¶ 161. Plaintiffs allege that each of these purported

21

enterprises has the common purposes of "perpetuating the use of inflated EpiPen list prices" and "selling, promoting and recommending for purchase, and administering prescriptions for EpiPens, and deriving secret profits from these activities." *Id.* ¶¶ 162, 166. The enterprises, according to Plaintiffs, functioned as "continuing unit[s]" because they were connected by "contractual relationships, financial ties, and continuing coordination of activities." Compl. ¶ 167. Defendants raise essentially two arguments, which will be addressed in turn.

1

Defendants first argue that Plaintiffs have not plausibly alleged a common purpose because Mylan and each of the PBMs were simply pursuing their own "divergent goals." Mylan Defs.' Mem. in Supp. at 11–13. Plaintiffs respond that the allegations show that each member of the purported enterprises stood to benefit from the EpiPen bribery-and-kickback scheme. Pls.' Mem. in Opp'n at 12–14.

Plaintiffs have the better argument. It is true that "divergent goals among members of a purported association-in-fact enterprise" are a "fatal problem" for a RICO claim. *Craig Outdoor Advert., Inc. v. Viacom Outdoor, Inc.*, 528 F.3d 1001, 1027 (8th Cir. 2008) (internal quotation marks and citation omitted); *accord Baker v. IBP, Inc.*, 357 F.3d 685, 691 (7th Cir. 2004). But the Complaint contains a fairly clear description of why Mylan and the PBM Defendants all had interests in keeping EpiPen prices inflated. Mylan allegedly paid higher rebates to each PBM Defendant in exchange both for favorable formulary placement and to ensure that the PBMs would not police its price increases. *See* Compl. ¶¶ 5–6. This unsurprisingly benefitted Mylan, which got to charge more for its

22

products.  But the PBM Defendants stood to benefit too, because the amount they received in rebates and other fees was tied to the EpiPen's list price, and they did not share the wealth with their clients the way they used to.  In other words, with assurance that it could raise its prices with impunity, Mylan was able to "use[] the list price increases as a way of splitting the increased profits between itself and the Defendant PBMs."  Compl. ¶ 122; *see id.* ¶¶ 5–6, 122–25, 165–66.  This type of mutual benefit shows that enterprises had a common purpose.  *See In re Insulin Pricing Litig.*, No. 3:17-cv-699-BRM-LHG, 2019 WL 643709, at *6 & n.7 (D.N.J. Feb. 15, 2019) (addressing similar allegations about a different drug); *Pharm. Indus. Average Wholesale Price Litig.*, 307 F. Supp. 2d 196, 205–06 (D. Mass. 2004); *see also Abels v. Farmers Commodities Corp.*, 259 F.3d 910, 919 (8th Cir. 2001) (explaining that an aligned profit motive can indicate a common purpose). Defendants try to frame the relationship between Mylan and the PBMs as one of purely arms-length business transactions, but this framing is based largely on Plaintiffs' factual allegations about how PBMs are *supposed* to function, not how their business activities were allegedly corrupted here.  *See* PBM Defs.' Mem. in Supp. at 14; *compare, e.g.*, Compl. ¶ 76, *with id.* ¶ 99.

2

Defendants' next argument is that Plaintiffs have not adequately alleged that the enterprises had an ascertainable structure.  The Eighth Circuit has long held that a RICO enterprise must have an "ascertainable structure distinct from the conduct of a pattern of racketeering."  *Crest Const. II, Inc. v. Doe*, 660 F.3d 346, 354 (8th Cir. 2011) (quoting *United States v. Lee*, 374 F.3d 637, 647 (8th Cir. 2004)); *see also, e.g.*, *Diamonds Plus,*

*Inc. v. Kolber*, 960 F.2d 765, 769–70 (8th Cir. 1982).[11]  "Whether the enterprise has a structure that is distinct from the pattern of racketeering activity turns on whether the enterprise would still exist if the racketeering activity were absent."  *Ill. Farmers Ins. Co. v. Mobile Diagnostic Imaging, Inc.*, No. 13-cv-2820 (PJS/TNL), 2014 WL 4104789, at *14 (D. Minn. Aug. 19, 2014); *see also McDonough v. Nat'l Home Ins. Co.*, 108 F.3d 174, 177 (8th Cir. 1997) (explaining that "the common activities of the enterprise [must] extend beyond the minimal association necessary to sustain the pattern of racketeering").

Defendants argue that the "only alleged relationship between Mylan and the PBMs" are the unlawful rebate payments—in other words, that no legitimate pursuits tie Mylan and the PBM Defendants together as a "continuing unit."  PBM Defs.' Mem. in Supp. at 6–7; Mylan Defs.' Mem. in Supp. at 14.  Indeed, although Plaintiffs acknowledge that Defendants have lawfully cooperated in "the sale, promotion and recommendation for purchase, and/or administration of prescriptions for EpiPens" in the past, they argue that the alleged bribery-and-kickback scheme corrupted the business relationship.  Compl. ¶ 179; *see* Pls.' Mem. in Opp'n at 15.  At first glance, this framing of the claim suggests that no legitimate business structure is left.

---

[11]     The Supreme Court in *Boyle* wrote that when courts require a structure "[b]eyond that inherent in the pattern of racketeering activity," they simply mean that "the existence of an enterprise is a separate element that must be proved."  556 U.S. at 947.  This statement, combined with the Court's more general rejection in that case of formal structural requirements, has led some courts to suggest that *Boyle* did away with the separate-structure requirement.  *See, e.g.*, *Jay E. Hayden Found. v. First Neighbor Bank, N.A.*, 610 F.3d 382, 388–89 (7th Cir. 2010).  The Eighth Circuit in *Crest Construction II* cited the separate-structure requirement and *Boyle* without suggesting that the two were inconsistent with one another, and Plaintiffs do not argue that the requirement no longer applies.  *See Sebrite Agency, Inc. v. Platt*, 884 F. Supp. 2d 912, 919 n.4 (D. Minn. 2012).

Nonetheless, Plaintiffs have done enough to allege a distinct structure. They claim that Mylan pays the PBM Defendants administrative fees for "benefit claim services" and other services not directly related to the alleged bribery-and-kickback scheme. Compl. ¶¶ 71, 81. Moreover, if the alleged bribery-and-kickback scheme were discontinued, it seems plausible that Mylan and the PBM Defendants would revert to the legitimate business practices that Plaintiffs contend they abandoned. To be sure, some of Plaintiffs' allegations on this score are off the mark or conclusory. They allege, for example, that "each *member* of the respective RICO enterprises has an existence separate and apart from the pattern of racketeering activities," Compl. ¶ 168 (emphasis added), but that is irrelevant, because it is the "*enterprise itself*" that must have the separate existence, *Ill. Farmers Ins. Co.*, 2014 WL 4104789, at *15 n.11. As noted above, however, the Complaint does more. At this stage, Plaintiffs' allegations of legitimate business practices are enough to show that Mylan and the PBM Defendants have "an association beyond the alleged predicate acts."[12] *Harris Cnty. v. Eli Lilly & Co.*, Civ. Action H-19-4994, 2020 WL 5803483, at *9 (S.D. Tex. Sept. 29, 2020) (holding that plaintiffs in an analogous case had plausibly alleged an enterprise in the face of similar arguments); *see also Handeen v. Lemaire*, 112 F.3d 1339, 1352 (8th Cir. 1997) (holding that a plaintiff had adequately

---

[12]    Mylan argues that "it is well established that mere 'contractual relationships agreements, financial ties and coordination' are not enough to establish a RICO enterprise." Mylan Defs.' Mem. in Supp. at 14 (quoting *Sebrite Agency, Inc. v. Platt*, 884 F. Supp. 2d 912, 920 (D. Minn. 2012)). The problem in *Sebrite*, however, was not that these types of connections could not show an enterprise; it was that the allegations at issue were conclusory. *See* 884 F. Supp. at 920.

pleaded that a bankruptcy estate had an ascertainable structure because, absent the alleged unlawful activity, it "would still have continued as a vehicle" for legitimate purposes); *cf. Nelson v. Nelson*, 833 F.3d 965, 969 (8th Cir. 2016) (finding no enterprise where some of the defendants "had [no]thing to do with each other" and were not engaged in a "group effort").[13]

B

Defendants next argue that Plaintiffs have not alleged that each Defendant played a sufficient role in the enterprises.  Recall that the RICO provision Plaintiffs invoke only applies when a "person employed by or associated with" an enterprise "conduct[s] or participate[s], directly or indirectly, in the conduct of such enterprise's affairs."  18 U.S.C. § 1962(c).  To meet this standard, the Supreme Court has held, a defendant "must participate in the operation or management of the enterprise itself," not simply conduct "[its] own affairs."  *Reves v. Ernst & Young*, 507 U.S. 170, 179, 185 (1993).  This requires some degree of "authority in the decision making process of the enterprise."  *Progressive N. Ins. Co. v. Alivio Chiropractic Clinic, Inc.*, No. 05-cv-951 (PAM/RLE), 2005 WL 2739304, at *3 (D. Minn. Oct. 24, 2005).

