### UNITED STATES DISTRICT COURT
### DISTRICT OF MINNESOTA

In re: EpiPen Direct Purchaser Litigation

(This Document Applies to All Actions)

Case No. 20-cv-827 (ECT/JFD)

**ORDER ON
PLAINTIFFS' MOTIONS
TO COMPEL DISCOVERY**

**FILED UNDER SEAL**

This matter is before the Court on three nearly identical Motions brought by Co-Lead Plaintiffs Rochester Drug Co-Operative, Inc. and Dakota Drug, Inc. (together "Plaintiffs"), on behalf of a proposed class: Plaintiffs' First Motion to Compel Defendants Express Scripts, Inc. and Medco Health Solutions, Inc. (Dkt. No. 172), First Motion to Compel Defendants OptumRX, Inc. (Dkt. No. 181), and First Motion to Compel Defendants Caremark PCS Health, L.L.C., Caremark, L.L.C., and Caremark Rx, L.L.C. (Dkt. No. 190).

This Court held a motions hearing on Thursday, October 14, 2021. Noah Silverman and Bruce Gerstein from Garwin Gerstein & Fisher LLP, Peter Kohn from Faruqi & Faruqi, LLP, and David Sorensen from Berger Montague PC, represented Plaintiffs. Jonathan Cooper from Quinn Emanuel Urquhart & Sullivan LLP, and Jessica Nelson and Donald Heeman from Spencer Fane LLP, represented Defendants Express Scripts, Inc. and Medco Health Solutions, Inc. (collectively, "Express Scripts"). Andrew Hatchett, Elizabeth Broadway Brown, and Jordan Edwards from Alston & Bird LLP, and Drew Glasnovich from Stinson LLP, represented Defendant OptumRX, Inc. ("OptumRx"). Daniel Dockery

and Craig D. Singer from Williams & Connolly, LLP, and John Ursu from Faegre Drinker Biddle & Reath LLP, represented Defendants Caremark PCS Health, L.L.C., Caremark, L.L.C., and Caremark Rx, L.L.C. (collectively, "CVS Caremark"). David Foster, Carolyn DeLone, and Elizabeth Jose from Hogan Lovells US LLP represented Defendants Mylan Inc. and Mylan Specialty, L.P. (collectively, "Mylan").

The main thrust of Plaintiffs' Motions concerns 22 separate requests for production ("RFP"), with some additional discovery-related disputes besides. To all these, the Defendants interpose objections and ask for wholesale denial of Plaintiffs' Motions. The Court orders the production of only that information which is both relevant and proportional to this case. Therefore, Plaintiffs' Motions are granted in part and denied in part, as detailed below.

## I. Background

Plaintiffs filed the operative Amended Complaint on October 20, 2021. (Dkt. No. 271.) Plaintiffs allege, on behalf of a proposed class of pharmaceutical wholesalers, that Defendant Mylan obtained a dominant position within the market for Epinephrine Auto-Injectors ("EAI")—which are a class of medical devices that can be used to inject a life-saving dose of epinephrine into a person having a severe, allergic reaction—by an unlawful commercial bribery scheme. (Am. Compl. ¶¶ 1–2.) Specifically, Plaintiffs allege Mylan achieved market dominance for its EpiPen product not because it is a better product or available at a better price, but because Mylan paid bribes and kickbacks to pharmacy benefit managers ("PBM" - companies that administer prescription benefit plans for

insurance companies and health care plans) so those companies would make EpiPen the preferred plan option. (*Id.* ¶ 3.)

Mylan is a defendant in this case, together with three groups of pharmacy benefit managers ("PBM Defendants"): Express Scripts, OptumRx, and CVS Caremark. (*Id.* ¶ 1.) Plaintiffs allege that because PBMs have power to confer market share on favored products, and because Mylan bribed the PBM Defendants to favor EpiPen, Mylan could raise the price of EpiPen without risking its illegally obtained monopoly position in the EAI market. (*Id.* ¶¶ 1–10.) Plaintiffs contend that the PBM Defendants breached their fiduciary duty to their customers by giving public assurances of their work to negotiate fair prices on behalf of health plan holders and customers, while privately working in their own interests to pocket bribes and kickbacks. (Pls.' Mem. Supp. Mot. Compel Against Express Scripts at 1–2, Dkt. No. 174.[1]) Plaintiffs allege that Defendants' actions violate the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c), and that Mylan's actions also violate Sections One and Two of the Sherman Antitrust Act, 15 U.S.C. §§ 1–2. (*Id.* ¶ 10.)

The parties have been in discovery since March of 2021. (*See* Pretrial Scheduling Order, Dkt. No. 150.) Initial disclosures from the PBM Defendants included discovery produced in two earlier, separate cases involving EpiPen pricing and rebate: *In re EpiPen ERISA Litig.* ("*EpiPen ERISA*"), No. 17-1884 (PAM/HB) (D. Minn.); and *In re EpiPen*

---

[1] For efficiency, where Plaintiffs' Memoranda in Support or Exhibits raise the same issues or present the same information across all three Motions, the Court will refer to the materials in Plaintiffs' first Motion against Express Scripts as representative of all three Motions.

*(Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.* ("*EpiPen MDL*"), No. 2:17-md-2785 (D. Kan. 2020). (Rule 26(f) Report & Proposed Sched. Order at 20, Dkt. No. 145.) Fact discovery in this case is due to be completed by April 1, 2022, so at the time Plaintiffs filed their Motions, the parties had most of the last half of discovery remaining. (Pretrial Sched. Order at 1.)

Plaintiffs served their initial discovery requests on the three PBM Defendants on April 19, 2021. (Pls.' Mem. Supp. Mot. Compel Against Express Scripts at 5.) The PBM Defendants responded on May 26, 2021 (Express Scripts and CVS Caremark) and June 1, 2021 (OptumRX) raising various, often boilerplate objections to Plaintiffs' requests as unduly burdensome, duplicative of initial productions from the *EpiPen ERISA* and *EpiPen MDL* litigation, disproportionate to the needs of the case, and seeking confidential and privileged information, but in some instances, agreed to produce some of the documents that Plaintiffs requested. (Pls.' Express Scripts Ex. 2, Dkt. No. 175-1; Pls.' OptumRX Ex. 2, Dkt. No. 187; Pls.' CVS Caremark Ex. 2, Dkt. No. 195-2.)

The parties have met and conferred in-person and via telephone and letters multiple times during discovery to seek resolutions to disputes, and while agreement has been reached on some issues, numerous disputes remain, as evidenced by the instant Motions. (Pls.' Mem. Supp. Mot. Compel Against Express Scripts at 5.) The parties have raised meet-and-confer problems extensively in their briefs and at oral argument. (*See, e.g.,* Def. Express Scripts' Mem. Opp'n at 1, Dkt. No. 225; Def. OptumRX's Mem. Opp'n at 2, Dkt. No. 234; Def. CVS Caremark's Mem. Opp'n at 33, Dkt. No. 243.)

