UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

In re: EpiPen Direct Purchaser Litigation                     File No. 20-cv-0827 (ECT/JFD)

THIS DOCUMENT RELATES TO:                          **OPINION AND ORDER**
ALL ACTIONS

Noah Silverman, Bruce E. Gerstein, Jonathan M. Gerstein, and Joseph Opper, Garwin Gerstein & Fisher LLP, New York, NY; David F. Sorenson, Caitlin G. Coslett, Andrew C. Curley, and John Parron, Berger Montague PC, Philadelphia, PA; E. Michelle Drake, Berger & Montague PC, Minneapolis, MN; David S. Golub and Steven Bloch, Silver Golub & Teitell LLP, Stamford, CT; Susan C. Segura, David C. Raphael, Jr., and Erin R. Leger, Smith Segura & Raphael, LLP, Alexandria, LA; Russell Chorush and Eric Enger, Heim Payne & Chorush LLP, Houston, TX; Christopher M. First, Houston, TX; Joseph T. Lukens and Peter Kohn, Faruqi & Faruqi, LLP, Philadelphia, PA; Stuart Des Roches, Andrew Kelly, Amanda Leah Hass, Chris Letter, Dan Chiorean, and Thomas Maas, Odom & Des Roches, LLC, New Orleans, LA, for Plaintiffs Rochester Drug Co-Operative, Inc., and Dakota Drug, Inc.

Adam K. Levin, Anthony Ufkin, Carolyn A. DeLone, Christine A. Sifferman, Elizabeth Jose, Justin Bernick, Kathryn Marshall Ali, Charles A. Loughlin, and David M. Foster, Hogan Lovells US LLP, Washington, DC; Peter H. Walsh, Hogan Lovells US LLP, Minneapolis, MN; and Katherine Booth Wellington, Hogan Lovells US LLP, Boston, MA, for Defendants Mylan Inc. and Mylan Specialty L.P.

Adithi S. Grama, Craig D. Singer, Daniel M. Dockery, Enu A. Mainigi, Williams & Connolly LLP, Washington, DC, and John W. Ursu and Isaac B. Hall, Faegre Drinker Biddle & Reath LLP, Minneapolis, MN, for Defendants Caremark PCS Health LLC, Caremark LLC, Caremark Rx LLC, and CVS Caremark Part D Services, LLC.

Donald G. Heeman, Jessica J. Nelson, and Randi J. Winter, Spencer Fane LLP, Minneapolis, MN; Jonathan Gordon Cooper, Michael John Lyle, Eric Christopher Lyttle, and Samel Johnson, Quinn Emanuel Urquhart & Sullivan LLP, Washington, DC, for Defendants Express Scripts Inc. and Medco Health Solutions Inc.

Kadee Jo Anderson and Andrew Glasnovich, Stinson LLP, Minneapolis, MN; Elizabeth Broadway Brown, David Andrew Hatchett, Bradley Harder, and Jordan Elise Edwards, Alston & Bird LLP, Atlanta, GA; Brian David Boone and Brandon C.E. Springer, Alston & Bird LLP, Charlotte, NC, for Defendants OptumRX Inc. and United Healthcare, Inc.

This is the second Motion to Dismiss this putative class action alleging a conspiracy to fix the prices of EpiPen, an epinephrine auto-injector ("EAI") with a ninety-plus percent market share.[1]  Familiarity with relevant facts[2] and procedural history from the previous opinion addressing the first motion to dismiss is assumed.  ECF No. 125.

Plaintiffs are two drug wholesalers, Rochester Drug Co-Operative, Inc., and Dakota Drug, Inc., that purchase Epi-Pens directly from the manufacturers of the devices, Defendants Mylan Inc. and Mylan Specialty L.P. (collectively, "Mylan").  Plaintiffs allege that Mylan paid bribes and kickbacks to a group of pharmacy benefit managers—referred to collectively as CVS Caremark, Express Scripts, and OptumRx (or "PBM Defendants")[3]—to ensure that Mylan could raise the price of the EpiPen while keeping a monopoly share of the market.

After Defendants' initial motions to dismiss were granted in part and denied in part [ECF No. 125], Plaintiffs amended their complaint.  The First Amended and Consolidated Class Action Complaint ("1st Am. Compl.") [ECF No. 271], purports to raise four claims

---

[1]     The term "EpiPen" refers collectively to a group of Mylan products that encompasses the EpiPen, EpiPen Jr., EpiPen 2-Pak, and EpiPen Jr. 2-Pak.  *See* 1st Am. Compl. ¶ 1.  Auto-injector devices "allow a patient to quickly self-administer a prescribed amount of the drug epinephrine through a spring-loaded needle."  *Id.* ¶¶ 2, 42–43.  EAIs like the EpiPen are used as "an emergency treatment for severe allergic reactions."  *Id.*

[2]     In accordance with the standards governing a motion under Rule 12(b)(6), the facts are drawn entirely from Plaintiffs' first amended complaint.  *See Gorog v. Best Buy Co.*, 760 F.3d 787, 792 (8th Cir. 2014).

[3]     Each of these three sets of PBM Defendant groups consist of PBMs and their corporate parents.

against the original Defendants as well as two newly named Defendants on behalf of a putative class.  Counts One and Two assert that all Defendants violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c).  Count Three alleges that Mylan violated the Sherman Antitrust Act, 15 U.S.C. § 2.  Count Four contends that all Defendants violated the Sherman Act's § 1.

Defendants once again move to dismiss many of Plaintiffs' claims.  They reassert some arguments raised previously, namely that Plaintiffs' antitrust claims are time-barred and that the claims against the PBMs' corporate parent entities should be dismissed, and they again challenge some of the predicate acts that form the basis of Plaintiffs' RICO claims.  Defendants also seek dismissal of Plaintiffs' newly raised claim under § 1 of the Sherman Act, contending that Plaintiffs have not plausibly alleged the elements of an antitrust conspiracy.  Defendants do not again move to dismiss the § 2 claim (other than arguing that it may be untimely, as discussed below), and their arguments regarding predicate acts do not mandate dismissal of the RICO claims in their entirety.

