## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| In re: EpiPen Direct Purchaser Litigation | File No. 20-cv-00827 (ECT/JFD) |
| THIS DOCUMENT RELATES TO: | |
| *All Actions* | |

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION UNDER RULE 12(C) FOR PARTIAL JUDGMENT ON THE PLEADINGS

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................ 1

II.   BACKGROUND ................................................................................................. 1

      A.    Legal Standard ................................................................................... 1

      B.    Defendants' Voluminous Prior Rule 12 Briefing ............................ 2

      C.    The CAC's Extensive Allegations About Predicate Acts Under the
            State Law Commercial Bribery Statutes ........................................ 4

III.  ARGUMENT ....................................................................................................... 9

      A.    Plaintiffs Have Adequately Pled a Valid RICO Predicate Act
            Chargeable Under New Jersey Statutes Annotated § 2C:21-10 ............... 11

            1.    Averring lack of knowledge and consent is not required under
                  New Jersey's current commercial bribery statute ........................... 11

            2.    Even if lack of knowledge and consent were required under
                  New Jersey law, Plaintiffs have adequately pled lack of
                  knowledge and consent .................................................................. 12

      B.    Plaintiffs' Allegations of Concealment Satisfy Any "Lack of
            Knowledge and Consent" Element of the Missouri, Pennsylvania,
            Illinois, Virginia, California, and Texas Commercial Bribery Offenses .... 18

            1.    Plaintiffs have adequately pled a valid RICO predicate act
                  chargeable under Missouri Revised Statutes § 570.150.1 .............. 18

            2.    Plaintiffs have adequately pled a valid RICO predicate act
                  chargeable under 18 Pennsylvania Criminal Statutes
                  Annotated § 4108 .......................................................................... 18

            3.    Plaintiffs have adequately pled a valid RICO predicate act
                  chargeable under 720 Illinois Compiled Statutes § 5/29A .............. 20

            4.    Plaintiffs have adequately pled a valid RICO predicate act
                  chargeable under Virginia Code § 18.2-444 .................................... 22

            5.    Plaintiffs have adequately pled a valid RICO predicate act
                  chargeable under California Penal Code § 641.3 ............................. 23

6.    Plaintiffs have adequately pled a valid RICO predicate act chargeable under Texas Penal Code § 32.43 ................................... 24

C.    California and Rhode Island's Commercial Bribery Statutes Apply to Corporations .................................................................. 26

1.    California's commercial bribery statute applies to corporations .................................................................. 26

2.    Rhode Island's commercial bribery statutes apply to corporations .................................................................. 33

D.    The Complaint Alleges Sufficient Conduct Related to Texas, so the Motion's Remaining Basis to Challenge Claims Related to Texas Penal Code § 32.43 Must Also Fail ............................................... 37

IV.    CONCLUSION ........................................................................ 38

# TABLE OF AUTHORITIES

**Cases**                                                                       **Page(s)**

*Al Maha Trading & Contracting Holding Co. v. W.S. Darley & Co.,*
  2014 WL 2459674 (N.D. Ill. June 2, 2014) ......................................................... 20, 21

*Alicia T. v. Los Angeles,*
  222 Cal. App.3d 869 (1990) ............................................................................... 33

*Cal. Real Estate Loans, Inc. v. Wallace,*
  18 Cal. App. 4th 1575 (1993) ............................................................................ 27

*Carson Harbor Vill., Ltd. v. Unocal Corp.,*
  270 F.3d 863 (9th Cir. 2001) ............................................................................. 29

*Cook Cnty., Ill. v. U.S. ex rel. Chandler,*
  538 U.S. 119 (2003) ......................................................................................... 34

*Cotter & Sons v. BJ Corp.,*
  549 S.W.3d 715 (Tex. Ct. App. 2017) ........................................................... 37, 38

*Credit Suisse First Boston Corp. v. Grunwald,*
  400 F.3d 1119 (9th Cir. 2005) ........................................................................... 33

*Gxp Consultants Alliance v. Lacy Construction,*
  2016 Cal. Super. LEXIS 26997 (Cal. Super. Ct. Sept. 8, 2016) ............................. 31

*Jaclyn, Inc. v. Edison Brothers Stores, Inc.,*
  406 A.2d 474 (N.J. Super. Ct. Law Div. 1979) .................................... 11, 12, 13, 14

*Johnson v. Nextel Communications, Inc.*
  2017 WL 4326052 (S.D.N.Y. Sept. 19, 2017) ...................................................... 14

*LeBlanc v. Lange,*
  365 S.W.3d 70 (Tex. App. 2011) ........................................................................ 24

*McGowan v. State*
  938 S.W.2d 732 (Tex. Ct. App. 1996) ........................................................... 37, 38

*People ex rel. Lungren v. Superior Ct.,*
  926 P.2d 1042 (Cal. 1996) ................................................................................. 29

*New Jersey Office Supply, Inc. v. Feldman,*
  1992 WL 219790 (D.N.J. Sept. 1, 1992) ...................................................... 15, 16, 17

*People v. Cornett*,
274 P.3d 456 (Cal. 2012) ................................................................................. 29

*People v. Riley*,
240 Cal. App. 4th 1152 (2015) .............................................................. 23, 31

*People v. Williams*,
176 Cal.App.4th 1521 (2009) ........................................................................ 33

*Rennick v. O.P.T.I.O.N. Care, Inc.*,
77 F.3d 309 (9th Cir. 1996) ........................................................................... 33

*State Farm Life Ins. Co. v. Youngs*,
No. 20-CV-2120, 2021 WL 2562848 (D. Minn. June 23, 2021)........................ 1, 2, 38

*State v. Hazard*,
68 A.3d 479 (R.I. 2013) ................................................................................. 36

*Taylor v. Quail*,
458 F. Supp. 2d 1065 (C.D. Cal. 2006) ......................................................... 33

*United States v. Burke*,
2022 WL 1970189 (N.D. Ill. June 6, 2022) .................................... 21, 22, 30

*United States v. Carrillo*,
229 F.3d 177 (2d Cir. 2000).......................................................................... 10

*United States v. Jimenez*,
507 F.3d 13 (1st Cir. 2007) ........................................................................... 35

*United States v. Johns*,
742 F. Supp. 196 (E.D. Pa. 1990) ................................................................ 19

*United States v. Kehoe*,
310 F.3d 579 (8th Cir. 2002) ......................................................................... 10

*United States v. Parise*,
159 F.3d 790 (3d Cir. 1998)........................................................................... 20

*Valentine v. GEP Cencast, LLC*,
2014 WL 6679097 (Cal. Dist. Ct. App. Nov. 25, 2014).......................... 32, 33

*Walker v. Spina*,
359 F. Supp. 3d 1054 (D.N.M. 2019) ........................................................... 14

*Yost v. Forestiere,*
    51 Cal. App. 5th 509 (2020) ...................................................................... 29, 30

*Zahn v. Yucaipa Cap. Fund,*
    218 B.R. 656 (D.R.I. 1998) .............................................................................. 34

**Statutes**

18 U.S.C. § 1961(1)(A) .............................................................................................. 9

California Penal Code § 4 ........................................................................................ 26

California Penal Code § 7 ........................................................................................ 29

California Penal Code § 641.3 ............................................................................ 26, 27

N.J.S.A. § 2C:21-10.................................................................................................. 12

Model Penal Code § 224.8 ................................................................................. 12, 18

Rhode Island General Law § 11-7-3 ................................................................... 34, 36

Rhode Island General Law § 11-7-4 ................................................................... 35, 36

Rhode Island General Law § 11-47-2 ....................................................................... 36

Rhode Island General Law § 43-3-2 ......................................................................... 34

Rhode Island General Law § 43-3-6 ................................................................... 34, 36

**Other Authorities**

Restatement (Second) of Agency § 1 ........................................................................ 28

Restatement (Second) of Agency § 14M ................................................................... 28

Restatement (Second) of Trusts § 96........................................................................ 28

Restatement (Third) of Agency § 3.15 ...................................................................... 28

Restatement (Third) of Trusts § 33 .......................................................................... 29

## I.     <u>INTRODUCTION</u>

Defendants' Motion for Judgment on the Pleadings (ECF No. 608, "Defs.' Br.") misinterprets the state law commercial bribery offenses comprising many of Plaintiffs' RICO predicate acts, ignores the well-pled averments of Plaintiffs' complaint (ECF No. 271), and overlooks this Court's previous rulings that are pertinent to the elements of the state commercial bribery offenses (namely those regarding Plaintiffs' averments of the PBMs' concealment).  The Motion should be denied.

It is curious that Defendants have had two prior opportunities to challenge the adequacy of Plaintiffs' pleading of state law commercial bribery and did not do so. Previously, Defendants acquiesced in the addition of several states' commercial bribery offenses in Plaintiffs' amended complaint (ECF No. 271), challenging just a single one (West Virginia) and leaving all others unchallenged. This does not preclude Defendants' third attempt to attack most of these allegations, but it does color their Motion.

