## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

In re: EpiPen Direct Purchaser Litigation          Case No. 20-CV-827 (ECT/JFD)

THIS DOCUMENT RELATES TO:                    **ORDER**
All Actions

This case is before the Court on the Motion (Dkt. No. 564) of Defendants Express Scripts and OptumRx to Compel Plaintiffs to Answer Interrogatories. The case has been referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636 and District of Minnesota Local Rule 72.1. The Court held a motion hearing on November 21, 2022, where Peter Kohn argued for Plaintiffs and Samuel Johnson argued for the moving defendants. (Hr'g Mins., Dkt. No. 591.) The Court grants in part and denies in part Defendants' motion.[1] Specifically, Plaintiffs need not supplement their responses to Express Scripts' Interrogatory 7 because Express Scripts has not made a threshold showing that an estimated allocation of damages among Mylan, Express Scripts, CVS Caremark, and OptumRx is relevant when the harms alleged are price increases resulting from illegal monopolization. Plaintiffs must, however, supplement their responses to Express Scripts' Interrogatory 9 and OptumRx's Interrogatory 14 now, and again at the close of expert discovery. Plaintiffs must also supplement their responses to Express Scripts' Interrogatory 10, but not until the close of expert discovery. The contention interrogatories—Express

---

[1] Plaintiffs filed their memorandum in opposition to the motions under seal, but because the Court has only cited from the redacted public version of the memorandum, it files this order publicly.

Scripts' Interrogatory 9, Express Scripts' Interrogatory 10, and OptumRx's Interrogatory 14—seek relevant evidence, and they are proportional to the case, but fully responding to them will require input from experts, which is not available now but will be forthcoming.

## I.   BACKGROUND

Plaintiffs are drug wholesalers who purchased EpiPens[2] from their manufacturers, Mylan Inc. and Mylan Specialty L.P. ("Mylan"). (First Am. Compl. ¶ 1, Dkt. 271.) Plaintiffs allege that pharmacy benefit managers CVS Caremark, Express Scripts, and OptumRx ("PBM Defendants") accepted bribes and kickbacks from Mylan in exchange for making EpiPen, rather than its competitors, the drug of choice in their pharmacy benefit plans, which the PBMs administer for insurance companies and health plans. (*Id.* ¶¶ 1, 3–4.) In Plaintiffs' theory of the case, bribes and kickbacks to PBM defendants allowed Mylan to increase the price of EpiPens without losing sales to its competitors. (*Id.* at ¶ 6.) PBM Defendants ensured that EpiPen was the favored product in the PBM's plans, no matter the price. (*Id.*) Thus, patients would use EpiPen not necessarily because it was the best product but because their insurance covered it most favorably. (*See id.* at ¶¶ 4–6, 49, 66, 119, 120.) Plaintiffs claim that this scheme artificially inflated the price of EpiPens so

---

[2] EpiPens are auto-injector devices that allow patients experiencing severe allergic reactions to treat themselves with a prescribed dose of epinephrine in a spring-loaded needle. (First Am. Compl. ¶ 2.) Because EpiPens are a combination product, consisting of both a "drug (epinephrine) and a device (the auto-injector)," this Order uses the word drug and device interchangeably when referring to EpiPens. Press Release, Food & Drug Admin, *FDA Approves First Generic Version of EpiPen* (Aug. 26, 2018), https://www.fda.gov/news-events/press-announcements/fda-approves-first-generic -version-epipen.

that when Plaintiffs bought EpiPens from Mylan at the list price,[3] they paid an "overcharge." (*Id.* at ¶ 11.) Plaintiffs sued on behalf of themselves and a proposed class of direct purchasers for violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c)–(d), and Section Two of the Sherman Antitrust Act. (*Id.* ¶ 10; *see also* Opinion and Order 28, Dkt. No. 414 (dismissing Plaintiffs' Section One Sherman Antitrust Act claim).) The complete factual and procedural background of this complex litigation is more thoroughly outlined elsewhere. (*See, e.g.*, Opinion and Order, Dkt. No. 125; Order, Dkt. No. 322; Opinion and Order, Dkt. No. 414.)

The current motion to compel concerns Plaintiffs' responses to four interrogatories posed by the moving defendants, Express Scripts and OptumRx. Express Scripts asks the Court to compel Plaintiffs to answer or supplement their answers to Express Scripts' Interrogatories 7, 9, and 10. (Defs.' Mot. to Compel 1, Dkt. No. 564.) OptumRx asks the Court to require Plaintiffs to supplement their answer to OptumRx's Interrogatory 14, which is substantially similar to Express Scripts' Interrogatory 9. (*Id.*; *Compare* Ex. C at 8–9 (reprinting and answering Express Scripts' interrogatory), Dkt. No. 567-3 *with* Ex. D at 5–6 (reprinting and answering OptumRx's interrogatory), Dkt. No. 567-4.)

### A. Express Scripts' Interrogatory 7

Express Scripts' Interrogatory 7 asks Plaintiffs to explain "how much of the alleged overcharge" the Plaintiffs paid for EpiPens "is attributable to the purported Mylan-Express Scripts enterprise . . . and how much is attributable to other sources," such as Mylan's

---

[3] The published list price is often called the "Wholesale Acquisition Cost" or "WAC price." (First Am. Compl. ¶ 47.)

alleged abuse of monopoly power, Mylan's payments of rebates and fees to nonparties, the alleged Mylan-CVS Caremark racketeering enterprise, the alleged Mylan-OptumRx racketeering enterprise, and illegal behavior alleged in other EpiPen lawsuits. (Ex. A at 7–8, Dkt. No. 567-7.) Plaintiffs have agreed to allege the overcharges they paid on a per-class-member basis (Ex. B at 2, Dkt. No. 567-2) but this interrogatory seeks more detail: an "allocation of the overcharge among different potential sources" (*Id.* at 5). Plaintiffs objected to the interrogatory as requiring premature expert discovery, and as being vague, ambiguous, and compound. (Ex. C at 6.) Plaintiffs claimed that they are not required to provide such an allocation and, even if they were, the task would be impossible. (*Id.*) However, Plaintiffs did clarify that they are not seeking damages related to overcharges from the wrongful conduct alleged in other EpiPen litigation or Mylan's payments to third parties. (*Id.* at 7.) During the meet and confer process, Plaintiffs reiterated their claim that no Eighth Circuit precedent requires them to provide the requested allocation and subsequently served an amended response with new relevance and proportionality objections. (Ex. B at 3–5; Ex. K at 2, 7, Dkt. No. 567-11) Plaintiffs served this additional response two weeks after their initial response.  (Ex. C at 11; Ex. K at 12.) Express Scripts argues these objections are untimely and thus waived. (Ex. B at 3; Transcript of November 21, 2022 Motion Hearing ("Tr.") at 11:24–12:6.)