---

[13]    The PBM Defendants also argue that Plaintiffs "improperly lump the alleged enterprises together" without specifying "how each individual Defendant participated in [each alleged] RICO enterprise."  PBM Defs.' Mem. in Supp. at 7 (quoting *H & Q Props., Inc. v. Doll*, No. 8:13CV38, 2014 WL 2919139, at *7 (D. Neb. June 26, 2014).  Although the Complaint does frequently refer to the PBM Defendants collectively, "it also alleges facts about each [one]," so this is not, in itself, a reason to dismiss the case.  *Harris Cnty.*, 2020 WL 5803483, at *5 n.7.

For their arguments, Defendants rely heavily on two cases that are worth exploring in some detail. The first, *United Food & Commercial Workers Unions & Employers Midwest Health Benefits Fund v. Walgreen Co.*, involved allegations that a drug manufacturer convinced a pharmacy that it could profit if it filled prescriptions using a type of drug dosage that was more expensive than the dosage actually prescribed to patients. 719 F.3d 849, 852 (7th Cir. 2013). The Seventh Circuit held that these allegations did not show that the defendants had conducted the alleged enterprise's affairs. The reason was that the complaint was "entirely consistent" with the defendants "going about [their] own business" and showed, at most, that they had a "commercial relationship" and were acting "in their individual capacities, to advance their individual self-interests." *Id.* at 854–55. By contrast, the plaintiffs did not allege that either defendant "involved [itself] in the affairs of the other." *Id.* at 854. The defendants had not, for example, "act[ed] in concert on behalf of a shadow enterprise while maintaining the outward appearance of a normal commercial relationship." *Id.* at 855. In distinguishing another case, the court suggested that a different result would be appropriate if the defendants "could not have achieved their goals . . . without cooperation that fell outside the bounds of the parties' normal commercial relationships." *Id.* at 856. But without such allegations, the complaint in that case only involved a degree of cooperation that was "inherent in every commercial transaction between a drug manufacturer and a pharmacy." *Id.*

The second case, *Nestle Purina Petcare Co. v. Blue Buffalo Co. Ltd.*, involved allegations that various defendants combined to "manufacture, market, mislabel, and sell adulterated ingredients" for pet food. 181 F. Supp. 3d 618, 629 (E.D. Mo. 2016). Relying

on the Seventh Circuit's opinion in *United Food*, the court held that the allegations showed only "the existence of a commercial partnership that would benefit each defendant's own self-interests." *Nestle Purina*, 181 F. Supp. 3d at 632. Even if some of the alleged conduct was wrongful, the defendants were simply acting in accordance with their roles in the market—some as ingredient suppliers, and others as ingredient brokers—in a way that indicated an "ordinary business relationship," not a RICO enterprise. *Id.* at 632–33.[14]

Based on these cases, Defendants argue that Plaintiffs are trying to turn the entire PBM industry into a RICO claim. Specifically, they argue that Mylan and each PBM Defendant were simply pursuing their own interests within the framework of normal commercial relationships, "with Mylan seeking to maximize its EpiPen profits, and each PBM seeking to maximize net price reductions for their clients." PBM Defs.' Mem. in Supp. at 9–10; *see* Mylan Defs.' Mem. in Supp. at 15–17. Plaintiffs argue that *United Food* and *Nestle Purina* do not apply because the alleged bribery involved here was clearly "outside of a legitimate commercial relationship" and neither Mylan nor the PBM Defendants could have achieved the enterprises' goals alone. *See* Pls.' Mem. in Opp'n at 18–20 (quoting *Humana Inc. v. Mallinckrodt ARD LLC*, No. 19-cv-6926 DSF (MRW), 2020 WL 3041309, at *9 (C.D. Cal. Mar. 9, 2020)).

Defendants' arguments ignore the line Plaintiffs have drawn between what they see as legitimate manufacturer-PBM interactions and the "corrupt[ed]" nature of the relationship between Mylan and the PBM Defendants with respect to the EpiPen. Compl.

---

14    The court also noted that the complaint contained no allegations "that the individual RICO defendants knew of each other's existence." *Id.* at 633.

¶ 6.   Plaintiffs claim that each of the alleged enterprises deviated from an ordinary commercial relationship—Mylan by paying bribes in the form of inflated rebates, and each PBM Defendant by accepting the bribes in exchange for abandoning any effort to police EpiPen price increases.  *Id.* ¶¶ 6, 99.  As Plaintiffs point out, bribery is a recognized means of participating in the conduct of an enterprise's affairs.  *See Reves*, 507 U.S. at 184 (identifying bribery as an example of "operat[ion]" or "manage[ment]"); *see also United States v. Ferriero*, 866 F.3d 107, 118–20 (3d Cir. 2017) (concluding that a defendant could participate in the conduct of an enterprise's affairs by taking bribes); *Aetna Cas. Sur. Co. v. P & B Autobody*, 43 F.3d 1546, 1560 (1st Cir. 1994) (concluding that a defendant could participate in the conduct of an enterprise's affairs by paying bribes or "other methods of inducement").  This only makes sense, because the type of scheme that Plaintiffs allege necessarily requires a degree of "coordinated effort."  *Harris Cnty.*, 2020 WL 5803483, at *9.  Had Mylan not paid the alleged bribes, the PBM Defendants would not have had a reason to give the EpiPen favorable formulary status; and had the PBM Defendants played their typical gatekeeping role, Mylan would not have been able to raise its prices so dramatically.  Faced with similar allegations, at least two other federal courts have distinguished *United Food* and concluded that defendants had gone beyond the realm of legitimate business practices.  *See Harris Cnty.*, 2020 WL 5803483, at *8–9; *In re Insulin Pricing Litig.*, 2019 WL 643709, at *6.  At this early stage, Plaintiffs have done enough to allege that the Defendants each conducted the affairs of a distinct enterprise.

C

Plaintiffs must also allege "two or more related acts of racketeering activity that amount to or pose a threat of criminal activity." *Crest Const. II, Inc.*, 660 F.3d at 356 (quoting *Nitro Distrib.*, 565 F.3d at 428). In RICO parlance, these are referred to as "predicate acts," *id.*, and the statute provides an "exhaustive list" of activities that qualify, *Beck v. Prupis*, 529 U.S. 494, 497 n.2 (2000); *see* 18 U.S.C. § 1961(1). In the Complaint, Plaintiffs identify six potential categories of predicate acts. The first three involve bribery: (1) violation of state bribery laws, *see* 18 U.S.C. § 1961(1)(A); (2) violation of the federal Travel Act through the violation of state bribery laws, *see* 18 U.S.C. §§ 1952(a), 1961(1)(B); and (3) violation of the federal Travel Act through the violation of the federal Anti-Kickback Statute, *see* 18 U.S.C. § 1961(1)(B); 42 U.S.C. § 1320a-7b(b)(1)–(2). Compl. ¶¶ 190–223. The latter three all involve fraud: (4) deprivation of honest services through mail and wire fraud, *see* 18 U.S.C. §§ 1341, 1343, 1961(1)(B); (5) mail fraud, *see* 18 U.S.C. §§ 1341, 1961(1)(B); and (6) wire fraud, *see* 18 U.S.C. §§ 1343, 1961(1)(B). Compl. ¶¶ 224–35. Defendants, between their separate motions, challenge each of these categories.

1

Start with what is arguably Plaintiffs' most complicated predicate-act theory: that Defendants violated RICO by violating the Travel Act by violating the federal Anti-Kickback Statute ("AKS"). Compl. ¶¶ 219–23. This theory takes some explanation. The AKS makes it a crime to "knowingly and willfully solicit[] or receive[] any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, . . . in

return for . . . recommending purchasing . . . any good . . . for which payment may be made in whole or in part under a Federal health care program." 42 U.S.C. § 1320a-7b(b)(1). But the AKS itself is not included on RICO's exhaustive list of "racketeering activity." 18 U.S.C. § 1961(1); *see Ill. Farmers Ins. Co.*, 2014 WL 4104789, at *9 ("Violations of the anti-kickback statutes are not predicate acts under RICO . . . ."). So, Plaintiffs look to the Travel Act, which *is* included on RICO's list. *See* 18 U.S.C. § 1961(1)(B). That statute prohibits, among other things, "us[ing] the mail or any facility in interstate or foreign commerce, with intent to . . . carry on . . . any unlawful activity" and subsequently "perform[ing] or attempt[ing] to perform" such activity." 18 U.S.C. § 1952(a). "[U]nlawful activity," for purposes of the Travel Act, includes "bribery . . . in violation of the laws of . . . the United States."[15] *Id.* § 1952(b)(i)(2). According to Plaintiffs, Mylan's payments to the PBM Defendants amounted to "bribery . . . in violation of the" AKS and were therefore "unlawful activity" under the Travel Act, which brings them within the realm of racketeering activity. Compl. ¶ 219. Defendants raise three challenges to this theory.

a

First, Defendants describe the theory as an improper "end-run around § 1961(1)" and, effectively, an attempt to sue directly under the AKS. PBM Defs.' Mem. in Supp. at 12–13; Mylan Defs.' Mem. in Supp. at 23–25. In their view, Congress deliberately chose

---

[15] The Supreme Court has held that Congress used the word "bribery" in the Travel Act in its "generic" sense, which can encompass "bribery of private persons." *Perrin v. United States*, 444 U.S. 37, 48 (1979).