Plaintiffs now bring Motions to Compel against each of the three PBM Defendants—Express Scripts, OptumRX, and CVS Caremark—asking the Court to compel these Defendants to supplement their allegedly deficient discovery productions in four areas: (1) RFP Nos. 6–11 and 41 relate to the PBM Defendants' duties to their customers and seek documents relating to Defendants' marketing statements, as well as the purposes and effects of those statements; (2) RFP Nos. 27–31 relate to the PBM Defendants' duties to their customers and seek documents containing company-wide policies, practices, and strategies about formulary agreements with manufacturers and Defendants' disclosures about these agreements to customers; (3) RFP Nos. 19–22 and 34 relate to how much money the PBM Defendants retained from the alleged bribes and kickbacks and seek documents showing the contents of payment database libraries and documents identifying plan types, customer organizations, value exchanges, and money flows specific to EAI devices within those plans; and (4) RFP Nos. 13–14 and 38–40 relate to both the PBM Defendants' alleged fraud and concealment and their safe harbor defenses and seek documents regarding payments to and from rebate aggregators and group purchasing organizations ("GPO"). (Pls.' Mem. Supp. Mot. Compel Against Express Scripts at i.) Plaintiffs also move for an award of costs and fees in bringing these Motions. (*Id.*)

Additionally, while Plaintiffs' Motions are similar, they raise a few disputes specific to some, but not all, PBM Defendants. Plaintiffs argue Defendants OptumRX and CVS Caremark should also be compelled to produce documents within Plaintiffs' proposed reasonable timeframe, "January 1, 2011 through December 31, 2018 for most categories

of documents, and January 1, 2007 through December 31, 2018 for certain data and contracts[,]" and to supplement their initial productions relating to the earlier EpiPen cases. (Pls.' Mem. Supp. Mot. Compel Against Express Scripts at 9; Pls.' Mem. Supp. Mot. Compel Against OptumRX at 29–41, Dkt. No. 183; Pls.' Mem. Supp. Mot. Compel Against CVS Caremark at 27–34, Dkt. No. 192.) Plaintiffs also contend Defendant CVS Caremark should be compelled to supplement an additional four RFPS, including RFP Nos. 17 and 33–35, which relate to government health plan documents, data, and reports. (Pls.' Mem. Supp. Mot. Compel Against CVS Caremark at 27–29.)

Each PBM Defendant opposes Plaintiffs' Motions and asks the Court to deny them in their entirety. (Def. Express Scripts' Mem. Opp'n at 43; Def. OptumRX's Mem. Opp'n at 39; Def. CVS Caremark's Mem. Opp'n at 43.) They argue that Plaintiffs' Motions fail procedurally because they are premature and reflect Plaintiffs' failure to use the meet-and-confer process properly. (Def. Express Scripts' Mem. Opp'n at 8; Def. OptumRX's Mem. Opp'n at 1–4; Def. CVS Caremark's Mem. Opp'n at 1–2.) Defendants also contend Plaintiffs' Motions fail substantively, because Plaintiffs' requests are overbroad, and ask for what has already been produced, does not exist, is irrelevant, or is disproportionate to the needs of the case. (Def. Express Scripts' Mem. Opp'n at 8; Def. OptumRX's Mem. Opp'n at 1–4; Def. CVS Caremark's Mem. Opp'n at 1–2.)

After a review of the governing law for deciding these Motions, the Court will first address the preliminary matters of problematic attorney conduct during pretrial litigation, including: the dysfunctional meet-and-confer process, the need to diligently review already-produced discovery, the importance of presenting discovery requests consistently

during the meet-and-confer process, and the need to answer opposing counsel's communications in a timely fashion. The Court will then turn to the bulk of the Motions' disputes that center on 22 RFPs, after which the Court will address those disputes Plaintiffs raise with some, but not all, PBM Defendants. The Court will close by reviewing whether to award any of the costs and fees incurred in bringing these Motions.

## II. Governing Law

Pursuant to Federal Rule of Civil Procedure 26, parties are entitled to liberal discovery regarding "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). Courts construe the scope of Rule 26(b)(1) broadly. *See Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978) (citing *Hickman v. Taylor*, 329 U.S. 495, 501 (1947)). However, the scope of discovery is intended to focus on the actual claims or defenses that are at issue in the litigation. *See Sherman v. Sheffield Fin., LLC*, 338 F.R.D. 247, 252 (D. Minn. 2021) (citation omitted.)

A discovery request is relevant unless the information sought can have no possible bearing on the claims or defenses of the case. *Scheffler v. Molin*, No. CIV. 11-3279 (JNE/JJK), 2012 WL 3292894, at *6 (D. Minn. Aug. 10, 2012) (citation omitted). "The required threshold showing of relevance 'is met if the information sought is []relevant to the subject matter involved in the pending action.'" *Patterson Dental Supply, Inc. v. Pace*, No. 19-CV-1940 (JNE/LIB), 2020 WL 10223625, at *20 (D. Minn. June 17, 2020) (citations omitted). The party that seeks discovery has the burden of making this threshold showing of relevance. *Id.* (citing *Hofer v. Mack Trucks, Inc.*, 981 F.2d 377, 380 (8th Cir.

1992)). Then, "[t]he party resisting production bears the burden of establishing lack of relevancy or undue burden." *Inline Packaging, LLC v. Graphic Packaging Int'l, Inc.*, No. 15-CV-3183 (ADM/LIB), 2016 WL 6997113, at *7 (D. Minn. Sept. 6, 2016) (citing *St. Paul Reinsurance Co. v. Commercial Fin. Corp.*, 198 F.R.D. 508, 511 (N.D. Iowa 2000)).

Beyond being relevant, Rule 26 requires that information sought in discovery also be "proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). Factors important to a court's proportionality analysis include "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." *Id.* A court may "find that a request on its face is not proportional to the needs of the case, given the relevance of the requested discovery." *Stan Koch & Sons Trucking, Inc. v. Am. Interstate Ins. Co.*, No. 18-CV-2945 (PJS/HB), 2020 WL 2111349, at *3 (D. Minn. May 4, 2020) (quoting *Klein v. Affiliated Grp., Inc.*, Case No. 18-CV-949 (DWF/ECW), 2019 WL 1307884, at *7 n.9 (D. Minn. Mar. 22, 2019)).

When a requesting party believes its discovery requests are relevant and proportional, but a responding party has failed to produce the requested information, a requesting party may move a court to compel the responding party's production. Fed. R. Civ. P. 37. The burden of demonstrating why information need not be produced—such as undue burden and disproportionality—is on the party resisting disclosure. *Beseke v. Equifax Info. Servs., LLC*, No. 17-CV-4971 (DWF/KMM), 2018 WL 6040016, at *4 (D. Minn. Oct. 18, 2018) (citation omitted).

A party resisting production cannot use boilerplate objections to meet its burden. "Routine, '[b]oilerplate objections, without more specific explanations for any refusal to provide information, are not consistent with the Federal Rules of Civil Procedure.'" *Stan Koch & Sons Trucking*, 2020 WL 2111349, at *3 (quoting *Lubrication Techs., Inc. v. Lee's Oil Serv., LLC*, Case No. 11-CV-2226 (DSD/LIB), 2012 WL 1633259, at *5 n.5 (D. Minn. Apr. 10, 2012)). Defendants' original RFP objections are almost entirely boilerplate, and therefore almost entirely ineffectual. The Court gives weight only to Defendants' non-boilerplate objections.

## III.    Preliminary Matters Concerning the Discovery Process

Each side claims the other has engaged in discovery tactics resulting in needless delays. The Court will address a few of the most egregious here.

### A.    The Badly Broken Meet-and-Confer Process

"The meet-and-confer requirement of the Local Rules is intended to lead to a meaningful, pre-motion-filing exchange of views between the parties to a lawsuit, and, if possible, to a full or partial resolution of the matter(s) that are the subject of a contemplated motion." *Magistrate Judge John F. Docherty's Practice Pointers and Preferences*, https://www.mnd.uscourts.gov/judges-practice-pointers, at 3 (last visited Dec. 2, 2021). In their briefs and during the October 14, 2021 motions hearing, the PBM Defendants claimed that Plaintiffs filed the instant Motions before the parties' meet-and-confer negotiations had reached an impasse. (*See, e.g.,* Hr'g Tr. at 68:15–19, Dkt. No. 273.)[2] Plaintiffs, in turn,

---

[2] The unredacted motions hearing transcript is currently restricted to court users and the applicable parties.

complained that Defendants did not timely respond—or in some cases did not respond at all—to Plaintiffs' questions or requests for information that would allow Plaintiffs to have framed more precise production requests. (*See, e.g., id.* at 75.)

The Court has observed that the parties describe themselves as frequently meeting-and conferring. The parties' meet-and-confer letters often run to multiple pages. Yet the meet-and-confer process has not solved more than a few minor discovery disputes, nor focused those disputes that remain. Instead, the Court is faced with the instant motions to compel, which are broad and numerous, involving as they do 22 RFPs, plus other discovery matters. Indeed, the meet-and-confer process in this case seems to breed additional disputes and acrimony.