At the outset, there is no dispute that the previous determination regarding the timeliness of Plaintiffs' Sherman Act § 2 claim applies with equal force to the newly raised Sherman Act § 1 claim.  Mot. to Dismiss Hr'g Tr. [ECF No. 404] at 30.  The prior order found that the Sherman Act's four-year limitations period begins to run when the alleged wrongful act occurs, not when the plaintiff becomes aware of the injury.  ECF No. 125 at 16–17.  Plaintiffs allege that Defendants' scheme began in 2012, and thus the initial antitrust injury, at least, falls outside the statute of limitations.  *Id.* at 17.  The previous decision also made clear that Plaintiffs had not sufficiently pleaded equitable tolling for

3

Plaintiffs' original Sherman Act claim, and that holding applies equally to the newly asserted antitrust claim.  *Id.* at 18.  Because Plaintiffs could save some aspects of their Sherman Act claims with evidence of continuing violations, a final decision on the timeliness of the antitrust claims will be postponed until such discovery can be taken.  Thus, as before, until summary judgment, "the statute of limitations does not provide a basis to dismiss Plaintiffs' antitrust claims in their entirety."  *Id.* at 20.  This aspect of the motion will be denied without prejudice.

The remainder of the motion to dismiss, however, will be granted.  Plaintiffs have not alleged a plausible basis for holding either the previously dismissed or newly named corporate parents of the PBMs liable.[4]  Nor have Plaintiffs plausibly asserted their Sherman Act § 1 claim.  Finally, Plaintiffs' invocation of the Anti-Kickback Statute and West Virginia's bribery statute as violations of the Travel Act and therefore actionable RICO predicates fails because these statutes define bribery more broadly than does the Travel Act.

I

As discussed in detail in the previous order, this case involves drug formularies, which are lists of drugs that health insurance companies agree to cover for their insureds. PBMs act as the middlemen in the prescription-drug process, not purchasing or selling those drugs but rather performing functions such as (1) negotiating with manufacturers to

---

[4]     The newly named Defendants are CVS Caremark Part D Services, LLC, and United Healthcare, Inc.  1st Am. Compl. ¶¶ 21, 32.  Defendants do not challenge the addition of Caremark Part D Services, but contend that United Healthcare, Inc., should be dismissed. Mem. in Supp. [ECF No. 317] at 25 n.5.

obtain rebates that offset the list prices of drugs; and (2) "designing, developing and managing formularies and formulary compliance programs." 1st Am. Compl. ¶ 54. Drug manufacturers are understandably eager to tap into health insurers' formularies, given the number of consumers those plans cover. And because formularies set the specific drugs that plan participants can receive, they can and often do favor some drugs over others. *See id.* ¶ 4.

Plaintiffs argue that Mylan's eagerness for preferential placement on formularies led Mylan to pay substantial kickbacks, or bribes, to Defendant PBMs in exchange for EpiPen's preferential placement on the formularies these PBMs administered. *Id.* ¶ 3. According to Plaintiffs, rather than lowering costs for their clients as PBMs claim to do, these concerted activities ultimately doubled or nearly tripled the list price of EpiPens. *Id.* ¶ 9. While such price increases might have been expected to lead drug wholesalers such as Plaintiffs to purchase EpiPen's competitors' products, Plaintiffs claim that the PBMs bolstered Mylan's market share by not including competitive products on their formularies or giving those products less preferential formulary placement in exchange for the kickbacks.

The PBMs benefitted from EpiPen's rising prices because the alleged kickbacks they received were generally calculated as a percentage of the EpiPen's wholesale price. *Id.* ¶ 102. Plaintiffs also allege that whereas PBMs had historically passed savings like these on to their clients, the PBM Defendants began to keep more of the increased fees for themselves. *Id.* ¶ 101. Mylan, in turn, used its list-price increases to recoup the costs of its increasing payments to the PBMs, and its operating profit increased by almost 150%

between 2012 and 2016. *Id.* ¶ 123, 125. Plaintiffs, who paid the list price for EpiPens, were left to bear the burden of these steep price increases. *See id.* ¶ 45.

## II

In reviewing a motion to dismiss for failure to state a claim under Rule 12(b)(6), a court must accept as true all of the factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *Gorog v. Best Buy Co.*, 760 F.3d 787, 792 (8th Cir. 2014) (citation omitted). Although the factual allegations need not be detailed, they must be sufficient to "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted). The complaint must "state a claim to relief that is plausible on its face." *Id.* at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## III

To establish a civil RICO claim, a plaintiff must show that that the defendant "engaged in '(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.'" *H & Q Props., Inc. v. Doll*, 793 F.3d 852, 856 (8th Cir. 2015) (quoting *Nitro Distrib., Inc. v. Alticor, Inc.*, 565 F.3d 417, 428 (8th Cir. 2009)). Only the last element—racketeering activity—is at issue in this motion.

Plaintiffs must allege "two or more related acts of racketeering activity that 'amount to or pose a threat of continued criminal activity.'" *Crest Const. II, Inc. v. Doe*, 660 F.3d 346, 356 (8th Cir. 2011) (quoting *Nitro Distrib.*, 565 F.3d at 428). What constitutes these

so-called "predicate acts," *id.*, is set forth in exhaustive detail in the statute. *Beck v. Prupis*, 529 U.S. 494, 497 n.2 (2000); *see* 18 U.S.C. § 1961(1).   Defendants' motion argues that two of the predicate acts Plaintiffs allege are not cognizable under RICO:  (1) violation of the federal Travel Act through the violation of the federal Anti-Kickback Statute, *see* 18 U.S.C. § 1961(1)(B); 42 U.S.C. § 1320a-7b(b)(1)–(2); and (2) violation of West Virginia Code § 47-11A-3.   1st Am. Compl. ¶¶ 229–33.   Defendants do not challenge the alleged predicate acts of mail and wire fraud or the bribery statutes of multiple other states. [5]   *Id.* ¶¶ 235–45.