## II.     <u>BACKGROUND</u>

### A.     **Legal Standard**

"Judgment on the pleadings is appropriate where no material issue of fact remains to be resolved and the movant is entitled to judgment as a matter of law."  *State Farm Life Ins. Co. v. Youngs*, No. 20-CV-2120, 2021 WL 2562848, at *2 (D. Minn. June 23, 2021) (Tostrud, J.) (citing *Lansing v. Wells Fargo Bank, N.A.*, 894 F.3d 967, 971 (8th Cir. 2018)).  "A motion for judgment on the pleadings is assessed under the same standard as a Rule 12(b)(6) motion to dismiss."  *State Farm*, 2021 WL 2562848, at *2 (citing *Ashley Cnty. v. Pfizer, Inc.*, 552 F.3d 659, 665 (8th Cir. 2009)).  Accordingly, the

Court "must accept as true all of the factual allegations in the relevant pleading and draw all reasonable inferences in [Plaintiffs'] favor." *State Farm*, 2021 WL 2562848, at *2 (citing *Gorog v. Best Buy Co.*, 760 F.3d 787, 792 (8th Cir. 2014)).  Relevant "factual allegations need not be detailed," but merely "be sufficient to 'raise a right to relief above the speculative level.'" *State Farm*, 2021 WL 2562848, at *2 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

## B.    Defendants' Voluminous Prior Rule 12 Briefing

Defendants' current Motion seeks a third bite at the apple to attack the sufficiency of the state law predicate offense allegations in Plaintiffs' complaint.  Defendants have already had two prior rounds of briefing attacking Plaintiffs' complaint, spanning 164 pages of combined briefing.  *See* ECF Nos. 87, 92, 108, 109, 317, 372; *see also* ECF No. 170, at 16-18 (opposing Plaintiffs' motion for leave to file its amended complaint, including briefing on "five states' bribery laws").  Defendants' first set of motions sought dismissal of all RICO claims based on state law predicate offenses.  *See, e.g.,* ECF No. 87 at 24-27; ECF No. 92 at 42-44.  But as the Court noted, "rather than exhaustively explore all of the potential differences between these states' laws . . . Defendants make only high-level arguments for dismissal."  ECF No. 125 at 38-39.  The Court rejected each of Defendants' challenges to Plaintiffs' allegations based on state commercial bribery statutes, for various reasons.  *See generally id*. at 38-46.

Plaintiffs filed their amended complaint on October 20, 2021.  *See* ECF No. 271 (the "Amended Complaint" or "CAC").  As the Court has noted, "Plaintiffs [pled] violations of sixteen state bribery statutes as direct RICO predicates . . . : Alabama,

Arizona, California, Connecticut, Florida, Illinois, Michigan, Minnesota, Mississippi, Missouri, New Jersey, Rhode Island, Texas, Utah, Virginia, and Washington," and "violations of the statutes of these and four other states—Arkansas, Indiana, Pennsylvania, and West Virginia—as RICO predicates through the Travel Act." ECF No. 414, at 7 n.5. Defendants' second motion to dismiss "argue[d] that . . . violation of West Virginia Code § 47-11A-3" is not a "predicate act[] . . . cognizable under RICO." *Id.* at 7. But as the Court noted, that was the only state law predicate offense that Defendants challenged in the amended complaint; "Defendants [did] not challenge the alleged predicate acts of . . . the bribery statutes of multiple other states." *Id.* Because the West Virginia statute "define[s] bribery more broadly than [] the Travel Act" the Court granted Defendants' challenge to the West Virginia statute, *id.* at 4, 13, which left intact Plaintiffs' RICO claims based on every other state commercial bribery statute.

Defendants' present Motion seeks dismissal of the predicate acts alleged in the CAC for violation of the bribery statutes of the remaining states, this time under Rule 12(c). The Motion specifically seeks dismissal of Counts I and II of the CAC, "to the extent they rely on [certain] state laws as direct RICO predicates or as RICO predicates under the Travel Act[.]" ECF No. 611 at 1-2.[1] In sum, Defendants made a tactical

---

[1] Following Plaintiffs' narrowing of their predicate act offenses during discovery on the issue of territorial jurisdiction, the state laws in question are: (a) California (Cal. Pen. § 641.3); (b) Illinois (720 I.L.C.S. §§ 5/29A-1 & 5/29A-2); (c) Missouri (V.A.M.S. §§ 570.150.1(1) & 570.150.1(3)); (d) New Jersey (N.J.S.A. § 2C:21-10); (e) Pennsylvania (18 Pa. C.S.A. § 4108); (f) Rhode Island (R.I. Gen. Laws §§ 11-7-3 & 11-7-4); (g) Texas (Tex. Penal Code § 32.43); and (h) Virginia (Va. Code Ann. § 18.2-444). ECF No. 611 at 1-2.

choice not to brief their current arguments in their voluminous prior briefing under Rule

12(b).  Defendants now ask the Court to indulge yet another attempt to attack the

pleadings in the present Motion under Rule 12(c).

## C.     The CAC's Extensive Allegations About Predicate Acts Under the State Law Commercial Bribery Statutes

Defendants principally argue that "[t]here is no factual allegation that any

Defendant did anything" without an employer's or principal's "knowledge and consent."[2]

However, as argued at length below, allegations of concealment of a bribery scheme are

the equivalent of allegations of the absence of "knowledge and consent."  *See infra* at

III.A.2, III.B.1-6.  The Court has already ruled that Plaintiffs have satisfactorily alleged

"indicators of concealment":

> Mylan did not reveal the "true reason for [its] price increases" when it reported them. *Id.* ¶¶ 163–65, 175. The PBM Defendants misleadingly classified payments in order to avoid passing them on to clients, *id.* ¶ 128; placed limitations on the scope of audits that might have revealed the true nature and amount of payments received, *id.* ¶¶ 136–37; and continued to represent to their clients and the public that they were working to secure lower prices, *e.g.*, *id.* ¶¶ 92–96.

ECF No. 125 at 34-35 (citing Plaintiffs' initial complaint, ECF No. 76); *see also id.* at 18

("Defendants do not seem to dispute that there was some concealment here."); *id.*

("Plaintiffs allege that Defendants 'refuse[d] to disclose the real reason behind Mylan's

---

[2] Defs.' Br. at 14 (addressing California law); *see also id.* at 15 (arguing the same for New Jersey law); *id.* at 16 (arguing the same for Missouri law); *id.* at 16-17 (arguing the same for Pennsylvania law); *id.* at 17 (arguing the same for Illinois law); *id.* at 18 (arguing the same for Virginia law); *id.* at 21 (arguing the same for Texas law).

increased list prices for EpiPens' and 'falsely and affirmatively mischaracterized' payments that Mylan received from the PBM Defendants by 'repeatedly referring to them as 'discounts' that benefit health plans and their patient members.'") (citing ECF No. 76 ¶¶ 139, 135); *id.* ("Plaintiffs also identify a number of marketing statements that the PBM Defendants made describing themselves as working to reduce costs for their clients.") (citing ECF No. 76 ¶¶ 92–98).

Indeed, the CAC includes such extensive averments of concealment, recounted below, that the Court's motion to dismiss opinion did not catalog them all:

- "It was improper and illegal under one or more state and federal laws for Mylan to pay bribes and kickbacks to the Defendant PBMs to act contrary to the interests of their clients *and to conceal same*." ECF No. 271 ¶ 10 (all emphases added).

- The PBM Defendants "widely proclaimed to clients (and the market as a whole)" that they "use their negotiating power to reduce costs" and "act[] in the best interest of their clients." *Id*. ¶ 130. "However, because many insurers/health plans (and other PBM clients) *have limited (or no) information about the Defendant PBMs' contract terms with the drug manufacturers*, Defendant PBMs are free to negotiate the payment of money by drug makers that *falls outside the contract* between the PBM and the insurer/health plan (and other PBM clients). As a result, Defendant PBMs *secretly collect* — and retain — large amounts of drug company payments simply by labeling those drug company payments differently than payments which the Defendant PBMs partly pass through to the insurers/plans (and other PBM clients). . . . In short, contractual agreements often leave insurers/health plans (and other PBM clients) *with little idea what the PBM is actually being paid* by the drug manufacturers, and whether it is all being passed through to the insurer/health plan (and other PBM clients). Many payments from drug companies to PBMs are *shrouded in secrecy and difficult to track*." *Id*. (footnote omitted).

- Averments of two "industry experts" as well as the American Health Policy Institute acknowledging a "Rebate Re-Labeling Game" whereby "PBMs define drug company rebates in narrow terms in order to remit only a

fraction of the amounts received from drug companies to their plan clients."
*Id.* ¶¶ 131-132 (footnotes omitted).

- "[The Health and Human Services Department] has remarked that PBMs *hide from insurers/health plans* the flow of money from drug manufacturers." *Id.* ¶ 133 (emphasis added).  Additionally, it proposed a "rule change" because the "rebate system is *not transparent*" and "plan sponsors under Medicare Part D and Medicaid MCOs *have limited information* about the percentage of rebates passed on to them and the percentage retained by their PBMs. The terms of rebate agreements manufacturers negotiate with PBMs may be treated as *highly proprietary* and, in many instances, may be *unavailable to the plans*." *Id.*

- "Congressman Earl Carter stated in a September 21, 2016 Congressional hearing that 'Nobody knows how much of this is going to the pharmacy benefits manager, because there is no transparency.'" *Id.* (footnote omitted).

- "[T]he American Benefits Council has explained that PBMs *conceal from insurers/health plans* the amount of moneys flowing to the PBMs from drug manufacturers." *Id.* ¶ 134.

- "63% of employers surveyed by the National Pharmaceutical Council expressed the view that *PBMs lacked transparency in how they make money*." *Id.* ¶ 135 (footnote omitted).