### B.  Express Scripts' Interrogatory 9 and OptumRx's Interrogatory 14

Plaintiffs allege violations of state law as RICO predicate offenses. (First Am. Compl. at ¶¶ 192–228, 260.) Express Scripts' Interrogatory 9 and OptumRx's Interrogatory 14 ask Plaintiffs to "identify which payments from Mylan to Express Scripts [they] contend

violated each respective state law and state the basis for [their] contention that such payments are within that state's jurisdiction such that they are chargeable under that state's law." (Ex. A at 8; Ex. D at 14 (using substantially similar language).) Plaintiffs summarized their response to the interrogatories as follows:

> Plaintiffs first identified the payments Plaintiffs contend were violative:
>
> Rebate, administrative fee, and other monies Mylan paid to [the PBM Defendant(s)] as a consequence of WAC price increases constituted a benefit, consideration, compensation, reward, gift, gratuity, or thing of value to [the PBM Defendant(s)], to the extent retained by [the PBM Defendants(s)]. Without admitting it is necessary to do so, Plaintiffs state that, "[f]or each state law" that Plaintiffs "allege [the PBM Defendant] violated by receiving bribes or other payments from Mylan," some of the corresponding bases for territorial jurisdiction to charge [the PBM Defendant and Mylan] are as follows[.]
>
> ECF No. 567-3 at 8; ECF No. 567-4 at 3. Then, for each Defendant, Plaintiffs set forth a detailed chart stating each state commercial bribery law that Plaintiffs contend was violated by that Defendant, and the various bases for each state's territorial jurisdiction over the Defendant such that the state's offense was chargeable[.]

(Pls.' Mem. Opp'n Mot. Compel 10 (all but the last modification in original).) For example, when Plaintiffs described their basis for believing Express Scripts violated California Penal Code § 641.3, they wrote, "Dey, Inc., the general partner of Mylan Specialty, LP was located here when the Mylan Defendants and Express Scripts signed agreements providing for the payment of money to Express Scripts[.]" (Ex. C at 9; *see also* Ex. D at 4–5.) Express Scripts and OptumRx seek an order requiring Plaintiffs to identify the specific payments that violated state statutes. (Defs.' Mem. Supp. Mot. Compel 6, Dkt. No. 566.) Plaintiffs believe their original answer is sufficient. (Pls.' Mem. Opp'n Mot. Compel 25–26.) Plaintiffs report that all PBM defendants served similar interrogatories, but that only

5

Express Scripts and OptumRx are dissatisfied with their responses. (Pls.' Mem. Opp'n Mot. Compel 14–15, Dkt. No. 579.)

### C. Express Scripts' Interrogatory 10

Express Scripts' Interrogatory 10 asks Plaintiffs to state how much of the money Express Scripts collected from Mylan (in the form of rebates and fees) Plaintiffs believe Express Scripts could lawfully keep. (Ex. A at 8.) Plaintiffs initially objected to the interrogatory, claiming that it demanded premature expert discovery and that discovery of Express Scripts' financial information was not yet complete. (Ex. C at 10.) Plaintiffs have since confirmed that their experts will answer this interrogatory, in expert discovery. (Pls.' Mem. Opp'n Mot. Compel 31.) Express Scripts wants an answer now. (Tr. 5:7–20.)

## II.   LEGAL STANDARD

Federal Rule of Civil Procedure 26(b) allows parties to discover any nonprivileged information relevant to a claim or defense. Fed. R. Civ. P. 26(b)(1). But this broad disclosure standard is not boundless; parties can discover only that information which is "proportional to the needs of the case," considering "the importance of the issues," "the amount in controversy," "the parties' relative access to relevant information," their resources, how important the discovery is in resolving the issues, and "whether the burden or expense of the proposed discovery outweighs its likely benefit."

A party can serve an interrogatory on another party regarding any matter within the scope of discovery. Fed. R. Civ. P. 33(a)(2). A party must respond "separately and fully" to every interrogatory (unless it files a timely objection) within 30 days. Fed. R. Civ. P. 33(b)(2)–(4). A party fails to respond to an interrogatory not only when it does not answer,

but also when it submits an "evasive or incomplete" answer. Fed. R. Civ. P. 37(a)(4). If a party fails to respond to an interrogatory, the party seeking discovery can file a motion to compel a response. Fed. R. Civ. P. 37(a)(3)(B)(iii). If the moving party meets its initial burden of showing that the requested discovery is relevant and proportional, then the burden shifts to the party resisting discovery to show that it is not relevant or is unduly burdensome. *Patterson Dental Supply, Inc. v. Pace*, No. 19-CV-1940 (JNE/LIB), 2020 WL 10223625, at *20 (D. Minn. June 17, 2020) (citing *Hofer v. Mack Trucks, Inc.*, 981 F.2d 377, 380 (8th Cir. 1992)).