31

to leave the AKS out of the definition of racketeering activity and chose not to provide a private right of action under the AKS. *See Allstate Ins. Co. v. Linea Latina De Accidentes, Inc.*, 781 F. Supp. 2d 837, 850 (D. Minn. 2011) (collecting cases and holding that there is no private right of action under the AKS). For support, Defendants cite *Baglio v. Baska*, 940 F. Supp. 819, 834 (W.D. Pa. 1996), as a purported example of a court rejecting Plaintiffs' Travel-Act theory. PBM Defs.' Mem. in Supp. at 13.

At this stage, Defendants' arguments come up short. Plaintiffs do not argue that a violation of the AKS is itself a predicate act under RICO, nor do they purport to sue under the AKS directly. Moreover, the court in *Baglio* did not analyze and reject the theory that Plaintiffs advance here; it merely held that the plaintiff had not shown that his injury was proximately caused by the alleged RICO violation. *See* 940 F. Supp. at 834. To be sure, Plaintiffs' reading of the statutes is somewhat circuitous, and it is unlikely that Congress would have anticipated it. On the face of the statutes, however, the theory seems plausible as long as a violation of the AKS counts as "bribery . . . in violation of the laws of . . . the United States" within the meaning of the Travel Act. 18 U.S.C. § 1952(b)(i)(2). And, crucially, Defendants have not meaningfully challenged that proposition. Given the absence of briefing, it is appropriate to leave the "bribery" question for another day, should Defendants choose to raise it. For purposes of these motions, Plaintiffs' Travel Act theory at least gets out of the starting gate.

b

One Defendant group argues that Plaintiffs have not adequately pleaded an AKS violation. Mylan Defs.' Mem. in Supp. at 25–26. To do so in this context requires six

elements: (1) knowing and willful (2) solicitation or receipt of (3) remuneration (4) in return for recommending the purchase of a good (5) for which payment may be made under a federal health care program, and (6) "that the remuneration could reasonably induce such . . . purchase." *Shoemaker v. Cardiovascular Sys., Inc.*, 300 F. Supp. 3d 1046, 1053 (D. Minn. 2018) (citing *Jones-McNamara v. Holzer Health Sys.*, 630 F. App'x 394, 401 (6th Cir. 2015)); *see* 42 U.S.C. § 1320a-7b(b).[16]   Mylan attacks Plaintiffs' pleadings with respect to three of these elements.

The first is the mens rea element.  According to Mylan, Plaintiffs must plead "not only that PBM rebates were kickbacks in violation of the AKS, but that Mylan *knew* the rebates were illegal kickbacks."  Mylan Defs.' Mem. in Supp. at 28–30; Mylan Reply Mem. at 13–14.  This was not possible, says Mylan, because the rebates it paid to PBMs fell within statutory and regulatory safe harbors or, at the very least, Mylan believed that they did.  Plaintiffs respond that Mylan gets the intent standard wrong and that the rebates did not fall within the relevant safe harbor.  *See* Pls.' Mem. in Opp'n at 30–39.

The AKS only applies when a defendant acts "knowingly and willfully." 42 U.S.C. § 1320a-7b(b)(1).  But the defendant need not have "actual knowledge" of the AKS or a "specific intent" to violate it.  *Id.* § 1320a-7b(h).  Consistent with this provision, the Eighth Circuit has held that the AKS "requires 'proof that [the defendant] knew that

---

[16]     This listing of elements is derived from the statutory text.  *Shoemaker*, which Mylan cites, does not list all of the elements this way or explicitly mention the mens rea requirement that appears on the face of the statute.  In that case, the alleged AKS violation was used as a predicate to support a securities-fraud claim.  300 F. Supp. 3d at 1053.

his conduct was wrongful, rather than proof that he knew it violated a known legal duty.'" *United States v. Yielding*, 657 F.3d 688, 708 (8th Cir. 2011) (emphasis omitted) (quoting *United States v. Jain*, 93 F.3d 436, 441 (8th Cir. 1996)).[17]  In other words, Mylan is wrong if it is arguing that it would have needed to know that its rebates were AKS violations.  But it is correct that it must have known that its payments were, in some sense, wrongful. Evidence of this mental state includes "acts that indicate an awareness of an exchange of money for an improper purpose, such as . . . efforts to conceal the nature and source of such payments."  *Hall v. St. Jude Med. S.C., Inc.*, 326 F. Supp. 3d 770, 783 (D. Minn. 2018) (citation omitted).

Plaintiffs' allegations on mental state are close to the "conclusory" line, but they are plausible.  Plaintiffs claim that Mylan paid rebates and other fees so that the PBM Defendants would "act contrary to the interests of their clients" by favoring the comparatively high-priced EpiPen on formularies and that Mylan used its large list-price increases to fund these payments.  Compl. ¶¶ 134, 176.  Members of all three enterprises met regularly to coordinate these payments.  *Id.* ¶ 172.  And there are indicators of concealment.  Mylan did not reveal the "true reason for [its] price increases" when it reported them.  *Id.* ¶¶ 163–65, 175.  The PBM Defendants misleadingly classified payments in order to avoid passing them on to clients, *id.* ¶ 128; placed limitations on the scope of audits that might have revealed the true nature and amount of payments received,

---

[17]     *Yielding* did not cite subsection h, which was added in the Patient Protection and Affordable Care Act in 2010, s*ee* Pub. L. No. 111-148, 124 Stat. 119 (Mar. 23, 2010), after *Jain* was decided.

*id.* ¶¶ 136–37; and continued to represent to their clients and the public that they were working to secure lower prices, *e.g.*, *id.* ¶¶ 92–96.  Accepting these allegations as true, it is plausible that Defendants knew that their conduct was "wrongful."  *Yielding*, 657 F.3d at 708.[18]

The second challenged AKS element is "remuneration."  Mylan seems to argue that the payments at issue are not "remuneration" under the AKS because they do not qualify as bribes under the mail and wire fraud statutes.  Mylan Defs.' Mem. in Supp. at 25.  This argument doesn't get Mylan very far, because "remuneration" under the AKS encompasses "virtually anything of value."  *Shoemaker*, 300 F. Supp. 3d at 1053 (quoting *Jones-McNamara*, 630 F. App'x at 401); *see* OIG Compliance Program Guidance for Ambulance Suppliers, 68 Fed. Reg. 14245, 14252 (Mar. 24, 2003).  Plaintiffs have alleged that Mylan's payment of rebates and fees had value to the PBM Defendants, who largely retained them rather than passing on the value to clients.  Compl. ¶ 6.

Finally, Mylan argues that Plaintiffs have failed to draw a nexus to a federal healthcare program because they do not "allege that any particular rebates led to any particular result with respect to federal healthcare programs."  Mylan Defs.' Mem. in Supp. at 25–26; Mylan Reply Mem. at 11.  This overreads the statute, which requires only that "payment *may be made* in whole or in part under a Federal health care program" for the

---

[18]      For purposes of these motions, the mere existence of statutory and regulatory safe harbors does not necessarily negate these mental-state allegations, as Mylan suggests.  The premise of this argument is that the safe harbors categorically applied to Mylan's payments to the PBM Defendants.  As discussed in greater detail below, the safe harbors are affirmative defenses that Mylan has the burden to prove, which means that it is generally inadvisable to resolve them at the pleading stage.

good or service in question.  42 U.S.C. § 1320a-7b(b)(1)(B) (emphasis added).  Plaintiffs allege that Mylan's EpiPen controlled 99% of the EAI market; that the PBM Defendants represented "between 75-80% of the total number of patients covered by PBMs"; that the PBM Defendants represented government health plans; and that Mylan's payments "successfully provided EpiPen favorable formulary status."  Pls.' Mem. in Opp'n at 30; Compl. ¶¶ 4 n.2, 5, 43, 51, 95–96, 219.  To be sure, Plaintiffs could have done more to show how Defendants' conduct could jeopardize the public fisc, but these allegations make it reasonable to infer that federal health care programs "may" pay for EpiPens, and that is enough.  42 U.S.C. § 1320a-7b(b)(1)(B); *see MedPricer.com, Inc. v. Becton, Dixon & Co.*, 240 F. Supp. 3d 263, 272–73 (D. Conn. 2017).[19]

c

Third, Defendants argue that, even if Plaintiffs could otherwise plead a violation of the AKS, it doesn't matter because Mylan's payments fell within statutory and regulatory "safe harbors."  PBM Defs.' Mem. in Supp. at 13–14; Mylan Defs.' Mem. in Supp. at 26–28.  There are at least two safe harbor provisions relevant to this case: one statutory and one regulatory.  The statutory safe harbor provides that the AKS will not apply to:

> a discount or other reduction in price obtained by a provider of
> services or other entity under a Federal health care program if
> the reduction in price is properly disclosed and appropriately

---

[19]    Defendants cite *Spine Imaging MRI, L.L.C. v. Liberty Mut. Ins. Co.*, 818 F. Supp. 2d 1133 (D. Minn. 2011), in which the court dismissed counterclaims alleging a violation of the AKS because the counterclaimant had "alleged no payment to a federal health care program."  *Id.* at 1141.  It is not entirely clear what the court meant, because the statute requires payment "by" a federal health care program.  Moreover, the court included no analysis on this question, and in light of the statutory text, it is not reasonable to read *Spine Imaging* to require allegations that a specific payment occurred.