In response so far, the Court has ordered the parties to participate in regular Case Management Conferences ("CMC"), which provide increased structure and accountability to the parties' meet-and-confer process. (*See* Dkt. Nos. 249, 310.) To date, one CMC has been held, with others scheduled through July 2022. If the CMCs do not significantly improve the parties' meet-and-confer process, the Court may consider other options to provide even greater structure and accountability.

Regarding future meet-and-confers, the Court reminds the parties that letters and emails are disfavored in a successful meet-and-confer process, and "[n]either a desultory, pro forma conversation, nor letter-writing or email campaigns satisfy the letter—or the spirit—of the meet-and-confer requirement of the Local Rules." *Magistrate Judge Docherty's Practice Pointers* at 3. Additionally, arbitrary deadlines and ultimatums are not favored. *See Lureen v. Holl*, No. 4:17-CV-04016-LLP, 2017 WL 3834739, at *3–4 (D.S.D.

Aug. 31, 2017) (citation omitted) ("The court frowned upon the movant's setting of an arbitrary deadline for the filing of a motion to compel because the facts showed that the parties were not at impasse[,]" finding that the parties "had yet to engage in a discussion of the genuineness of the opposing party's objections, what, if any, documents the discovering party was reasonably capable of producing, and what specific, genuine issues remained that could not be resolved without the court's intervention.").

**B.    The Necessity of Reviewing Already-Produced Discovery**

The PBM Defendants claim that Plaintiffs served approximately 40 separate RFPs—including those in dispute in the instant Motions—only six days after receiving Defendants' initial productions. (Def. Express Scripts' Mem. Opp'n at 7; Def. OptumRX's Mem. Opp'n at 5; Def. CVS Caremark's Mem. Opp'n at 8.) Plaintiffs respond that this compressed timeline does not tell the full story, since Plaintiffs spent months before filing this action reviewing the public record in other cases, including the *EpiPen ERISA* and *EpiPen MDL* cases, and noting what materials had been requested previously. (Hr'g Tr. at 7:21–8:14.) Thus, when Plaintiffs served their discovery requests on the PBM Defendants, Plaintiffs claim they already knew what gaps they would find in the PBM Defendants' initial productions. (*Id.* at 8.)

However, Plaintiffs lose credibility in demanding information that, with minimal effort, they would have found already produced and in their possession. As the most egregious example of several, Defendant OptumRX notes Plaintiffs move to compel it to produce contact information for a videographer who recorded a deposition, but the videographer's name "appears on the first line of the deposition transcript that OptumRx

produced" to Plaintiffs. (Def. OptumRX's Mem. Opp'n at 18.) Reviewing documents from prior cases is not the same as reviewing the documents actually received during discovery, and Plaintiffs would do well to do both. Within 20 days of this Order, Plaintiffs shall file a sworn statement declaring whether all Defendants' initial disclosures, and any documents subsequently produced, either were received in an accessible, searchable format, or have been put into such a format by the Plaintiffs. Any disclosures that are inaccessible for format reasons shall be converted to an accessible format by the Plaintiffs, if economical and possible. If there are inaccessible documents that Plaintiffs cannot reasonably convert to an accessible format, Defendants shall re-produce those documents in a format accessible for Plaintiffs. Any future discovery-related motions or requests for IDR from either party will include a statement, signed by the attorneys who are filing the motion or request, affirming that counsel searched thoroughly for responsive documents within documents already in its possession before presenting the motion or request to the Court.

### C. The Importance of Precise Communication During Discovery

PBM Defendants also claim Plaintiffs' discovery requests are a moving target in which they ask for one thing in RFPs that Defendants describe as broad, vague, and lengthy, another during various meet-and-confers, yet another in their instant Motions, and another still in their proposed orders. (*See, e.g.,* Def. Express Scripts' Mem. Opp'n at 9–12; Hr'g Tr. at 58:7–59:8.) The breadth, vagueness, and length of Plaintiffs' RFPs, the PBM Defendants allege, allow Plaintiffs to refashion RFPs so that when Defendants close one door with an answer, Plaintiffs then just open a window. (*See, e.g.,* Def. Express Scripts' Mem. Opp'n at 11–12.)

For example, RFP Nos. 27–31 requested documents regarding the PBM Defendants' rebate adjustments and their policies, practices, and strategies in making these adjustments. (Pls.' Express Scripts Ex. 2 at 62.) When the PBM Defendants objected to this RFP due to overbreadth, the PBM Defendants claim Plaintiffs opened a window, stating that these RFPs sought "non-policy documents from an 'RFP Database.'" (Def. Express Scripts' Mem. Opp'n at 11–12 (citing Pls.' Mem. Supp. Mot. Compel Against Express Scripts at 16).) The PBM Defendants also claim that Plaintiffs raise in their Motions and proposed orders, for the first time, the idea that RFP Nos. 27–28 are requesting information about "policies prohibiting customers from negotiating directly with manufacturers." (Hr'g Tr. at 59:9–60:19.)

The Court observes that in this example, when the PBM Defendants objected to these RFPs as overly broad, Plaintiffs offered to narrow their RFPs to centrally located, non-comprehensive documents illustrating the PBM Defendants' policies. (Pls.' Mem. Supp. Mot. Compel Against Express Scripts at 16.) This did not, as Defendants claim, shift the RFPs in question into searches unrelated to the PBM Defendants' policies. Likewise, Plaintiffs noted that they discussed the request for information about a ban on direct customer negotiations in RFP Nos. 27–28 with Defendants in a meet-and-confer letter on August 27, 2021, so Plaintiffs did not broach a prohibition on direct negotiations for the first time in their Motions and Proposed Orders. (Hr'g Tr. at 20:11–21:23, 75:11–76:15; Pls.' Ex. 13 at 3.) In asking Plaintiffs to do their reviewing homework, the PBM Defendants would do well to do their own too.

The Court acknowledges that, for utility in describing detailed discovery requests, summaries are often used during litigation in place of a wooden repetition of lengthy RFPs, and parties often do so without nefarious intent. Likewise, the fact that broad, vague, or lengthy RFPs may take more limited, defined shape after a meet-and-confer is an indication that a particular meet-and-confer functioned successfully in a case in which, as observed above, successfully functioning meet-and-confers have been rare. Nevertheless, the Court takes the PBM Defendants' point that moving targets are hard to answer. Plaintiffs should be careful to be precise and consistent in their discovery communications to avoid changing already broad and detailed RFPs and needlessly complicating—and delaying—Defendants' answers.

## D.    The Importance of Timely Communication During Discovery

Finally, Plaintiffs claim the PBM Defendants are intentionally not negotiating because they identify problems rather than seek solutions during meet-and-confers—or simply fail to respond to Plaintiffs' communications at all—knowing delays will help them by giving Plaintiffs foreseeable headaches because of the tight litigation schedule required in this case. (Hr'g Tr. at 74:23–75:10.) Timely, solution-driven communication is at the heart of effective lawyering, and this Court hopes that the guidance offered for the meet-and-confer challenges will end such unbecoming tactics to the extent they are occurring.

## IV.    Requests for Production at Issue

Turning now to the primary matter before the Court, Plaintiffs ask the Court to compel the PBM Defendants to supplement their responses to: (1) RFP Nos. 6–11 and 41, which pertain to the PBM Defendants' duties to their customers; (2) RFP Nos. 27–31,

relating to policies, practices, and strategies about formulary agreements; (3) RFP Nos. 19–22 and 34, which pertain to how much money the PBM Defendants retained from the alleged bribes and kickbacks; and (4) RFP Nos. 13–14 and 38–40, which relate to rebate aggregators and GPOs and the PBM Defendants' safe harbor defenses. The Court will discuss each group of requests in turn.