## A

Defendants' first motion to dismiss nominally challenged Plaintiffs' theory that a violation of the Anti-Kickback Statute ("AKS") counts as "bribery . . . in violation of the laws of . . . the United States" within the meaning of the Travel Act, which is an enumerated RICO predicate act. [6]  18 U.S.C. § 1952(b)(i)(2).   The order denying the motion noted that Plaintiffs' theory "seem[ed] plausible" but that Defendants had neither

---

[5]     Plaintiffs plead violations of sixteen state bribery statutes as direct RICO predicates. 1st Am. Compl. ¶¶ 192–208.   These states are: Alabama, Arizona, California, Connecticut, Florida, Illinois, Michigan, Minnesota, Mississippi, Missouri, New Jersey, Rhode Island, Texas, Utah, Virginia, and Washington.   Plaintiffs add violations of the statutes of these and four other states—Arkansas, Indiana, Pennsylvania, and West Virginia—as RICO predicates through the Travel Act.   *Id.* ¶¶ 209–28.

[6]     For the same reasons that apply to their challenge to the AKS as a RICO predicate, Defendants also challenge Plaintiffs' newly pled averment that West Virginia's unfair trade practices law, W. Va. Code § 47-11A-3, is a RICO predicate through the Travel Act's bribery prohibition.

"meaningfully challenged" nor fully briefed the issue.  ECF No. 125 at 32.  The previous decision left "the 'bribery' question for another day."  *Id.*

Plaintiffs first complain that Defendants' current motion is an impermissible attempt at a "do-over" on the bribery issue.  But there are two new Defendants in the case who had no opportunity to raise this issue previously.  *See* Fed. R. Civ. P. 12(g)(2) (stating that "a party that makes a motion under this rule must not make another motion under this rule raising a defense or objection that was *available to the party* but omitted from its earlier motion") (emphasis added).  Moreover, as Defendants note, Defendants could raise this issue at any time through a motion for judgment on the pleadings under Rule 12(h).  Even if Rule 12(g)(2) applied, practical considerations would warrant considering this issue now, when it has been fully briefed and argued, rather than forcing the parties to brief and argue the issue later.  *See RocketPower, Inc. v. Strio Consulting, Inc.*, No. 19-CV-1928 (ECT/BRT), 2019 WL 5566548, at *4 (D. Minn. Oct. 29, 2019) ("As a practical matter then, denying [defendant's] motion on the basis of Rule 12(g)(2) probably would just delay consideration of the same issues [defendant] raises now.").  As indicated at the hearing, the merits of Defendants' arguments will be considered.  Mot. to Dismiss Hr'g Tr. at 30.

B

One of RICO's enumerated predicate acts is the Travel Act, 18 U.S.C. § 1952(a). *See* 18 U.S.C. § 1961(1)(B).  As relevant here, the Travel Act prohibits certain "unlawful activity" with a federal nexus—such as use of the mail or interstate commerce.[7]  18 U.S.C.

---

[7]      The Travel Act also defines "unlawful activity" as "bribery . . . in violation of the laws of the State in which committed."  18 U.S.C. § 1952(b)(2).  As noted, Plaintiffs allege

§ 1952(a).  "[U]nlawful activity," for purposes of the Travel Act, includes "bribery . . . in violation of the laws of . . . the United States."  *Id.* § 1952(b)(i)(2).  The AKS in turn makes it a crime to "knowingly and willfully solicit[] or receive[] any remuneration (including any kickback, bribe, or rebate) . . . in return for . . . recommending purchasing . . . any good . . . for which payment may be made in whole or in part under a Federal health care program."  42 U.S.C. § 1320a-7b(b)(1).

According to Plaintiffs, Mylan's payments to the PBM Defendants amounted to "bribery . . . in violation of the" AKS and were therefore "unlawful activity" under the Travel Act.  Plaintiffs allege that Defendants' violation of the Travel Act through the AKS forms a predicate act for purposes of a civil RICO claim.  1st Am. Compl. ¶ 229.

Plaintiffs' theory succeeds only if the definition of bribery under the Travel Act is coextensive with the definition of bribery under the AKS.  Defendants urge the Court to engage in a "modified categorical" analysis usually used to determine whether a crime constitutes a crime of violence within the meaning of the Armed Career Criminal Act ("ACCA").  Plaintiffs believe that such an analysis is inappropriate, arguing that only the statutory language need be considered:  the Travel Act criminalizes "bribery . . . in violation of the laws of the United States," and the federal AKS criminalizes "bribery" in the context of federal health-care programs.

Supreme Court precedent forecloses Plaintiffs' argument.  A criminal statute such as RICO that lists offenses in generic language, such as "murder" or "rape" or, for our

---

as RICO predicates Defendants' violations of the Travel Act through their alleged violation of the bribery laws of twenty States.  *See supra* n.5.

purposes, "bribery," "must refer to generic crimes." *Nijhawan v. Holder*, 557 U.S. 29, 37 (2009). But even without this general precept, we know that bribery under the Travel Act means generic bribery, because the Supreme Court said explicitly that. *Perrin v. United States*, 444 U.S. 37, 49 (1979) (holding that bribery in the Travel Act carries its "generic definition . . . , rather than a narrow common-law definition."). In *Perrin*, the Court determined that, while common-law bribery involved only bribery of public officials, "by the time the Travel Act was enacted in 1961, federal and state statutes had extended the term bribery well beyond its common-law meaning." *Id.* at 43. The Court thus held that Travel-Act bribery was the generic version of bribery, which "included the bribery of individuals acting in a private capacity." *Id.* at 45, 50.

The Supreme Court's reference to the "generic definition" of bribery is notable because "[w]hen a federal scheme incorporates state law, whether a state-law violation qualifies as a federal predicate depends on whether the state offense falls within that crime's generic definition." *United States v. Ferriero*, 866 F.3d 107, 115 (3d Cir. 2017). This principle also holds when the predicate is another violation of federal law: whether a different federal crime qualifies as a federal predicate for the Travel Act depends on whether that violation falls within the generic definition of the crime. Put another way, whether bribery in violation of the AKS constitutes bribery under the Travel Act—and is thereby a RICO predicate—depends on whether bribery under the AKS falls within the generic definition of bribery.

Although *Perrin* did not set out the precise parameters of the "generic definition" of bribery for purposes of the Travel Act, the opinion offers some hints at what the Supreme

10

Court considered part of that definition.  Not only does generic bribery include payments to public or private individuals "to influence their actions," but it also applies to payments that corrupt "relations which are recognized in a society as involving special trust." *Perrin*, 444 U.S. at 46, 45 n.11.  Cases discussing the generic definition of bribery under the Travel Act emphasize that this definition "reasonably includes" the element of "special trust." *Ferriero*, 866 F.3d at 123.