- "PBM statements that they use their negotiating power to reduce the health plans' costs and are acting in the best interests of their clients have not only *actively concealed information* but also furthered and maintained the scheme in which Mylan paid Defendant PBMs *undisclosed* bribes and kickbacks to act contrary to the interests of their clients and their patient members[.]" *Id.* ¶ 136.

- "The Defendant PBMs and Mylan have *falsely and affirmatively mischaracterized the payments*, repeatedly referring to them as 'discounts' that benefit health plans and their patient members . . . even if an insurer/health plan (or other PBM client) were aware of the PBMs' tactics regarding retained rebates and fees, the insurer/health plan (or PBM client) *would not be able to determine* the total dollar or percentage amounts of drug company payments that the PBM retains.  Indeed, *PBMs refuse to disclose such information to any plan client*." *Id.* ¶ 137 (footnote omitted).

- During audits, "PBMs ensure that their clients *remain in the dark, unable to learn the true cost of any specific drug*, including EpiPens.  For example, PBMs require all auditors to execute an Auditor Confidentiality Agreement."  *Id*. ¶ 138.

- PBMs are "*secretive* about their collection and distribution of drug company payments" and enforce that secrecy through at least six specific audit protocols.  *Id*. ¶ 139.

- "Mylan and Defendant PBMs *refuse to disclose the real reasons* behind Mylan's increased list prices for EpiPens, and have not until recently disclosed Mylan's scheme to bribe Defendant PBMs by way of increased EpiPen list prices."  *Id*. ¶ 141.

- "Mylan was *concealing the conduct* complained of herein[.]"  *Id*. ¶ 142.

-  "Mylan and the Defendant PBMs' *knowing and active fraudulent concealment* and denial of the facts alleged herein throughout the period relevant to this action."  *Id*. ¶ 145.

- "These profits are greater than either Mylan or the PBMs could obtain absent their *fraudulent concealment* of the substantial 'rebates' and other fees from Mylan to the PBMs."  *Id*. ¶ 164.

- "The Mylan-PBM EpiPen Pricing Enterprises then reported Mylan's list price increases to the general public, and to the respective PBM's clients, including insurers and health plans (and participants and beneficiaries), *while simultaneously concealing* that the true reason for the price increases was to fund bribes and kickbacks to the Defendant PBMs in exchange for formulary placement, and also to increase the dollar value of those bribes and kickbacks to increase profits to both Mylan and the Defendant PBMs." *Id*. ¶ 165.

- "Mylan's list price increases were fraudulent in that they were artificially inflated to fund the bribes and kickbacks, *which the Mylan-PBM EpiPen Pricing Enterprises concealed*. The Mylan-PBM EpiPen Pricing Enterprises *also concealed the economic purpose* of these list price increases to Mylan and the Defendant PBMs[.]"  *Id*. ¶ 167.

- "[E]ach of the Defendant PBMs have, in concert with Mylan through the respective Mylan-PBM EpiPen Pricing Enterprises, engaged in the *hidden profit-making schemes*, the Defendant PBMs garnering rebates and other

fees and compensation from Mylan that the Defendant PBMs, to a significant extent, keep, and do not share with or provide to their clients, including insurers and health plans[.]" *Id.* ¶ 168.

- "At all relevant times, each of the Mylan-PBM EpiPen Pricing Enterprises was operated for criminal and fraudulent purposes, namely, carrying out the bribery and kickback scheme *and its concealment*." *Id.* ¶ 169.

- "In addition, as part of and to further the respective schemes, the Defendant PBMs *misrepresent and/or conceal* from insurer/health plan clients, plan participants and beneficiaries and the public the existence, amount and purpose of the rebates, administrative fees and/or other monies the Defendant PBMs are paid by Mylan as well as the effect of the rebates, administrative fees and/or other monies on EpiPen list prices, and also publish, distribute and disseminate materials and information concerning EpiPen list prices, net prices and the purpose of 'rebates' and so-called 'discounts' *to conceal* the Mylan-PBM EpiPen Pricing Enterprises' schemes." *Id.* ¶ 171.

- "But for the Mylan-PBM EpiPen Pricing Enterprises' common purpose of inflating Mylan's list prices to fund the bribes and kickbacks, the Defendant PBMs would have had the incentive to disclose the fraudulent inflation of Mylan's list prices, and would have used their control over the management and administration of their health plan clients' formularies to penalize Mylan's undue price increases. *By concealing this information*, the Defendant PBMs and Mylan perpetuated the conduct of the Mylan-PBM EpiPen Pricing Enterprises." *Id.* ¶ 172.

- Ten enumerated "material misrepresentations and/or omissions" made by the Defendants. *Id.* ¶ 177.

- "Indeed, an essential part of the successful operation of the bribery and kickback scheme alleged herein *depended upon secrecy*. The Mylan-PBM EpiPen Pricing Enterprises took deliberate steps *to conceal the wrongdoing*." *Id.* ¶ 184.

- Mylan "[p]ublish[ed] and announc[ed] list price increases and the reasons therefor *but conceal[ed]* that the increases were to fund the bribes and kickbacks to the Defendant PBMs to secure exclusive and/or favorable formulary placement." *Id.* ¶ 186(h).

- Each PBM Defendant "*[m]isrepresent[ed] and/or conceal[ed]* from their clients" the "existence, amount, and purpose" as well as the "effect" of the "rebates, administrative fees and/or other monies from Mylan." *Id.* ¶ 187(b), (c).

- Each PBM Defendant "[p]ublish[ed], distribut[ed] and disseminat[ed] materials and information concerning EpiPen list prices, net prices and/or the purpose of rebates (and administrative fees and/or other monies) [that were] falsely and misleadingly portrayed as lowering drug costs to perpetuate *and conceal the scheme.*"   *Id.* ¶ 187(d)

- "Even if, in some instances, Defendant PBMs pass 100% of certain 'rebates' through to their clients, Defendant PBMs *have applied different labels to certain payments (or portions thereof) to conceal and retain* a significant portion of the payments they receive from drug manufacturers (including Mylan), which are *hidden from or undisclosed to the PBM's clients.*  For example, by self-classifying the amount of the payments they receive from drug manufacturers as 'fees' instead of 'rebates,' and by retaining the entirety of the former classification for themselves, Defendant PBMs effectively set their own compensation for services." *Id.* ¶ 241.

- Mylan's EpiPens have been promoted through electronic means, thereby announcing to PBM clients and to patients Mylan's list price increases, but *omitting the material fact* that the reason for the increased list prices was to fund, increase, and/or recoup Mylan's bribes and kickbacks to Defendant PBMs to secure formulary placement. . . . Defendants have *falsely and misleadingly described* the bribes and kickbacks to the Defendant PBMs (in the form of rebates, administrative fees and/or other monies) as 'discounts' — which have been publicly represented as lowering drug costs — when, in fact, the bribes and kickbacks are for formulary placement, which enabled Mylan to sell EpiPen at inflated prices." *Id.* ¶ 244.

The above averments are more than enough to withstand the principal argument of Defendants' Motion, as explained below.

### III.   <u>ARGUMENT</u>

Before rebutting Defendants' specific arguments, it is notable that, at bottom, each of Defendants' challenges is to the chargeability of various statutory commercial bribery offenses under the law of the various states supplying the offense.  *See* 18 U.S.C.

§ 1961(1)(A) (defining "racketeering activity" as that which is "chargeable under state law").  But attacking whether a particular offense could be charged by a prosecutor in the state whose law supplies the offense is not a permitted argument in a RICO case.  As the Second Circuit stated in *United States v. Carrillo*, 229 F.3d 177, 182-83 (2d Cir. 2000) (cleaned up):

> "[T]he phrase 'chargeable under State law' does not require that the particular underlying conduct at issue could have been charged under state law, only that such conduct be chargeable as a general matter; i.e., that such conduct is criminal under state law. We based our decision in *Coonan* on our prior holding that Congress did not intend to incorporate the various states' procedural and evidentiary rules into the RICO statute."

*Carrillo* is cited in the Eighth Circuit's analogous decision, *United States v. Kehoe*, 310 F.3d 579, 588 (8th Cir. 2002).  This principle undercuts Defendants' Motion in its entirety, because Defendants are indeed challenging the sufficiency of Plaintiffs' CAC to state an offense under each state's law under the various procedural and evidentiary rules of each state, as if Plaintiffs were state prosecutors charging commercial bribery offenses rather than litigants in a civil RICO lawsuit.  Despite this underlying fallacy, Plaintiffs will respond comprehensively to Defendants' various arguments, as if *Kehoe* did not undercut them entirely.  But in doing so, Plaintiffs do not abandon the principle articulated in *Kehoe* or its adoption of the Second Circuit's rule in *Carrillo*.  Plaintiffs do not "need" *Kehoe* to win this Motion handily.  But *Kehoe* affords the Court the ability to sweep away Defendants' present arguments and ones of a similar, "technical" quality that Defendants will surely make in the future.