Plaintiffs categorize the interrogatories at issue in this motion to compel as "contention interrogatories." (Pls.' Mem. Opp'n Mot. Compel 16.) The term "contention interrogatory" can encompass several kinds of interrogatories. *Gilmore v. City of Minneapolis*, No. 13-CV-1019 (JRT/FLN), 2014 WL 4722488, at *5 (D. Minn. Sept. 22, 2014); *In re Grand Casinos, Inc. Sec. Litig.*, 181 F.R.D. 615, 618 (D. Minn. 1998). *But see Kinetic Co. v. Medtronic, Inc.*, No. 08-CV-6062 (JMR/AJB), 2010 WL 11561275, at *3 n.1 (D. Minn. Nov. 23, 2010) (finding "no basis in the rules to distinguish contention interrogatories from other forms of discovery"). This Court understands contention interrogatories to be "questions asking a party to explain the facts known to them, if any, that support a claim or defense." *Bakambia v. Schnell*, No. 20-CV-1434 (NEB/KMM), 2021 WL 4622250, at *10 (D. Minn. Oct. 7, 2021). The purpose of such interrogatories is to help the requesting party understand the basis for the claims levied against them and prepare a defense. *Id.* The interrogatories can also help narrow the issues at trial. *Promotional Mktg. Insights, Inc. v. Affiliated Comp. Servs., Inc.*, No. 11-CV-2795

(PJS/AJB), 2012 WL 13028115, at *6 (D. Minn. Sept. 19, 2012); Fed. R. Civ. P. 33, advisory committee's notes to 1970 amendment.

The Federal Rules permit contention interrogatories, but courts may find that such interrogatories are better answered later in litigation. Fed. R. Civ. P. 33(a)(2) ("An interrogatory is not objectionable merely because it asks for an opinion or contention that relates to fact or the application of law to fact, but the court may order that the interrogatory need not be answered until designated discovery is complete, or until . . . some other time."). "A contention interrogatory will be considered overly broad and unduly burdensome 'if it seeks "all facts" supporting a claim or defense, such that the answering party is required to provide a narrative account of its case.'" *Shqeirat v. U.S. Airways Grp., Inc.*, No. 07-CV-1513 (ADM/AJB), 2008 WL 4232018, at *4 (D. Minn. Sept. 9, 2008) (quoting *Moses v. Halstead*, 236 F.R.D. 667, 674 (D. Kan. 2006); 8B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2167 (3d ed. 2022).[4]

## III.   ANALYSIS

This motion to compel poses three distinct questions. The first is whether Plaintiffs must allege how much of the overcharge they allegedly paid was due specifically to the

---

[4] In their memorandum opposing the motions to compel (Pls.' Mem. Supp. Mot. Compel 16–19, Dkt. No. 579), Plaintiffs describe the different forms that contention interrogatories can take, including asking "another party to indicate what it contends, to state all the facts on which it bases its contentions, to state all evidence on which it bases its contentions, or to explain how the law applies to the facts." *Id.* at 16 (quoting *Zubrod v. Hoch*, 2016 WL 1752770, at *6 (N.D. Iowa May 2, 2016)). Plaintiffs do not classify each interrogatory to which they object as one of these types. They do not need to, because Defendants make no claim that these are not contention interrogatories. The Court therefore accepts that these are contention interrogatories.

allegedly illegal payments from Mylan to Express Scripts. The second is whether Plaintiffs need to be more specific about which payments Mylan made to Express Scripts and OptumRx that were allegedly illegal. The third is whether Plaintiffs must answer, before the conclusion of expert discovery, Express Scripts' interrogatory about which payments from Mylan it thought it could lawfully keep. The Court answers no to the first and third questions and yes to the second question.

### A. Plaintiffs Need Not Supplement Their Response to Express Scripts' Interrogatory 7 Regarding the Allocation of Damages.

Express Scripts claims that Plaintiffs have failed to answer Express Scripts' Interrogatory 7. (Defs.' Mem. Supp. Mot. Compel 5, 10; Ex. C at 6–7.) Express Scripts argues that it is entitled to know "how much of the alleged EpiPen overcharges" Plaintiffs attribute to the conduct of Express Scripts, and how much of the overcharges Plaintiffs attribute to other causes. (*Id.* at 11.) In fact, Express Scripts argues that it was entitled to this allocation of damages in Plaintiffs' initial disclosures. (*Id.* at 11–13.) Express Scripts further argues that it cannot be held jointly and severally liable with other defendants because the District Court dismissed the claim that Mylan and the PBM Defendants (a category which includes Express Scripts) operated in a single Section One conspiracy. (*Id.* 13–14 (citing Opinion and Order, Dkt. No. 414 at 13–17).) Express Scripts also claims that it should be told the amount of money for which Plaintiffs allege they are liable. (*Id.* at 11–13.)

Plaintiffs argue that the interrogatory "is incoherent" because "[s]eparate conduct that works together to cause harm in the form of artificially inflated prices is indivisible

and as a matter of law need not (and cannot) be allocated among the individual wrongdoers." (Pls.' Mem. Opp'n Mot. Compel 20.) Plaintiffs claim that Express Scripts must show that the harm is divisible, which it cannot do. (*Id.* at 23–24.) Because the harm of the increased prices is indivisible, according to Plaintiffs, the PBM defendants are jointly and severally liable under Eighth Circuit precedent. (*Id.* at 21.) Further still, Plaintiffs argue that because there is no right of contribution among civil RICO defendants, a jury could not apportion damages among the PBM defendants anyway. (Pls.' Mem. Opp'n Mot. Compel 22–23.)

At the motions hearing, counsel for Express Scripts argued that a discussion of joint and several liability is a merits issue that was irrelevant to addressing this discovery dispute and that it would be improper for the Court to address it, though he did not explain why it would be improper. (Tr. 11:11–19, 12:7–14.) Counsel added that if the Court addressed this issue, it should find that there can be no joint and several liability among multiple RICO enterprises, only joint and several liability within an individual RICO enterprise. (Tr. 12:15–14:20.)

For their part, counsel for Plaintiffs argued that the harm done was the single, indivisible harm of an inflated EpiPen list price. (Tr. 18:8–18:21, 20:19–21:18.) Plaintiffs' theory of the case is that Mylan raised the list price by the amount that would convince the PBMs to give EpiPen favorable treatment; they did not raise the price incrementally based on how much it needed to satisfy each PBM. (Tr. 21:19–22:4.) Counsel for Express Scripts retorted that if Plaintiffs planned to analyze what the list price would be without the alleged RICO enterprises, they could also analyze what the price would be if Express Scripts had

not been a part of an alleged RICO enterprise, just as they should analyze what the price would be absent the monopolization by Mylan that is the subject of their Section Two claim. (Tr. 22:13–23:3.)