> reflected in the costs claimed or charges made by the provider
> or entity under a Federal health care program.

42 U.S.C. § 1320a-7b(b)(3)(A).  The regulatory safe harbor similarly exempts certain

"discount[s]" as long as a variety of conditions are met.  42 C.F.R. § 1001.952(h); *see also*

42 U.S.C. § 1320a-7b(b)(3)(E) (providing that "payment practice[s] specified by the

[HHS] Secretary in regulations" are exempt from the AKS).  In order to qualify for the

regulatory safe harbor, a "discount" must be the product of an "arms-length transaction,"

and does not include "[a] reduction in price applicable to one payer but not to Medicare,

Medicaid or other Federal health care programs."  *Id.* § 1001.952(h)(5).

Courts generally treat the AKS's safe-harbor provisions as affirmative

defenses.  *See Yielding*, 657 F.3d at 700 (noting that the parties did not dispute this

characterization); *see also United States v. Job*, 387 F. App'x 445, 455–56 (5th Cir. 2010);

*United States v. Norton*, 17 F. App'x 98, 102 (4th Cir. 2001); *United States v. Medoc Health

Servs. LLC*, 470 F. Supp. 3d 638, 651 (N.D. Tex. 2020).  Plaintiffs clearly anticipated a

safe-harbor defense when they argued in the Complaint that no safe harbor applies.  *See*

Compl. ¶¶ 219–23.  But Defendants have the burden to plead and prove affirmative

defenses, and such defenses do not provide a basis for dismissal unless they are "apparent

on the face of the complaint."  *Noble Sys. Corp. v. Alorica Cent., LLC*, 543 F.3d 978, 983

(8th Cir. 2008); *cf. United States v. Davis*, Crim. Action No. H-14-171S-12, 2014 WL

6679199, at *5 (S.D. Tex. Nov. 25, 2014) (denying a motion to dismiss an indictment under

the AKS on the ground that the government was not obligated to "anticipate and rule out

every affirmative defense").[20]  Given the complexity of the safe-harbor provisions at issue and the relative lack of space devoted to them in the briefing, summary judgment is a "more appropriate procedural device" for addressing them.  5B Arthur R. Miller, Mary K. Kane, & A. Benjamin Spencer, *Federal Practice and Procedure* § 1357 (3d ed. Oct. 2020 Update).  In sum, Plaintiffs have plausibly alleged a RICO predicate act based on Defendants' violation of the Travel Act through the AKS.

2

Plaintiffs also allege predicate acts based on violations of state laws relating to bribery and kickbacks.[21]  *See* 18 U.S.C. § 1961(1)(A) (including within the definition of "racketeering activity" "any act or threat involving . . . bribery . . . which is chargeable under State law and punishable by imprisonment for more than one year").  Rather than exhaustively explore all of the potential differences between these states' laws—many of which overlap in substance with one another and with the federal AKS—Defendants make

---

[20]     Mylan cites a case in its reply brief for the proposition that a safe harbor must be pleaded "at the outset."  Mylan Reply Mem. at 12 (quoting *In re Lehman Bros. Holdings Inc.*, 553 B.R. 476, 501 (S.D.N.Y. 2016)).  *Lehman Bros.* involved a safe-harbor provision in the Bankruptcy Code, and although the court granted a motion to dismiss in part based on the applicability of the provision, it is not clear that the quoted language was meant to place a burden on the plaintiff to plead the *in*applicability of the provision; the court simply wrote that a safe harbor should not be raised "after the parties have been at sea in litigation for years."  553 B.R. at 501.

[21]     Plaintiffs plead violations of thirteen state bribery statutes as direct RICO predicates.  Compl. ¶¶ 190–203.  These states are: Alabama, Connecticut, Florida, Illinois, Michigan, Minnesota, Mississippi, Missouri, New Jersey, Rhode Island, Utah, Virginia, and Washington.  Plaintiffs add violations of the statutes of two other states—Arkansas and Indiana—as RICO predicates through the federal Travel Act.  Compl. ¶¶ 204–18.  The reason for this different treatment is not clear.

only high-level arguments for dismissal.  PBM Defs.' Mem in Supp. at 15–18; Mylan Defs.' Mem. in Supp. at 30–32.  For this reason, the state laws will be addressed collectively.

a

Start with Defendants' argument that Plaintiffs fail to plead a connection between the alleged criminal conduct and the states whose laws they invoke.  There are two potential legal issues at play here.  The first is whether named plaintiffs in a class action may bring claims based on the laws of states where they do not reside and where they did not experience effects of the challenged conduct.  Some courts treat this as a constitutional issue, holding that "named plaintiffs generally lack standing to assert class-wide claims under laws of states with which they have no connection."  *Hunnicutt v. Zeneca, Inc.*, No. 10-CV-708-TCK-TLW, 2012 WL 4321392, at *5 (N.D. Okla. Sept. 19, 2012); *see also Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*, No. 13-cv-2664 (ADM/SER), 2014 WL 943224, at *11 (D. Minn. Mar. 11, 2014).  Others treat it as a Rule 23 issue and defer considering it until the class-certification stage.  *See In re Target Corp. Data Sec. Breach Litig.*, 66 F. Supp. 3d 1154, 1160 (D. Minn. 2014); *see also In re Wellbutrin XL Antitrust Litig.*, 260 F.R.D. 143, 152–55 (E.D. Pa. 2009) (collecting cases and summarizing the debate).  Either way, however, the problem with this argument is that Plaintiffs are not trying to bring claims "under" state laws; they are trying to bring claims under RICO—a federal statute.  Defendants do not cite any cases holding that a RICO plaintiff must reside in a state in order for that state's law to be a RICO predicate.

The other issue is whether the lack of a connection between the Parties and particular states would deprive those states of the power to charge the alleged offenses. This matters because, in order to be a RICO predicate, an "act or threat involving . . . bribery" must be "chargeable under [s]tate law." 18 U.S.C. § 1961(1)(A). Generally, this requires that either the challenged conduct or its effects occur within the state's territorial limits. *See United States v. Lee*, 359 F.3d 194, 206 (3d Cir. 2004) (citing *Strassheim v. Daily*, 221 U.S. 280, 284 (1911)); *see also* Model Penal Code § 1.03 (discussing the territorial applicability of state criminal laws); Wayne R. LaFave, *Substantive Criminal Law* § 4.4(a) (3d ed. Oct. 2020 Update) ("[A] state has power to make conduct or the result of conduct a crime if the conduct takes place or the result happens within its territorial limits." (footnotes omitted)).

For purposes of these motions, Plaintiffs have alleged an adequate connection to the states whose laws they invoke. First, they allege that they and the Defendant entities are headquartered in many of the states. *See* Compl. ¶¶ 13–16, 19–21, 25–26, 33.[22] It is reasonable to infer that Defendants took actions to further their alleged scheme at their respective corporate headquarters and that Plaintiffs felt the effects of those actions at their headquarters. Second, at a more basic level, the scheme that Plaintiffs allege is clearly nationwide in scope. Both Mylan and the PBM Defendants controlled a significant share of the market and touched the lives of many covered patients. *See id.* ¶¶ 43, 47, 57. It is at least plausible that the scheme's effects extended to all the states whose laws Plaintiffs

---

[22]   As discussed below, the PBMs' corporate parent entities will be dismissed as Defendants, so the locations of those entities' headquarters has no bearing here. Plaintiffs, in their brief, seem to suggest that the headquarters of only some of the Defendant entities should be considered, but it is not clear why this is so. *See* Pls.' Mem. in Opp'n at 45.

identify.  Third, Defendants have not yet argued that these states' laws differ from one another in any meaningful way, so there is no practical reason to definitively resolve which laws may apply and which may not.  If appropriate, Defendants may raise these or other arguments later in the case.

b

Next, the PBM Defendants argue that Plaintiffs have not plausibly alleged that the PBMs owe a fiduciary duty or "duty of fidelity" to their clients.  This matters because some of the state bribery statutes that Plaintiffs invoke as RICO predicates only apply when such a duty exists.  *See, e.g.*, N.J. Rev. Stat. § 2C:21-10; Minn. Stat. § 609.86, subd. 2; Mo. Rev. Stat. § 570.150.  The PBM Defendants assert that a fiduciary duty between PBMs and their clients could only arise from the terms of individual plans, so Plaintiffs "must allege facts specific to each of thousands of clients to plausibly demonstrate that a PBM owed (and breached) a fiduciary duty that could translate into a criminal violation."  PBM Defs.' Reply Mem. at 13; *see* PBM Defs.' Mem. in Supp. at 16–17.  For support, they rely principally on cases arising under ERISA.  *See In re EpiPen ERISA Litig.*, No. 17-cv-1884 (PAM/HB), 2020 WL 4501925, at *3–4 (D. Minn. Aug. 5, 2020) ("*EpiPen II*") (denying class certification because PBMs' fiduciary status would "depend almost entirely on the terms of individual plans" and was therefore "not susceptible of class-wide proof"); *see also, e.g.*, *Chi. Dist. Council of Carpenters Welfare Fund v. Caremark, Inc.*, 474 F.3d 463, 475–77 (7th Cir. 2007) (holding that a PBM did not owe a fiduciary duty based on the terms of its contract with a union health plan).