### A.    RFP Nos. 6–11 and 41

These seven RFPs collectively request that the PBM Defendants produce documents containing iterations of their past public statements inviting customer confidence, their intentions in making those statements, and the effects of those statements. (Pls.' Mem. Supp. Mot. Compel Against Express Scripts at 7.) RFP No. 6 asks PBM Defendants to provide "[a]ll" relevant, time-limited, public statements by which they characterized and marketed their services in negotiating with manufacturers to provide customers with lower drug prices. (Pls.' Express Scripts Ex. 2 at 18–19.) RFP No. 7 requests that PBM Defendants provide "[a]ll" public documents and statements about customer loyalty and working on behalf of customer interests, as well as disclosures to customers about the PBM Defendants' sources of revenue, income, or earnings, including transparency about how the PBM Defendants' financial relationships with drug manufacturers bore out their assertions of loyalty to, and interest-alignment with, their customers. (*Id.* at 23–24.) RFP No. 8 seeks "[a]ll" public documents and statements by which the PBM Defendants sought to earn, maintain, or retain their customers' loyalty. (*Id.* at 25–26.) RFP No. 9 asks for "[a]ll" documents pertaining to the PBM Defendants' "strategies, purposes, tactics and/or goals" in their public statements or documents requested in RFP Nos. 6–8. (*Id.* at 27.) RFP

No. 10 requests "[a]ll" documents concerning PBM Customer trust and alignment between the PBM Defendants' interests and the interests of their customers, including "surveys, market research, and internal analyses or observations . . . ." (*Id.* at 29–30.) RFP No. 11 seeks "[a]ll" documents regarding the PBM Defendants' consultation with third parties regarding PBM Defendants' marketing and public relations in promoting their services to their customers. (*Id.* at 31.) And finally, RFP No. 41 asks for "[a]ll" documents concerning Defendants' "Customer Pledge" from a 2003 annual report and an online statement of "Business Principles" in 2012. (*Id.* at 85.)

During the meet-and-confer process, Plaintiffs agreed to limit the PBM Defendants' production for these RFPs to:

> (a) exemplars of system-wide documents from [the PBM Defendants'] marketing and promotional departments, such as samples of all of [the PBM Defendants'] different promotional, advertising and/or marketing materials . . . ;

> (b) centrally-maintained press releases, public testimony, and/or interviews of [the PBM Defendants'] representatives . . . [;]

> (c) documents regarding marketing, advertising or promotional strategies, tactics or campaigns, and their intended effects; and

> (d) the materials sought in Requests 10 and 41.

(Pls.' Express Scripts Ex. 7 at 9.)

Plaintiffs argue these RFPs are both relevant and proportional. (Pls.' Mem. Supp. Mot. Compel Against Express Scripts at 7–11.) Specifically, Plaintiffs claim that these RFPs seek relevant evidence that will substantiate their claim that the PBM defendants had a fiduciary duty to their customers. Under some state laws, one must prove the existence

of a fiduciary duty as part of proving bribery. This includes some of the state bribery laws Plaintiffs have alleged as RICO predicates. (*Id.* at 7.) Therefore, by alleging those state law bribery violations, Plaintiffs have taken up the burden of proving that the PBM Defendants tried to induce customer trust and reliance—and succeeded in some cases. (*Id.* at 9.) Plaintiffs allege that the relevance of their RFPs has been established by the Honorable Eric C. Tostrud in his January 15, 2021 Order. (*Id.* at 7.) In that Order, Judge Tostrud set out the two avenues under Minnesota law (assuming for present purposes that Minnesota law will govern the question) by which Plaintiffs could demonstrate the existence of the required fiduciary duty: either by showing the disparity between "business experience and invited confidence[,]" or by showing the PBM Defendants' customers' confidence and the PBM Defendants' "resulting superiority and influence . . . ." (*Id.* (citing Order at 43–44, Dkt. No. 125).) Plaintiffs argue that RFP Nos. 6–11 and 41 are seeking this relevant, confidence-related evidence. Beyond this, Plaintiffs also allege these marketing statements are relevant to show that "the Defendants' pattern of predicate acts included mail and wire fraud." (*Id.* at 33.)

Regarding the proportionality of these RFPs, Plaintiffs contend that RICO, and the state laws whose violation Plaintiffs allege as RICO predicates, are remedies for broad, market-wide injurious conduct, justifying the scope of the broad, market-wide information sought in these RFPs. (*Id.* at 9.) While Defendants made robust initial disclosures that included past discovery disclosures from the *EpiPen ERISA* and *EpiPen MDL* cases, Plaintiffs contend that the information requested in RFP Nos. 6–11 and 41 is not duplicative because past EpiPen litigation did not advance the instant case's fiduciary duty theory

relating to marketing statements and strategies. (*Id.* at 10.) Plaintiffs further argue that the requests are proportional because they have limited the scope of RFP Nos. 6–9 and 11 to statements "located in [the PBM Defendants'] central files (such as [their] marketing or public-relations departments)." (*Id.* at 9.)

The PBM Defendants object to each of these production requests as premature, duplicative, irrelevant, and disproportionate. (Def. Express Scripts' Mem. Opp'n at 13 n.2; Def. CVS Caremark's Mem. Opp'n at 11–18.) Their primary objection is that Plaintiffs' motion is premature regarding these RFPs because the record shows that the ongoing meet-and-confer process was not at impasse when Plaintiffs filed these Motions. (Def. Express Scripts' Mem. Opp'n at 13; Def. OptumRX's Mem. Opp'n at 18.) The PBM Defendants also argue these requests are duplicative of their initial production, which includes the voluminous discovery produced during the past *EpiPen ERISA* and *EpiPen MDL* litigation. (Def. Express Scripts' Mem. Opp'n at 15–16, 21; Def. OptumRX's Mem. Opp'n at 8, 18.) They also attack Plaintiffs' fiduciary duty theory, arguing that Plaintiffs will not be able to sustain a theory requiring evidence of specific relationships with particular customers through broad-based marketing statements. (Def. Express Scripts' Mem. Opp'n at 18–20; Hr'g Tr. at 38:13–40:15.) The PBM Defendants further allege that Plaintiffs' attempt to prove the PBM Defendants committed fraud by means of broad marketing statements presents insurmountable but-for causation and third-party reliance challenges. (Def. Express Scripts' Mem. Opp'n at 20.) Regarding RFP No. 41, the PBM Defendants object to the request because it seeks information from 2003, which is outside of the agreed upon

timeframe for discoverable information of 2011–2018 generally, with some exceptions (though no exception goes back further than 2007). (*Id.* at 21–22.)

The Court finds that Plaintiffs' requests in RFP Nos. 6–11 and 41 are both relevant and proportional and orders the PBM Defendants to supplement their responses to these discovery requests. *See* Fed. R. Civ. P. 26(b)(1). Despite the PBM Defendants' insistence that these RFPs seek irrelevant information that cannot substantiate Plaintiffs' fiduciary duty theory, Plaintiffs' theory has potential merit under Minnesota law because they allege the PBM Defendants' marketing and public statement is the kind of "invited confidence" that the law contemplates can give rise to a fiduciary duty. (*See* Order at 43 (citing *Buscher v. Brown & Brown, Inc.*, No. A08-1813, 2009 WL 2595937, at *2 (Minn. Ct. App. Aug. 25, 2009) (citation omitted) (finding a fiduciary relationship exists where "confidence is reposed on one side and there is resulting superiority and influence on the other) and *Stark v. Equitable Life Assurance Soc'y*, 285 N.W. 466, 470 (Minn. 1939) (citations omitted) (finding a fiduciary relationship exists "where there is a '[d]isparity of business experience and invited confidence'").) And even were this not the case, the PBM Defendants are mistaken when they assert that if evidence is less than needed to establish a violation of the law it is irrelevant. This ignores the broad scope of Rule 26, which allows parties to seek a wide sweep of evidence—even evidence that might not be admissible—so long as it is relevant. *See* Fed. R. Civ. P. 26(b)(1). Because Plaintiffs seek relevant evidence in RFP Nos. 6–11 and 41, Defendant shall produce information responsive to these requests.