This "special trust" element is lacking in bribery under the AKS.  A violation of the AKS requires proof of six elements, none of which is a "special trust" or other fiduciary relationship.  ECF No. 125 at 32–33.  A "crime cannot qualify as a [Travel Act] predicate if its elements are broader than those of a listed generic offense."  *Mathis v. United States*, 136 S. Ct. 2243, 2251, 579 U.S. 500 (2016).  Bribery under the AKS is broader than generic bribery under the Travel Act.

Plaintiffs rely heavily on two cases from the Central District of California to argue that a special-trust relationship is not required to constitute bribery under the Travel Act. *United States v. Gross*, 370 F. Supp. 3d 1139 (C.D. Cal. 2019); *United States v. Rogers*, 389 F. Supp. 3d 774 (C.D. Cal. 2019).  *Gross* found that California's anti-kickback statutes were "bribery" under the Travel Act, but those statutes criminalized the "use [of a] position of trust to influence another . . . for the purpose of financially benefitting a third party." *Gross*, 370 F. Supp. 3d at 1150.  The California laws thus contained the special-trust element of generic bribery.

Plaintiffs point out that *Gross* and *Rogers* held specifically that the "categorical approach" to examining statutory predicates does not apply to the Travel Act.  *E.g.*, *Rogers*,

11

389 F. Supp. 3d at 785.  These two decisions draw a distinction between statutes such as the ACCA, which focus on the elements of a defendant's prior convictions, with the Travel Act, which focuses "on the 'unlawful activity' of the defendant."  *Id.* at 791.  Because the Travel Act references "unlawful activit[ies]" rather than any specific elements, the reasoning goes, it "completely foreclose[s] the application of the elements-based categorical approach."  *Id.*

I respectfully disagree with that determination.  As the Supreme Court made clear, a criminal statute that enumerates covered offenses by listing those offenses—"burglary" in the ACCA, "extortion, bribery, or arson" in the Travel Act—"must refer to generic crimes."[8] *Nijhawan*, 557 U.S. at 37.  And the Supreme Court has specified what constitutes "bribery" under the Travel Act:  generic bribery, which includes the element of a special trust.  *Perrin*, 444 U.S. at 46, 45 n.11.

According to the *Rogers* court, the Supreme Court in *Perrin* and *United States v. Nardello*, 393 U.S. 286 (1969), another Travel Act case, focused on the defendants' conduct, not on categorical definitions of the underlying offenses.  *Rogers*, 389 F. Supp. 3d at 791–92.  But the Supreme Court's discussion of relevant conduct in *Perrin* and *Nardello* was in the context of determining whether the state statutes criminalizing that conduct were Travel Act predicates, not whether the conduct violated the Travel Act itself.  So, in *Perrin*, the Court focused on the fact that the defendants were not public officials.

---

[8]  *Nijhawan* contrasted the listing of offenses that refer to generic crimes with other criminal statutes that "call for circumstance-specific application," such as a statute proscribing certain conduct "if committed for commercial advantage."  *Nijhawan*, 557 U.S. at 38 (quoting 8 U.S.C. § 1101(a)(43)(K)(ii)).

444 U.S. at 40.  The Court did so in order to establish that the relevant state statute that criminalized defendants' conduct—by proscribing commercial bribery—fit within the generic definition of bribery.  *See id.* at 39 n.3 (Louisiana's commercial bribery statute). Moreover, *Perrin* and *Nardello* predate the modern development of the categorical approach by one to two decades.  Should the Supreme Court be faced with determining this issue today, there is little doubt that it would follow its now well-established approach of examining the requirements of the statutes involved, not the details of the underlying conduct.

Because bribery under the AKS is broader than Travel Act bribery, it cannot form a predicate act for Plaintiff's RICO claims.  This conclusion necessarily means that the West Virginia statute Plaintiffs invoke as a Travel Act predicate is not one.  Defendants' motion to dismiss these RICO predicates will be granted.

IV

The only new claim in the amended pleading alleges that all Defendants violated § 1 of the Sherman Act, which provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."  15 U.S.C. § 1.  "To demonstrate a violation of section 1 of the Sherman Act, a plaintiff must provide proof of an illegal contract, combination, or conspiracy which results in an unreasonable restraint of trade."  *Double D Spotting Serv., Inc. v. Supervalu, Inc.,* 136 F.3d 554, 558 (8th Cir. 1998).

There are two types of restraint for purposes of § 1.  A restraint may be horizontal— a classic example is direct competitors agreeing to fix prices—or it may be vertical,

13

between actors in different levels of a market.  *See Bus. Elecs. Corp. v. Sharp Elecs. Corp.,* 485 U.S. 717, 730 (1988) ("Restraints imposed by agreement between competitors have traditionally been denominated as horizontal restraints, and those imposed by agreement between firms at different levels of distribution as vertical restraints."). Plaintiffs assert that they have alleged both a horizontal restraint among all Defendants and vertical restraints between Mylan and each Defendant PBM.

A

A horizontal restraint is one that has "no purpose except stifling of competition." *United States v. Topco Assocs.*, 405 U.S. 596, 608 (1972).  Such a restraint is illegal per se, and Plaintiffs allege this per se illegality here.  1st Am. Comp. ¶ 297.  "[T]o succeed in their claims of per se antitrust violations, [Plaintiffs] must show that [Mylan] was in direct competition with [the PBMs] and that it was taking steps with its co-conspirators to restrain trade."  *Nitro Distrib., Inc. v. Alticor, Inc.*, 565 F.3d 417, 424 (8th Cir. 2009).

Plaintiffs do not dispute that the horizontal conspiracy they allege can only be established through a "hub and spoke" model, in which Mylan is the center of the "wheel" and each PBM is on the rim, connected to Mylan through a "spoke."  Defendants insist that Plaintiffs must also show that each PBM agreed with the other PBMs, forming a "rim" on the "wheel" of the antitrust conspiracy.  Plaintiffs assert that such a "rim" allegation is unnecessary, and that Eighth Circuit precedent allows such a "rimless wheel" antitrust conspiracy. *See Dickson v. Microsoft Corp.*, 309 F.3d 193, 203 (4th Cir. 2002) ("A rimless wheel conspiracy is one in which various defendants enter into separate agreements with a common defendant, but where the defendants have no connection with one another, other

14

than the common defendant's involvement in each transaction."); *see also Impro Prods., Inc. v. Herrick*, 715 F.2d 1267, 1279 n.14 (8th Cir. 1983) (assuming without deciding that rimless wheel conspiracy could be cognizable under § 1).