**A.     Plaintiffs Have Adequately Pled a Valid RICO Predicate Act Chargeable Under New Jersey Statutes Annotated § 2C:21-10**

**1.     Averring lack of knowledge and consent is not required under New Jersey's current commercial bribery statute**

Defendants rely on a single New Jersey case to assert that a principal's lack of consent is an element of the commercial bribery offense under N.J.S.A. § 2C:21-10: *Jaclyn, Inc. v. Edison Brothers Stores, Inc.*, 406 A.2d 474 (N.J. Super. Ct. Law Div. 1979). However, *Jaclyn* analyzed New Jersey's *former* (and long-since repealed) commercial bribery statute, N.J.S.A. § 2A:170-88. *Id*. at 482. Plaintiffs do not, and could not, assert Defendants' violation of a repealed statute. While that repealed statute did include language requiring that the person receiving a bribe act "without the knowledge and consent" of his or her principal, the statute was repealed and replaced in September 1979, taking that requirement along with it. The current statute, which is based on the Model Penal Code's version of the commercial bribery offense, eliminated such language. The current statute reads in relevant part:

>          a.     A person commits a crime if he solicits, accepts or agrees to accept any benefit as consideration for knowingly violating or agreeing to violate a duty of fidelity to which he is subject as:
>
> (1) An agent, partner or employee of another;
>
> (2) A trustee, guardian, or other fiduciary;
>
> ***
>          c.     A person commits a crime if he confers, or offers or agrees to confer, any benefit the acceptance of which would be criminal under this section.

N.J.S.A. § 2C:21-10.  The above language is nearly identical to Model Penal Code § 224.8, which also does not require a lack of "knowledge and consent."  Model Penal Code § 224.8 ("A person commits a misdemeanor if he solicits, accepts or agrees to accept any benefit as consideration for knowingly violating or agreeing to violate a duty of fidelity[.]").  Under the plain language of New Jersey's current statue, lack of knowledge and consent is simply not an element of New Jersey's commercial bribery offense.  Defendants' argument is contrary to the express language of the statute and fails out of the gate.

**2.     Even if lack of knowledge and consent were required under New Jersey law, Plaintiffs have adequately pled lack of knowledge and consent**

But even assuming *arguendo* that lack of knowledge and consent were an element of the commercial bribery offense under New Jersey law, Plaintiffs have adequately pled that element, even under Defendants' inapposite case law.  The *Jaclyn* case, decided under the repealed New Jersey commercial bribery offense, made clear that in order for the element of lack of knowledge and consent to be defeated, the principal must have "*full* knowledge and consent" of the illicit conduct, which means "sufficient knowledge such that the principal is not in ignorance of the bribery scheme and hence *has not been misled or defrauded*."  *Jaclyn*, 406 A.2d at 485 (emphasis added).  As explained above, the Court has already held that Plaintiffs sufficiently pled that Defendants concealed the nature of their activities and misled the PBM clients.  *See supra* at II.C.  And, Plaintiffs have extensively pled concealment.  *See supra* at II.C. (cataloging averments of CAC).

Indeed, the Court held that Plaintiffs have alleged multiple different "indicators of concealment."  ECF No. 125 at 34-35.

*Jaclyn*'s facts illustrate why Plaintiffs, by pleading the PBMs' concealment, adequately pled the absence of the PBM Defendants' clients' knowledge and consent to the illegal bribery scheme alleged in the CAC.  In *Jaclyn*, a handbag manufacturer sued a retailer to collect on goods delivered.  The retailer counterclaimed and interposed a "defense of commercial bribery" — claiming that the manufacturer had bribed the retailer's purchasing agents in exchange for placing orders.  406 A.2d at 477.  But the retailer had received "several reports that [the manufacturer] was making kick-backs to [retailer]'s buyers," reports which had been "promptly relayed" to one of the owners of the retailer.  *Id*. at 477.  More than mere reports, the retailer sought and obtained "[c]onfirmatory evidence of the kick-backs," which "took the form of a cancelled check[.]"  *Id*. at 478.  By contrast, Plaintiffs allege the absence of such knowledge by extensively pleading the PBMs' concealment.

Moreover, exculpatory consent by the retailer was found in *Jaclyn* because the retailer *deliberately allowed* additional bribes and purchases to go forward as it conducted an investigation. Therefore, the retailer asserting commercial bribery under the former New Jersey statutory offense was found to have consented:

> The executives of [retailer], in possession of *reliable information of its agent's disloyal conduct* in January 1976, decided to 'conduct an investigation' by which *the purposeful decision was made not to confront the offending agent*. It was not until mid-April 1976 that [retailer] engaged outside legal counsel, and it was not until May 10, 1976 that the disloyal agent was called to account. In the interim,

> merchandise worth hundreds of thousands of dollars was
> ordered by the agent *with the tacit, if not the express,*
> *approval of [retailer]*.

*Id*. at 488 (emphasis added).  Thus, in *Jaclyn*, knowledge and consent sufficient to defeat

the then-existing "lack of knowledge and consent" element of the former New Jersey

commercial bribery statute was found because the retailer *purposefully* consented to the

illegal acts after it was armed with "reliable information of its agent's disloyal conduct."

*Id*.  By contrast, Plaintiffs' CAC alleges the very opposite of knowledge and consent.  In

the CAC, Plaintiffs allege that the PBM Defendants' clients were actively misled and

unaware of the PBM's disloyalty because the PBM Defendants concealed it.  *See supra* at

II.C (cataloging averments).

Defendants' only other case analyzing New Jersey's commercial bribery statute —

from the Southern District of New York — is also inapposite.  *Johnson v. Nextel*

*Communications, Inc.* concerned a law firm that represented a class of plaintiffs against

Nextel.  2017 WL 4326052, at *2 (S.D.N.Y. Sept. 19, 2017).[3]  The class of plaintiffs sued

Nextel under New Jersey's commercial bribery statute, alleging that Nextel's payment of

attorneys' fees as well as a $2 million consultancy fee to plaintiffs' law firm

compromised the law firm's representation of the plaintiffs.  *Id*.  However, the law firm

disclosed its conflict of interest and had every plaintiff "sign a waiver as to the conflicts."

---

[3] Not only is *Nextel* factually inapposite, but as a New York case, it is entitled to
little weight in its analysis of New Jersey law.  *See Walker v. Spina*, 359 F. Supp. 3d
1054, 1081 (D.N.M. 2019) ("It is perhaps a more workable design for each district court
to keep track of legal developments in the state law of its own state(s) than it is for the
Tenth Circuit to monitor separate legal developments in eight states.").

14

*Id*.  Therefore, plaintiff's complaint in *Johnson*, pleading a violation of New Jersey's commercial bribery statute (which the court wrongly believed to contain, as in the repealed statutory offense, an essential element of lack of knowledge and consent), was deemed implausible.  Plaintiffs plead no such disclosure to or express waiver by the PBMs' clients in the CAC here.  On the contrary, Plaintiffs have alleged that the PBMs' clients were actively misled into believing the PBMs' interests were aligned with theirs, and further allege, extensively, that the bribery scheme was concealed.  *See, e.g.*, ECF No. 271 ¶¶ 97-98, 237-238 (Express Scripts enacted a "client pledge" to "always align its interests" with its clients and its CEO testified before Congress that *"[o]ur business model is one of alignment"*; OptumRx's CMO testified to Congress that it was "working *to reduce costs for their customers*" and "*effectively negotiate[s] with drug companies . . . and manages pharmacy benefits on behalf of customers*"; Caremark's representative testified before Congress that "[w]e negotiate the best possible discounts off the manufacturer's price *on behalf of* employers, unions, government programs, and the beneficiaries that we serve.") (emphases in original) (footnotes omitted).

New Jersey case law makes abundantly clear that a defendants' alleged concealment of a bribery scheme necessarily means that the plaintiff lacked knowledge and did not consent.  In *New Jersey Office Supply, Inc. v. Feldman*, 1992 WL 219790 (D.N.J. Sept. 1, 1992), the CEO of New Jersey Office Supply ("NJOS"), defendant Feldman, hatched two schemes and took steps to conceal his conduct from NJOS.  The Court granted partial affirmative summary judgment for the plaintiff under New Jersey's commercial bribery statute (N.J.S.A. § 2C:21-10).  *Id*. at *12.

15

In the first scheme, labeled "furniture for cars," Feldman gave away free furniture belonging to NJOS to car dealerships in exchange for three personal vehicles. Feldman actively concealed each transaction by: (1) instructing an employee "to destroy any paperwork associated with the furniture he bartered for the car"; (2) telling the employee on another occasion that "there should be no paperwork"; and (3) telling the employee "to cancel billing created for goods shipped to [the dealership]." *Id*. at *3. The court, laboring under the misapprehension that lack of knowledge and consent was still an element, held in any event that this scheme violated New Jersey's commercial bribery statute, further noting that "NJOS could not consent to the transactions involving the cars because Feldman *concealed the transactions* by having the relevant paperwork destroyed." *Id*. at *11 (emphasis added).[4]

Feldman's second scheme was called the "Paper Mart Kickback Scheme." Paper Mart, Feldman's co-defendant, supplied NJOS with paper and provided a rebate of $.03 per ream. Feldman directed this money to himself instead of NJOS, and received it through a third party, "Tempkin." *Id*. at *3. Tempkin then "created phony invoices to cover up the Paper Mart scheme." *Id*. Again, the court held that concealment of the scheme meant there was no knowledge or consent: "NJOS alleges that the Paper Mart rebate scheme violated

---

[4] In *New Jersey Office Supply*, the Court mistakenly applied the reasoning of *Jaclyn* to New Jersey's modern commercial bribery statute, and therefore analyzed the absence of "the knowledge and consent of the principal." *Id*. at *11. New Jersey's current commercial bribery statute does not contain such an element. But even if it does, *New Jersey Office Supply* demonstrates that Plaintiffs have adequately pled lack of knowledge and consent.

the commercial bribery statute. Feldman argues that NJOS knew of, and benefitted from, the rebate scheme. *This argument fails because Feldman concealed his acts* by creating a fictitious invoicing scheme." *Id.* at *11 (emphasis added).