As the moving party, Express Scripts must show that Interrogatory 7 seeks relevant and proportional information. If it can do so, the burden shifts to Plaintiffs to show that the information is irrelevant or that the burden of producing the information, even if relevant, is undue. *Patterson Dental Supply, Inc.*, 2020 WL 10223625, at *20. Express Scripts claims that the "allocation of plaintiffs' alleged overcharge is directly relevant to damages." (Tr. 11:20–23.) But this assumes that damages will (or could) be allocated by the finder of fact. If the finder of fact will never allocate damages, Plaintiffs' stance on what that allocation should be is irrelevant to preparing a defense. So, underlying this discovery dispute is a larger dispute about whether damages should be apportioned across civil RICO conspiracies and other anticompetitive conduct when the alleged harm is a price increase. But Express Scripts says the Court should not reach that legal question, characterizing it as a merits issue. To determine the relevance of the information Express Scripts seeks in Interrogatory 7, which the Court must do in evaluating Express Scripts' motion to compel, the Court must answer the question. It concludes that damages should not be apportioned in this case.

### i.    *Tort Principles Apply to Civil RICO.*

The Eighth Circuit has recognized that tort principles apply to civil RICO cases. In *Bieter Co. v. Blomquist*, 987 F.2d 1319, 1329 (8th Cir. 1993), the Eighth Circuit noted that other courts found civil RICO to be a "statutory tort remedy—simply one with particularly

drastic remedies." *Id.* (quoting *Brandenburg v. Seidel*, 859 F.2d 1179, 1189 (4th Cir. 1998),

*overruled on other grounds by Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706 (1996)); *see*

*also Reynolds v. E. Dyer Dev. Co.*, 882 F.2d 1249, 1253 (7th Cir. 1989) (citing

*Brandenburg* for the proposition that "causation principles that generally apply in tort cases

apply in civil RICO cases"); *Kaufman v. BDO Seidman*, 984 F.2d 182, 185 (6th Cir. 1993)

(citing *Reynolds*); *Lateral Recovery, LLC v. Cap. Merch. Servs., LLC*, No. 21-CV-9336

(LJL), 2022 WL 4815615, at \*26 (S.D.N.Y. 2022) (collecting additional cases). The Eighth

Circuit then proceeded to apply tort law limitations on damages in the civil RICO case

before it. *Bieter Co.*, 987 F.2d at 1329. The Court will therefore apply traditional tort

principles in determining whether damages should be apportioned in this civil RICO case.

### ii.   *Indivisible Harms Prompt Joint and Several Liability in Tort.*

Torts can cause a variety of harms and the certainty with which the identity of the

actor causing any particular harm can be ascertained can also vary.  When "the causation

of each part can be separately assigned to each tortfeasor," damages are divisible, and a

court can allocate them accordingly. *Edmonds v. Compagnie Generale Transatlantique*,

443 U.S. 256, 260 n.8 (1979). But when the injury cannot be so divided it is, by definition,

indivisible. Restatement (Third) of Torts: Apportionment of Liability § 26 cmt. g (2000)

("Damages are indivisible, and thus the injury is indivisible, when all legally culpable

conduct of the plaintiff and every tortious act of the defendants and other relevant persons

caused all the damages. Unless sufficient evidence permits the factfinder to determine that

damages are divisible, they are indivisible."); Restatement (Second) of Torts § 433A

(1977). The Third Restatement provides:

> (b) Damages can be divided by causation when the evidence provides a reasonable basis for the factfinder to determine:
>> (1) that any legally culpable conduct of a party or other relevant person to whom the factfinder assigns a percentage of responsibility was a legal cause of less than the entire damages for which the plaintiff seeks recovery and
>> (2) the amount of damages separately caused by that conduct.
> Otherwise, the damages are indivisible and thus the injury is indivisible.

Restatement (Third) of Torts: Apportionment of Liability § 26 (2000).

When a single, indivisible injury results from the actions of multiple tortfeasors, the general rule is that joint and several liability applies. *Jackson v. City of Saint Louis*, 220 F.3d 894, 898 (8th Cir. 2000) (citing *Lockard v. Mo. Pac. R.R.*, 894 F.2d 299, 305 (8th Cir. 1990)) (noting that this rule is not "ironclad."); *see also e.g.*, *Cox v. City of Dallas*, 256 F.3d 281, 301 n.37 (5th Cir. 2001). *S.E.C. v. Hughes Cap. Corp.*, 124 F.3d 449, 455 (3d Cir. 1997); Joint and several liability is a "creature of tort law" that holds two or more defendants liable for the entire amount of a harm they both caused, although the plaintiff can only recover the full amount of the harm once. *Honeycutt v. United States*, 581 U.S. 443, 447 (2017).

### iii. *Joint and Several Liability Applies Because the Harm to Plaintiffs Is Indivisible.*

Apprehensive that the Court will address the question of whether joint and several liability applies among defendants in separate RICO conspiracies, Express Scripts relies on *Allstate Insurance Company v. Nazarov* for the proposition that a participant in one civil RICO enterprise can only be jointly and severally liable with other actors within that RICO enterprise, not with those in other RICO enterprises of which the original participant was

not a member. *Allstate Ins. Co.*, No. 11-CV-6187 (PKC/VMS), 2015 WL 5774459, (E.D.N.Y. Sept. 30, 2015); (Defs.' Mem. Supp. Mot. Compel 13–14; Tr. 12:15–13:13.)

In *Allstate*, the Allstate Insurance Company sued numerous defendants for seeking to defraud the company by participating in multiple civil RICO enterprises. *Id.* at *4–6. In one fraud and kickback scheme, the defendant clinics provided fraudulent prescriptions for medical equipment, then the defendant wholesalers provided cheap medical equipment to the defendant retailers, which then sent an inflated bill to Allstate. *Id.* The defendants in the case failed to answer the complaint and Allstate moved for default judgment. *Id* at *7. After concluding that Allstate was entitled to default judgment on its RICO claims, the court considered whether the defendants within each RICO enterprise could be jointly and severally liable. *Id.* *17. The court held that the defendants in each of the 19 RICO enterprises were jointly and severally liable with other participants in their individual RICO enterprise. *Id.* at *17, 22. The *Allstate* court did not explain its reasoning for applying joint and several liability within RICO enterprises, but not also among them.[5] *See Id.* at 17. However, courts have since cited the case as limiting joint and several liability for civil RICO across RICO enterprises. *See Allstate Ins. Co. v. New Century Pharmacy Inc.*, No.