41

In an extensive portion of their brief, Plaintiffs argue that they have plausibly alleged that PBMs owe fiduciary duties both under ERISA (to those clients who are ERISA plans) and under state law (to those clients who are not).  Plaintiffs especially emphasize the state-law principle that a duty of loyalty can arise based on "extra-contractual conduct that induce[s] trust and confidence."  Pls.' Mem. in Opp'n at 54.

As an initial matter, the PBM Defendants make too much of the class-certification decision in *EpiPen II*.  In that case—which involved the same Defendants and the same drug product—Judge Magnuson held that class certification was inappropriate because *proving* that each PBM was acting as an ERISA fiduciary for each of its clients would require an individualized examination of the contract terms between the PBM and the particular client.  *EpiPen II*, 2020 WL 4501925, at *3–4.  But earlier in the same case, Judge Magnuson held that the plaintiffs had adequately alleged fiduciary status using broader strokes.  *See In re EpiPen ERISA Litig.*, 341 F. Supp. 3d 1015, 1019–20 (D. Minn. 2018) ("*EpiPen I*").  No matter the terms of the individual contracts, the plaintiffs had plausibly alleged that the PBMs "control[led] the amount they receive[d] in rebates" and "exercise[d] discretion over how much of that money [was] paid to the plans."  *Id.*  So, even if Defendants could later rely on *EpiPen II* to argue that class certification is inappropriate, that case does not create the unreasonably high pleading standard that the PBM Defendants seek.

With this context in mind, the next question is whether Plaintiffs have plausibly alleged that the PBM Defendants acted as fiduciaries under ERISA and state law.  Begin with ERISA, since, as Plaintiffs acknowledge, some of the PBM Defendants' clients were

42

ERISA plans.  *See* Pls.' Mem. in Opp'n at 49 n.65.  When a contract does not specifically designate a party as an ERISA fiduciary, that party may still be a fiduciary to the extent it "(i) exercises any discretionary authority or control over management of the plan or its assets; (ii) offers 'investment advice for a fee' to plan members; or (iii) has 'discretionary authority' over plan 'administration.'"  *McCaffree Fin. Corp. v. Principal Life Ins. Co.*, 811 F.3d 998, 1002 (8th Cir. 2016) (quoting 29 U.S.C. § 1002(21)(A)).  Put differently, the question is whether the party was "performing a fiduciary function" while "taking the action subject to complaint."  *Pegram v. Herdrich*, 530 U.S. 211, 226 (2000).  In *EpiPen I*, as already noted, the plaintiffs satisfied this standard by alleging that PBMs "control[led] the amount they receive[d] in rebates or other fees from Mylan and likewise exercise[d] discretion over how much of that money [was] paid to the plans."  *EpiPen I*, 341 F. Supp. 3d at 1019.  They did so by "chang[ing] how they characterized drug-manufacturer payments—as rebates, administrative fees, or other types of payments—to allow [them] to keep more of the money and pay less to the plans."  *Id.*  Because Plaintiffs make essentially the same claims here, *see* Compl. ¶¶ 79–91, they have at least plausibly alleged the existence of a fiduciary duty under ERISA.

The result is the same with respect to the PBMs' non-ERISA clients.  Under Minnesota law,[23] a fiduciary relationship exists when "confidence is reposed on one side and there is resulting superiority and influence on the other."  *Buscher v. Brown & Brown,*

---

[23]   Plaintiffs say that the law of the forum state, Minnesota, will "likely" govern whether the PBM Defendants were acting as fiduciaries for these clients because the underlying state-law principles are "widely accepted."  Pls.' Mem. in Opp'n at 47.  For present purposes, Defendants do not seem to dispute this.

*Inc.*, No. A08-1813, 2009 WL 2595937, at *2 (Minn. Ct. App. Aug. 25, 2009) (quoting *Stark v. Equitable Life Assurance Soc'y*, 285 N.W. 466, 470 (1939)).  This may occur "where there is a '[d]isparity of business experience and invited confidence.'"  *Id.* (quoting *Murphy v. Cnty. House, Inc.*, 240 N.W.2d 507, 512 (1976)); *accord* Restatement (Third) of Agency § 8.01 cmt. c (Am. Law Inst. 2006).  But a fiduciary relationship does not arise when "one party merely ha[s] faith and confidence in another where the former should have known the latter was representing an adverse interest."  *Best Buy Stores, L.P. v. Devs. Diversified Realty Corp.*, No. 05-cv-2310 (DSD/JJG), 2006 WL 3544956, at *6 (D. Minn. Dec. 8, 2006) (citing *S. Minn. Mun. Power Agency v. City of St. Peter*, 433 N.W.2d 463, 468 (Minn. Ct. App. 1988)).

For two reasons, Plaintiffs have alleged the type of "invited confidence" that could plausibly give rise to a fiduciary relationship under Minnesota law.  First, they point to a number of public marketing statements in which the PBM Defendants represented that they would "align their interests and/or act in the best interests of their clients," Compl. ¶ 8, and that they were "uniquely positioned" to achieve lower costs, *id.* ¶¶ 93–96; *see, e.g.*, *In re Express Scripts, Inc., PBM Litig.*, 522 F. Supp. 2d 1132, 1144–47 (E.D. Mo. 2007) (applying similar principles under New York law).  Second, Plaintiffs allege that health plans in fact ceded significant control over both the design of their formularies and the classification of payments received from drug manufacturers, trusting that the PBMs would use this influence to protect their clients' interests.  Compl. ¶ 97; *see id.* ¶¶ 62, 66–74, 78–84.  Regardless of whether either one of these features of the PBM-client relationship

would suffice on its own, together they are enough to make the existence of a fiduciary duty plausible.

c

There is less to say for Defendants' final two arguments about the state-law predicates. Defendants assert that the federal AKS preempts the state laws that Plaintiffs invoke. *See* PBM Defs.' Mem. in Supp. at 15–16. This argument fails for two reasons. The first is that it seems to depend completely on the premise that the alleged rebates and fees fall within the AKS's statutory and regulatory safe harbors. As discussed above, the safe harbors are affirmative defenses that should be addressed at summary judgment. The second reason is that federal preemption itself is an affirmative defense for which Defendants bear the burden of proof. *See Hughs v. Union Pac. R.R. Co.*, No. 5:15-06079-CV-RK, 2017 WL 1380480, at *1 (W.D. Mo. Apr. 14, 2017); *see also* 5 Arthur R. Miller, Mary K. Kane & A. Benjamin Spencer, *Federal Practice and Procedure* § 1271 (3d ed. Oct. 2020 Update).

Defendants also argue that Plaintiffs have not alleged that they acted with the mens rea required under most of the state statutes. But this is essentially the same as Defendants' argument that Plaintiffs have not pleaded "knowing[] and willful[]" conduct under the AKS. For the same reasons discussed above, Plaintiffs have plausibly alleged that Defendants acted knowingly and willfully—*i.e.*, that they knew their conduct was

45

"wrongful." *Yielding*, 657 F.3d at 708.[24]  In sum, Plaintiffs have plausibly alleged RICO predicates based on the violation of at least some state bribery and anti-kickback laws.

3

Finally, Plaintiffs claim that Defendants engaged in racketeering activity by committing mail fraud, wire fraud, and honest-services fraud.  Compl. ¶¶ 224–35; *see* 18 U.S.C. §§ 1341, 1343, 1346.  Mail and wire fraud go together, but honest-services fraud is somewhat different, so it will be treated separately.

a

"When pled as RICO predicate acts, mail and wire fraud require a showing of: (1) a plan to scheme or defraud, (2) intent to defraud, (3) reasonable foreseeability that the mail or wires will be used, and (4) actual use of the mail or wires to further the scheme." *H & Q Props., Inc. v. Doll*, 793 F.3d 852, 856 (8th Cir. 2015) (citation omitted).  Plaintiffs must plead the predicate acts of mail and wire fraud with particularity under Rule 9(b).  *See Nitro Distrib., Inc. v. Alticor, Inc.*, 565 F.3d 417, 428–29 (8th Cir. 2009).

The gist of Plaintiffs' theory for these predicate acts is as follows: (1) the PBM Defendants spent years "proclaim[ing]" to their clients and to the public that they would use their negotiating power to act in their clients' interests and lower drug prices; (2) Mylan and the PBM Defendants promoted the EpiPen and announced its price increases without disclosing the real reason for those increases—namely, the bribery-and-kickback scheme; (3) Defendants misleadingly described Mylan's payments to the PBM Defendants as

---

[24]     Defendants do not argue at this stage that "knowing and willful" means something different under the state laws at issue than under the federal AKS.