The information sought in these RFPs is also proportional. The parties are engaged in resource-intensive litigation, and both the Defendants and the Plaintiffs must expect

there will be discovery burdens that are unique to this case and that may even go beyond *EpiPen ERISA* and *EpiPen MDL* discovery productions. Plaintiffs' fiduciary relationship theory is important to the RICO and Sherman Act issues at stake in a case with significant potential damages, and which implicates the public's interest in an efficient, corruption-free health care system. (*See* Am. Compl. at 112–13.) While some of the information Plaintiffs seek is public and available to both parties, Plaintiffs also seek data that is centrally maintained by Defendants. Defendants have more immediate, efficient access to that information. Beyond this, Plaintiffs seek not only public documents, but the internal, strategy-related information that illustrates the purposes behind those public statements. This information is also in the PBM Defendants' control. Given the importance of this relevant information, the burden and expense are outweighed, and the PBM Defendants shall supplement their productions in response to these RFPs. However, the parties' agreed upon timeframes provide a limiting factor, and to the extent that RFP No. 41's request falls outside of these, the PBM Defendant need not produce responsive documents.

### B.    RFP Nos. 27–31

These five RFPs collectively request that the PBM Defendants produce documents containing policies, practices, strategies, and standard contractual language that show the extent to which the PBM Defendants had discretionary control over functions impacting their own compensation—and the ability to conceal how they used this power. (Pls.' Mem. Supp. Mot. Compel Against Express Scripts at 12.) RFP No. 27 asks PBM Defendants to provide documents demonstrating their "policies, practices and strategies" and underlying purposes in reserving the right to adjust financial variables impacting their compensation.

(Pls.' Express Scripts Ex. 2 at 62.) RFP No. 28 requests that PBM Defendants produce documentation showing the conditions placed on PBM Customers relating to plan design, dissemination, and financial variables. (*Id.* at 64.) RFP No. 29 seeks documentation relating to the PBM Defendants' agreements with manufacturers and their customers' awareness of such agreements. (*Id.* at 66.) RFP No. 30 asks for similar documentation relating to the PBM Defendants' agreements with manufacturers specific to EAI devices and their customers' awareness of such agreements. (*Id.* at 67.) Finally, RFP No. 31 requests documents pertaining to the disclosure to PBM customers of PBM Defendants' agreements with, and payments to, EAI device manufacturers. (*Id.* at 68.)

During the meet-and-confer process, Plaintiffs agreed to initially limit the PBM Defendants' production for these RFPs to "(1) documents from 2011–2018 regarding "RFP Database standard responses," . . .; and (2) documents from 2011–2018 related to "Annual Content Review[s]" or "Rebate Review[s] . . . ." (Pls.' Express Scripts Ex. 17 at 5.) The PBM Defendants responded that they had nothing more to produce. (Pls.' Express Scripts Ex. 18 at 5–6; Pls.' OptumRX Ex. 40 at 5–6, Dkt. No. 187-30; Pls.' CVS Caremark Ex. 35 at 5–6, Dkt. No. 196-21.)

Plaintiffs argue these RFPs are both relevant and proportional, and that the RFPs seek documents that exist. Regarding relevance, Plaintiffs contend that evidence that the PBM Defendants could freely work hidden levers that allowed them to negotiate for, receive, and conceal a flow of bribes and kickbacks is necessary for Plaintiffs to show that the PBM Defendants breached their fiduciary duties to their customers, thereby violating state bribery laws. (Pls.' Mem. Supp. Mot. Compel Against Express Scripts at 12.) Beyond

this, Plaintiffs also allege these documents showing the PBM Defendants' discretionary control are also relevant to show "the Defendants' pattern of predicate acts included mail and wire fraud." (*Id.* at 33.) Regarding proportionality, Plaintiffs contend that these RFPs seek information not previously produced in the *EpiPen ERISA* or *EpiPen MDL* cases, and Plaintiffs offered to limit production to centrally located standard policy and contracting provisions derived from documents containing standard responses and annual content or rebate reviews. (*Id.* at 16.) And Plaintiffs insist that, despite what the PBM Defendants claim, there are indications in discovery productions to date that show that documents containing the information sought do, in some form, exist. (*Id.* at 12–16.)

The PBM Defendants object to each of these production requests as premature and assert that the documents sought do not exist. (Def. Express Scripts' Mem. Opp'n at 22–27; Def. OptumRX's Mem. Opp'n at 24–26; Def. CVS Caremark's Mem. Opp'n at 22–24.) The PBM Defendants argue that Plaintiffs are particularly premature in bringing their Motions where there has been no discussion during meet-and-confers about documents discussing policies that prohibit customers from negotiating directly with manufacturers, and say Plaintiffs have thus waived any such request. (Def. Express Scripts' Mem. Opp'n at 22–23.) The PBM Defendants further contend that no such responsive, centralized policy documents exist because Defendants negotiate separately and uniquely with each customer, including on customer-manufacturer direct negotiation rights, as well as on the PBM Defendants' rights to receive manufacturer payments, adjust rebates, and disclose information to customers. (Def. Express Scripts' Mem. Opp'n at 24–26; Def. CVS Caremark Mem. Opp'n at 22–24.)

The Court finds that Plaintiffs' requests in RFP Nos. 27–31 are both relevant and proportional and the PBM Defendants shall supplement their responses to these discovery requests. *See* Fed. R. Civ. P. 26(b)(1). As a preliminary matter, the Court takes the PBM Defendants at their word when they insist that these RFPs seek nonexistent policies, at least in the sense that there are no documents that are devoted to an exposition of a policy applied uniformly to all contracts. But the Court finds it unlikely that sophisticated corporations such as the PBM Defendants do no standardizing of their agreements to ensure profitability. It is also unlikely that the contractual levers that impact each agreement's financial viability for the PBM Defendants—such as their own financial rights in relation to manufacturers, particular drugs, and customers—is a piecemeal tapestry without any centralized oversight. In whatever forms such standardizations ensuring profitability are captured—which may be in practices and strategies rather than in policies - it is the Plaintiffs' contention that those behavioral signatures encode the means to receive bribes and kickbacks—by exerting control over certain functions that impact their compensation—in violation of RICO. (Hr'g Tr. at 19:18–22.) Plaintiff is entitled to investigate that contention. Thus, those standardizations are relevant to Plaintiffs' claims, and Defendants shall produce responsive documents to answer these RFPs.

In addition to being relevant, the information sought in these RFPs is also proportional, at least when responsive productions are limited by the Court in the manner described below. *See* Fed. R. Civ. P. 26(b)(1). The Court reiterates that the parties are sophisticated and able to anticipate there would be burdens and expenses to litigation beyond simply reproducing their productions from past EpiPen-related cases. The issues

raised in these RFPS—and their resolution—are central to Plaintiffs' state-law predicate acts in a case of public importance with a significant amount in controversy. The contracts at issue are accessible to Defendants and most efficiently produced by them. Therefore, the Court finds the benefit of requiring this production outweighs any costs or burdens such production imposes, and Defendant shall supplement their productions regarding these RFPs.

Given the PBM Defendants' contentions that every contract stands on its own without any separate, centralized guidance to shape it, the Court finds an appropriate compromise that avoids making this production disproportionate is for the PBM Defendants to alphabetize its contracts by customer name and produce every tenth contract to Plaintiffs, until the total number of produced contracts reaches ten percent of all contracts. While this will not provide the high-level, centralized strategy documents that dictate how agreements or reviews and revisions to negotiations work, the Court takes the PBM Defendants at their word that such centralized policies do not exist. *See Prokosch v. Catalina Lighting, Inc.*, 193 F.R.D. 633, 637 (D. Minn. 2000) (citation omitted) ("[T]he Court must accept, at face value, a party's representation that it has fully produced all materials that are discoverable."). Because not only centralized policies, but also practices and strategies, are sought by Plaintiffs, the Court finds these representative contract samples offer a suitable, proportionate compromise to resolve this discovery dispute.