An early case discussing a hub-and-spoke criminal conspiracy held that a conspiracy "of separate spokes meeting at a common center . . . without the rim of the wheel to enclose the spokes" was not "a single conspiracy, but . . . several [conspiracies]." *Kotteakos v. United States*, 328 U.S. 750, 755 (1946). The indictment in *Kotteakos* charged a single criminal conspiracy against more than thirty defendants. *Id.* at 766. But the evidence established multiple conspiracies with the same individual at the center and the other defendants at the rim, with no conspiracy among the individuals at the rim. *Id.* The Supreme Court determined that the "rim" defendants' convictions for a single conspiracy could not stand. *See id.* at 772 ("Guilt with us remains individual and personal, even as respects conspiracies.").[9]

Plaintiffs' reliance on *Impro Products* for their argument to the contrary is misplaced for a number of reasons. Although the *Impro Products* court "believe[d]" that a rimless-wheel conspiracy was cognizable under § 1 of the Sherman Act, it did not determine the issue because the evidence was insufficient to establish such a conspiracy. 715 F.2d at 1279 n.14. Another Judge in this District noted that the *Impro Products* court

---

[9]     Although *Kotteakos* noted that the harmless-error analysis for criminal and civil conspiracies might lead to different results, it did not explicitly or implicitly endorse the notion that a "rimless wheel" conspiracy was cognizable in the civil-conspiracy context. *E.g.*, *id.* at 762–63; *cf. Impro Prods.*, 715 F.2d at 1279 n.14 (suggesting that *Kotteakos* "indicated that such a [rimless-wheel] theory might be used in a civil case"); *see also Dickson*, 309 F.3d at 204 n.13 (discussing *Impro*'s misreading of *Kotteakos*).

declined to find any rimless-wheel conspiracy "because the record showed that the spokes did not communicate with each other about" the alleged scheme and did not know about the alleged scheme until after the filing of the lawsuit. *Target Corp. v. LCH Pavement Consultants, LLC*, No. 12-cv-1912 (JNE/JJK), 2013 WL 2470148, at *6 n.4 (D. Minn. June 7, 2013) (emphasis omitted). There is no allegation here that any Defendant PBM knew of Mylan's agreements with other PBMs or communicated with the other Defendant PBMs about the alleged conspiracy or even EpiPen rebates or pricing generally.

*Impro Products* relied on two decisions for its statement regarding the cognizability of the rimless-wheel theory: *Elder-Beeman Stores Corp. v. Federated Dep't Stores, Inc.*, 459 F.2d 138, 146–47 (6th Cir. 1972); and *Harlem River Consumers Coop., Inc. v. Assoc. Grocers of Harlem, Inc.*, 408 F. Supp. 1251, 1279 (S.D.N.Y. 1976). Both decisions are no longer good law. The Sixth Circuit Court of Appeals, although not explicitly overruling *Elder-Beeman*, has more recently held that to establish a hub-and-spoke antitrust conspiracy, "the critical issue . . . is how the spokes are connected to each other . . . ." *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 436 (6th Cir. 2008). And the Second Circuit Court of Appeals has similarly held that a hub-and-spoke conspiracy requires proof of a horizontal agreement, that is, an agreement on the "rim" of the wheel. *PepsiCo, Inc. v. Coca-Cola, Co.*, 315 F.3d 101, 110–11 (2d Cir. 2002). Indeed, "[o]ther circuits have uniformly held rimless hub-and-spokes conspiracies do not violate § 1 of the Sherman Act." *Target Corp.*, 2013 WL 2470148, at *6 (citing decisions from Second, Third, Fourth, Fifth, and Sixth Circuit Courts of Appeals).

Plaintiffs concede that, should the *Target Corp.* decision quoted above be followed here, their hub-and-spoke conspiracy claim fails. They nevertheless argue that they have sufficiently alleged knowledge on the part of each Defendant PBM that Mylan was paying similar rebates to the other PBMs for purposes of the § 1 conspiracy. 1st Am. Comp. ¶ 295. Defendants' knowledge is insufficient to plausibly plead the hub-and-spoke conspiracy Plaintiffs allege. *See Twombly*, 550 U.S. at 556 ("lawful parallel conduct fails to bespeak unlawful agreement"). Mere knowledge of the existence of other PBMs' agreements with Mylan does not constitute an agreement under § 1. *Id.* at 557 ("A statement of parallel conduct, even conduct consciously undertaken, needs some setting suggesting the agreement necessary to make out a § 1 claim . . . ."). Without an allegation of such an agreement, Plaintiffs' hub-and-spoke conspiracy claim fails.

Given that the parties have begun the discovery process and Plaintiffs were unable to allege any horizontal agreement among Defendant PBMs, and the Plaintiffs did not ask permission to re-plead, the dismissal of this aspect of Plaintiffs' § 1 claim will be with prejudice. *Pet Quarters, Inc. v. Depository Tr. & Clearing Corp.*, 559 F.3d 772, 778 (8th Cir. 2009).

B

Vertical restraints, like those Plaintiffs allege between Mylan and each Defendant PBM separately, result from agreements among "combinations of persons at different levels of the market structure, *e.g.,* manufacturers and distributors." *United States v. Topco Assocs.*, 405 U.S. 596, 608 (1972). "Vertical nonprice restrictions are governed by the rule

17

of reason and are not per se violations . . . ." *Double D*, 136 F.3d at 559; *see also* 1st Am. Compl. ¶ 298 (asserting a § 1 illegal restraint of trade under the rule of reason).