*New Jersey Office Supply* makes clear that even a partial disclosure of the illegal activity does not create knowledge or consent. The opinion notes that Feldman told "Sergeant," a superior executive of the parent company to NJOS, that some "crazy practices" were occurring, but "never detailed any of the schemes." *Id.* at *4. Feldman argued this constituted disclosure of suspicious activity, but the court rejected Feldman's argument that his activities were thereby known and consented to by NJOS: "Feldman insists that he engaged in legitimate business practices because Sergeant and other [parent company] executives authorized his activities. During his deposition, however, Feldman stated that he did not inform Sergeant about *the extent of his activities.*" *Id.* at *6 (emphasis added). Accordingly, it is clear that — even under this erroneous construction of the New Jersey commercial bribery statute (the operative version of which has no element of lack of knowledge and consent) — only by pleading the principal's "full knowledge and consent" to the full extent of the illegal activity will a plaintiff plead itself out of court. And here, Plaintiffs have pled beyond question the very opposite of "full knowledge and consent": Plaintiffs have pled that clients were not informed of the PBM Defendants' disloyalty and illegal acts, even partially, because it was all concealed. *See supra* at II.C.

**B.      Plaintiffs' Allegations of Concealment Satisfy Any "Lack of Knowledge and Consent" Element of the Missouri, Pennsylvania, Illinois, Virginia, California, and Texas Commercial Bribery Offenses**

**1.      Plaintiffs have adequately pled a valid RICO predicate act chargeable under Missouri Revised Statutes § 570.150.1**

Like the New Jersey commercial bribery statute, the Missouri statute is modeled on Model Penal Code § 224.8, and does not contain a "lack of knowledge and consent" element.  Defendants even concede the equivalence between the two statutes.  *See* Defs.' Br. at 10 ("substantively identical").  Defendants cite no Missouri case law suggesting that the offense contains an essential element of "lack of knowledge and consent." Defendants acknowledge that "Missouri courts do not appear to have considered whether a payment must be secret to qualify as commercial bribery[.]"  *Id.*  Since the plain language of the statute does not contain such an element, it would be surprising if Missouri courts did so.  Even if lack of consent were an element of the Missouri offense, Plaintiffs have pled such lack of consent by alleging the PBM Defendants' concealment. *See supra* at II.C (cataloging extensive averments).

**2.      Plaintiffs have adequately pled a valid RICO predicate act chargeable under 18 Pennsylvania Criminal Statutes Annotated § 4108**

Defendants again argue that Plaintiffs' claims pursuant to 18 Pa. C.S.A. § 4108 should be dismissed because Plaintiffs purportedly failed to allege that the PBM Defendants acted "without the consent" of their clients.  While the statute does contain the element Defendants attack, Defendants ignore Plaintiffs' extensive pleading of their concealment and the Court's related holdings.  *See supra* at II.C (cataloging averments).

Under Pennsylvania case law, Plaintiffs' alleging Defendants' concealment of the bribery scheme is sufficient and negates an averment of "consent" (which averment Plaintiffs do not, in any event, make). For example, in *United States v. Johns*, 742 F. Supp. 196 (E.D. Pa. 1990), a purchasing agent for Acme Markets, Mr. Johns, created three shell companies to receive kickbacks from vendors, whom he required pay him as the price for continued business with his employer, Acme. *Id*. at 200. "Johns' name did not appear on any of the incorporation papers for these companies, nor was he formally listed as an officer, director, or shareholder of any of them." *Id*. Johns' steps to conceal his relationship with the shell companies were sufficient to negate "consent" under Pennsylvania's commercial bribery statute. The court noted that "Johns made every effort to conceal from Acme the existence of [the shell companies] and his relationship with these shell companies. * * * There is no question that Johns conducted these activities without Acme's consent." *Id*. at 220. Likewise, in this case, Plaintiffs have extensively alleged that the bribery scheme was concealed from the PBM Defendants' clients, and that the clients were actively misled into believing the PBM Defendants were working on their behalf. *See supra* at II.C. (cataloging extensive averments of the CAC). Accordingly, Plaintiffs' pleading of the predicate offense of commercial bribery under 18 Pa. C.S.A. § 4108 is adequate and should not be dismissed.

Furthermore, even if "the PBMs' clients were aware of [] rebate negotiations" (Defs.' Br. at 11), that would not negate an averment of concealment or plead consent. General awareness of Defendants' rebate negotiations and consenting to a bribery scheme are two entirely different things. Even knowledge of acts of bribery — which Plaintiffs'

19

CAC does not allege the PBMs' clients possessed — does not equate to consenting to commercial bribery under the Pennsylvania statute.  *See United States v. Parise*, 159 F.3d 790, 801 n.11 (3d Cir. 1998) (upholding defendant's RICO conviction for facilitating bribe payments to union members and noting that "[s]imply because [union President] and some other corrupt union leaders knew that some port agents were bribed does not mean that the practice could not have been against the interest of the port agents' employer, the union").  Accordingly, Plaintiffs' claims pursuant to 18 Pa. C.S.A. § 4108 should not be dismissed.

### 3. Plaintiffs have adequately pled a valid RICO predicate act chargeable under 720 Illinois Compiled Statutes § 5/29A

Repeating the same argument, Defendants contend that Plaintiffs have not adequately alleged that "Caremark or Express Scripts acted 'without consent' of their clients" and therefore have not pled a RICO predicate act chargeable under 720 Illinois Compiled Statutes § 5/29A.  Defs.' Br. at 11.  But again, Plaintiffs have extensively alleged the PBM Defendants' concealment and, as in other jurisdictions, in Illinois pleading concealment of a bribery scheme negates any averment of "consent" (an averment Plaintiffs do not, in any event, make in the CAC).  For example, in *Al Maha Trading & Contracting Holding Co. v. W.S. Darley & Co.,* the plaintiff, a purchaser of fire trucks, sued a vendor of fire trucks for common law fraud and conspiracy after it was revealed that the vendor had bribed the plaintiff's employee to steer business to the vendor.  2014 WL 2459674, at *1 (N.D. Ill. June 2, 2014).  The bribes took the form of inflated prices and "commissions" paid directly to plaintiff's employee that were

concealed from the plaintiff. *Id*. at *2-3, 7-8. The court was "persuaded that [plaintiff]'s bribery allegations, whether based on Illinois' statutory bribery offense or the common law, sufficiently plead unlawful acts[.]" *Id*. at *9 (citations omitted). Contrary to Defendants' arguments on this motion, the mere fact that the plaintiff had authorized his employee to negotiate with the defendant did not amount to "consent" to the concealed bribery scheme. *Id*. at *2-3 (noting that plaintiff's employee was "responsible for recommending to [plaintiff] fire truck and equipment sellers" and that plaintiff had "relied upon [defendant vendor's] representations in its May 21, 2008 invoices for fire trucks and equipment" that did not "disclose[] to [plaintiff] that [defendant's] price quotes had been increased to pay [plaintiff's employee] a 'commission'"). The court correctly emphasized that the relevant issue was plaintiff's consent to *the illegal bribery scheme*, not plaintiff's mere authorization for its employee to negotiate on its behalf generally, as Defendants attempt to argue here.

The single Illinois case Defendants cite in support of their argument, *United States v. Burke*, 2022 WL 1970189 (N.D. Ill. June 6, 2022), does not help them at all. There, the court denied defendants' motions to dismiss in full. *Id*. at *1 ("Together these motions would have this Court dismiss almost every charge of the indictment against all Defendants . . . The Court denies these motions in full."). With respect to one defendant, the court rejected his argument that the City of Chicago "consented" to his receipt of bribes because they were supposedly authorized by an "ethics ordinance." *Id*. at *36 ("Cui insists that the City of Chicago consented to his receipt of compensation for outside employment through the ethics ordinance . . . The Court rejects the argument[.]").

21

*Burke* supports Plaintiffs' argument (more fully set forth in Part III.C., *infra*) that, contrary to Defendants' other arguments, the California and Rhode Island commercial bribery statutes reach corporations (and not just individuals) because the state legislatures would have expressly excluded corporations from the statutes if they intended for corporations to be excluded.  *See infra* at III.C.  In *Burke*, one of the defendants argued that the Illinois commercial bribery statute did not apply to public officials.  *Id*. at *34-35.  The court rejected the argument and noted that "[t]he General Assembly knows how to differentiate or exclude public officials from the commercial bribery statute, yet there is no language limiting the reach of the statute."  *Id*. at *35 (citation omitted).  We will revisit this argument in Part III.C.

### 4.    Plaintiffs have adequately pled a valid RICO predicate act chargeable under Virginia Code § 18.2-444

Defendants cite no Virginia case about the type or degree of consent that would negate a claim for commercial bribery, and thus Defendants press only a plain-text argument for dismissal.  Defs.' Br. at 12 (citing no cases).  Regardless, as Plaintiffs have been constrained to point out repeatedly on this motion, Plaintiffs' extensive averments of concealment demonstrate that the PBMs' clients did not have knowledge of, and did not consent to, the illegal bribery scheme.  *See supra* at II.C.  Accordingly, Defendants' Motion should be denied with respect to Plaintiffs' pleading of the predicate commercial bribery offense under Virginia state law.