---

[5] The *Allstate* court did explain that it would not hold two of the retailer defendants jointly and severally liable for the New York *common law claims* because plaintiffs in the case failed to allege that the defendants were involved in each other's fraudulent activities. In support of this point, the court continued: "Indeed, Plaintiffs identified Complete Equipment and Equiplus as separate RICO enterprises . . . In these circumstances, it would be inappropriate to assign joint and several liability." *Id.* at 18 (citing *Allstate Ins. Co. v. Asimov*, No. 11–CV–2391 (MKB), 2014 WL 527834 at *10 n.14 (Feb. 7, 2014)) (addressing damages for common law claims).

19-CV-5702 (ENV/VMS), 2021 WL 7830141, at *12 (E.D.N.Y. Aug. 13, 2021); ("A Defaulting Defendant can be jointly and severally liable only for the damages arising out of the RICO enterprise with which it or she was associated."); *Allstate Ins. Co. v. Abramov*, No. 16-CV-1465 (AMD/SJB), 2020 WL 1172697, at *9 (E.D.N.Y. Feb. 21, 2020), *R & R adopted*, 2020 WL 1166498 (E.D.N.Y. Mar. 11, 2020) ("A RICO Defaulting Defendant can be jointly and severally liable only for the damages arising out of the RICO enterprise with which it was associated.")

From this, Express Scripts argues that it can only be held liable for Plaintiffs' damages attributable to the Mylan-Express Scripts RICO enterprise, but not damages attributable to the Mylan-CVS Caremark RICO enterprise, or the Mylan-OptumRx enterprise, or attributable to Mylan's anticompetitive practices. (Defs.' Mem. Supp. Mot. Compel 14.) But *Allstate* is distinguishable because the RICO enterprises in *Allstate* did not raise the prices of medical equipment overall; rather, they fraudulently misrepresented the prices of individual pieces of medical equipment. It was clear which participants in which RICO enterprises caused which harms; specific defendants billed Allstate for specific products resulting in damages individual to each transaction. In contrast, Plaintiffs in this case allege that Mylan was a part of three separate RICO enterprises with PBMs (Express Scripts, OptumRx, and CVS Caremark), and abused monopoly power. (Ex. A at 7–8.) The intended consequence of the RICO enterprises was to maximize the rebates that the PBMs received and to maintain EpiPen's large share of the epinephrine auto injector market. (Tr. 18:4–7.) That resulted, Plaintiffs argue, in higher prices for everyone. While the enterprises were separate, they contributed to the same harm; EpiPen price increases

15

that cannot be reliably associated with individual contracts or actions of the parties. The Court is not convinced that there is a "reasonable basis" for a factfinder to determine "the amount of damages separately caused" by the parallel RICO enterprises, and anticompetitive conduct by Mylan, when the harm was a price increase. *See* Restatement (Third) of Torts: Apportionment Liability § 26 (2000). Plaintiffs convincingly argue that there is none.

Plaintiffs rely on *In Re Modafinil Antitrust Litigation*, 837 F.3d 238 (3d Cir. 2016) for their argument that they need not allocate damages among defendants whose separate conduct contributed to the single harm of inflated pricing. (Pls.' Mem. Opp'n Mot. Compel 20–21; Tr. 18:22–19:21.) In *Modafinil*, the plaintiffs were also drug wholesalers suing a pharmaceutical company, but instead of suing PBMs as well, they sued generic pharmaceutical companies. *Modafinil*, 837 F.3d 238, 244–46. The plaintiffs alleged that the pharmaceutical company manufacturing modafinil signed reverse-pay settlements in patent infringement cases[6] against would-be generic competitors to maintain its status as the exclusive manufacturer of modafinil. *Id.* As here, the plaintiffs alleged a single, global conspiracy of anticompetitive conduct under Section One of the Sherman Act, four separate antitrust conspiracies, and a monopolization claim under Section Two of the Sherman Act. *Id.* at 246. Also as here, the district court granted the defendants' motion for summary judgment on the Section One claim, leaving the four separate conspiracies and the

---

[6] In such an agreement, a patent holder suing an alleged infringer agrees to pay the alleged infringer money in exchange for the alleged infringer's promise to not make the product at issue until the patent expires. *F.T.C. v. Actavis, Inc.*, 570 U.S. 136, 140 (2013).

monopolization claim. *Id.* at 248. In *Modafinil*, the Third Circuit analyzed whether common questions of law or fact predominated over individual ones in the putative class of direct purchaser plaintiffs. *Id.* 260–66.

The *Modafinil* defendants argued that after the global conspiracy claim was dismissed, the plaintiffs' model of damages did not support a finding that claims common to the class predominated over claims unique to individuals because "[p]laintiffs' remaining theory of liability must isolate the harm that each individual reverse-payment settlement agreement caused each individual class member under the doctrine of antitrust standing." *Id.* at 261. Express Scripts is asking for exactly this kind of allocation, albeit not in the class certification or standing context. The Third Circuit found in *Modafinil* that if any one of the four generic manufacturers had entered the market, "there would have been no antitrust injury for anyone." *Id.* at 265, 266. But because no generic manufacturers entered the market, the lack of competition was "a harm that all four agreements work[ed] jointly to produce, even if there was no conspiracy between the generic manufacturers . . . . Thus, any class member would have antitrust standing to sue any or all of the four generic companies individually." *Id.* at 266. The Third Circuit then concluded that there was no need for an "individualized inquiry into the harm caused by each agreement" and found that questions of law or fact common to all wholesale purchasers predominated in the case. *Id.*

Plaintiffs argue that the agreements in *Modafinil* are akin to the alleged RICO enterprises in this case. They ask the Court to apply the Third Circuit's reasoning here, namely that when multiple conspiracies cause general harm, an antitrust plaintiff need not

specify the damages attributable to any individual conspiracy if the defendants worked jointly—even if they did not conspire—to cause general harm. The Court finds that the harm alleged in this case is an overcharge which cannot be reasonably allocated among the individual RICO enterprises. As in *Modafinil*, the plaintiffs here convincingly argue that when a pharmaceutical company engages in parallel agreements with other companies to ensure its competitive advantage, namely that it can sell its product at whatever price it wants, it works a singular harm: the harm of higher prices.