"discounts"; and (4) all of these communications occurred over the mail and wires. Compl. ¶¶ 232–35.

Defendants' principal argument is that Plaintiffs have not alleged any false statements or omissions with particularity.[25]   PBM Defs.' Mem. in Supp. at 19–20; Mylan Defs.' Mem. in Supp. at 18–19.  There is some merit to this argument.  Many of Plaintiffs' allegations address the PBM Defendants' actions collectively and with respect to many different clients at once.  And they generally do not identify specific dates and times.  There are not, for example, any allegations of a particular false statement made on a particular occasion to a particular client about a particular EpiPen list-price increase.  But "[t]he level of particularity required depends on the nature of a case," and the detail need only "give notice to the adverse party and enable him to prepare a responsive pleading."  *Corval Constructors, Inc.*, 2019 WL 5260483, at *7 (citations omitted).

While it is somewhat close, Plaintiffs have satisfied the particularity requirement. They allege that the PBM Defendants represented to their clients that their interests would be aligned and that rebates would lower drug costs, and they identify specific marketing statements to that effect.  Compl. ¶¶ 93–96, 169, 176.  They also allege that Defendants, including Mylan, used the mail and interstate wire facilities to transmit "thousands of communications" to further the scheme.  *Id.* ¶ 183 (listing different types of such

---

[25]    It is not entirely clear that a false statement or omission is actually required for mail and wire fraud.  *See Abels v. Farmers Commodities Corp.*, 259 F.3d 910, 918 (8th Cir. 2001) ("Because misrepresentations of fact are not necessary to the offense, it follows that no misrepresentations need be transmitted by mail or wire.").  Plaintiffs nod toward the argument that it is not, Pls.' Mem. in Opp'n at 61, but spend most of their time arguing that they have adequately pleaded false statements.

communications).  The courts in *Harris County* and *In re Insulin*—both analogous cases—found similar allegations to be sufficient under Rule 9(b).  *See Harris Cnty.*, 2020 WL 5803483, at *5; *In re Insulin*, 2019 WL 643709, at *5.

Defendants argue that there is no "scheme to defraud" for two more reasons.  Mylan Defs.' Mem. in Supp. at 20–22.  First, they argue that Mylan could not have paid rebates *for the purpose* of raising the EpiPen's list price because it had already begun raising its prices before the scheme started in 2013.  This is not persuasive; before 2013, Mylan had no significant competition for the EpiPen, Compl. ¶ 43, and after 2012, the EpiPen's price began to increase more rapidly, *id.* ¶ 119.

Second, Defendants argue that there was nothing wrong with any of the administrative fees that Mylan paid to the Defendant PBMs because Plaintiffs acknowledge that the PBMs performed some legitimate services for Mylan and there is no allegation that these services were unnecessary.  Mylan Defs.' Mem. in Supp. at 21–22.  Once again, this just sidesteps Plaintiffs' argument.  The problem was not that Mylan paid some fees to the PBM Defendants for legitimate services; it was that the PBM Defendants reclassified some of Mylan's payments—made in exchange for favorable formulary status—as "fees" in order to avoid passing them on to their clients.[26]

---

[26]     To the extent Defendants argue that Plaintiffs were required to plead reliance in order to establish predicate acts of mail or wire fraud, they are wrong.  *See Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 661 (2008).

b

There is less to say about the alleged predicate act of honest-services fraud.  On this issue, Defendants mostly reincorporate arguments that they make elsewhere in their briefs. *See* PBM Defs.' Mem. in Supp. at 20–21; Mylan Defs.' Mem. in Supp. at 23.  First, Defendants argue that the challenged payments were not bribes or kickbacks at all for the reasons already considered and rejected in the discussion of state bribery laws.  Second, Defendants argue that Plaintiffs have not alleged that the PBM Defendants owed their clients a fiduciary duty.  As discussed above, this argument fails, too.  In sum, Plaintiffs have adequately alleged RICO predicate acts based on mail fraud, wire fraud, and honest-services fraud.[27]

D

The last significant issue on the RICO claims is whether Plaintiffs have adequately alleged injury and causation.  "To have standing to make a RICO claim, a party must have 1) sustained an injury to business or property 2) that was caused by a RICO violation." *Gomez v. Wells Fargo Bank, N.A.*, 676 F.3d 655, 660 (8th Cir. 2012) (citation omitted). Defendants assert that Plaintiffs have not met either requirement.

Defendants' first argument is that Plaintiffs have not been injured at all because they resell all of the EpiPens that they purchase from Mylan and can accordingly recoup any losses they experience from inflated prices.  PBM Defs.' Mem. in Supp. at 24.  But that is

---

[27]    The PBM Defendants also state that Plaintiffs have not alleged a "pattern" of racketeering activity.  PBM Defs.' Mem. in Supp. at 21.  But their only argument is that Plaintiffs have not alleged *any* predicate acts.  Because the alleged predicate acts are plausible, this "pattern" argument falls away.

not how damages work in this type of case.  In the antitrust context, the Supreme Court long ago rejected this type of "passing-on defense." *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 488–90 (1968) (holding that a buyer seeking overcharge damages is "equally entitled to damages if he raises the price for his own product" and explaining that in such cases, "the possibility that plaintiffs had recouped the overcharges from their customers was . . . irrelevant").  Courts give RICO's remedy provision the "same meaning" as the Clayton Act's antitrust remedy provision, *Holmes v. Secs. Inv. Protection Corp.*, 503 U.S. 258, 268 (1992), and indeed, courts have applied the principle from *Hanover Shoe* in the RICO context, *see Terre Du Lac Ass'n v. Terre Du Lac, Inc.*, 772 F.2d 467, 473 (8th Cir. 1985) ("[W]e find no support for the defendants' argument that the Association lacks standing merely because it may pass its alleged injuries on to its members."); *see also Cnty. of Oakland v. City of Detroit*, 866 F.2d 839, 847–51 (6th Cir. 1989).  Plaintiffs have plausibly alleged an injury by claiming that they purchased EpiPens directly from Mylan at artificially inflated prices.

The more difficult question is whether Plaintiffs' claimed injury was "by reason of" the alleged RICO violations.  18 U.S.C. § 1964(c).  To meet this requirement, Plaintiffs must plausibly allege that Defendants' predicate acts were both the "but-for" and "proximate" causes of their injuries. *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 9 (2010).  Proximate cause, in this context, requires "some direct relation between the injury asserted and the injurious conduct alleged." *Holmes*, 503 U.S. at 268.  There can be no proximate causation if "the conduct directly causing the harm was distinct from the conduct giving rise to the" predicate act. *Hemi Grp.*, 559 U.S. at 11.

50

Proximate cause is highly fact dependent, but three Supreme Court cases help unpack its meaning in the world of RICO.  In the first, *Holmes*, a corporation with a duty to reimburse customers of insolvent stock broker-dealers sued a group of defendants for manipulating stock prices.  503 U.S. at 261–63.  The theory of injury was that the manipulation caused stock prices to fall, which meant that the broker-dealers could not satisfy their obligations to their customers, which meant that the plaintiff corporation had to make up the difference.  The Supreme Court held that the defendants' conduct did not proximately cause the plaintiff's injury because only the broker-dealers were directly harmed; the plaintiff's injury was "purely contingent" on that initial harm.  *Id.* at 271.

In the second case, *Anza v. Ideal Steel Supply Corp.*, a steel company claimed that a competitor defrauded the state of New York by failing to collect and pay sales taxes. 547 U.S. 451, 458 (2006).  This scheme allegedly allowed the competitor to charge lower prices, which in turn hurt the plaintiff's ability to attract business.  *Id.*  The Court held that this injury was too "attenuated" because New York was the "direct victim of [the] conduct."  *Id.* at 458–59.  The cause of the plaintiff's injury was "a set of actions (offering lower prices) entirely distinct from the alleged RICO violation (defrauding the State)."  *Id.* at 458.

Finally, in *Hemi Group*, New York *City* claimed that the defendant, an online seller of cigarettes, had violated RICO when it failed to satisfy a federal statutory requirement that it submit information about its customers to New York *State*.  559 U.S. at 5–6.  The city argued that, if it could have obtained this customer information from the state, it would have had an easier time collecting excise taxes on the cigarettes that the defendant sold.

*Id.* at 6.  The Court held that the chain of causation was even less direct than in *Anza*; the "conduct directly responsible for the City's harm"—the defendant's customers' failure to pay taxes—was distinct from the allegedly fraudulent conduct—the defendant's failure to report customer information to the state.  *Id.* at 11.

Defendants argue that Plaintiffs' claimed injuries—paying inflated EpiPen list prices—are only "collateral" to the price changes caused by the alleged scheme, which targeted third parties.  PBM Defs.' Mem. in Supp. at 23; Mylan Defs.' Mem. in Supp. at 33–34.  Plaintiffs respond that they have adequately alleged direct harm flowing from the RICO predicate acts, and that concluding otherwise would be inconsistent with the rule that direct purchasers—and generally, *only* direct purchasers—have statutory standing under RICO.  *See* Pls.' Mem. in Opp'n at 74–80.