### C.    RFP Nos. 19–22 and 34

These five RFPs collectively request that the PBM Defendants produce information specific to EAI manufacturer payments tracked within customer contract databases, how

much of these payments the PBM Defendants retained, and to what extent they benefitted from EpiPen price increases. (Pls.' Mem. Supp. Mot. Compel Against Express Scripts at 23.) RFP No. 19 asks for payment-related information for customers, in whatever way it is stored—including a breakdown of specific manufacturer rebates for drugs within plans—along with the information needed to navigate and understand those storage schemes. (Pls.' Express Scripts Ex. 2 at 44–45.) RFP No. 20 builds on RFP No. 19 to request an information breakdown of plan types and characteristics. (*Id.* at 47–48.) RFP No. 21 asks for electronic copies of the database directories relevant to responses in RFP Nos. 19–20, along with the information needed to navigate them, and any policies or procedures governing them. (*Id.* at 51–52.) Finally, RFP Nos. 22 and 34 seek additional information used by PBM Defendants to monitor EAI device manufacturer payments. (*Id.* at 53, 75.) There has been no narrowing of these RFPs during the meet-and-confer process.

Plaintiffs argue these RFPs are relevant and proportional. (Pls.' Mem. Supp. Mot. Compel Against Express Scripts at 19–27.) Specifically, Plaintiffs claim that these RFPs seek relevant evidence of the alleged bribery- and kickback-related money flow by illustrating the net cost of EAI devices for customers across health plans, thus illuminating what the PBM Defendants retained, and whether their public statements aligned with the financial decisions the PBM Defendants made for their customers. (Pls.' Mem. Supp. Mot. Compel Against Express Scripts at 20.) Plaintiffs contend facts about which customers received rebate value, in which ways, and for how much, will bear on Plaintiffs' alleged state law bribery claims. (*Id.* at 21; Hr'g Tr. at 33:17–34:8.) Plaintiffs also argue that, absent hard numbers for payments tied to EAI devices across plans, Plaintiffs should be allowed

to discover benchmarks, such as average payments kept across drugs, and average payments the PBM Defendants retained among types of manufacturer payments, customers, and formularies. (Pls.' Mem. Supp. Mot. Compel Against Express Scripts at 22.) Such benchmarks could be easily produced with little burden or risk, Plaintiffs claim, because they include already-produced, redacted spreadsheets, from which Plaintiffs simply ask the PBM Defendants to remove the redactions. (*Id.* at 23.) Additionally, Plaintiffs argue that Defendant Express Scripts must have ways of tracking how much it needs to pay to whom and how much it can retain, as the other PBM Defendants have produced this information during discovery, and indeed, Plaintiffs ask, "[h]ow else could a PBM run its business?" (*Id.* at 25.) Plaintiffs argue that Defendant Express Scripts should be compelled to disclose the existence of responsive database libraries, which is less burdensome than producing actual contracts and is not duplicative of what Defendants produced during previous EpiPen-related litigation. (*Id.* at 26–27.)

The PBM Defendants object to each of these production requests as overbroad and calling for the production of non-existent documents. (Def. Express Scripts' Mem. Opp'n at 27–28; Def. OptumRX's Mem. Opp'n at 27–33; Def. CVS Caremark Mem. Opp'n at 25–29.) They claim the reality is they have no centralized libraries that identify and categorize how they and their customers structured value exchanges in contracts, as Plaintiffs seek; rather, they have thousands of individual contracts that deal with payments, rebates, and value exchanges in terms unique to each contract. (*See, e.g.,* Def. Express Scripts' Mem. Opp'n at 27–29.) Furthermore, the PBM Defendants allege that there is no data that allows itemization of received payments on a drug-by-drug basis, which means

there is no way to calculate EpiPen's benefits and costs under any given plan—let alone all of them. (Hr'g Tr. at 51:13–53:12.) This, PBM Defendants argue, is because customers negotiate contracts for overall value, not for each specific drug. (*Id.* at 54.)

The Court finds that Plaintiffs' requests in RFP Nos. 19–22 and 34 are relevant, given that they are raising bribery- and kickback-related claims. Proportionality is where the challenge lies, since Defendants claim they have nothing more to produce that is responsive to these RFPs. When a party attests to the nonexistence of the discovery sought, courts generally take them at their word. *See Prokosch*, 193 F.R.D. at 637.

However, while a drug-specific breakdown may not exist, given the relevance of the value flow Plaintiffs seek in these RFPs to their claims, there may be generalized benchmarks Plaintiffs can obtain by looking at financial records for different plans. If the Court ordered Defendants to turn over *all* their financial records so that Plaintiffs could confirm the information they seek does not exist, the discovery sought would not be "proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). But Plaintiffs are entitled to look for themselves in proportion to the needs of the case.

As a first step, the PBM Defendants are ordered to remove the redactions from and resend to Plaintiffs the spreadsheets produced in response to RFP Nos. 19–22 and 34 showing net cost data for health plans, including documents bearing the Bates numbers ES_EPIDP_000181054, ES_EPIDP_000182724, ES_EPIDP_00018271, and ES_EPIDP_000167501, and all similar spreadsheets previously produced. As a second step, Plaintiffs shall produce to Defendants five search terms that Plaintiffs believe will lead to the discovery of responsive documents, and will choose five custodians as to whom

those search terms shall be run. The PBM Defendants shall run those search terms across those custodians, order responsive documents chronologically, then produce every tenth document. Between the unredacted spreadsheets and the document sample, Plaintiffs should have the information they need to explain in detail what an appropriately focused, proportionate, response to this RFP would be. The Court stresses that Plaintiffs will not be receiving all documents, because that would be disproportionate. Plaintiffs will receive sufficient information to draw conclusions about the flow and apportionment of funds between the PBM Defendants and other entities, such as drug wholesalers, manufacturers, and the PBM Defendants' customers. The parties shall meet-and-confer about search terms and custodians, with the goal of writing search terms and composing a custodian list that maximize the likelihood of obtaining sufficient information to permit Plaintiffs to draft a supplemental RFP that focuses on responsive materials, without sweeping in less relevant or outright irrelevant material.

### D.    RFP Nos. 13–14 and 38–40

These five RFPs collectively request that the PBM Defendants produce documents about the flow of rebate payments, which would also provide evidence relating to the PBM Defendants' safe harbor defense, which Defendants can avail themselves of only if they properly disclosed and passed on all EpiPen payments to governmental health plan customers. (Pls.' Mem. Supp. Mot. Compel Against Express Scripts at 27–32.) RFP No. 13 asks for "[a]ll" documents relating to entities other than EAI device manufacturers who gave or received payments related to EAI devices in connection with each PBM Defendant, such as rebate aggregators like the Coalition for Advanced Pharmacy Services ("CAPS")

28

and similar entities. (Pls.' Express Scripts Ex. 2 at 34.) RFP No. 14 requests "[a]ll" documents relating to each PBM Defendants' work "with, for, or as" a rebate aggregator or group purchasing organizations, or GPOs, for EAI devices. (*Id.* at 36.) RFP. No. 38 seeks "[a]ll" documents supporting the PBM Defendants' safe harbor defenses for any EAI manufacturer payments. (*Id.* at 81.) RFP No. 39 asks for "[a]ll" documents relating to compliance with safe harbor requirements for EAI manufacturer payments. (*Id.* at 82.) Finally, RFP No. 40 requests documents showing that any EAI manufacturer payment fell under PBM Defendants' asserted safe harbors. (*Id.* at 83.) There has been no narrowing of these RFPs during the meet-and-confer process.

Plaintiffs argue that these RFPs are relevant and proportional. (Pls.' Mem. Supp. Mot. Compel Against Express Scripts at 27–32.) Tracing the flow of the alleged bribes or kickbacks is evidence of their existence and magnitude, and thus is evidence of what the PBM Defendants stood to gain from EpiPen price increases—and from fraudulently concealing those gains. (*Id.* at 29–30.) Plaintiffs also claim tracing this flow is relevant to the PBM Defendants' safe harbor defenses, which place a burden on the PBM Defendants to show that they properly "disclosed and passed all EpiPen payments related to government formulary placement to the relevant governmental health plan customers." (*Id.* at 30.) Plaintiffs further argue their requests are proportional because such payment-sharing data could be easily produced, in part, with little burden, where the PBM Defendants have already produced redacted spreadsheets that Plaintiffs simply ask to be unredacted. (*Id.* at 31–32.)