The "rule of reason" requires a factfinder to determine "whether the questioned practice imposes an unreasonable restraint on competition." *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997). "This 'rule of reason' analysis involves an inquiry into the market structure and the defendant's market power in order to assess the actual effect of the restraint." *Double D*, 136 F.3d at 558. A plaintiff must first allege "a valid relevant market . . . to determine whether the arrangement amounts to an unreasonable restraint of trade within the meaning of section 1 of the Sherman Act." *Id.* at 560. A plaintiff must also plead the alleged restraint's effect on competition in that market, because "proof that defendant's activities had an impact upon competition in the relevant market is an absolutely essential element of the rule of reason case." *Ryko Mfg. Co. v. Eden Servs.*, 823 F.2d 1215, 1231 (8th Cir. 1987) (cleaned up). Ultimately, to succeed in challenging a vertical restraint, a plaintiff must plead and "prove the defendant's substantial market power in a relevant market," *Assam Drug Co. v. Miller Brewing Co.*, 798 F.2d 311, 316 (8th Cir. 1986), because without substantial market power, the defendant's activities could not have anticompetitive effect.

Plaintiffs have alleged that Mylan had virtual monopoly power over the EAI market. But the relevant market for Plaintiffs' claim against the PBM Defendants is the PBM market, not the EAI market. *Cf.* 1st Am. Comp. ¶ 276 ("[T]he relevant product market at issue in this case is EAIs."). PBM Defendants have no power in the EAI market. *See Dickson*, 309 F.3d 208. In *Dickson*, a computer manufacturer asserted Sherman Act § 1

18

claims against two rival computer manufacturers, Compaq and Dell, and a software manufacturer, Microsoft. Having first determined that the plaintiff's allegations of a "rimless wheel" conspiracy could not sustain the § 1 claim, the Fourth Circuit next examined whether the allegations, "if proven true, would establish that the [individual] conspiracies separately imposed unreasonable restraints of trade in interstate commerce." *Id.* at 205. Even though it was undisputed that Microsoft had 80 to 90% of the computer-software market, the plaintiff's failure to allege that defendant computer manufacturers had substantial market power meant that the plaintiff was "unable, as a matter of law, to demonstrate that Microsoft's agreements with Compaq and Dell, *when considered individually*, [were] capable of causing any substantial harm to competition." *Id.* at 208 (emphasis added). As in *Dickson*, the PBM Defendants' power in the PBM market is "critical in the analysis" because their "ability to influence competition in the relevant [EAI] markets through their separate agreements with [Mylan] is dependent on their ability to influence competition in the [PBM] market." *Id.* at 207 n.18.

Each PBM Defendant has a PBM market share of 30% or less. 1st Am. Compl. ¶ 60. Such a market share is insufficient as a matter of law to establish "substantial market power" on the part of the individual PBM Defendants. *See McWane, Inc. v. FTC*, 783 F.3d 814, 837 (11th Cir. 2015) ("Traditionally a foreclosure percentage of at least 40% has been a threshold for liability . . . ."). Without that substantial market power, Plaintiffs cannot demonstrate the gravamen of any antitrust claim: harm to competition from the alleged agreements between Mylan and each PBM Defendant. Put differently, they cannot show that rival EAI manufacturers' access to any of these PBM Defendants individually hindered

19

those manufacturers' ability to compete in the EAI market or "denied them access to a significant number of consumers" of EAIs. *Dickson*, 309 F.3d at 208.

Plaintiffs seem to understand the difficulty the market-share requirement poses for their § 1 claim. They contend, however, that Defendants have it wrong, that the relevant market share is the market share of these PBM Defendants in aggregate, not individually.[10] Plaintiffs' position is unsupported by relevant legal authority. Indeed, as Defendants point out, all of the cases on which Plaintiffs rely focus on market power of the entity analogous to Mylan, not on the aggregate market power of the entities analogous to the PBM Defendants.

Plaintiffs' reliance on the Eight Circuit's opinion in *Ryko* is a typical example. Plaintiffs say that the *Ryko* decision "examined the aggregate share of the downstream distribution market" and "reasoned that [the plaintiff] had failed to adduce any evidence of the share of downstream distribution that the challenged exclusive dealing contracts covered in the aggregate." Mem. in Opp'n [ECF No. 349] at 16. But the *Ryko* decision said nothing about aggregating market share. Moreover, to the extent that one could read *Ryko*'s comments regarding the manufacturer's other distributor contracts as endorsing

---

[10] Plaintiffs complain that the authorities Defendants cite are not on point because the anti-competitive conduct in those cases took the form of exclusive dealing, not bribery and kickbacks. But while bribery and kickbacks may be objectionable and potentially illegal business practices, such conduct does not violate the Sherman Act unless it operates as a restraint on trade—unless, for example, the bribery is in the service of exclusivity. The distinction Plaintiffs draw is a false one, because they allege that Mylan's bribes and kickbacks were made with the purpose, and had the effect, of EpiPen receiving exclusive or preferential placement on the PBM Defendants' formularies. This is an exclusive-dealing claim.

aggregating market power in the § 1 analysis, the only market power at issue was the market power of the manufacturer—the Mylan equivalent—not the distributors or "downstream" entities, such as the PBM Defendants. *See Ryko*, 823 F.2d at 1234 (noting manufacturer's 8-to-10% share of the "relevant market").

The same holds true for *Minnesota Mining & Manufacturing Co. v. Appleton Papers, Inc.*, 35 F. Supp. 2d 1138 (D. Minn. 1999). Plaintiffs portray this decision as aggregating the market share of distributors to deny summary judgment on an antitrust claim. *See* Mem. in Opp'n at 16. The *Appleton Papers* decision did not discuss market-share aggregation, however, instead focusing on the market power of the manufacturer. *Appleton Papers*, 35 F. Supp. 2d at 1143–44. The opinion determined that a manufacturer's 67% market power was sufficient to raise a genuine issue of fact as to the manufacturer's ability to restrain competition. *Id.* at 1144. And *Appleton Papers* indicated, contrary to Plaintiffs' argument here, that a distributor market share of less than 40% would likely be insufficient to establish the substantial market power required for an antitrust claim. *See id.* at 1143 (citing authority that foreclosure rate of greater than 40% is necessary for plaintiffs to succeed on an exclusive-dealing claim).[11]

---

[11]     Plaintiffs seem to argue that there is a difference between aggregating market power or market share and aggregating foreclosure rate. Mem. in Opp'n at 17. But foreclosure is merely the mirror image of market power for exclusive dealing cases. *See* Jonathan M. Jacobson, *Exclusive Dealing, "Foreclosure," and Consumer Harm*, 70 Antitrust L.J. 311, 311 (2002) (stating that "the percentage of the market foreclosed is the determinant of antitrust liability in exclusive dealing cases"). As noted above, Plaintiffs insist that this is not an exclusive dealing case, so their focus on foreclosure rate (and their reliance solely on exclusive dealing precedent) is difficult to understand.