5. **Plaintiffs have adequately pled a valid RICO predicate act chargeable under California Penal Code § 641.3**

Defendants' Motion asserts two bases for judgment on the commercial bribery offense under California's statute. The first is Defendants' rehashed consent argument.[5] For the same reasons set forth above, Plaintiff has adequately pled the absence of consent under California Penal Code § 641.3 given Plaintiffs' extensive allegations of concealment. *Supra* at II.C.

Defendants cite only one California case to support their argument — *People v. Riley*, 240 Cal. App. 4th 1152 (2015). *Riley*, however, supports Plaintiffs, not Defendants. The prosecution in that case charged that a casino executive took bribes from an insurance broker so that the broker could charge excessive fees to the casino in connection with insurance purchased from the broker covering the casino that employed the casino executive. *Id*. at 1154. *Riley* makes clear that pleading concealment of a bribery scheme meets the element of lack of consent under California Penal Code § 641.3. The court in *Riley* held that "wrongful concealment or suppression of the truth," which Plaintiffs' CAC extensively alleges, was sufficient to show that bribe money was accepted "corruptly," for purposes of the element of the offense requiring money to be accepted "corruptly and without the knowledge or consent of the employer." *Id*. at 1163 (citation omitted). Plaintiffs' allegations of concealment thus clearly aver the requisite lack of knowledge and consent under California Penal Code § 641.3(d)(3).

---

[5] Defendants' other basis is discussed in Part III.C.1., *infra*.

### 6. Plaintiffs have adequately pled a valid RICO predicate act chargeable under Texas Penal Code § 32.43

For the same reasons set forth above, Plaintiffs' pleading of the absence of consent is sufficient under Texas Penal Code § 32.43, given Plaintiffs' extensive allegations of concealment.

The one case Defendants cite, *LeBlanc v. Lange*, 365 S.W.3d 70 (Tex. App. 2011), does not support their position. *LeBlanc*, which was decided on summary judgment rather than a motion attacking the complaint, concerned plaintiff's claim that his former friend, business associate and attorney breached a fiduciary duty to plaintiff by representing the plaintiff's counterparty to a settlement agreement. *Id*. at *73-77. Plaintiff alleged, among other things, that the settlement agreement violated Texas Penal Code § 32.43. *Id*. at *86-87. The Texas Court of Appeals affirmed the trial court's summary judgment ruling in favor of the defendant, finding that LeBlanc had failed to establish that the defendant owed a fiduciary duty to LeBlanc because defendant "made clear to LeBlanc that [defendant] had a duty to represent the interests of the [counterparties to the settlement agreement]" and LeBlanc was represented by *other* counsel during the negotiations. *Id*. at *84. Further, the Court of Appeals found that LeBlanc was fully aware of any "benefits" that the defendant would potentially realize in connection with his work on (or interest arising from) the settlement agreement and, thus, defendant did not obtain benefits without LeBlanc's consent (though it was not LeBlanc's to give in light of the fact that there was no fiduciary duty owed by defendant to LeBlanc, and LeBlanc was represented by other counsel). *Id*. at *77, 84-85, 87.

24

In stark contrast, the Court here previously held that Plaintiffs sufficiently alleged Defendants' fiduciary duty and duty of fidelity to their health plan clients. *See* ECF No. 125 at 41-45. The Court reasoned that Plaintiffs sufficiently alleged that the PBMs "control[led] the amount they receive[d] in rebates" and "exercise[d] discretion over how much of that money [was] paid to the plans." *Id.* at 43. The Court also reasoned that the PBM Defendants' "invited confidence" plausibly gave rise to a fiduciary relationship based on the PBMs' representations that they would "align their interests and/or act in the best interests of their clients," and that they were "uniquely positioned" to achieve lower costs, resulting in health plan clients ceding "significant control over both the design of their formularies and the classification of payments received from drug manufacturers, trusting that the PBMs would use this influence to protect their clients' interests." *Id*. at 44-45. Further, as outlined herein, Plaintiffs have extensively alleged that the PBM Defendants concealed the bribery scheme and represented that their interests were aligned with their clients. *Supra* at II.C (cataloguing averments of concealment), III.A.2 (cataloguing averments that the PBMs represented that their interests were "aligned" with their clients and that they were working "on behalf of" clients).

The Motion for judgment on the pleadings regarding the predicate offense of commercial bribery under the Texas statute should be denied.

**C.**      **California and Rhode Island's Commercial Bribery Statutes Apply to Corporations**

    **1.**      **California's commercial bribery statute applies to corporations**

Defendants argue that "the California statute does not reach conduct by corporations" (Defs.' Br. at 6), but Defendants' argument is based on a constricted reading of the statute and a mischaracterization of the scant case law interpreting it. California Penal Code § 641.3(a) provides:

> (a) Any employee who solicits, accepts, or agrees to accept money or any thing of value from a person other than his or her employer, other than in trust for the employer, corruptly and without the knowledge or consent of the employer, in return for using or agreeing to use his or her position for the benefit of that other person, and any person who offers or gives an employee money or any thing of value under those circumstances, is guilty of commercial bribery.

Defendants seize upon the word "employee" to argue that a corporation is not an "employee" under the statute and therefore "[a]lleged payments to a corporation cannot violate California Penal Code § 641.3[.]" Defs.' Br. at 7. Defendants are wrong.

At the outset, Defendants' proposed narrow interpretation of California Penal Code § 641.3 does not comport with California Penal Code § 4, which reads in full:

> The rule of the common law, that penal statutes are to be strictly construed, has no application to this Code. All its provisions are to be construed according to the fair import of their terms, with a view to effect its objects and to promote justice.

Cal. Penal Code § 4. Nowhere in § 641.3 is there a term providing that corporations are excepted from liability, or that liability is limited to natural persons or "individuals." The words "natural persons" and "individuals" do not appear in the statute at all. This Court

is "not authorized to insert qualifying provisions and exceptions which have not been included by the Legislature, and may not rewrite a statute to conform to an intention which does not appear in the statutory language." *Cal. Real Estate Loans, Inc. v. Wallace*, 18 Cal. App. 4th 1575, 1582 (1993) (citation omitted).

Defendants' interpretation of the statute not only constitutes an impermissible rewrite, but is at odds with the definitions contained within its provisions and their context. Under Defendants' reasoning, because § 641.3 uses the term "employee" to refer to the transgressor who solicits, accepts, or agrees to accept money or any thing of value, and does not use the word "corporation" as a term used to define "employee," all terms used to define "employee" must somehow necessarily be limited to natural persons. From this baseless premise, Defendants' argument concludes that corporations are excluded from liability. These logical leaps do not withstand scrutiny, and impermissibly ignore the important context revealed by the statute and both the plain and accepted legal meaning of the terms used in the definitions. The juxtaposed definitions of "employee" and "employer" under § 641.3 say:

> "Employee" means an officer, director, agent, trustee, partner, or employee.

> "Employer" means a corporation, association, organization, trust, partnership, or sole proprietorship.

*Id.* § 641.3(d)(1)-(d)(2). Viewed in context, it is obvious that the legislature is seeking to capture the universe of fiduciary-beneficiary dyads, and chose the shorthand of employee-employer to refer to the greater universe, which in turn is set forth at length in these two juxtaposed definitions. A corporate officer or director owes a fiduciary duty to

27

a corporation.  A trustee owes a fiduciary duty to a trust.  An agent owes a fiduciary duty to a principal, be that principal a corporation, association, organization, and so forth. And of course an employee owes a duty of loyalty to the employer.  But where is Defendants' wished-for limitation, to natural persons, of the bearer of the duty of loyalty regardless of the dyad?  It is nowhere to be found.

It is not just nowhere to be found, but is flatly inconsistent not just with the context of the statute, but also with both the plain meaning and appropriate legal meaning of "agent" or "trustee."  Everyone knows that agents and trustees are frequently not natural persons but are instead corporations.  This is the legal meaning those terms have acquired, too.  *See* Restatement (Second) of Agency § 1 cmt. a ("Either of the parties to the relation may be a natural person, groups of natural persons acting for this purpose as a unit such as a partnership, joint undertakers, *or a legal person, such as a corporation.*") (emphasis added); *id.* § 14M reporter's note ("It is an accepted principle of agency that the term 'agent' includes both natural persons and corporations.  Likewise, a 'principal' may be either human or a corporation.  Further, the terms 'master' and 'servant' denoting a particular kind of principal-agent relation can properly be applied to corporations notwithstanding the anthropomorphic sound of the titles.  It follows that a corporation can be an agent for another corporation."); Restatement (Third) of Agency § 3.15 cmt. b ("*When an agent is itself a corporation or other legal person*, its officers, employees, partners, or members who are designated to work on the principal's account are subagents) (emphasis added); Restatement (Second) of Trusts § 96(1) ("The extent of the *capacity of a corporation* to take and hold property in trust is the *same as that of a*

*natural person* except as limited by law"); Restatement (Third) of Trusts § 33(1) (similar).