Express Scripts attempts to distinguish *Modafinil* from this case by arguing that "the harm that the [*Modafinil*] court found was indivisible was that the actions of all the defendants collectively prevented the creation of a market at all. Here the alleged harm is an overcharge." (Tr. 15:6–17.) This is a distinction without a difference. The prevention of a competitive market in *Modafinil* resulted in overcharges, which is exactly what the damages expert was calculating. *Modafinil*, 837 F.3d 238, 262 ("[Plaintiffs' expert] noted the prices and overcharges actually paid by the class members and compared that to but-for worlds that included the launch of anywhere between one and five generic competitors.") This is the same kind of calculation that will occur in this case.

In sum, Express Scripts has not shown that an allocation of damages is relevant to any claim or contention in this case because it has not shown that damages can (or will) be allocated at all. The parties have not cited—and the Court has not found—binding law on the specific question of apportionment of damages across RICO enterprises that cause the same indivisible harm. Thus, the Court relies on traditional tort principles to conclude that

Plaintiffs are not required to supplement their response to Express Scripts' Interrogatory 7, because such information would be irrelevant.

### B. Plaintiffs Must Supplement Their Response to Express Scripts' Interrogatory 9 and OptumRx's Interrogatory 14 now, and at the Conclusion of Expert Discovery.

Express Scripts and OptumRx both claim that Plaintiffs failed to answer their respective interrogatories asking Plaintiffs to identify which transactions between the two companies and Mylan they contend were illegal. (Defs.' Mem. Supp. Mot. Compel 8; Ex. C at 8–9; Ex. D at 4–5.) Express Scripts seeks a supplement to Plaintiffs' response to its Interrogatory 9, regarding alleged violations of law in five states, and OptumRx seeks a supplement to Plaintiffs' response to its Interrogatory 14, regarding alleged violations of law in four states. (Defs.' Mem. Supp. Mot. Compel 8, 19.) Express Scripts and OptumRx ("Moving PBM Defendants") argue that they should receive notice of the "specific payment, agreement, or conduct that supports" Plaintiffs' state law claims, and that Plaintiffs never objected to the interrogatories in the first place. (*See* Defs.' Mem. Supp. Mot. Compel 21–22.)

Plaintiffs reply that this issue is resolved and that the motion should be dismissed as moot. (Pls.' Mem. Opp'n Mot. Compel 7.) According to Plaintiffs, their responses to the interrogatories explain the payments to which they refer (rebates, administrative fees, or other money Mylan paid Moving PBM Defendants—because of the supracompetitive price

of EpiPen—which Moving PBM Defendants then kept) and why[7] those payments violate relevant state laws. (Pls.' Mem. Opp'n Mot. Compel 25–26.) Plaintiffs claim that Moving PBM Defendants already know how much Mylan paid them during the period at issue and the jurisdictional facts which support the state law claims, so requiring Plaintiffs to answer these interrogatories with greater specificity would simply be "make-work." (Pls.' Mem. Opp'n Mot. Compel 28.)

At the motions hearing, counsel for Express Scripts—arguing for Moving PBM Defendants—explained that these interrogatories required Plaintiffs to give an answer that explains which payments (e.g., what money, under what contract, etc.) were appropriate and which were not. (Tr. 27:6–19.) Further, these answers could be categorical in nature. (Tr. 27:6–10.) Counsel for Plaintiffs retorted that, under Plaintiffs' theory of the case, whole payments from Mylan to Moving PBM Defendants are not suspect, only the portion of those payments that are "the product of the WAC price increase" are suspect. (Tr. 31:13–24.) Counsel for Express Scripts claimed that counsel for Plaintiffs did not include this level of detail in their answer and asked the Court to order Plaintiffs to provide it in a supplement. (Tr. 33:6–4.)

From the discussion at the motion hearing, the Court understands that Moving PBM Defendants are comfortable with receiving a response from Plaintiffs about what categories of payments were inappropriate, but that they view the categorizations provided by

_____

[7] Plaintiffs argue that they are not required to establish territorial jurisdiction for a violation of a state's commercial bribery law before they can use it as a civil RICO predicate. (Pls.' Mem. Opp'n Mot. Compel 26 n.5.)

Plaintiffs as insufficiently detailed. (Tr. 26:22–28:17.) Moving PBM Defendants seek a response that will at the very least allow them to "infer" which payments from Mylan were lawful and which were not. (Tr. 27:6–10.) The Court agrees that Plaintiffs' statement that a "[r]ebate, administrative fee, and other monies Mylan paid to [the PBM Defendant(s)] as a consequence of WAC price increases constituted a benefit, consideration, compensation, reward, gift, gratuity, or thing of value to [the PBM Defendant(s)], to the extent retained by [the PBM Defendants(s)]" is too broad to be informative. (*See* Pls.' Mem. Opp'n Mot. Compel 10.) As written, the statement applies to all the state predicate offenses mentioned in the response.