This is a somewhat close question.  On one hand, it intuitively seems like the alleged fraudulent scheme was directed at the PBM Defendants' clients, not at the wholesaler Plaintiffs.  In that sense, Plaintiffs do not seem like the "direct victim[s]" of the scheme. *Anza*, 547 U.S. at 458; *see Hamm v. Rhone-Poulenc Rorer Pharms., Inc.*, 187 F.3d 941, 954 (8th Cir. 1999) (finding no proximate cause and noting that the alleged racketeering activity was "directed against third-parties").  Moreover, although Plaintiffs' point about the direct-purchaser rule has some practical appeal, it is a bit of a red herring because proximate cause and the direct-purchaser requirement of statutory standing are not the

same thing.[28]  *See Trollinger v. Tyson Foods, Inc.*, 370 F.3d 602, 614–15 (6th Cir. 2004) (distinguishing the two).

Nonetheless, at this early stage, Plaintiffs have plausibly alleged proximate causation.  Mylan's price increases, at least according to the Complaint, were not just collateral effects of the alleged bribery-and-kickback scheme.  Because the EpiPen list price helped determine the amount of Mylan's unlawful payments to PBMs, raising the list price was itself a means that Mylan allegedly used to carry out the scheme.  It is therefore incorrect to say that the alleged RICO violation (a bribery-and-kickback scheme that depended on price increases) was "entirely distinct" from the cause of Plaintiffs' harm (the price increases themselves).  *Anza*, 547 U.S. at 458.  And the connection here is certainly less attenuated than in the cases that Defendants cite.  *See, e.g.*, *Newton v. Tyson Foods, Inc.*, 207 F.3d 444 (8th Cir. 2000) (finding no proximate cause where poultry producers allegedly bribed federal regulators, which led to more lenient poultry regulations, which led to lower poultry prices, which led to less demand for the beef that plaintiffs sold, costing them business).

E

Finally, the PBM Defendants argue that, even if the PBMs themselves are potentially liable under RICO, the PBMs' corporate parents—CVS Health Corporation,

---

[28]     Mylan, in its reply brief, notes that a court in the District of Kansas declined to apply the direct-purchaser requirement to RICO claims brought by indirect purchasers of the EpiPen.  *See In re EpiPen Marketing, Sales Practices & Antitrust Litig.*, 336 F. Supp. 3d 1256, 1325 (D. Kan. 2018).  Mylan suggests that, in light of that case, it would be improper to allow Plaintiffs' case to proceed here.  Mylan Reply Mem. at 16.  But it did not raise this argument in its opening brief or develop it any further in its reply.

Express Scripts Holding Company, UnitedHealth Group, Inc., United Healthcare Services, Inc., Optum, Inc., and OptumRx Holdings, LLC—should be dismissed from the case. PBM Defs.' Mem. in Supp. at 27–28; PBM Defs.' Reply Mem. at 20–21. This argument is based on the "general principle of corporate law" that "a parent corporation . . . is not liable for the acts of its subsidiaries," *United States v. Bestfoods*, 524 U.S. 51, 61 (1998), unless the subsidiary was "a mere instrumentality or adjunct or agency of the parent," *Masterson Personnel, Inc. v. McClatchy Co.*, No. 05-cv-1274 (RHK/JJG), 2005 WL 3132349, at *5 (D. Minn. Nov. 22, 2005) (citation omitted). Corporate parents can, however, be liable for their own actions when "the alleged wrong can seemingly be traced to the parent through the conduit of its own personnel and management[.]" *Bestfoods*, 524 U.S. at 64. (citation omitted).

Plaintiffs' only argument for maintaining their claims against the PBMs' corporate parents is that the parents "ma[de] statements that [were] part and parcel of [the] mail and wire fraud predicate acts." Pls.' Mem. in Opp'n at 96. These were general public statements representing that PBMs lower their clients' costs by negotiating prices and rebates with their clients' interests at heart. *See, e.g.*, Compl. ¶¶ 93–96. These statements alone do not seem like enough to hold the parent companies liable under RICO. Plaintiffs acknowledge that, in other contexts, PBMs can and do negotiate rebates in a legitimate way. They do not tie these public statements of the corporate parents to the alleged deviation from industry norms that the EpiPen pricing scheme represented. Absent such a connection, the corporate parents will be dismissed.

V

Both groups of Defendants argue that Plaintiffs have failed to state a RICO conspiracy claim. Their only argument, however, is that the conspiracy claim must fail because the underlying RICO claim fails. *See* PBM Defs.' Mem. in Supp. at 27; Mylan Defs.' Mem. in Supp. at 36. The two accordingly rise and fall together. Because Plaintiffs have stated an underlying RICO claim, then for purposes of these motions, they have also stated a RICO conspiracy claim.

VI

Plaintiffs also assert a claim against Mylan under section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2. This provision makes it unlawful to "monopolize, or attempt to monopolize . . . any part of the trade or commerce among the several States." *Id.* To plead a violation, Plaintiffs must plausibly allege that Mylan (1) "possessed monopoly power in the relevant market" and (2) "willfully acquired or maintained this monopoly power by anticompetitive conduct as opposed to gaining that power as a result 'of a superior product, business acumen, or historical accident.'" *Inline Packaging, LLC v. Graphic Packaging Int'l, LLC*, 962 F.3d 1015, 1024 (8th Cir. 2020) (quoting *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1060 (8th Cir. 2000)); *see United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966). A plaintiff must also plausibly allege an "antitrust injury," which is an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes [the] defendants' acts unlawful." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990) (citation omitted). Mylan argues that Plaintiffs have failed to

allege a relevant product market, an antitrust injury, or anticompetitive conduct.  *See* Mylan Defs.' Mem. in Supp. at 36–45.

A

Mylan first argues that Plaintiffs have not plausibly alleged a relevant product market.  Identifying the relevant product market is a "threshold" issue in a monopolization case, *SuperTurf, Inc. v. Monsanto Co.*, 660 F.2d 1275, 1277 (8th Cir. 1981), because it "provides the framework within which to assess competitive impact," 2 Julian O. von Kalinowski et al., *Antitrust Laws and Trade Regulation* § 24.01[1] (Aug. 2020 Update). "The relevant product market should include 'products that have reasonable interchangeability for the purpose for which they are produced.'" *Little Rock Cardiology Clinic PA v. Baptist Health*, 591 F.3d 591, 596 (8th Cir. 2009) (quoting *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 404 (1956)).  This generally requires a factual inquiry into "how consumers will shift from one product to the other in response to changes in their relative costs," *HDC Med., Inc. v. Minntech Corp.*, 474 F.3d 543, 547 (8th Cir. 2007) (citation omitted), and dismissal on the pleadings is accordingly "disfavored," *Sitzer v. Nat'l Ass'n of Realtors*, 420 F. Supp. 3d 903, 914 (W.D. Mo. 2019).

Plaintiffs allege that "the relevant product market at issue in this case is EAIs." Compl. ¶ 266.  According to Mylan, this does not work because, in the very next paragraph of the Complaint, Plaintiffs allege that "[a] small but significant, non-transitory price increase above the competitive level for EpiPens did not and would not cause a significant loss of sales to other EAIs sufficient to make such a price increase unprofitable." *Id.* ¶ 267. What this shows, Mylan says, is that "other EAIs are not sufficiently interchangeable with

56

EpiPen devices to be in the same product market."  Mylan Defs.' Mem. in Supp. at 38; *cf.*

*Se. Mo. Hosp. v. C.R. Bard, Inc.*, 642 F.3d 608, 613 (8th Cir. 2011) ("Evidence that

consumers will substitute one product for another in response to a slight decrease in price,

strongly indicates those products compete in the same product market.").

Plaintiffs do not extensively brief this question,[29] but the factual allegations in the

Complaint plausibly show a relevant product market.  Plaintiffs allege that EAIs serve a

specific purpose (front-line administration of epinephrine to treat anaphylaxis) for a distinct

group of people (those prone to severe allergic reactions).  Compl. ¶¶ 40–41; *see HDC

Med.*, 474 F.3d at 547 (stating that factors relevant to determining the relevant product

market include "the product's peculiar characteristics and uses" and "distinct customers").

Plaintiffs specifically allege that, when competitors tried to introduce two new EAIs to the

market, Mylan "felt the need to price compete" and was motivated to engage in its bribery-

and-kickback scheme with the PBM Defendants in order to eliminate the competitive

threat.  Compl. ¶¶ 43, 118, 125.  The allegation that Mylan identifies, taken in context,

seems to mean only that customers did not abandon the EpiPen for competitors *because of*

Mylan's alleged anticompetitive conduct, not because the EAIs were insufficiently

interchangeable.  To be sure, Plaintiffs could have been more specific and could have used

terms of art like "reasonable interchangeability" and "cross-elasticity of demand," *see*

Mylan Defs.' Mem. in Supp. at 37, but at the pleading stage, they have done enough.