The PBM Defendants object to each of these production requests as irrelevant, disproportionate, and premature (Def. Express Scripts' Mem. Opp'n at 37–41; Def. OptumRX's Mem. Opp'n at 34–37; Def. CVS Caremark's Mem. Opp'n at 34.) They argue that Judge Tostrud opined the PBM Defendants might plausibly owe a fiduciary duty to health plan customers, but point out that rebate aggregators and GPOs are not health plan customers, and thus, data relating to such entities has no relevance to establishing whether the PBM Defendants breached a fiduciary duty. (Def. Express Scripts' Mem. Opp'n at 37–38.) Likewise, the PBM Defendants argue that while the flow of money to governmental health plan customers is relevant to Defendants' safe harbor defenses requiring that flow to be proper and disclosed, Defendants point out that rebate aggregators and GPOs are not government health plan customers, and thus, data relating to such entities is irrelevant to their safe harbor defenses. (Def. Express Scripts' Mem. Opp'n at 38–39.) Additionally, the PBM Defendants argue that to produce "a full picture of all rebate sharing would require collecting and producing every single customer or DFO contract" which, given their numerosity and irrelevance, would be disproportionate to the needs of the case. (Def. Express Scripts' Mem. Opp'n at 39.) The PBM Defendants are willing, however, to produce a portion of this big picture, including contracts with CAPS between 2011–2018, should the Court order it. (*Id.* at 39–40; Def. OptumRX's Mem. Opp'n at 36.) Beyond all this, they claim that discussions with Plaintiffs regarding RFP Nos. 38–40 relating to the PBM Defendants' safe harbor defenses are still ongoing, with search term negotiations midstride when Plaintiffs filed these Motions for disputes that are not yet ripe. (Def. Express Scripts' Mem. Opp'n at 40–41; Def. CVS Caremark's Mem. Opp'n at 33–34.) For

all these reasons, Defendants ask the Court to deny Plaintiffs' Motion with respect to these RFPs. (Def. Express Scripts' Mem. Opp'n at 37, 41; Def. CVS Caremark's Mem. Opp'n at 34.)

The Court finds that Plaintiffs' requests in RFP Nos. 13–14 and 38–40 are relevant. The PBM Defendants may be correct that rebate aggregators and GPOs cannot be parties injured by a breach of any fiduciary duty under Plaintiffs' claims, but it does not logically follow that the only information relevant to the alleged injuries resides in the nexus between the PBM Defendants and health plan customers, including governmental ones. Since the flow of payments for EAI devices is relevant to Plaintiffs' claims, the various directions where those payments flowed—and in what amounts—are also relevant because what the PBM Defendants did not pay to health plan customers, including governmental ones, or retain, is information needed to see the whole financial picture for EAI device payment flows. This big picture, in turn, gives meaningful information about how much of the EAI payments the PBM Defendants retained of the total, which can then become the ruler by which any breach of Defendants' fiduciary duty to customers can be measured. In other words, did the PBM Defendants say they would act in their customers' best interest, fail to do so, and conceal that failure? To answer this relevant question requires understanding how contracts apportioned payments, and to whom, and in what quantities, and whether the outcome (mis)aligned with what Defendants represented to customers. Thus, these RFPs are relevant.

Proportionality is a more difficult question, since Defendants rightly claim that the full picture of the flow of payments, including to rebate aggregators and GPOs, would bury

the Plaintiffs under a mountain of production containing virtually every contract the PBM Defendants have made. Given that the flow of payments is central to the issues in this case, and given that such payment information is most efficiently accessible to the PBM Defendants, the Court finds some production should be required of the PBM Defendants. The Defendants propose a limiting solution, and the Court agrees this narrowing presents a solution that is proportional to the needs of the case. Therefore, the PBM Defendants shall produce their contracts with CAPS between 2011–2018. Beyond this, the PBM Defendants shall also alphabetize rebate aggregators and GPOs with whom they had contracts between 2011–2018, and shall produce every third additional rebate aggregator's contracts during this same date duration until reaching ten percent of the total aggregators in this list, to provide Plaintiffs with enough data for useful benchmarking. The Court finds these representative contract samples offer a proportionate compromise to resolve this discovery dispute.

## V.    Discovery Disputes Between Plaintiffs and Some PBM Defendants

Plaintiffs also raise a few disputes specific to some, but not all, PBM Defendants. Specifically, Plaintiffs move to compel Defendants OptumRX and CVS Caremark to agree to Plaintiffs' proposed reasonable timeframe, and to supplement their initial productions. (Pls.' Mem. Supp. Mot. Compel Against OptumRX at 29–41; Pls.' Mem. Supp. Mot. Compel Against CVS Caremark at 27–34.) Plaintiffs also move to compel Defendant CVS Caremark to supplement its discovery responses to RFP Nos. 17 and 33-35 pertaining to government health plan documents, data, and reports. (Pls.' Mem. Supp. Mot. Compel Against CVS Caremark at 27–29.)

A.    **Plaintiffs' Disputes with OptumRX and CVS Caremark**

Plaintiffs argue that OptumRX and CVS Caremark should be compelled to produce documents within Plaintiffs' proposed reasonable timeframe, and to supplement their initial productions as required by the Rule 26(f) Report. (Pls.' Mem. Supp. Mot. Compel Against OptumRX at 29–41; Pls.' Mem. Supp. Mot. Compel Against CVS Caremark at 27–30.)

Regarding the parties' discovery timeframe dispute, Plaintiffs contend that their request for the PBM Defendants' production of documents spanning 2007–2018 is both relevant and proportional. Plaintiffs argue such dates capture the "before-and-after" of the alleged bribery and kickback scheme, including the negotiations regarding payment flows facilitating the scheme, and the alleged scheme's impact on the launch of generic EpiPen devices by both Mylan and Teva. (Pls.' Mem. Supp. Mot. Compel Against OptumRX at 30–31; Pls.' Mem. Supp. Mot. Compel Against CVS Caremark at 28–30.) Defendant OptumRX has agreed, without waiving its objections, to Plaintiffs' proposed timeframe. (Def. OptumRX's Mem. Opp'n at 37.) However, Defendant CVS Caremark asks the Court to deny Plaintiffs' Motion with respect to the discovery period Plaintiffs propose because the Motion is premature. (CVS Caremark's Mem. Opp'n at 36–37.) Defendant CVS Caremark argues that Plaintiffs failed to exhaust the meet-and-confer process negotiations on the relevant timeframe to limit discovery, and asks the Court to order such negotiations to continue. (*Id.*)

The Court finds that the requested period of 2007–2018 for the PBM Defendants' discovery disclosures is both relevant and proportional. The Court agrees that a proper

contextualization of the alleged bribery and kickback scheme is appropriate. *See Hodges v. Pfizer, Inc.*, No. 14-CV-4855 (ADM/TNL), 2015 WL 13804602, at \*3–4 (D. Minn. Dec. 17, 2015), *aff'd*, 2016 WL 1222229 (D. Minn. Mar. 28, 2016) (finding the relevant discovery timeframe permitted contextualizing the alleged violations). Here, Mylan first acquired rights to market the EpiPen in 2007, and Plaintiffs allege the PBM Defendants' violations, at least through their effects, continued until at least 2016. (Am. Compl. ¶¶ 15, 128.) Therefore, permitting a discovery period stretching as early as 2007, and encompassing a period through 2018 where the effects of the scheme may be viewed in light of newly competing generic EAI products on the market, appears most useful to resolving the issues that are central to the Plaintiffs' claims. This period also is proportional, given the sophistication and resources of the parties and the significant amount in controversy. Defendant CVS Caremark is therefore ordered to supplement its discovery productions accordingly.