Plaintiffs also rely on *Southeast Missouri Hospital v. C.R. Bard, Inc.*, as support for their aggregation argument. No. 1:07CV0031TCM, 2008 WL 199567 (E.D. Mo. Jan. 22, 2008). In that case, antitrust plaintiffs asserted that two catheter manufacturers conspired to corner the market for their products by, among other behaviors, entering into exclusive-dealing contracts with purchasing organizations, "conditioning discounts, rebates, and lower prices on a member hospital's agreement to purchase a specific percentage of urological catheters from them and penalizing the hospitals who purchase other, unrelated products from another vendor." *Id.* at *5. But absent any alleged agreement between the two manufacturers, the court determined that the plaintiffs could not aggregate the manufacturers' market share. *Id.* at *6.

Plaintiffs apparently hang their hat on the court's refusal to dismiss the § 1 claim against the manufacturer with a 75 to 90% market share. *Id.* at *7. As the opinion noted, the plaintiff hospitals alleged "that [the manufacturer] used its market power to control the market by combining with" various purchasing organizations. *Id.* This implies, to Plaintiffs' reading, that the court aggregated the market share of downstream entities in evaluating the alleged § 1 conspiracies. The court did not, however, discuss the market share that any of these downstream entities possessed, likely because those entities were not parties to the case. And the inference Plaintiffs draw, that the purchasing organizations did not possess sufficient market power individually, is only as plausible as the opposing inference, that one or more of the purchasing organizations possessed substantial market power in the relevant markets. *Bard* does not support Plaintiffs' aggregation argument.

A § 1 claim depends on "whether the combination or conspiracy, not each individual conspirator, has the [market] power to hurt competition in the relevant market." *Spectators' Commc'n Network v. Colonial Country Club*, 253 F.3d 215, 225 (5th Cir. 2001). The PBM Defendants are simply "not responsible for all of [Mylan's] unilateral acts with other [PBMs] who were not members of the alleged conspiracies." *Dickson*, 309 F.3d at 211. "[T]o state a viable § 1 claim, [Plaintiffs are] required to allege facts which, if proven true, would demonstrate that [each PBM Defendant's] individual agreement[] with [Mylan was] likely to result in an anti-competitive effect." *Id.* Plaintiffs' failure to allege that any PBM Defendant individually possessed substantial market power means that Plaintiffs have not plausibly pleaded their § 1 claim.

V

The previous order determined that Plaintiffs insufficiently alleged claims against the PBM Defendants' corporate parents.[12] ECF No. 125 at 54. Magistrate Judge John F. Docherty allowed Plaintiffs to replead the claims against the corporate parents, and Plaintiffs assert that this determination establishes that they have sufficiently pleaded their claims against these entities. But Magistrate Judge Docherty was careful to point out that his decision rested on the liberal pleading standards of Rule 15, not on Rule 12(b)(6). ECF No. 268 at 13–14, 15–16. Under Rule 15, leave to amend a pleading should be "freely

---

[12]    Those parents include six corporations from the original pleading—CVS Health Corporation, Express Scripts Holding Company, UnitedHealth Group, Inc., United Healthcare Services, Inc., Optum, Inc., and OptumRx Holdings, LLC—as well as newly named United Healthcare, Inc. *See* 1st Am. Compl. ¶ 2. As noted above, Defendants do not dispute that the other newly named Defendant, CVS Caremark Part D Services, LLC, is appropriately a Defendant here.

give[n] [] when justice so requires." Fed. R. Civ. P. 15(a)(2).  Although the order granting leave to amend commented that Plaintiffs' new facts, if true, would show that the corporate parents were involved in the alleged scheme [ECF No. 268 at 14], this determination was not made under Rule 12(b)(6)'s plausible-pleading standard, but rather under Rule 15's liberal-amendment standard.  In fact, the order specifically stated that Magistrate Judge Docherty did not evaluate the new allegations under Rule 12(b)(6), leaving that to "the subsequent motions to dismiss that Defendants reserve[d] their right to bring." *Id.* at 15–16.  There is no procedural barrier to Defendants' motion to dismiss these corporate-parent Defendants.

In the initial complaint, Plaintiffs' factual allegations were insufficient to state a claim against the parents, because those allegations did not "not tie the[] public statements of the corporate parents to the alleged deviation from industry norms that the EpiPen pricing scheme represented."  ECF No. 125 at 54.  Plaintiffs argue that they have now sufficiently alleged the connection between the corporate parents and their PBM subsidiaries' scheme.  The amended pleading contains the following new allegations:

- Employees "whose titles identify them as employees of CVS Health" or who used "email addresses at CVSHealth.com" "negotiated with Mylan for rebates and formulary placement."  1st Am. Comp. ¶¶ 18(b), (c).  Emails regarding these negotiations used "the CVS Health logo on their stationery." *Id.* ¶ 18(e).

- Employees who made formulary and tier-placement recommendations "based on Mylan's rebates and other payments" "identified themselves as employees of Express Scripts Holding Company."  *Id.* ¶ 25.

- "Employees using email addresses at uhc.com negotiated with Mylan for rebates and other payments," and individuals "who serve as employees, agents or representatives of UnitedHealth Group Incorporated negotiated

24

with Mylan (along with employees of OptumRx) for rebates and formulary placement . . .[and] engaged in the decision-making process pertaining to rebates and formulary placements . . . ." *Id.* ¶¶ 30(a)–(c).

- "Employees, agents, or representatives of UnitedHealthcare [sic] Services, Inc., engaged in formulary development for EAIs, negotiated with Mylan for the rebates for EpiPen, and made preferential formulary and tier placement recommendations for EpiPen based on Mylan's kickbacks and bribes." *Id.* ¶ 31.

- "Employees, agents, or representatives of UnitedHealthcare, Inc., engaged in formulary development for EAIs, negotiated with Mylan for the rebates for EpiPen, and made preferential formulary and tier placement recommendations for EpiPen based on Mylan's kickbacks and bribes." *Id.* ¶ 32.