Whether taken together or separately, the context, plain meaning, and legal meaning of these terms compel rejection of Defendants' construction, because the California Penal Code requires that "[w]ords and phrases must be construed according to the context and the approved usage of the language; but technical words and phrases, and such others as may have acquired a peculiar and appropriate meaning in law, must be construed according to such peculiar and appropriate meaning." Cal. Penal Code § 7(16). *See also Carson Harbor Vill., Ltd. v. Unocal Corp.*, 270 F.3d 863, 878 (9th Cir. 2001) (court focused on the plain meanings of the terms used in statute to define "disposal"). The statute thus plainly encompasses corporations as "employees."[6]

Defendants cite a single case California case concerning statutory construction, *Yost v. Forestiere*, 51 Cal. App. 5th 509 (2020). Because of the obvious context of the definitions of "employer" and "employee" in California Penal Code § 641.3, *Yost*'s statutory construction analysis is inapposite. Moreover, *Yost* demonstrates that if the California Legislature meant to exclude corporations from the reach of § 641.3, or limit

---

[6] Defendants cite the "rule of lenity," but that principle "has no application where, as here, a court can fairly discern a contrary legislative intent. * * * Here, defendant's proposed construction of the statutory language is improbable and would impede the protective function of the Act. It is, therefore, not in relative equipoise with the application of a commonsense understanding of the language, which understanding is consistent with and promotes the Legislature's protective purpose." *People v. Cornett*, 274 P.3d 456, 462 (Cal. 2012). "The rule of strict construction of penal statutes is not an inexorable command to override common sense and evident statutory purpose." *People ex rel. Lungren v. Superior Ct.*, 926 P.2d 1042, 1053 (Cal. 1996).

its application to natural persons, it could and would have expressly said so in the statute. *Yost* concerned a grandfather's request to modify a restraining order placed on him to stay away from his granddaughter.  The question before the court was whether the grounds for modification of a restraining order in California Civil Procedure Code § 527.6(j)(1) were limited to the three enumerated scenarios in California Civil Procedure Code § 533.  "Grandfather asserted that if the Legislature had intended such a limitation, it would have referred to section 533 in section 527.6's modification provision."  51 Cal. App. 5th at 524.  The court agreed, and noted that "the Legislature clearly was capable of referring to other provisions in the Code of Civil Procedure when it intended them to apply to civil harassment restraining orders."  *Id*. at 525.  The court noted that other sections of § 527.6, such as subsection (a)(2) and (u)(2), expressly incorporated other provisions of the Code when they intended for them to apply.  *Id*.  "In short, had the Legislature wanted to include section 533 as a limitation on the scope of section 527.6's modification provision, it was capable of doing so.  It did not."  *Id*. (citation and quotation omitted).

Likewise, this Court should not read a limitation into California Penal Code § 641.3 that is not expressly stated.  If the California Legislature wanted to exclude corporations from § 641.3, "it was capable of doing so," and would have so stated.  *Id*.  It did not.  *See also, supra*, III.B.3 (explaining that in *Burke*, 2022 WL 1970189, at *35, the court held that Illinois' commercial bribery statute applied to public officials because "[t]he General Assembly knows how to differentiate or exclude public officials from the commercial bribery statute, yet there is no language limiting the reach of the statute").

Defendants' other cited cases are inapt.  Neither *People v. Riley*, 240 Cal. App. 4th 1152 (2015) nor *Gxp Consultants Alliance v. Lacy Construction*, 2016 Cal. Super. LEXIS 26997 (Cal. Super. Ct. Sept. 8, 2016) holds that California's commercial bribery laws do not apply to corporations.  In *Riley* (discussed in Part III.B.5, *supra*), which concerned an insurance broker's bribes to a casino executive so that the broker could charge excessive fees to the casino in connection with the purchase of insurance products, the court was not called upon and was not required to examine the liability of corporate entities and thus did not address the issue of whether corporations fell within the scope of § 641.3. Certainly, the court in *Riley* did not make any pronouncement that California's commercial bribery laws apply only to natural persons and not corporations.

*Gxp Consultants* dealt with a contract between two corporations for construction projects that included a "finder's fee."  The court found that there was nothing illegal about the fee in question, and held only that no bribery had taken place, not that corporations are exempt from California's bribery laws.  2016 Cal. Super. LEXIS 26997, at *2.  It reasoned:

> There is nothing illegal about a finder's fee in a contract such as the ones at issue in the first and second causes of action. The defendant has presented no authority to support a finding that the 2.5% fee for the Westlake Village project at issue in the first cause or the 2.1% fee for the La Habra project at issue in the second cause are unenforceable, improper or illegal. The defendant's reliance on *Penal Code § 641.3* does not support a finding of illegality under these facts since, such statute applies to an employee taking a bribe.

*Id.* at *2 (emphasis in original).  Contrary to Defendants' attempt to stretch the court's

31

finding, it is clear that the court's statement that the "statute applies to an employee taking a bribe" was intended to mean that no bribe had occurred given the legality of the finder's fee, not that a bribe had occurred but was not actionable because it involved payment to a corporation.

Defendants' attempt to manufacture a sweeping pronouncement in *Valentine v. GEP Cencast, LLC*, 2014 WL 6679097 (Cal. Dist. Ct. App. Nov. 25, 2014) that corporations are excepted from the commercial bribery laws to support its strained position is similarly unavailing. *Valentine*, if anything, reflects that a corporate entity may be subject to liability under California Penal Code section 641.3, but that plaintiff's complaint there suffered from insufficient allegations. *Id*. at *6 ("The allegation that a *company* has extorted payments or accepted bribes to favor certain actors over others is a mere conclusion without any factual support. Our de novo review of the operative complaint reveals no factual allegations linking the assignment of work to the payment of bribes or unauthorized fees. The complaint even acknowledges that some '[u]nion members, unaffiliated with Central's 'proxy', would 'laboriously' obtain coveted union engagements . . . .' Because the complaint does not allege any contractual or legal provision preventing Central Casting from charging additional fees, it does not allege the elements for extortion or violating federal RICO laws. Despite Valentine's protestations to the contrary, monthly fees charged by third parties do not establish that Central Casting violated Labor Code section 1702.") (alterations in original) (emphasis added) (citation omitted). The court's comment that "[o]nly individual employees can violate Penal Code section 641.3 . . . by acting to the detriment of the employer" was directed to

32

the fact that the alleged bribes were made to "Central Casting *employees*," flowed to "third party call-in services," not the corporation sued, and were to Valentine's detriment not the employer's. *Valentine*, 2014 WL 6679097, at \*2, 6.[7]  Again, the word "individual" does not appear in the statute.

To be sure, Defendants cite several cases where California's commercial bribery statute is applied to "individual criminal defendants" (Defs.' Br. at 8 n.3), but none of those cases holds that corporations are excluded from the reach of California's commercial bribery statute.  For all the reasons stated above, it is clear that corporations are not excluded.

### 2. Rhode Island's commercial bribery statutes apply to corporations

Similar to their argument under California law, Defendants ask this Court to disregard a plain reading of Rhode Island's commercial bribery statute and find that when it uses the word "person," it applies only to natural persons and not corporations.  Defs.'

---

[7] Moreover, *Valentine* is an unpublished opinion that is uncitable under California Rule 8.1115 and entitled to no weight.  *See People v. Williams*, 176 Cal.App.4th 1521, 1529 (2009) (warning practitioners "[d]o *not, under any circumstances*, cite to an *unpublished or depublished* opinion . . . unless . . . one of the narrow exceptions to the noncitation rule applies") (emphasis and alteration in original) (citation and quotation marks omitted).  *See also Alicia T. v. Los Angeles*, 222 Cal. App.3d 869, 885-886 (1990) (imposing sanctions on counsel for violating citation rules regarding unpublished decisions).  *See also Credit Suisse First Boston Corp. v. Grunwald,* 400 F.3d 1119, 1126, n.8 (9th Cir. 2005) ("Under California Rules of Court … an unpublished opinion cannot be cited to or relied on by other courts. In short, an unpublished opinion does not constitute binding precedent.") (citation omitted); *Rennick v. O.P.T.I.O.N. Care, Inc.*, 77 F.3d 309, 317 (9th Cir. 1996) (refusing to consider a party's citation to a decision cited by one of the parties because the California Court of Appeal had granted rehearing, thereby superseding the opinion and rendering it unpublished under California's publication rules); *Taylor v. Quail*, 458 F. Supp. 2d 1065, 1068 (C.D. Cal. 2006) (rejecting a party's citations to two unpublished California Court of Appeal opinions).

Br. at 12 ("Rhode Island commercial bribery laws apply only in situations in which (1) an individual employee or (2) a public official is bribed.").  Again, no such exclusion exists, and this court is not authorized to import one into the statute.  *See Zahn v. Yucaipa Cap. Fund*, 218 B.R. 656, 669, 672 (D.R.I. 1998) ("Courts must assume that the Legislature knew how to create an exception if it wished to do so," and further noting "[t]he foregoing analysis applies to the law of Rhode Island as well.  Rhode Island's principles of statutory construction are similar to those of California[.]") (quotation omitted) (citations omitted).