The Court finds that these interrogatories request relevant information, namely the factual basis of the predicate offenses that underlie Plaintiffs' civil RICO claims, and further finds that the interrogatories are proportional. The bases for the RICO predicates are necessary to establishing a "pattern of racketeering activity," which is an essential element of a civil RICO claim, so the bases are of central importance in resolving the claims against Moving PBM Defendants. *See* 18 U.S.C. § 1962(c); *Aguilar v. PNC Bank, N.A.,* 853 F.3d 390, 402 (8th Cir. 2017) ("To prove a RICO violation, a plaintiff must produce evidence that '(1) that an enterprise existed . . . (5) that the defendant participated in the enterprise through a pattern of racketeering activity by committing at least two racketeering (predicate) acts.'") (quoting *United States v. Darden*, 70 F.3d 1507, 1518 (8th Cir. 1995)). The amount in controversy—hundreds of millions of dollars in overcharge damages, with a treble damages penalty, plus costs and attorneys' fees—also supports a finding of proportionality. (Am. Compl. ¶ 252; Am. Compl. 112–113.) *Willis Elec. Co. v. Polygroup*

21

*Trading Ltd.*, No. 15-CV-3443 (WMW/KMM), 2021 WL 568454, at *10 (D. Minn. Feb. 16, 2021) (noting that a "very large lost profits claim . . . would weigh in favor of a finding of proportionality.") Further, these disclosures' likely benefit to Moving PBM Defendants will not be outweighed by the burden that answering these interrogatories places on Plaintiffs. In fact, the Court expects that Plaintiffs will find it necessary to conduct at least some review of the financial documents underlying their RICO claims before trial. Further specificity in this interrogatory response will streamline trial preparation and narrow the issues for trial. Two factors weigh against a finding of proportionality, but they are not significant enough to outweigh the three factors strongly favoring it. These factors are the parties' relative access to information and resources. Now that fact discovery is complete, the parties have similar access to the records documenting the payments from Mylan to Moving PBM Defendants. Plaintiffs and Moving PBM Defendants are represented by numerous lawyers, suggesting that the parties have comparable resources to expend in this litigation.

Plaintiffs did not timely object to these relevant and proportional interrogatories (Ex. B at 3–4; Ex. C. at 8–9; Ex. D at 4–6) and at the motions hearing they did not argue that the interrogatories requested irrelevant information or that answering them would impose an undue burden (Tr. 28:18–33:1). Plaintiffs simply argued that their answers were adequate, framed in terms of categories of payments, and included important limitations on their claims. (*Id.*) While the Court acknowledges Plaintiffs' responses were categorical and included limitations, it respectfully disagrees that the responses were adequate.

Rule 33 requires parties to answer interrogatories "fully" under oath, and litigants are discouraged from reading interrogatories in a hypertechnical fashion to make the fewest disclosures possible before trial. Fed. R. Civ. P. 33(b)(2); Fed. R. Civ. P. 37, advisory committee's notes to 1993 amendment. Reading the interrogatories at issue, the Court understands them to be requesting a statement of (1) the state law Plaintiffs allege the company violated, (2) the specific payment(s) that violated state law, and (3) the jurisdictional basis showing why each specific payment violated the state law. Plaintiffs have provided at least a partial response to items one and three, and a categorical response to item 2. Plaintiffs must provide a full response to each item. Plaintiffs' claim that giving a more detailed response would be "make-work" is not well taken. (Pls.' Mem. Opp'n Mot. Compel 28.) Plaintiffs chose to pursue their case using the powerful, wide-ranging tool of civil RICO, and these interrogatories provide Moving PBM Defendants the opportunity to inquire about the basis of the alleged RICO predicates. Plaintiffs must answer them. *Eberline Oilfield Serv., Inc. v. Eberline*, No. 18-CV-245, 2023 WL 157404, at *9 (D.N.D. Jan. 11, 2023) ("[Plaintiff] chose to play the RICO card. Defendants' efforts to now flesh out the basis for EOS's claim should come as no surprise.")

Plaintiffs must answer the interrogatories now and supplement them later with responsive information from expert discovery. Federal Rule of Civil Procedure 33(a)(2) advises that an interrogatory may "ask[] for an opinion or contention that relates to fact or the application of law to fact" and where it does, a court "may order that the interrogatory need not be answered until designated discovery is complete." This interrogatory requires Plaintiffs to apply law to fact and make a contention, several contentions, in fact. While

the Court finds that expert discovery about the list price of EpiPen in the hypothetical world without the anticompetitive conduct alleged is necessary for Plaintiffs to finalize their responses to these contentions, the Court also finds that waiting until the close of expert discovery to supplement this interrogatory would prevent Moving PBM Defendants from using Plaintiffs' response in shaping further discovery. The Court therefore orders that Plaintiffs answer Express Scripts' Interrogatory 9 and OptumRx's Interrogatory 14 now, and supplement their responses as needed at the end of expert discovery.  The initial supplement should include (1) every state law Plaintiffs allege the company violated, (2) every payment that contained a commercial bribe and thus violated state law, and (3) the jurisdictional basis showing why each specific payment violated the state law. To be clear, the Court is not asking Plaintiffs to estimate what portion of each payment was the result of the supracompetitive price of EpiPen (in other words, the alleged commercial bribe) in its initial supplementation; Plaintiffs need only identify the payments themselves. Expert discovery will provide additional detail about what portion of those payments Plaintiffs claim were commercial bribes, and Plaintiffs will provide this to Express Scripts at the conclusion of expert discovery.

### C. Plaintiffs Must Supplement Their Response to Express Scripts' Interrogatory No. 10 at the Conclusion of Expert Discovery.

Express Scripts claims that Plaintiffs also failed to respond to their Interrogatory 10. (Defs.' Mem. Supp. Mot. Compel 6; Ex. C at 9–10.) Express Scripts demands that Plaintiffs explain which rebates and fees they believe Express Scripts could lawfully retain, and which were bribes or racketeering activity. (Defs.' Mem. Supp. Mot. Compel 22.) Express

Scripts argues that Plaintiffs should be able to answer this interrogatory because they have had "the data reflecting all the EpiPen rebates and fees it received from Mylan during the relevant time frame" for over a year and a half, and Express Scripts complied with the Court's order on financial sampling "months ago." (Defs.' Mem. Supp. Mot. Compel 24.)

Plaintiffs apologized for not clarifying with Express Scripts that their experts will analyze what fees and rebates Express Scripts could lawfully retain and that they will disclose that information with their expert report. (Pls.' Mem. Opp'n Mot. Compel 7.) Plaintiffs argue that only an expert can answer Express Scripts' Interrogatory 10. (Pls.' Mem. Opp'n Mot. Compel 15.) Plaintiffs promise that their experts will answer the interrogatory. (Pls.' Mem. Opp'n Mot. Compel 31.) After reviewing correspondence between Plaintiffs and Express Scripts, it appears that Express Scripts was at one point willing to "wait until expert discovery for an explanation" if Plaintiffs agreed to answer the interrogatory. (Pls.' Mem. Opp'n Mot. Compel 16 (citing Ex. B).)