---

[29]     Plaintiffs at times seem to argue that they need not plead a relevant product market
because there is direct evidence of monopoly power, *see* Pls.' Mem. in Opp'n at 81–82,
but they cite no authority for this proposition.

B

Next up is whether Plaintiffs have plausibly alleged an antitrust injury.  It is not enough for an antitrust plaintiff to prove an injury that is "causally related to an antitrust violation"; the injury must also be "attributable to an anti-competitive aspect of the practice under scrutiny."  *Atl. Richfield Co.*, 495 U.S. at 334; *see Blue Shield of Va. v. McCready*, 457 U.S. 465, 482 (1982).  Mylan argues that Plaintiffs have not alleged an injury flowing from anticompetitive conduct, again focusing on language from one paragraph in the Complaint: "The existence of other EAIs has not significantly constrained Mylan's pricing of EpiPens" and Mylan has never changed "the price of EpiPens in response to the pricing of other branded or generic drugs or EAIs."  Compl. ¶ 264.  According to Mylan, this shows that its alleged exclusion of other EAI products from the relevant market "cannot have affected the price of EpiPen devices."  Mylan Defs.' Mem. in Supp. at 39.

This misses the forest for the trees.  Plaintiffs' whole theory of the case seems to be that other EAIs did not constrain the EpiPen's prices because they never had a chance to.  Plaintiffs allege that, if other EAIs had had a fair shot in the market, Mylan would have been forced to lower its prices or to limit price increases.  *See* Compl. ¶ 43.  It is true that Plaintiffs have not pointed to a time in the past where another EAI actually forced Mylan to lower the price of the EpiPen, but that is because Mylan already controlled nearly the whole market by the time its potential competitors were introduced.  *Id.*  Given this context, the Complaint makes it plausible to believe that the EpiPen's prices are higher than they otherwise would be, and assuming that the alleged pricing scheme qualifies as anticompetitive conduct, the inflated prices are "the type of loss that the claimed violations

. . . would be likely to cause." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977) (quoting *Zenith Radio Corp. v. Hazeltine Research*, 395 U.S. 100, 125 (1969)); *see Sitzer*, 420 F. Supp. 3d at 916 ("Paying a higher price as a result of the alleged trade restraint is certainly the type of injury 'antitrust laws were intended to prevent.'" (citation omitted)).

C

Finally, Mylan argues that Plaintiffs have not plausibly alleged anticompetitive conduct. Merely possessing monopoly power is not enough to violate section 2 of the Sherman Act; "rather, the statute targets 'the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.'" *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 447–48 (2009) (quoting *Grinnell Corp.*, 384 U.S. at 570–71). "Anticompetitive conduct is conduct without legitimate business purpose that makes sense only because it eliminates competition." *HDC Med.*, 474 F.3d at 549 (quoting *Morgan v. Ponder*, 892 F.2d 1355, 1358 (8th Cir. 1989)).

The Parties dispute how to properly frame Plaintiffs' theory of the case. According to Mylan, Plaintiffs are trying to raise one of two fairly common theories of anticompetitive conduct—predatory pricing and exclusive contracts—but have not plausibly alleged either one. Mylan Defs.' Mem. in Supp. at 40–44. Plaintiffs respond that they are raising a different theory entirely—*i.e.*, that Mylan engaged in bribery that unreasonably excluded competition from the market. Pls.' Mem. in Opp'n at 85–89. In view of Plaintiffs' framing,

it is unnecessary to address the predatory-pricing or exclusive-contract theories in any detail.[30]

The question is whether the bribery that Plaintiffs allege "impaired competition in an unnecessarily restrictive way," *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 (1985). Mylan first argues that bribery is not a "recognized monopolization theory" at all. Mylan Reply Mem. at 21. Although the law on this question is somewhat unclear, it does not support the broad argument that Defendants advance. To be sure, a number of courts have concluded that bribery, "standing alone," is not anticompetitive conduct for purposes of the Sherman Act, at least when there is no evidence of a broader effect on competition. *Calnetics Corp. v. Volkswagen of Am., Inc.*, 532 F.2d 674, 687 (9th Cir. 1976); *see also, e.g.*, *Fed. Paper Bd. Co. v. Amata*, 693 F. Supp. 1376, 1383 (D. Conn. 1988); *Sterling Nelson & Sons, Inc. v. Rangen, Inc.*, 235 F. Supp. 393, 400 (D. Idaho 1964). Bribery can implicate the Sherman Act, however, when it is directed toward suppressing competition in the market generally. *See Instructional Sys. Dev. Corp. v. Aetna Cas. & Sur. Co.*, 817 F.2d 639, 649–50 (10th Cir. 1987) (reversing summary judgment on a section 2 claim where the plaintiff presented evidence that the defendant "bribed purchasing officials" in a way that "denied [it] access to the [relevant] market"); *Assoc. Radio Serv.*

---

[30] To proceed under a predatory-pricing theory, a plaintiff must allege: (1) "that the prices complained of are below an appropriate measure of its rival's costs"; and (2) that the defendant has a "dangerous probability[] of recouping its investment in below-cost prices," *Brooke Grp Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 222, 224 (1993). For an exclusive contract to be anticompetitive, it must "foreclose[] competition in a substantial share of the line of commerce involved." *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 329 (1961); *see Sterling Merch., Inc. v. Nestle, S.A.*, 656 F.3d 112, 123–24 (1st Cir. 2011).

*Co. v. Page Airways, Inc.*, 624 F.2d 1342, 1354 (5th Cir. 1980) (distinguishing between "persuading buyers to specify features of a product that only one company can provide" and "induc[ing]" them "in an improper manner, through bribes or similar practices"); *see also Doron Precision Sys., Inc. v. FAAC, Inc.*, 423 F. Supp. 2d 173, 185 (S.D.N.Y. 2006) (stating that bribery can be anticompetitive when it "rob[s] the ultimate purchaser of the opportunity to choose [a] product"); *Damon Corp. v. Geheb*, No. 80 C 1500, 1982 WL 1927, at *3 (N.D. Ill. Nov. 23, 1982) (distinguishing between commercial bribery and "mere reduction[s] in purchase price"). This makes sense; if potential competitors are unable even to enter the market and try to sell their products because of bribes, there is undoubtedly a harm to competition. *Cf. Stearns Airport Equip. Co. v. FMC Corp.*, 170 F.3d 518, 524–26 (5th Cir. 1999) (rejecting a section 2 claim where the defendant allegedly tried to influence municipal purchasers to favor its products ahead of a competitive bidding process but suggesting that the result would be different if there were evidence of bribery because "[b]ribery and threats are not competition on the merits"); *see generally* Franklin A. Gevurtz, *Commercial Bribery and the Sherman Act: The Case for Per Se Illegality*, 42 U. Miami L. Rev. 365, 390–92 (1987) (discussing the potential anticompetitive effects of commercial bribery). In light of these authorities, Mylan goes too far when it suggests that bribery allegations can never support a section 2 claim.

Mylan alternatively argues that Plaintiffs have not plausibly alleged that the bribery here excluded competitors from the market or that Mylan's conduct was "outside industry norms such that other competitors [could not] compete in the same way." Mylan Reply Mem. at 21. The flaw in this argument is the same one present in Mylan's arguments on

other claims: it assumes that Plaintiffs' allegations are limited to the innocent payment of rebates and discounts for formulary placement that Plaintiffs themselves acknowledge are a standard part of the prescription-drug industry. *See* Compl. ¶¶ 60–63. On the contrary, Plaintiffs claim that Mylan paid rebates and other fees not only to secure formulary placement but also to induce PBMs to abandon their role as a price disciplinarian in the market. *Id.* ¶¶ 5–6. It undertook this scheme in direct response to the threat of competition from new EAI products. *See id.* ¶¶ 111–17. And despite its "huge price increases," Mylan retained a "stable" market share at "extraordinarily high levels." *Id.* ¶ 119. These allegations make it plausible to believe that Mylan's bribes were more than "a simple case of buying influence," *Sterling Nelson & Sons*, 235 F. Supp. at 400, and denied competitors "access to the [relevant] market," *Instructional Sys. Dev. Corp.*, 817 F.2d at 649. Plaintiffs have adequately alleged a monopolization claim.

Accordingly, **IT IS HEREBY ORDERED** that:

1. The PBM Defendants' Motion to Dismiss [ECF No. 85] is **GRANTED IN PART** and **DENIED IN PART** as follows:

   a. The motion is **GRANTED** as to Defendants CVS Health Corporation, Express Scripts Holding Company, United Health Group Incorporated, United Healthcare Services Inc., Optum Inc., and OptumRx Holdings, LLC. The claims against those Defendants are **DISMISSED WITH PREJUDICE**.

      b.  The motion is **DENIED** in all other respects.

2.  The Mylan Defendants' Motion to Dismiss [ECF No. 90] is **DENIED**.

Date:  January 15, 2021                         s/ Eric C. Tostrud                   

                                                      Eric C. Tostrud
                                                      United States District Court