Regarding the parties' initial productions dispute, Plaintiffs claim that Defendants OptumRX and CVS Caremark have failed to comply with the Rule 26(f) Report's initial disclosures which involved production of previous discovery in the *EpiPen ERISA* and *EpiPen MDL* cases. (Pls.' Mem. Supp. Mot. Compel Against OptumRX at 32–40.) Specifically, Plaintiffs seek initial productions from the *EpiPen MDL*, including Class Plaintiffs' and Mylan's subpoenas to OptumRX; correspondence relating to sample contracts produced to Mylan, and privilege logs. (*Id.* at 34–36.) From the *EpiPen ERISA* case, Plaintiffs seek initial productions that include the final search terms and custodians

used, details regarding OptumRX's identified production deficiencies, and any data produced identifying ERISA plan-based customers. (*Id.* at 36–40.)

Beyond these initial disclosure disputes, Plaintiffs also seek past *EpiPen MDL* deposition testimony in RFP No. 1, and past discovery responses, expert reports, and employee declarations from the *EpiPen ERISA* case in RFP Nos. 3–5. (*Id.* at 40–41; Pls.' Mem. Supp. Mot. Compel Against CVS Caremark at 34–35.) Additionally, from CVS Caremark, Plaintiffs seek descriptions of the discovery production parameters regarding data, and agreements made about discovery's scope. (Pls.' Mem. Supp. Mot. Compel Against CVS Caremark at 30–31.) Plaintiffs also ask CVS Caremark to produce inaccessible files from initial discovery in a format that Plaintiffs can access. (*Id.* at 33.)

Plaintiffs make some relevance and proportionality arguments to support these requests. They claim the past EpiPen cases, which include discovery about the rebates at issue in the instant case, provide a way to streamline discovery in the instant case, and that even if a few irrelevant documents are produced, the benefits of that efficiency far outweigh the burdens. (Pls.' Mem. Supp. Mot. Compel Against OptumRX at 40; Pls.' Mem. Supp. Mot. Compel Against CVS Caremark at 35 n.15.) Defendants object and contend that the information Plaintiffs seek has either already been produced, or need not be produced under the Rule 26(f) Report. (Def. OptumRX's Mem. Opp'n at 8–18; Def. CVS Caremark's Mem. Opp'n at 37–42.)

The Court finds that the information sought by Plaintiffs is relevant to Plaintiffs' claims involving EpiPen payment information contained in past EpiPen-related litigation. However, to the extent that Defendants claim they have already produced all discovery

responsive to the requirements of initial disclosures and the Plaintiffs' RFPs in question, the Court takes Defendants at their word. *See Prokosch*, 193 F.R.D. at 637. Therefore, the Court denies Plaintiffs' Motions with respect to the supplementation of initial disclosures or responses to RFP Nos. 1 and 3–5.

### B. Plaintiffs' Disputes with CVS Caremark Regarding RFP Nos. 17 and 33–35

Plaintiffs also move to compel Defendant CVS Caremark to supplement its responses to RFP Nos. 17 and 33–35, which relate to government health plan documents, data, and reports. (Pls.' Mem. Supp. Mot. Compel Against CVS Caremark at 27–29.) RFP No. 17 seeks a representative sample of the PBM Defendants' contracts with government health plans and their administrators. (Pls.' Express Scripts Ex. 2 at 41.) RFP No. 33 requests "[a]ll" documents for government health plans relating to placement and coverage for EAI devices, purchasing recommendations, or payments. (*Id.* at 72.) RFP No. 34 asks for "all" documents related to any EAI manufacturer payment. (*Id.* at 75.) Finally, RFP No. 35 seeks "[a]ll" information related to the money flow of rebates, prices, sales, and manufacturer payments for EAI devices for governmental health plans. (*Id.* at 76.)

Plaintiffs argue these RFPs seek relevant and proportional information. (Pls.' Mem. Supp. Mot. Compel Against CVS Caremark at 24–26.) The information is directly relevant, Plaintiffs allege, to their bribery and kickback claims, as well as mail and wire fraud claims. (*Id.*) Plaintiffs allege these requests are proportional because Defendants did not previously produce this information during past EpiPen-related litigation, so is not duplicative of the

instant case's initial disclosures, and beyond this, Defendant CVS Caremark has not raised cognizable objections under Federal Rule of Civil Procedure 26(b)(1). (*Id.* at 25.)

Defendant CVS Caremark responds that RFP Nos. 17 and 33–35 are premature, vague, overbroad, irrelevant, disproportionate, unduly burdensome, and duplicative. (Def. CVS Caremark's Mem. Opp'n at 27, 33–34.) Defendant CVS Caremark argues that it did, indeed, produce this information during the past EpiPen litigation, objects to Plaintiffs' enormous request for "the contents of all databases," and states that the parties' meet-and-confers had not reached an impasse when Plaintiff abruptly brought these Motions—after failing to confer with CVS Caremark on these RFPs since July 2021. (*Id.* at 34.)

The Court agrees with Plaintiffs that these RFPs seek information relevant to Plaintiffs' claims relating to bribery and kickbacks. In addition to being relevant, some information sought in these RFPs is proportional. *See* Fed. R. Civ. P. 26(b)(1). The Court again observes that the parties are sophisticated and able to anticipate new burdens and expenses to litigation beyond simply reproducing their productions from past EpiPen-related cases. The issues raised in these RFPS—and their resolution—are central to Plaintiffs' bribery, kickback, and mail and wire fraud claims in a case with a significant amount in controversy. The representative sample of contracts at issue are accessible to Defendants and most efficiently produced by them. Therefore, the Court finds the benefit of requiring this production outweighs any costs or burdens such production imposes, and Defendant shall supplement their productions regarding these RFPs. However, Defendant CVS Caremark is correct that the entire contents of databases are disproportionate to the needs of the case. Instead, Defendant CVS Caremark shall produce any library of the

contents of databases that exists for databases containing payment information for manufacturers and customers during the period from 2011–2018.

## VI.     Plaintiffs' and PBM Defendants' Requests for Costs and Fees

Plaintiffs and the PBM Defendants have asked for an award of costs and fees pursuant to Federal Rule of Civil Procedure 37(a)(5). When a motion to compel is granted, a court should not order the payment of expenses when (1) the movant did not attempt to obtain the discovery without court involvement; (2) the opposition party's position was substantially justified; or (3) an award would be unjust. Fed. R. Civ. P. 37(a)(5). Here, given the parties' multiple—albeit problematic—attempts to meet and confer, and because the Court grants in part and denies in part Plaintiffs' Motion, the Court finds that an award of expenses would be unjust. Each side will bear their own fees and expenses.

Accordingly, based on all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Plaintiffs Rochester Drug Co-Operative, Inc. and Dakota Drug, Inc.'s First Motion to Compel Defendants Express Scripts, Inc. and Medco Health Solutions, Inc. (Dkt. No. 172) is **GRANTED** in part and **DENIED** in part as set forth above;

2. Plaintiffs Rochester Drug Co-Operative, Inc. and Dakota Drug, Inc.'s First Motion to Compel Defendants OptumRX, Inc. (Dkt. No. 181) is **GRANTED** in part and **DENIED** in part as set forth above;

3. Plaintiffs Rochester Drug Co-Operative, Inc. and Dakota Drug, Inc.'s First Motion to Compel Defendants Caremark PCS Health, L.L.C., Caremark, L.L.C., and Caremark Rx, L.L.C. (Dkt. No. 190) is **GRANTED** in part and **DENIED** in part as set forth above;

4. The parties' requests for an award of fees and costs are **DENIED**; and

5. This Order shall be unsealed in its entirety 30 days from the date it is filed, unless the parties show in writing good cause to keep specific portions of the Order under seal. Accordingly, the parties shall promptly meet and confer regarding any redactions that may be required to protect confidential information referred to in this Order, and shall submit a joint letter and proposed redacted order within 14 days from the date this Order is filed, identifying with specificity what redactions they believe are required and the basis for those redactions.

Dated: December 7, 2021                    *s/ John F. Docherty*
                                           JOHN F. DOCHERTY
                                           United States Magistrate Judge