- Because United Healthcare Services, Inc, also does business as Optum, Inc., which is the registrant for the trademark Optum Rx, "the conduct complained of in this case can be traced to this defendant." *Id.* ¶ 33.

Plaintiffs also contend that their allegations that various members of the executive leadership at parent companies also served in executive leadership at the subsidiaries, 1st Am. Compl. ¶¶ 28, 34, "further support the additional factual allegations" that the parents were "part and parcel" of the subsidiaries' schemes. Mem. in Opp'n at 35, 37 (quoting ECF No. 125 at 54). They acknowledge, however, that the previous order found the same alter-ego allegations insufficient. *Id.* at 37.

As before, we begin with the "general principle of corporate law" that "a parent corporation . . . is not liable for the acts of its subsidiaries." *United States v. Bestfoods*, 524 U.S. 51, 61 (1998). This maxim is overcome only if the subsidiary was "a mere instrumentality or adjunct or agency of the parent," *Masterson Personnel, Inc. v. McClatchy Co.*, No. 05-cv-1274 (RHK/JJG), 2005 WL 3132349, at *5 (D. Minn. Nov. 22, 2005) (citation omitted), or when "the alleged wrong can seemingly be traced to the parent

25

through the conduit of its own personnel and management[.]" *Bestfoods*, 524 U.S. at 64. (citation omitted).

The touchstone of any evaluation of a pleading's allegations is the underlying causes of action. Only if Plaintiffs' new allegations add plausibility to their claims of a RICO or an antitrust violation will those allegations sufficiently state a claim. Thus, it is not enough for Plaintiffs to allege, as they frequently do, that employees who appear to be employed by one or more of the PBM Defendant's parent companies "negotiated" with Mylan, or even made formulary placement decisions or recommendations regarding the EpiPen. Such conduct is not illegal. Rather, only negotiations seeking illegal kickbacks or formulary-placement decisions based on those illegal kickbacks can underpin Plaintiffs' claims. It is thus immaterial whether any employee used a parent company's email address or the logo for the parent company in emails to Mylan regarding EpiPen's formulary placement or rebates for EpiPen unless those emails were part of the alleged scheme, something Plaintiffs do not allege. *See, e.g.*, 1st Am. Compl. ¶¶ 18, 30.

Nor can Plaintiffs establish the requisite "conduit" between the parent and PBM subsidiary by alleging that the parent does business as the PBM or is the registrant for the PBM's trademarked name. Those bare facts simply do not establish that "the conduct complained in this case can be traced to [that] defendant," *id.* ¶ 33, despite Plaintiffs' allegation in that regard.

The only new allegation that approaches the *Twombly* line—that has the potential to nudge Plaintiffs' claims regarding the corporate parents from conceivable to plausible—are the allegations against United Healthcare Services, Inc., and United Healthcare, Inc.

26

*See Twombly*, 550 U.S. at 570; 1st Am. Compl. ¶¶ 31, 32.  In these allegations, Plaintiffs contend that employees of these two parents of the OptumRx PBM Defendants "made preferential formulary and tier placement recommendations for EpiPen based on Mylan's kickbacks and bribes."  1st Am. Comp. ¶¶ 31–32.  These are the only allegations in the 113-page amended complaint that any parent corporation might have had a hand in the illegal conduct Plaintiffs claim: preferential treatment for EpiPen on PBM formularies because of Mylan's kickbacks and bribes.  Even these allegations, though, are not sufficient.

It is notable that the allegations regarding these two entities are identical.  *Compare id.* ¶ 31, *with id.* ¶ 32.  This identical wording seems formulaic and at the very least reflects a lack of particularity.  And although Plaintiffs insist that pleading standards are lower for allegations against multiple related corporate defendants, the legal authority they cite for this argument does not support it.  Mem. in Opp'n at 38.  One decision that ostensibly found group pleading appropriate in fact determined that the plaintiffs were required to replead to "particularly state which defendants engaged in which acts . . . ." *Block v. Toyota Motor Corp.*, 795 F. Supp. 2d 880, 890 (D. Minn. 2011).  The other determined that a plaintiff had not impermissibly pleaded a fraud claim collectively against related corporate defendants because he alleged that "each of the [defendant] entities acted fraudulently . . . ." *Kruger v. Lely N. Am., Inc.*, 518 F. Supp. 3d 1281, 1293 (D. Minn. 2021).  This is a far cry from Plaintiffs' insistence that all that is required to plead a RICO or antitrust claim against a parent is the allegation that the parent also does business as the accused subsidiary or that the parent's logo appears in emails.

Plaintiffs' new allegations are little more than "threadbare recitals" of terms that courts use when determining whether a corporate parent is liable for the acts of its subsidiary. *Iqbal*, 556 U.S. at 678. As in *Iqbal*, the new allegations suggest "the mere possibility of misconduct" but do not show that Plaintiffs are entitled to relief. *Id.* at 679. Plaintiffs' claims against CVS Health Corporation, Express Scripts Holding Company, United Health Group, Inc., United Healthcare Services, Inc., Optum, Inc., OptumRx Holdings, LLC, and United Healthcare, Inc. are dismissed with prejudice.

## ORDER

Based on the foregoing, and all of the files, records, and proceedings herein, **IT IS ORDERED THAT** the PBM Defendants' Motion to Dismiss [ECF No. 315] is **GRANTED IN PART** and **DENIED IN PART** as follows:

1. The motion is **GRANTED** as to Defendants CVS Health Corporation, Express Scripts Holding Company, United Health Group, Inc., United Healthcare Services, Inc., United Healthcare, Inc., Optum Inc., and OptumRx Holdings, LLC. The claims against those Defendants are **DISMISSED WITH PREJUDICE**.

2. The motion is **GRANTED** as to Plaintiffs' claim under 15 U.S.C. § 1 and that claim is **DISMISSED WITH PREJUDICE**.

3. The motion is **GRANTED** as to Plaintiffs' reliance on the Anti-Kickback Statute and W. Va. Code § 47-11A-3 to constitute violations of the Travel Act for the RICO claims.

4. The motion is **DENIED WITHOUT PREJUDICE** as to the timeliness of

Plaintiffs' Sherman Act claims.

Dated:  April 5, 2022                                s/ Eric C. Tostrud
                                                     Eric C. Tostrud
                                                     United States District Court