It has been understood for centuries that "the term 'person' . . . extend[s] to corporations" when construing statutory language.  *Cook Cnty., Ill. v. U.S. ex rel. Chandler*, 538 U.S. 119, 125 (2003) (noting that as early as 1826 the Supreme Court has "recognized the presumption" that the term "person" includes corporations) (quoting *United States v. Amedy*, 24 U.S. 392, 412 (1826)).  Rhode Island General Law § 43-3-6 states plainly that "[t]he word 'person' extends to and includes co-partnerships *and bodies corporate* and politic." (emphasis added).  This rule of construction applies to all Rhode Island statutes.  *See* R. I. Gen. L. § 43-3-2.

The statutes at issue, Rhode Island General Laws §§ 11-7-3 and 11-7-4, are replete with references to "persons."  Rhode Island General Law § 11-7-3 is extracted in full below:

> (a) **No person** in public or private employ, or public official shall corruptly accept, or obtain or agree to accept, or attempt to obtain **from any person**, for himself or herself **or any other person**, any gift or valuable consideration as an inducement or reward for doing or forbearing to do, or for

having done or forborne to do, any act in relation to the business of his or her principal, master, employer, or state, city, or town of which he or she is an official, or for showing or forbearing to show favor or disfavor **to any person** in relation to the business of his or her principal, master, employer, or state, city, or town of which he or she is an official.

(b) It shall not be a defense to a prosecution under this section that **the person** did not have the power or authority to perform the act or omission for which the reward or inducement was offered, solicited, accepted, or agreed upon.

(emphasis added).  And Rhode Island General Law § 11-7-4 similarly uses the term

"person" repeatedly:

(a) **No person** shall corruptly give or offer any gift or valuable consideration **to any person** in public or private employ, or any public official as an inducement or reward for doing or forbearing to do, or for having done or forborne to do, any act in relation to the business of his or her principal, master, or employer, or the state, city, or town of which he or she is an official, or for showing or forbearing to show favor or disfavor **to any person** in relation to the business of his or her principal, master, employer, or state, city, or town of which he or she is an official.

(b) It shall not be a defense to a prosecution under this section that **the person** did not have the power or authority to perform the act or omission for which the reward or inducement was offered, solicited, accepted, or agreed upon.

(emphasis added).  In light of Rhode Island General Law § 43-3-6's rule that "person"

also encompasses a corporation, it is clear that Rhode Island's commercial bribery

statutes apply to corporations under a plain reading.

Rhode Island General Laws §§ 11-7-3 and 11-7-4 are not ambiguous and the "rule

of lenity" does not apply.  *See United States v. Jimenez*, 507 F.3d 13, 21 (1st Cir. 2007)

("We recently wrote that the rule [of lenity] 'only applies if there is a *grievous* ambiguity in the statute.'") (emphasis in original) (citation omitted).

The one case Defendants cite on the issue, *State v. Hazard*, 68 A.3d 479 (R.I. 2013), is inapposite.  There, the criminal defendant possessed a pistol that was "damaged and unable to be fired in the condition in which it was found[.]"  *Id*. at 483.  The question of statutory construction before the court was whether the following italicized language, which would require that a gun be capable of expelling a "projectile," modified only "other instrument" or the entire list of weaponry in the statute: "'Firearm' includes any machine gun, pistol, rifle, air rifle, air pistol, 'blank gun,' 'BB gun,' or other instrument *from which steel or metal projectiles are propelled, or that may readily be converted to expel a projectile*[.]"  R.I. Gen. Laws § 11-47-2 (emphasis added).  The court applied the rule of lenity and found that the italicized language applied to the entire list of weaponry, such that "a 'firearm' must either have the capability to expel a projectile or be readily convertible to do so."  *Hazard*, 68 A.3d at 492.

Here, analysis of Rhode Island's commercial bribery statutes requires no difficult parsing of ambiguous language to determine if one phrase modifies only its immediate antecedent or an entire list of items.  Rhode Island General Laws §§ 11-7-3 and 11-7-4 expressly apply to "persons," and "persons" expressly includes corporations under Rhode Island General Law § 43-3-6.  The statutory analysis is not complicated.

Like their argument for California, Defendants again relegate to a footnote several cases where Rhode Island's commercial bribery statutes are applied to individual persons.  Defs.' Br. at 14 n.4.  And again, none of the cases excludes corporations from the reach

36

of Rhode Island's commercial bribery laws.  For all the reasons stated above, it is clear

that corporations are included within the reach of §§ 11-7-3 and 11-7-4.

**D.**  **The Complaint Alleges Sufficient Conduct Related to Texas, so the Motion's Remaining Basis to Challenge Claims Related to Texas Penal Code § 32.43 Must Also Fail**

Defendants argue that Plaintiffs lack "factual allegations that Defendants violated

the statute through conduct in Texas[.]"  Defs.' Br. at 15-16.  Defendants are wrong.

Their cited authority, *McGowan v. State*, holds that Texas would have jurisdiction if a

defendant "solicited, accepted or agreed to accept a benefit in Texas."  938 S.W.2d 732,

735 (Tex. Ct. App. 1996).  But the CAC clearly alleges that "one Caremark entity,

CaremarkPCS Health, L.L.C., has its headquarters in Texas[.]"  Defs.' Br. at 17.  In

ruling on Defendants' first motions to dismiss (and applying the same standard as this

Motion, under Rule 12), the Court already held that Plaintiffs "alleged an adequate

connection to the states whose laws they invoke," in part because Plaintiffs "allege that . .

. the Defendant entities are headquartered in many of the states."  ECF No. 125 at 40.

The Court further held that "[i]t is reasonable to infer that Defendants took actions to

further their alleged scheme at their respective corporate headquarters[.]"  *Id.*  The CAC's

allegations about Caremark's part in the scheme are extensive, including solicitation and

receipt of money by Caremark entities.  *See, e.g.,* ECF No. 271 ¶¶ 166, 187, 207, 248,

291.  This is sufficient for Texas to be able to charge a violation of its commercial bribery

law.  For example, Texas courts have held that a payment to a fiduciary embedded in a

contract can be bribe under this statute, which would include contracts with the Texas-

based Caremark entity.  *Cotter & Sons v. BJ Corp.*, 549 S.W.3d 715, 724-25 (Tex. Ct.

37

App. 2017).  Indeed, even just soliciting a bribe is sufficient, *id.* at 724, and the CAC

alleges that Caremark (including the Texas Caremark entity) solicited, was offered, and

accepted payments from Mylan.  *See, e.g.,* ECF No. 271 ¶¶ 166, 187, 207, 248, 291.

In contrast, the Defendant in *McGowan* lived in Washington, and "the

circumstantial evidence indicate[d] that the benefit was accepted outside of the State of

Texas."  *McGowan*, 938 S.W.2d at 743 n.3.  This Court must "draw all reasonable

inferences in [Plaintiffs'] favor," *State Farm*, 2021 WL 2562848, at *2 (citing *Gorog*,

760 F.3d at 792), which would include an inference that a Texas-based Caremark entity

solicited, agreed to accept, and/or accepted Mylan's money while in Texas.  The Motion

lacks support and should be denied.

## IV.    <u>CONCLUSION</u>

For the reasons set forth above, Defendants' Motion should be denied.

Dated:  February 1, 2023                    Respectfully submitted,

/s/ *David F. Sorensen*                     /s/ *Bruce E. Gerstein*
David F. Sorensen                           Bruce E. Gerstein
Caitlin Coslett                             Noah Silverman
BERGER MONTAGUE PC                          GARWIN GERSTEIN & FISHER LLP
1818 Market Street, Suite 3600              88 Pine Street, 10th Floor
Philadelphia, PA 19103                      New York, NY 10005
(215) 875-3000                              (212) 398-0055
dsorensen@bm.net                            bgerstein@garwingerstein.com
ccoslett@bm.net                             nsilverman@garwingerstein.com

*Interim Co-Lead Counsel for the Direct Purchaser Class*

E. Michelle Drake, Bar No. 0387366          Peter Kohn
BERGER MONTAGUE PC                          Joseph T. Lukens
43 SE Main Street, Suite 505                FARUQI & FARUQI, LLP
Minneapolis, MN 55414                       1617 JFK Blvd., Suite 1550
(612) 594-5933                              Philadelphia, PA 19103

emdrake@bm.net

Stuart E. Des Roches
Andrew Kelly
ODOM & DES ROCHES, LLC
650 Poydras Street, Suite 2020
New Orleans, LA 70130
(504) 522-0077
stuart@odrlaw.com
akelly@odrlaw.com

David Golub
Steven Bloch
SILVER GOLUB & TEITELL LLP
184 Atlantic Street
Stamford, CT 06901
(203) 325-4491
dgolub@sgtlaw.com
sbloch@sgtlaw.com

(215) 277-5770
pkohn@faruqilaw.com
jlukens@faruqilaw.com

David Calvello
FARUQI & FARUQI, LLP
685 Third Avenue, Floor 26
New York, NY 10017
(212) 983-9330
dcalvello@faruqilaw.com

Susan Segura
David C. Raphael, Jr.
SMITH SEGURA RAPHAEL & LEGER
221 Ansley Blvd.
Alexandria, LA 71303
(318) 445-4480
ssegura@ssrllp.com
draphael@ssrllp.com

Russ Chorush
HEIM PAYNE & CHORUSH, LLP
1111 Bagby, Suite 2100
Houston, TX 77002
(713) 221-2000
rchorush@hpcllp.com

*Attorneys for Plaintiffs Rochester Drug Co-Operative, Inc.,
Dakota Drug, Inc., and the Direct Purchaser Class*