At the motions hearing, counsel for Express Scripts told the Court that Express Scripts was no longer willing to wait. (Tr. 4:5–11 ("[W]e made an offer as a matter of compromise to wait until the end of expert discovery. Plaintiffs didn't accept that offer. They forced us to file this motion . . . we believe the plaintiffs are required to answer that motion now and they can supplement after expert discovery as appropriate.") Counsel for Express Scripts argued that his client needed to have an answer from Plaintiffs during fact discovery so it could use it during depositions (Tr. 5:7–20) but acknowledged that waiting until the close of expert discovery is "something [it] could live with" (Tr. 5:17–22.) For his part, counsel for Plaintiffs stated that the Plaintiffs' lawyers could "muddle through" and

determine some answer to the interrogatory, but that it was necessary to engage an expert to determine what EpiPen list prices would be in a world where the conduct alleged never occurred, and therefore, what "rebates and administrative fees that are a function of the WAC prices of Mylan's EpiPens . . . would be capable of being retained without being unlawful." (Tr. 7:16–22.) In essence, the payments that are allegedly commercial bribes are fractions of existing payments, which are a function of the alleged price inflation.

The Court finds that this interrogatory requests relevant information, namely greater clarity about what payments form the basis of Plaintiffs' contention that Express Scripts received commercial bribes from Mylan. Further, for the same reasons that the Court found the state law interrogatories proportional to the needs of the case, it also finds Interrogatory 10 proportional. The Court also finds that this interrogatory is a contention interrogatory requiring "an opinion or contention that relates to fact or the application of law to fact." Fed. R. Civ. P. 33(a)(2). Because the Court finds that expert discovery about the list price in the but-for world is necessary for Plaintiffs to determine how to make this contention, it will require Plaintiffs to answer the interrogatory at the close of expert discovery. Requiring Plaintiffs to answer this interrogatory before that time would not encourage the "speedy[] and inexpensive determination" of this action, because Plaintiffs' counsel would need to spend time answering the interrogatory with speculations about what the EpiPen list price would be but for the alleged illegal conduct of the defendants. Counsel would do this with the understanding that they would need to re-answer the interrogatory after receiving analysis from their experts on what the list price would be in the but-for world.

26

Having Plaintiffs guess at an answer now only to have it superseded by an expert later is not an efficient use of time and resources. The Court will not order such a course of action.

This case is distinguishable from *Soo Line Railroad Company v. Travelers Indemnity Company*, cited by Express Scripts. *Soo Line R.R. Co.*, No. 18-CV-1989 (SRN/TNL), 2019 WL 2296596 (D. Minn. May 30, 2019). After paying millions of dollars in losses and legal fees related to environmental contamination at a railroad site, Soo Line Railroad Company sued its insurer for partial indemnification. *Id.* at *1. The insurer served an interrogatory on Soo Line that asked for all the information and documents supporting its contention that there was only one "occurrence" of contamination, rather than multiple occurrences of contamination. *Id.* at *5. Soo Line "provided a narrative response" to the interrogatory and failed to identify documents as requested, saying that it "anticipates that the issue of occurrences will ultimately be decided by the Court, with heavy reliance on the input of experts," and promised to disclose the documents its experts relied on at a later date. *Id.* at *6. The court found this was improper, saying "[t]he fact that Soo Line may rely on experts in the future does not exempt Soo Line from fully responding to Interrogatory 19 and identifying those documents in support of its position at this time." *Id.* (citing *United States v. Cameron-Ehlen Grp., Inc.*, No. 13-CV-3003 (WMW/DTS), 2019 WL 1453063, at *2 (D. Minn. Apr. 2, 2019)). In this case, Plaintiffs are not withholding documents; they simply claim that they would be speculating as to the answer to the interrogatory in advance of expert discovery. (*See* Tr. 7:16–22.) The Court sees no purpose in requiring Plaintiffs to guess at answers, and any unfair prejudice to Express

27

Scripts by a delayed answer is belied by Express Scripts' own prior offer to wait until the end of expert discovery for an answer. (Pls.' Mem. Opp'n Mot. Compel 16 (citing Ex. B).)

## IV.   CONCLUSION

Express Scripts and OptumRx seek relevant and proportional information in their motion to compel a further response to Express Scripts' Interrogatories 9 and 10 and OptumRx's Interrogatory 14. However, the Court will exercise its power to delay Plaintiffs' responses to these interrogatories to minimize speculation and its attendant inefficiencies. Plaintiffs will supplement their answers to Express Scripts' Interrogatory 9 and OptumRx's Interrogatory 14 now. When expert discovery concludes, Plaintiffs will supplement their answers to those interrogatories, and fully answer Express Scripts' Interrogatory 10. But because Express Scripts did not make a threshold showing of relevance regarding the information sought in its Interrogatory 7, it is not entitled to an allocation of damages from Plaintiffs.

Accordingly, based on all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Defendants Express Scripts and OptumRx's Motion to Compel (Dkt. No. 564) is **GRANTED IN PART AND DENIED IN PART**, as follows:

1. Express Scripts' motion to compel a further response to its Interrogatory 7 is **DENIED**.

2. Express Scripts and OptumRx's motion to compel a further response to Express Scripts' Interrogatory 9 and OptumRx's Interrogatory 14 is **GRANTED IN PART AND DENIED IN PART**. Plaintiffs will provide a supplement as described above, on or before April 21, 2023, and will update it at the close of

expert discovery.

3. Express Scripts' motion to compel a further response to its Interrogatory 10 is

   **GRANTED IN PART AND DENIED IN PART**. Plaintiffs will provide a full

   response at the close of expert discovery.

Date: March 29, 2023                            *s/ John F. Docherty*
                                                 JOHN F. DOCHERTY
                                                 United States Magistrate Judge