UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

In re: EpiPen Direct Purchaser Litigation          File No. 20-cv-827 (ECT/JFD)

THIS DOCUMENT RELATES TO:          **OPINION AND ORDER**
ALL ACTIONS

Peter Kohn and Joseph T. Lukens, Faruqi & Faruqi, LLP, Philadelphia, PA; Andrew Kelly, Chris Letter, Dan Chiorean, Stuart Des Roches, and Thomas Maas, Odom & Des Roches, LLC, New Orleans, LA; Andrew C. Curley, Caitlin G. Coslett, and David F. Sorensen, Berger Montague PC, Philadelphia, PA; E. Michelle Drake, Berger Montague PC, Minneapolis, MN; Richard D. Schwartz, Berger Montague PC, Chicago, IL; Bruce E. Gerstein, Jonathan M. Gerstein, Noah Silverman, and Samuel E. Bonderoff, Garwin, Gerstein & Fisher LLP, New York, NY; Christopher M. First, Eric Enger, and Russell Chorush, Heim, Payne & Chorush, LLP, Houston, TX; David S. Golub and Steven Bloch, Silver Golub & Teitell LLP, Stamford, CT; and David C. Raphael, Jr., Erin R. Leger, and Susan C. Segura, Smith Segura & Raphael, LLP, Alexandria, LA, for Plaintiffs Rochester Drug Co-Operative, Inc. and Dakota Drug, Inc.

Adam K. Levin, Carolyn A. DeLone, Charles A. Loughlin, Christine A. Sifferman, Christopher Fitzpatrick, David M. Foster, Devin Urness, Elizabeth Jose, Justin Bernick, and Michael D. Gendall, Hogan Lovells US LLP, Washington, D.C.; Katherine Booth Wellington, Hogan Lovells US LLP, Boston, MA; Anthony Ufkin and Peter H. Walsh, Hogan Lovells US LLP, Minneapolis, MN; Brittany C. Armour, Hogan Lovells US LLP, Philadelphia, PA; Brian C. Fries and Carrie E. Josserand, Lathrop GPM LLP, Kansas City, MO; and Jason Johnson, Lathrop GPM LLP, Minneapolis, MN, for Defendants Mylan Inc. and Mylan Specialty L.P.

Atticus DeProspo, Craig Singer, Daniel M. Dockery, Dylan McDevitt, Enu A. Mainigi, Lori Jo Interlicchio, McKayla Stokes, Raymond Kennon Poteat, III, Annie Showalter, and Ashley Wall Hardin, Williams & Connolly LLP, Washington, D.C.; and John W. Ursu, Faegre Drinker Biddle & Reath LLP, Minneapolis, MN, for Defendants CVS Caremark Part D Services, L.L.C., CaremarkPCS Health, L.L.C., Caremark L.L.C., and Caremark Rx L.L.C.

Jonathan Gordon Cooper, Michael John Lyle, Eric Christopher Lyttle, Samuel Johnson, Nicholas Inns, and Michael Chesley Smith, Quinn Emanuel Urquhart & Sullivan LLP, Washington, D.C.; Ellison Ward Merkel, Quinn Emanuel Urquhart & Sullivan LLP, New York, NY; and Donald G. Heeman, Jessica J. Nelson, and Randi J. Winter, Spencer Fane

LLP, Minneapolis, MN, for Defendants Express Scripts, Inc. and Medco Health Solutions, Inc.

Andrew Glasnovich and Kadee Jo Anderson, Stinson, LLP, Minneapolis, MN; Bradley Harder, David Andrew Hatchett, Elizabeth Broadway Brown, Jordan Elise Edwards, Mark David Boyer, II, and Reagan Drake, Alston & Bird LLP, Atlanta, GA; and Brandon C.E. Springer, Brian David Boone, and Kyle Hair, Alston & Bird LLP, Charlotte, NC, for Defendant OptumRx, Inc.

---

Plaintiffs Rochester Drug Co-Operative, Inc. and Dakota Drug, Inc. are drug wholesalers. Plaintiffs claim that Defendants Mylan Inc. and Mylan Specialty L.P. (collectively "Mylan"), the manufacturers of a device called the "EpiPen,"[1] paid bribes and kickbacks to a group of pharmacy benefit managers (the "PBM Defendants")[2] to ensure that Mylan could raise the price of EpiPen with impunity while preserving a monopoly market share. In doing so, Plaintiffs claim, all Defendants violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c), and Mylan violated the Sherman Antitrust Act, 15 U.S.C. § 2. Plaintiffs assert these claims for themselves and for a proposed class of drug wholesalers who, like Plaintiffs, purchased EpiPens directly from Mylan.

---

[1] The term "EpiPen" refers collectively to a group of Mylan products that encompasses the EpiPen, EpiPen Jr., EpiPen 2-Pak, and EpiPen Jr. 2-Pak. *See* ECF No. 271 ¶ 1. Auto-injector devices "allow a patient to quickly self-administer a prescribed amount of the drug epinephrine through a spring-loaded needle." *Id.* ¶¶ 2, 42–43. Epinephrine auto-injectors like the EpiPen are used as "an emergency treatment for severe allergic reactions." *Id.*

[2] The PBM Defendants are: CaremarkPCS Health, L.L.C., Caremark L.L.C., CVS Caremark Part D Services, L.L.C., Caremark Rx L.L.C., Express Scripts, Inc., Medco Health Solutions, Inc., and OptumRx, Inc. *See* ECF No. 271 ¶¶ 19–22, 26–27, 35.

Plaintiffs seek class certification under Federal Rule of Civil Procedure 23. Defendants oppose class certification and, under Federal Rule of Evidence 702, seek exclusion of all opinions expressed by Plaintiffs' proffered class-certification expert. Both motions will be denied. Plaintiffs' class-certification motion will be denied because Plaintiffs have not carried their burden to show that the proposed class satisfies Rule 23(a)'s threshold numerosity and adequacy requirements or Rule 23(b)(3)'s predominance requirement. Defendants' Rule 702 motion identifies persuasive reasons to reject aspects of the expert's analysis, but exclusion is a moot point considering the denial of class certification.

\*

Four points set the table for the class-certification analysis: (1) Plaintiffs' factual allegations and claims have been described in previous opinions. *See In re: EpiPen Direct Purchaser Litig.*, No. 20-cv-827 (ECT/TNL), 2021 WL 147166 (D. Minn. Jan. 15, 2021); *In re: EpiPen Direct Purchaser Litig.*, No. 20-cv-827 (ECT/JFD), 2022 WL 1017770 (D. Minn. Apr. 5, 2022); *In re: EpiPen Direct Purchaser Litig.*, No. 20-cv-827 (ECT/JFD), 2023 WL 2860858 (D. Minn. Apr. 10, 2023). Familiarity with these opinions is presumed. No separate factual background or procedural history is provided here. The facts will be discussed to the extent they are relevant to, and in the context of analyzing, Rule 23's elements. (2) The "rigorous analysis" a court must undertake when ruling on a class-certification motion "may require the court to resolve disputes going to the factual setting of the case, and such disputes may overlap the merits of the case." *In re Zurn Pex Plumbing Prod. Liab. Litig.*, 644 F.3d 604, 625 n.10 (8th Cir. 2011) (Gruender, J., dissenting)

(quoting *Blades v. Monsanto Co.*, 400 F.3d 562, 567 (8th Cir. 2005)).  Again, to the extent fact disputes must be resolved, that will happen as those fact disputes surface in analyzing Rule 23's elements.  (3) Plaintiffs seek to certify the following class:

> All persons or entities in the United States and its territories that directly purchased EpiPen, EpiPen Jr., EpiPen 2-Pak, and/or EpiPen Jr. 2-Pak from Mylan from January 1, 2013 through December 31, 2020.[3]

> Excluded from the Class are Defendants, their officers, directors, management, employees, subsidiaries, and affiliates, and all federal governmental entities.

ECF No. 680 at 1.  Plaintiffs' basic class-supporting allegation is that they and every putative class member suffered damages in the form of overcharges resulting from Defendants' RICO and Sherman Act violations.  (4) For ease of reference, documents will be cited by CM/ECF number only, not any document's title.  And page citations are to a document's CM/ECF pagination appearing in the upper right corner, not to a document's original pagination.

# I

Several general rules govern the adjudication of a class-certification motion.  "The class action is an 'exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'"  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979)).  "District courts must engage in a 'rigorous analysis' to determine whether the requirements of Rule 23 have been

---

[3]      It is not clear why the proposed class period ends December 31, 2020, but it doesn't seem to matter.  No party has suggested this question must be answered or that the issue holds any significance for the class-certification motion.

satisfied." *Postawko v. Mo. Dep't of Corr.*, 910 F.3d 1030, 1036 (8th Cir. 2018) (citation omitted).

"A party seeking class certification 'must affirmatively demonstrate . . . compliance' with Rule 23." *Hudock v. LG Elecs. U.S.A., Inc.*, 12 F.4th 773, 775 (8th Cir. 2021) (quoting *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013)). The Rule "does not set forth a mere pleading standard." *Dukes*, 564 U.S. at 350. Rather, the party "must show that the proposed class satisfies Rule 23(a)'s threshold requirements of numerosity, commonality, typicality, and adequacy, and that the class fits within 'one of the three subsections of Rule 23(b).'" *Stuart v. State Farm Fire & Cas. Co.*, 910 F.3d 371, 374 (8th Cir. 2018) (quoting *Webb v. Exxon Mobil Corp.*, 856 F.3d 1150, 1155 (8th Cir. 2017)). Under Rule 23(b)(3), a plaintiff must show that (1) common questions predominate over any questions affecting only individual members, and (2) class resolution is superior to other available methods for the fair and efficient adjudication of the controversy. Fed. R. Civ. P. 23(b)(3); *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615 (1997).

## II

## A

A class cannot be certified unless it "is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "No specific rules govern the required size of a class, and what constitutes impracticability depends upon the facts of each case." *Portz v. St. Cloud State Univ.*, 297 F. Supp. 3d 929, 944 (D. Minn. 2018) (cleaned up); *see also Paxton v. Union Nat'l Bank*, 688 F.2d 552, 559 (8th Cir. 1982) ("No arbitrary rules regarding the necessary size of classes have been established."). "The most obvious factor,

5

of course, is the number of potential class members," and "[o]ther relevant factors include the nature of the action, the size of individual claims, the inconvenience of trying individual suits, and any other factor that sheds light on the practicability of joining all putative class members." *Alberts v. Nash Finch Co.*, 245 F.R.D. 399, 409 (D. Minn. 2007) (citing *Paxton*, 688 F.2d at 559–60); *see also Portz*, 297 F. Supp. 3d at 944 ("Practicality of joinder depends on such factors as the size of the class, the ease of identifying its members and determining their addresses, the facility of making service on them if joined, their geographic dispersion and whether the size of the individual claims is so small as to inhibit individuals from separately pursuing their own claims.") (cleaned up)).  Here, the proposed class does not meet Rule 23(a)(1)'s numerosity requirement.

B

Begin with "the most obvious factor," the size of the class.  *Alberts*, 245 F.R.D. at 409.  The proposed class consists of "[a]ll persons or entities in the United States and its territories that directly purchased EpiPen . . . from Mylan from January 1, 2013 through December 31, 2020."  ECF No. 680 at 9.  Plaintiffs say that, so defined, the class includes sixty-six members.  *Id.* at 18.  Defendants disagree.  In their view, the class size drops from sixty-six to below forty members because (1) some class members' claims are barred by statutes of limitations, (2) some class members suffered no Article III injury, and (3) some class members should not be counted separately from other class members because they are organizational affiliates.  *See* ECF No. 693 at 18–22; ECF No. 697 at 44–57.  Consider these issues in that order.

6

1

RICO and the Sherman Act have four-year statutes of limitations. *See Rotella v. Wood*, 528 U.S. 549, 552 (2000) (RICO); *see also* 15 U.S.C. § 15b; *Varner v. Peterson Farms*, 371 F.3d 1011, 1019 (8th Cir. 2004) (Sherman Act). Plaintiffs filed this case on March 29, 2020. ECF No. 1. Considering just the four-year limitations period, Plaintiffs could not recover for claims arising before March 29, 2016. Included in the proposed class, however, are organizations that purchased EpiPens before that date—as far back as January 1, 2013, according to the proposed class definition. ECF No. 680 at 9.

Defendants argue that twenty would-be class members purchased no EpiPens in the four years before the case's filing and that these organizations cannot be included in determining the proposed class's size. ECF No. 693 at 21; ECF No 697 at 46. In other words, Defendants claim that as a matter of law—that is, once the applicable statutes of limitations are applied—the class period must be shortened to begin four years prior to the filing of the Complaint, or March 29, 2016; once that happens, Defendants point out, the proposed class's size shrinks by twenty. This argument triggers consideration of the RICO and Sherman Act statutes of limitations' accrual rules.

The Sherman Act is straightforward. As explained in previous rulings, its four-year limitations period begins to run when the alleged wrongful act occurs, not when the plaintiff becomes aware of the injury. *In re EpiPen Direct Purchaser Litig.*, 2021 WL 147166, at *5; *In re EpiPen Direct Purchaser Litig.*, 2022 WL 1017770, at *2. According to Plaintiffs, the Sherman Act-violating conduct began in 2013. *See* ECF No. 680 at 13; ECF No, 271 ¶ 45. Plaintiffs have given no reason, and none is apparent, to allow

7

Plaintiffs' claims to reach back before March 29, 2016, with respect to their Sherman Act claims.

The RICO claims require more analysis. Begin with the law. Though the Supreme Court has not resolved when the RICO statute of limitations begins to run, it has said the clock starts at one of two moments: either when the plaintiff's injury occurs or when the plaintiff should reasonably be able to discover its injury. *See Rotella*, 528 U.S. at 554–55 & n.2. The Eighth Circuit and courts in this District follow the latter approach—*i.e.*, the injury-discovery rule. *Hope v. Klabal*, 457 F.3d 784, 790–91 (8th Cir. 2006); *see, e.g.*, *Schreier v. Drealan Kvilhaug Hoefker & Co.*, 611 F. Supp. 3d 746, 758 (D. Minn. 2020), *aff'd*, 992 F.3d 674 (8th Cir. 2021); *accord Sidney Hillman Health Ctr. v. Abbott Lab'ys*, *Inc.*, 782 F.3d 922, 926 (7th Cir. 2015). What matters under this rule is "discovery of the injury, not discovery of the other elements of a claim." *Rotella*, 528 U.S. at 555. "The discovery rule employs both a subjective and an objective inquiry. The Court must ask whether the plaintiff actually knew of her injury, and also, using a reasonable person standard, whether she should have known." *Rennenger v. Aquawood, LLC*, No. 4:19-cv-00123 *et al.*, (RGE/SBJ), 2022 WL 20854492, at *7 (S.D. Iowa Mar. 29, 2022) (quoting *Bendzak v. Midland Nat. Life Ins.*, 440 F. Supp. 2d 970, 980 (S.D. Iowa 2006)). In other words, when a plaintiff exercising reasonable diligence can discover its injury, the limitations period begins to run even if there is "confusion as to what the actual source of the injury was." *Robert L. Kroenlein Tr. ex rel. Alden v. Kirchhefer*, 764 F.3d 1268, 1278–79 (10th Cir. 2014).

8

The better answer on this record is that Plaintiffs knew or should have known of their injuries long before 2016. In their operative First Amended Consolidated Class Action Complaint, Plaintiffs alleged the limitations period is tolled because they could not have discovered the bribery scheme until September 2016. *See* ECF No. 271 ¶¶ 140–44. That is when, in response to growing concern regarding EpiPen's pricing, Mylan Chief Executive Officer Heather Bresch testified before Congress and made other public statements regarding EpiPen prices. ECF No. 271 ¶ 123; ECF No. 683-18 at 73:21–74:19; *see generally* ECF No. 683-34. Plaintiffs, in other words, acknowledge that CEO Bresch's public statements gave Plaintiffs enough information to discover their injuries. Defendants raised the RICO statute-of-limitations issue in the first round of 12(b)(6) motions. In that context, I determined that the question could not be resolved at the pleading stage. *In re EpiPen Direct Purchaser Litig.*, 2021 WL 147166, at *5–6. There has since been extensive discovery. In their opening class-certification brief, Plaintiffs identified no specific record evidence answering the injury-discovery question. In their opposition brief, the PBM Defendants cited deposition testimony and documents tending to show that class members knew or should have known of their alleged injury well before March 29, 2016. ECF No. 697 at 55–57 & nn.148–56. For example, Rochester's former CEO testified that Rochester knew more than twenty years ago that PBMs made rebate deals with manufacturers for preferential formulary placement. ECF No. 698-8 at 26:2–28:16. In his deposition, Dakota's CEO agreed that the industry has "long faced allegations that [PBMs] receive kickbacks from drug companies to choose specific drugs, thus contributing to inflated prices," and has thought it to be true "for a long time." ECF No. 698-13 at 23:8–24:17.

This testimony shows that Plaintiffs knew or should have known that they were being overcharged because of "rebate deals" and "kickbacks" well before 2016. Plaintiffs identify no evidence or reasons that might cast doubt on this understanding of their CEOs' testimony or undermine the testimony's legal significance to the limitations question. *See generally* ECF No. 718 at 38–39. Plaintiffs' RICO claims are therefore not tolled in any respect, and Plaintiffs may not assert claims outside the four years preceding this case's filing.

This decision—that Plaintiffs' RICO and Sherman Act claims are not tolled—has consequences for the proposed class's numerosity. Plaintiffs' inability to assert claims that predate March 29, 2016, means the proposed class definition must begin to run from that date, not January 1, 2013. Twenty would-be class members made no EpiPen purchases after March 29, 2016. ECF No. 683-2 ¶ 61; *id.* at App. Table 2; ECF No. 683-6 at Ex. 20.[4] As a result, the proposed class's size shrinks from sixty-six possible members to forty-six.[5]

---

[4]    The twenty proposed class members who made no EpiPen purchases after March 29, 2016 are: (1) American Sales Company, Inc., (2) Banyan International Corp., (3) Dealmed Inc., (4) Drogueria Central, Inc., (5) Globe Medical Surgical Supply Co., (6) Great Lakes Wholesale Drug, (7) Hammer Medical, (8) Healthfirst, (9) Kaiser Hospitals (Livermore), (10) Keystone Distribution, L.L.C., (11) Lifeline Pharmaceuticals, LLC, (12) Livingston Stern & Associates, (13) Management & Technology Solutions I, (14) Merit Pharmaceutical, (15) Physician Sales & Service, (16) Practicon, Inc., (17) Progressive Medical International, (18) Sav-A-Life LLC, (19) The Sanborn Company, and (20) Walgreen Company. ECF No. 683-5 at Ex. 20; *see* ECF No. 683-2 ¶ 61; *id.* at App. Table 2. (Another potential member, Sound Medical Supply Partners, LLC, made no EpiPen purchases after March 29, 2016, but it was excluded from the class on a different basis. Plaintiffs could not confirm it is a distinct legal entity. *See* ECF No. 680 at 18 n.9.)

[5]    To be precise, the class might be smaller; it's difficult to tell because the record is not clear. For their part, Plaintiffs originally acknowledged that, if statutes of limitations

2

Defendants raise what they say is a certification-preventing Article III standing problem. Settled rules govern the application of Article III standing doctrine to class cases. "The constitutional requirement of standing is equally applicable to class actions." *Avritt v. Reliastar Life Ins.*, 615 F.3d 1023, 1034 (8th Cir. 2010) (citing *Sutton v. St. Jude Med. S.C., Inc.*, 419 F.3d 568, 570 (6th Cir. 2005)). "Although federal courts 'do not require that each member of a class submit evidence of personal standing,' a class cannot be certified if it contains members who lack standing." *Id.* (quoting *Denney v. Deutsche Bank AG*, 443 F.3d 253, 263–64 (2d Cir. 2006)). "A class 'must therefore be defined in such a way that anyone within it would have standing.' Or, to put it another way, a named plaintiff cannot represent a class of persons who lack the ability to bring a suit themselves." *Id.* (quoting *Denney*, 443 F.3d at 264).

The standing problem arises here because Plaintiffs' original class definition included uninjured members. Specifically, the original class definition included three class members—Drogueria Central, Inc., Keystone Distribution, LLC, and Progressive Medical International—who purchased EpiPens only during the first six months of 2013. ECF No. 683-3 ¶¶ 54–55; ECF No. 695-2 at 209:15–210:11. In those six months, however, everyone

_____

were applied, the class would include forty-two members. ECF No. 680 at 18 n.9. That figure was based on the report of Plaintiffs' class-certification expert, Hal J. Singer, Ph.D. But Dr. Singer's report is not consistent on this question. *Compare* ECF No. 683-1 at App. Table 3 (identifying forty-two class members remaining if class period is shortened), *with* ECF No. 683-2 at App. Table 2 (identifying forty-six class members). Regardless, the PBM Defendants' expert identified forty-six remaining class members if the period were shortened. *See* ECF No. 683-5 at Ex. 20. On this record, better to presume that forty-six is the right number.

11

seems to agree that EpiPens' "real-world" price—that is, the price Mylan actually charged for EpiPens—matched EpiPens' price in the "but-for world"—that is, the price Dr. Singer opined Mylan would have charged had the price not been raised illegally. ECF No. 683-3 at Ex. 8; ECF No. 693 at 38. In his deposition, Dr. Singer acknowledged that these three would-be members were uninjured, a fact his damages model did not catch. ECF No. 695-2 at 209:15–210:11 ("So that's where your experts discovered there were three class members, because they stopped purchasing before July, would escape injury under the stepwise formulation . . . . [Y]ou would have to redefine the class to start, say, in July of 2013.").

In a different case, the presence of uninjured members in a proposed class might pose a barrier to certification. It doesn't here. The uninjured members were dropped when the class was redefined to commence March 29, 2016 (owing to the limitations issues). And no authority has been cited by the parties or identified through independent research that might prevent a district court from curing an Article III standing problem by moving a proposed class's start date forward to remove a small number of would-be members who, during a discrete period, suffered no injury.

3

Mylan argues essentially that some would-be class members shouldn't be counted separately because they share an organizational affiliation with other class members. ECF No. 693 at 21–22. The source of this argument seems to be Mylan's expert, John H. Johnson, Ph.D.; he identified several putative class members that are subsidiaries of other class members. ECF No. 683-3 ¶¶ 71–74. For example, Dr. Johnson reported:

12

> Several of the putative class members are either subsidiaries of AmerisourceBergen or were acquired by AmerisourceBergen during the class period. For example, Oncology Supply and ASD Specialty/Besse Medical (who Dr. Singer identified as one combined class member), have been subsidiaries of AmerisourceBergen throughout the class period. AmerisourceBergen also acquired H.D. Smith Wholesale in January 2018, which itself had previously acquired Valley Wholesale Drug in November 2012.

*Id.* ¶ 71. In Mylan's view, accounting for these organizational relationships (by combining organizational affiliates) would reduce the proposed class's size to thirty-seven members. *Id.* ¶ 74.

As legal support for this argument, Mylan cites *In re Nexium (Esomeprazole) Antitrust Litigation*, 296 F.R.D. 47 (D. Mass. 2013). There, the plaintiffs' expert determined there were either thirty-one or twenty-six class members. *In re Nexium*, 296 F.R.D. at 51. But the court "adopt[ed] the [d]efendants' figures of twenty-nine or twenty-four members, [to] account for the consolidation of two entities with their parent corporations." *Id.* Regardless, the court ultimately found the proposed class sufficiently numerous (even with as few as twenty-four members) and granted certification. *Id.* at 53, 60.

This argument is not persuasive. Though there is room for misunderstanding, the "consolidation" question addressed in *In re Nexium* seems different from the affiliation question presented here. In other words, it might make sense to count separate business organizations as a single organization if they have consolidated or merged to form a single legal entity. We're not talking about consolidation or merger here. Mylan has shown only that some would-be member organizations are affiliated with other would-be member

organizations.  *See* ECF No. 683-3 ¶¶ 71–74.  Mylan has cited no authority that might support disregarding the presumption that separate business organizations should be treated separately in the numerosity analysis.  So long as each entity purchased EpiPens from Mylan within the class period—which Mylan does not dispute—then each entity would have suffered injury under the alleged scheme and may be counted separately in ascertaining the proposed class's size.

*

Owing to statutes of limitations, I find that the proposed class would not begin to run until March 29, 2016, and would include forty-six members at most.  I do not find that the class size decreases further based on the presence of uninjured members or the presence of members that share organizational affiliations.

C

According to Plaintiffs, the impracticability of joinder is "presumed" when the proposed class has forty or more members.  ECF No. 680 at 18–19.  I do not agree.  A presumption usually implies burden-shifting.  So, in other words, if the impracticability of joinder were "presumed" when a proposed class has forty or more members, one would expect the burden to shift to a defendant—perhaps to rebut the presumption or to bear the burden of showing joinder's practicability.

No Eighth Circuit case does that or says that's what should happen.  It is true that cases from this District have recognized that the presence of forty or more class members represents an ordinarily significant threshold.  Some have described a "general rule" that a class of more than forty is sufficiently large to make joinder impracticable.  *See Alberts*,

14

245 F.R.D. at 409 ("In general, a putative class exceeding 40 members is sufficiently large to make joinder impracticable.") (citing *Lockwood Motors, Inc. v. Gen. Motors Corp.*, 162 F.R.D. 569, 574 (D. Minn. 1995)); *see also Portz*, 297 F. Supp. 3d at 944 ("[T]he customary forty-person class . . . generally results in a finding of numerosity.").   Others have described a "presumption" of numerosity when the class contains forty or more members. *See, e.g.*, *Murphy v. Piper*, No. 16-cv-2623 (DWF/BRT), 2017 WL 4355970, at *3 (D. Minn. Sept. 29, 2017) ("In general, . . . 'a class of 40 or more members raises a presumption of impracticability of joinder based on numbers alone.'" (quoting William B. Rubenstein, *Newberg on Class Actions* § 3:12 (5th ed. 2017 Update)); *In re Wholesale Grocery Prods. Antitrust Litig.*, No. 09-md-2090 (ADM/TNL), 2016 WL 4697338, at *7 (D. Minn. 2016).   But these decisions did not shift the burden of disproving joinder's impracticability on to a defendant.   The bottom line here is that forty-six is a significant number of class members, but that number holds no special legal significance that might warrant presuming joinder's impracticability or trump other relevant considerations.

## D

Next consider whether the size of the absent class members' claims is so small as to inhibit the separate pursuit of these claims.   It is difficult to see how the claims in this case might reasonably be characterized that way.   The claims are large.   As Dr. Singer describes things, the proposed class's aggregate claim is greater than $1.2 billion ($1,276,657,110, to be exact).   *See* ECF No. 683-1 at App. Table 3.   Three absent class members—the "Big Three" wholesalers AmerisourceBergen, Cardinal, and McKesson—have claims totaling $1.19 billion ($1,193,521,516, to be exact).   *Id.*   AmerisourceBergen's claim is

15

$319,664,517. *Id.* Cardinal's claim is $480,640,208. *Id.* And McKesson's claim is $393,216,791. *Id.* The claims belonging to the other would-be class members are mostly quite large. Nine absent class members' claims exceed $1 million, ranging from $37,252,681 on the high end to $1,038,780 on the low end. *Id.* Fifteen class members have six-figure claims ranging from $683,231 to $140,471. *Id.* Fourteen claims are for less than $100,000. *Id.* All other things being equal, we would usually say that most of these claims have a value that would justify their separate, non-class pursuit.

Plaintiffs rely on the cost of prosecution to show that absent class members would be inhibited from separately pursuing these claims. Plaintiffs assert that the "likely cost of litigation" for individual claims would be $3.7 million, a number exceeding a clear majority of class members' claims. ECF No. 680 at 19–20 & n.15. Plaintiffs do not tether this figure to this case specifically. They represent that this is "the likely cost of litigation (excluding attorney fees) based on the *Nexium* trial experience," referring to *In re Nexium (Esomeprazole) Antitrust Litig.*, 296 F.R.D. 47 (D. Mass. 2013). *Id.* The $3.7 million figure is not helpful. Plaintiffs do not explain how this case compares with *Nexium* such that the "likely cost of litigation" would be identical or similar. Nonetheless, Plaintiffs have a point. Owing to this case's relative complexity, it seems safe to predict that the cost of prosecution will be substantial. It also seems safe to predict that litigation costs would deter class members with five- or perhaps lower six-figure claims from filing their own, separate cases. But those claims are not representative of most absent class members' claims, and the disincentive to file a separate, independent case does not say much about

whether business organizations with lower-value claims would nonetheless be motivated to join the case under Rule 20.

On that joinder question, the fact that three would-be class members' claims amount to more than ninety percent—93.49%, to be precise—of the total damages claimed in the case is significant. Consider *In re Modafinil Antitrust Litigation*, 837 F.3d 238 (3d Cir. 2016), *as amended* (Sept. 29, 2016). There, the Third Circuit vacated certification of a class of twenty-two drug wholesalers in a suit against a manufacturer and remanded for the district court to reconsider, among other things, numerosity. *In re Modafinil*, 837 F.3d at 258–59. In its analysis, the Third Circuit explained the class members:

> appear likely to have the ability and incentive to bring suit as joined parties, thus preventing the alleged wrongdoers from escaping liability. In fact, three class members, none of whom are named plaintiffs, each have claims estimated at over $1 billion—even before the trebling of damages. These three make up over 97% of the total value of the class claims, and can hardly be considered as candidates who need the aggregative advantages of the class device. While this factor could weigh in favor of class status *if* the remaining class members had very small claims, that is simply not the case here.

*Id.* at 258 (footnote omitted). The same could be said of this case.

## E

Other, less important considerations cut against each other. A practical consideration applied to assess the impracticability of joinder is "the ease of identifying its members and determining their addresses" as well as "the facility of making service on them if joined." *Portz*, 297 F. Supp. 3d at 944. Here, all class members are readily identifiable. ECF No. 693 at 20; ECF No. 697 at 47. Dr. Singer identified each class

17

member in his report.  *See* ECF No. 683-1 at App. Table 1.  Plaintiffs do not contend there

are any unknown members.  Dr. Singer also provides a map showing each class member's

location, signifying their addresses have been determined and that service would not be

difficult.  *Id.* at App. Figure 2.  At the same time, the "geographic dispersion" of class

members—they are in over twenty states and Puerto Rico—favors finding impracticability.

*See Portz*, 297 F. Supp. 3d at 944.  Regardless, these considerations offset each other and

do not change the impracticability-of-joinder analysis.[6]

*

Relative to Rule 23(a)(1)'s numerosity requirement, the paradigmatic class action

involves many members with small claims.  *See DeBoer v. Mellon Mortg. Co.*, 64 F.3d

1171, 1175 (8th Cir. 1995) (describing one of the two "purposes behind class actions" as

"providing small claimants with a means of obtaining redress for claims too small to justify

individual litigation").  This case isn't like that.  Here, Plaintiffs seek certification of a

comparatively small class comprised of members with mostly large individual claims.  It's

not that a class with those characteristics could never satisfy Rule 23(a)(1)'s numerosity

requirement.  But on this case's specific facts, the better answer is that Plaintiffs have not

shown that their proposed class does.

---

[6]      In a letter to Magistrate Judge Docherty dated January 9, 2023, Plaintiffs' counsel
wrote that "the action will proceed regardless of the determination on class certification."
ECF No. 618 at 3.  Defendants argue that this statement amounts to a concession that
joinder is not impracticable.  *See* ECF No. 693 at 11, ECF No. 697 at 45.  That goes too
far.  Plaintiffs' counsel made the assertion, not as if it were Plaintiffs' primary position, but
as a fallback and to support Plaintiffs' arguments regarding case-management questions
that were the letter's subject.  To be clear, the statement has not factored into this analysis
of the Rule 23(a)(1) issue.

III

To obtain certification, Plaintiffs must show "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "Commonality requires the plaintiff[s] to demonstrate that the class members 'have suffered the same injury,'" as opposed to having "suffered a violation of the same provision of law." *Dukes*, 564 U.S. at 349–50 (quoting *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 157 (1982)). "What matters to class certification . . . is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Powers v. Credit Mgmt. Servs., Inc.*, 776 F.3d 567, 571 (8th Cir. 2015) (alteration in original) (quoting *Dukes*, 564 U.S. at 350). To satisfy commonality, the class members' "claims must depend upon a common contention" that is "capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 564 U.S. at 350.

In their opening brief, Plaintiffs argued that they have "identified numerous common factual and legal questions about the existence, scope, and legality of Defendants' conduct." ECF No. 680 at 21. As support for this assertion, Plaintiffs cited their Proposed Trial Plan, ECF No. 680-1 § III, evidently intending to incorporate that document by reference in their opening brief. The Proposed Trial Plan identifies several issues Plaintiffs intend to prove or rebut at trial. Examples include: "Whether Mylan and each Defendant PBM, through the respective Mylan-PBM EpiPen Pricing Enterprises, engaged in a pattern of bribery through inflating WAC prices of EpiPens"; "Whether Plaintiffs and Class members were harmed by reason of Defendants' predicate acts of bribery, honest services

19

fraud, and/or mail fraud and wire fraud"; and "Whether Mylan unlawfully maintained monopoly power over EpiPen." *Id.* § III ¶¶ a, g, h.

Defendants do not limit their response specifically to the Rule 23(a)(2) commonality question, choosing instead to pair their opposition regarding Rule 23(a)(2) with Rule 23(b)(3)'s predominance requirement.  This makes sense.  As the Eighth Circuit recently observed, "[c]ommonality is subsumed within the predominance requirement." *Cody v. City of St. Louis*, --- F.4th ---, 2024 WL 2809509, at *4 (8th Cir. June 3, 2024).  Rule 23(a)(2) will be analyzed together with the Rule 23(b)(3) questions.

## IV

A class may be certified only if "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  The Rule "requires a demonstration that there are other members of the class who have the same or similar grievances as the plaintiff." *Paxton*, 688 F.2d at 562 (quoting *Donaldson v. Pillsbury Co.*, 554 F.2d 825, 830 (8th Cir. 1977)).  Typicality is "fairly easily met so long as other class members have claims similar to the named plaintiff." *DeBoer*, 64 F.3d at 1174.  "Factual variations in the individual claims will not normally preclude class certification if the claim arises from the same event or course of conduct as the class claims, and gives rise to the same legal or remedial theory." *Alpern v. UtiliCorp United, Inc.*, 84 F.3d 1525, 1540 (8th Cir. 1996) (citing *Donaldson*, 554 F.2d at 831).

Rule 23(a)(3)'s typicality requirement is not seriously contested.  For their part, Plaintiffs argue typicality is "easily met" and cite several supporting RICO and Sherman Act cases.  ECF No. 680 at 21–22 & n.23.  Mylan is silent on typicality. *See generally*

ECF No. 693.  The PBM Defendants state in an argument heading in their opposition brief that the named Plaintiffs have "atypical" claims, ECF No. 697 at 22, but their arguments in this section of their brief are directed expressly to challenging Rule 23(a)(4)'s adequacy requirement.  Given the parties' framing of the issue, better to analyze these issues in that context.

## V

## A

A class representative must "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).  "The party moving for certification bears the burden to prove that [it] will adequately represent the class," and "[t]he district court must decide whether Rule 23(a)(4) is satisfied through balancing the convenience of maintaining a class action and the need to guarantee adequate representation to the class members." *Rattray v. Woodbury Cnty.*, 614 F.3d 831, 835 (8th Cir. 2010) (cleaned up).  "Conflicts between the representatives and the class and among the class members can defeat class certification." *Taqueria El Primo LLC v. Ill. Farmers Ins.*, 577 F. Supp. 3d 970, 993 (D. Minn. 2021) (citations omitted).  "Perfect symmetry of interest is not required and not every discrepancy among the interests of class members renders a putative class action untenable.  To forestall class certification the intra-class conflict must be so substantial as to overbalance the common interests of the class members as a whole." *Vogt v. State Farm Life Ins.*, 963 F.3d 753, 767 (8th Cir. 2020) (cleaned up) (quoting *Matamoros v. Starbucks Corp.*, 699 F.3d 129, 138 (1st Cir. 2012)).  "The inquiry into adequacy of representation, in particular, requires the district court's close scrutiny, because the purpose of Rule 23(a)(4) is to ensure

21

due process for absent class members, who generally are bound by a judgment rendered in a class action." *Rattray*, 614 F.3d at 835. "This inquiry requires the Court to evaluate the adequacy of both the proposed class representatives and the proposed class counsel." *Taqueria El Primo*, 577 F. Supp. 3d at 993.

B

There is no question Plaintiffs' counsel are adequate. Plaintiffs propose three lawyers to serve as the proposed class's co-lead counsel: Bruce Gerstein of Garwin, Gerstein & Fisher LLP, David Sorensen of Berger Montague PC, and Peter Kohn of Faruqi & Faruqi, LLP. ECF No. 680 at 22. Mr. Gerstein has extensive experience litigating complex actions and has been named lead counsel in federal- and state-court class actions. *See* Bruce E. Gerstein, https://garwingerstein.com/professionals/bruce-e-gerstein/ (last visited June 13, 2024). Mr. Sorensen has a similarly extensive history with complex antitrust cases, many of which involve allegations against pharmaceutical manufacturers, and has been named lead or co-lead counsel by federal courts throughout the country. *See* David F. Sorensen, https://bergermontague.com/attorneys/david-f-sorensen/ (last visited June 13, 2024). Mr. Kohn's record is comparable; he has been appointed to leadership positions in many cases. *See* Peter Kohn, https://www.faruqilaw.com/attorney/29/peter-kohn (last visited June 13, 2024). In addition to their broader experience, these lawyers and their teams have vigorously litigated this case through three rounds of Rule 12 motions, years of fact and expert discovery, and discovery-related motions. I've had several opportunities to review counsel's work product and to engage with them in hearings. Based on my observations, counsel's advocacy has been appropriately zealous and exceptional.

22

C

Whether Rochester and Dakota are adequate representative parties is a difficult question. Owing to what I conclude are substantial conflicts between Plaintiffs and some class members, the better answer is that Plaintiffs have not shown they are adequate in the Rule 23(a)(4) sense.

1

Defendants allege that some class members benefitted from EpiPen price increases. This, Defendants explain, is because these class members received additional sums in the form of service fees, rebates, and inventory appreciation based on EpiPen's list price (or wholesale acquisition cost, "WAC"). ECF No. 693 at 23–27; ECF No. 697 at 24–30. In other words, when EpiPen's list price increased, so did these class members' profits. Thus, Defendants contend, there is a fundamental conflict between Rochester and Dakota on the one hand, who claim to have been injured by EpiPen price increases, and class members who benefitted from EpiPen price increases, on the other.

As primary legal support for this argument, Defendants rely on *Valley Drug Co. v. Geneva Pharmaceuticals, Inc.*, 350 F.3d 1181 (11th Cir. 2003), an antitrust case. ECF No. 693 at 23–27; ECF No. 697 at 24–30. There, the Eleventh Circuit vacated certification of a class of hypertension medication direct purchasers. *Valley Drug*, 350 F.3d at 1183–84. The Eleventh Circuit found that the district court improperly certified the class because the named plaintiffs, two regional wholesalers, were not adequate representatives of a class which included "three national wholesalers, whose transactions with [the manufacturer] constitute over fifty percent of the plaintiffs' total claims, [and] experienced a net gain."

23

*Id.* at 1190.  In vacating certification, the Eleventh Circuit explained that "a class cannot be certified when its members have opposing interests or when it consists of members who benefit from the same acts alleged to be harmful to other members of the class." *Id.* at 1189 (quoting *Pickett v. Iowa Beef Processors*, 209 F.3d 1276, 1280 (11th Cir. 2000)).  The court found the named plaintiffs had "divergent interests and objectives" from the national wholesalers who may have profited from the behavior which plaintiffs claimed was illegal. *Id.* at 1193.  The court "note[d] that this case has been brought by two regional wholesalers with relatively small claims who do not sell on a cost-plus basis, while the three national wholesalers with the bulk of the claims have chosen not to participate in the litigation." *Id.* This "suggests that the interests of the named representatives are not substantially aligned with the interests of all of the class members whom they purport to represent because some of the class members would have experienced a net gain from the conduct alleged to be wrongful in this instance." *Id.*

This case is a lot like *Valley Drug*.  Like *Valley Drug*, the proposed class here includes "three national wholesalers, whose transactions with [Mylan] constitute over fifty percent" (over ninety percent) of the class's total claims. *Valley Drug*, 350 F.3d at 1190; ECF No. 683-1 at App. Table 4; ECF No. 683-2 at App. Table 2.  And, like *Valley Drug*, the record shows that these three national wholesalers—AmerisourceBergen, Cardinal, and McKesson—benefitted from EpiPen price increases in significant ways that Rochester and Dakota did not.

The Big Three's contracts with Mylan required the payment of fees synced to EpiPen's list price. *See* ECF No. 704-4 at 2 ("Supplier [Mylan] shall pay a Primary

Distribution Services Fee to ABC [AmerisourceBergen] for primary distribution services . . . .   The amount of the Primary Distribution Services Fee is ███████ times the amount of ABC's ██████████████████."); ECF No. 704-7 at 8 ("Supplier [Mylan] shall pay Cardinal Health a quarterly 'Service Fee.'  The Service Fee for 2005 shall be an amount equal to ██████ multiplied times the total value of Cardinal Health's ██████████████ █████ measured at then current Wholesale Acquisition Cost."); ECF No. 704-5 at 7 ("Total Annual Fee for Services Provided: ███████ of ████████████████████████ ████████, as described in Section III, a., above."  Section III, a., in turn, states, "Service Fee payment calculations shall be based on McKesson's ██████████████████ ███████ at WAC."  *Id.* at 3).  The service-fees provisions were contained in early versions of the agreements between the Big Three and Mylan, and were renewed with amendments. *See, e.g.*, ECF No. 699-8 at 7 (including a graduated table of service fees in a 2010 amendment between McKesson and Mylan); ECF No. 704-6 at 3 (same, in a later amendment).[7]  Corporate representatives' deposition testimony confirms that the Big Three benefitted from EpiPen list price increases.  *See* ECF No. 695-3 at 51:8–12 (Q: "Likewise, if Mylan increases the WAC of EpiPen devices, [AmerisourceBergen] also makes more money in distribution services fees; right?"  A: "Yes."); ECF No. 695-4 at 82:7–11 (Q: "So

---

[7]      The Big Three's early contracts were with "Dey Pharma L.P."  *See* ECF Nos. 704-4, 704-7, and 704-5.  To be clear, Dey Pharma is Mylan's predecessor; Mylan acquired Dey and renamed it Mylan Specialty, L.P.  *See* ECF No. 704-6 at 3 ("All sections of the Agreement, and subsequent amendments and/or modifications, where Manufacturer's name reads Dey, Dey, L.P. or Dey Pharma, L.P., shall be revised to reflect the name change to: Mylan Specialty L.P.").

the higher the WAC price, the greater the absolute value of the service fee [to Cardinal], right?"  A: "That would be correct."); ECF No. 695-5 at 61:23–62:12 (Q: "McKesson gets price increase benefits if the price of EpiPen is increased while this contract is in effect, right?"  A: "That's correct."  Q: "McKesson also generates additional revenue if the price of EpiPen increases because its service fee, whether it's ███████████████, would, as a dollar value, be higher after a price increase, right?"  A: "If you're referring to revenue as compensation from the manufacturer, then the answer is yes.").[8]  The record shows these fees are significant.  The PBM Defendants' expert, Dr. Mathur, estimates that over the proposed class period (2013–2020) AmerisourceBergen benefitted from more than ██████████ in increased service fees, that Cardinal's total benefit exceeded ██████████, and that McKesson's surpassed ██████████.  ECF No. 683-5 ¶ 75 (calculating a "conservative estimate" of the total value of service fees accrued during the class period).

The Big Three also benefitted from EpiPen price increases through inventory appreciation.  *See* ECF No. 698-3 at 24:17–25 ("Price appreciation is the difference between an old price and a new price, and the value . . . created . . . depending upon the amount of inventory that you have on hand at the time of that price increase."); ECF No. 683-5 ¶ 73.  Each held EpiPens in inventory, the value of which appreciated as EpiPen's

---

[8]    Mylan claims that three other direct-purchaser class members—Morris & Dickson, Walgreens, and Luis Garraton LLC—also contracted to receive service fees and thus benefitted from EpiPen list price increases.  ECF No. 693 at 25.  Mylan cites its expert for this contention.  *Id.*; *see* ECF No. 683-3 ¶ 47 n.131 (citing MYLDPP00717780–796, MYLDPP00717650, and MYLDPP00717856–881).  However, it does not appear Mylan filed these contract documents with its motion.  The expert's report cites only Bates numbers, not to specific ECF or exhibit numbers.  A search for those Bates numbers in Mylan's exhibits [ECF Nos. 694 through 695-21] returned no results.

list price increased, making this stock more valuable with each increase.  ECF No. 697 at

24.  The Big Three expected and accounted for this appreciation.  ███████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████  *Id.*; ECF No.

699-8 at 7 ("███████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████).

Plaintiffs do not dispute these facts or that the Big Three benefitted from EpiPen list

price increases in significant ways that Plaintiffs did not; Plaintiffs instead challenge the

legal relevancy of these facts, relying on *Hanover Shoe, Inc. v. United Shoe Machinery

Corp.*, 392 U.S. 481 (1968), and *Illinois Brick v. Illinois*, 431 U.S. 720 (1977).  *Hanover

Shoe* says that a buyer seeking overcharge damages is "equally entitled to damages if he

raises the price for his own product" and explained that in such cases, "the possibility that

plaintiffs had recouped the overcharges from their customers was . . . irrelevant."  *Hanover

Shoe*, 392 U.S. at 489–90.  *Hanover Shoe* thus rejects a "pass on" defense—that is, an

argument that a direct-purchaser plaintiff cannot recover damages merely because it

"passed on" overcharges to buyers.  *Id.* at 494.  *Illinois Brick* held that indirect purchasers

could not recover damages on the theory that a direct purchaser passed overcharges on to

them.  *Illinois Brick*, 431 U.S. at 730–31.  Plaintiffs claim *Valley Drug* was wrongly

decided considering *Hanover Shoe* and *Illinois Brick*.  ECF No. 718 at 13–18.

*Valley Drug* addressed this issue, reasoning that class certification under Rule 23(a)

is a distinct question from overcharge recovery.  The court explained that the question

addressed in *Hanover Shoe* and *Illinois Brick* "is a distinctly separate question from the

27

issue of whether class certification is appropriate where a fundamental conflict exists among the named and unnamed members of a class." *Valley Drug*, 350 F.3d at 1192.  The court continued:

> Nevertheless, plaintiffs' brief is replete with references to *Hanover Shoe* and *Illinois Brick* as if these cases were a talisman warding away the requirements of Rule 23 and barring this court from exercising its duty to conduct an inquiry into whether the plaintiffs' proposed class satisfies the four requirements of Rule 23(a).  We do not interpret the holdings of *Hanover Shoe* and *Illinois Brick* in this broad fashion.  Similarly, we disagree with [plaintiffs] when they assert "it would be a complete perversion of the rule and rationale of these cases to stop indirect purchasers from being able to recover these overcharges."  This argument misses the mark by our reasoning because our holding today in no way inhibits those direct purchasers who potentially experienced a net benefit from the defendants' conduct from nevertheless bringing suit against the defendants to recover their damages in the form of an overcharge.

*Id.* at 1192–93 (citation omitted).

It is true, as Plaintiffs say, that the Third Circuit rejected *Valley Drug* in *In re K-Dur Antitrust Litigation*, 686 F.3d 197 (3d Cir. 2012).  As the Third Circuit saw things, "requiring plaintiffs to show that no class member benefitted from the challenged conduct in the form of greater profits is contrary to the Supreme Court's decision in *Hanover Shoe*." *In re K-Dur*, 686 F.3d at 223.  The Third Circuit also explained that, because overcharges are the damages measure, "all of the class members have the same financial incentive for purposes of the litigation." *Id.*  It is also true that *Valley Drug* is not binding authority here, and neither the Supreme Court nor Eighth Circuit has addressed the issue.

I find *Valley Drug* persuasive regardless. (1) *Hanover Shoe* and *Illinois Brick* did not address class certification, and I agree with the Eleventh Circuit that intra-class conflicts matter to the Rule 23 certification analysis even if those conflicts result to some degree from the differing economic consequences of a product's sale to an indirect purchaser. The question is whether representative litigation is appropriate, not whether a direct purchaser may bring suit. (2) As the Eleventh Circuit pointed out, it is "not alone in interpreting Rule 23(a)(4) to preclude class certification where the economic interests and objectives of the named representatives differ significantly from the economic interests and objectives of unnamed class members." *Valley Drug*, 350 F.3d at 1190 (collecting cases from the Seventh, Fourth, and D.C. Circuits). (3) *Valley Drug* has been cited favorably by courts in this District and other district courts within the Eighth Circuit. *See Hoekman v. Educ. Minn.*, 335 F.R.D. 219, 243 (D. Minn. 2020) ("Intraclass conflicts precluding certification exist where some party members claim to have been harmed by the same conduct that benefitted other members of the class because in such a situation, the named representatives cannot vigorously prosecute the interests of the class through qualified counsel because their interests are actually or potentially antagonistic to, or in conflict with, the interest and objectives of other class members." (internal quotation marks omitted)); *Duchardt v. Midland Nat. Life Ins.*, 265 F.R.D. 436, 449 (S.D. Iowa 2009) (denying class certification in part because "Duchardt has shown that he has sustained losses . . . , but Midland has provided examples where policyholders have benefitted, or can be expected to benefit in the future, from [the challenged conduct]."). Recently, in *In re Pork Antitrust Litigation*, 665 F. Supp. 3d 967 (D. Minn. 2023), Judge Tunheim cited *Valley Drug* in

finding a proposed class representative inadequate "because it benefits from the same conduct that harms other class members."[9]  *In re Pork*, 666 F. Supp. at 999.  The situation is reversed but analogous to this case: Rochester and Dakota cannot adequately represent the class because they claim to have been harmed by the same conduct that benefitted other class members.  For this reason, Plaintiffs have not shown that they meet Rule 23(a)(4)'s adequate-representation requirement.

2

Mylan argues that Dakota is not adequate in the Rule 23(a)(4) sense because it has not meaningfully participated in this litigation.  ECF No. 693 at 29–30.  To support this contention, Mylan claims Dakota's CEO first learned of the case years after it was brought, when he sat for his deposition in 2023.  *Id.*  Mylan also says that Dakota's Rule 30(b)(6) designee "was not aware of any facts that would support Plaintiffs' allegations."  ECF No. 693 at 30.

These assertions are not persuasive.  Dakota's CEO had not read the original Complaint or the operative First Amended Complaint before his deposition, but his testimony shows that he is knowledgeable regarding the case's general nature and its underlying allegations.  *See* ECF No. 695-12 at 16:23–17:25 ("It's about the price of EpiPen . . . it went to 600-and-some dollars . . . it was too high a price, and the consumer

---

[9]     Despite the one representative's inadequacy, Judge Tunheim ultimately certified the *In re Pork* class because plaintiffs had "other acceptable class representatives" and adequacy "is satisfied as long as **one** of the class representatives is an adequate class representative."  *In re Pork*, 665 F. Supp. 3d at 999 (quoting *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 961 (9th Cir. 2009)).

couldn't afford it, and . . . the insurance companies were the big receiver of the pricing."). Dakota's Rule 30(b)(6) designee reviewed the Complaint before it was filed. *See* ECF No. 695-13 at 21:10–11 ("I reviewed the Complaint in this case before it was filed on Dakota's behalf."). It is true that, in response to questions asking whether he knew of facts showing that Defendants received bribes or kickbacks, the Rule 30(b)(6) designee testified that "Dakota doesn't have access to the information that supports that allegation." *Id.* at 356:23–358:5. It is not clear this answer violated the witness's obligations under Rule 30(b)(6); business organizations that bring suit sometimes lack access to specific categories of information supporting their claims. If it was a Rule 30(b)(6) violation, Mylan does not say it filed a motion to compel or for other relief concerning the violation. Regardless, Mylan cites no authority holding that a Rule 30(b)(6) deponent's testimony that the organization he represents lacks particular information renders the organization inadequate as a class representative under Rule 23(a)(4).

### 3

Mylan argues that Rochester is an inadequate representative party because it is in bankruptcy. ECF No. 693 at 27–29. In Mylan's view, this status makes Rochester an inadequate class representative because it means the organization is merely "lending [its] name to a suit controlled entirely by the class attorney." ECF No. 693 at 28 (quoting *Sondel v. Nw. Airlines, Inc.*, No. 3-92-cv-381, 1993 WL 559031, at *10 (D. Minn. Sept. 30, 1993)). Mylan also argues that Rochester's bankruptcy status means the organization owes Mylan a fiduciary duty that is incompatible with bringing this case. *Id.* Separately, Mylan argues that Rochester is inadequate because it "has admitted to making false statements to federal

31

law enforcement between 2012 and 2017 about a scheme to divert controlled substances to pharmacies Rochester knew were dispensing those substances for illegitimate purposes." *Id.* at 29.

Rochester filed Chapter 11 bankruptcy in 2021. *See* Notice of Effective Date of Chapter 11 Plan, *In re Rochester Drug Co-Operative, Inc.*, No. 20-20230 (Bankr. W.D.N.Y. Mar. 22, 2021), ECF No. 1305. It acts through its liquidating trustee. ECF No. 693 at 27; *see also* ECF No. 720-1 ¶¶ 3–5. Rochester is empowered to pursue its claims through the liquidating trustee. ECF No. 718 at 36. The liquidating trustee filed a declaration confirming that it has the power to litigate Rochester's antitrust claims without supervision or approval from the Bankruptcy Court, that it has consulted with class counsel and understands the case, and that it "has and will continue to perform [Rochester's] duties as class representative in this case." ECF No. 720-1 ¶¶ 3–5. Courts in other cases have held that Rochester's bankruptcy does not render it inadequate as a class representative, even though defendants were Rochester's creditors. *See, e.g.*, *In re Zetia (Ezetimibe) Antitrust Litig.*, 7 F.4th 227, 237 (4th Cir. 2021) ("Rochester's bankruptcy status gives it a 'strong interest' in recovering its 'fairly substantial' $40.5 million in treble damages. The fact that Merck and Glenmark are two of Rochester's creditors does not change that interest.") (citation omitted). Courts also have found that Rochester's deferred prosecution agreement for its fraud charges is not a barrier to finding Rochester adequate under Rule 23(a)(4). *In re Zetia (Ezetimibe) Antitrust Litig.*, No. 2:18-md-2836, 2020 WL 3446895, at *22–23 (E.D. Va. June 18, 2020), *report and recommendation adopted*, 481 F. Supp. 3d

571 (E.D. Va. 2020), *vacated and remanded on other grounds*, 7 F.4th 227 (4th Cir. 2021).

If it mattered, these cases would be followed here.

## VI

## A

Because Plaintiffs seek to certify the class under Rule 23(b)(3), they are required to demonstrate that (1) "questions of law or fact common to class members predominate over any questions affecting only individual members, and [(2)] that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  The "pertinent" matters to these inquiries include:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

*Id.*  "[A] Rule 23(b)(3) certification ruling is not to adjudicate the case; rather, it is to select the method best suited to adjudication of the controversy fairly and efficiently."  *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 460 (2013) (cleaned up).

## B

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997) (citing 7A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, *Federal Practice and Procedure* § 1777, at 518–19 (2d ed. 1986)).  The

33

inquiry "asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (quoting 2 William B. Rubenstein, *Newberg on Class Actions* § 4:49, at 195–96 (5th ed. 2012)).  The Supreme Court has explained the difference between individual and common questions:

> An individual question is one where members of a proposed class will need to present evidence that varies from member to member, while a common question is one where the same evidence will suffice for each member to make a prima facie showing or the issue is susceptible to generalized, class-wide proof.

*Tyson Foods*, 577 U.S. at 453 (cleaned up).  The Rule 23(b)(3) predominance inquiry is governed by an "even more demanding" rigorous analysis than Rule 23(a).  *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013).

"The predominance inquiry 'begins . . . with the elements of the underlying cause of action.'"  *In re Aluminum Warehousing Litig.*, 336 F.R.D. 5, 44 (S.D.N.Y. 2020) (quoting *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2001)); *see Harris v. Union Pac. R.R. Co.*, 953 F.3d 1030, 1033–34 (8th Cir. 2020) (applying Rule 23(b)(3)'s predominance and superiority requirements "by considering the nature of plaintiffs' claim").  The question is whether the essential elements of each of a would-be class plaintiff's claims are capable of common proof.  *Halvorson v. Auto–Owners Ins. Co.*, 718 F.3d 773, 778 (8th Cir.2013); *City of Pontiac Gen. Emp.'s Ret. Sys. v. Wal-Mart Stores, Inc.*, No. 5:12-cv-5162, 2016 WL 5400373, at *6 (W.D. Ark. Sept. 20, 2016).

34

Plaintiffs assert a civil RICO claim under 18 U.S.C. § 1962(c) against all Defendants and a claim against Mylan under section 2 of the Sherman Antitrust Act.  To establish their civil RICO claim, Plaintiffs must show that Defendants "engaged in '(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.'"  *H & Q Props., Inc. v. Doll*, 793 F.3d 852, 856 (8th Cir. 2015) (quoting *Nitro Distrib., Inc. v. Alticor, Inc.*, 565 F.3d 417, 428 (8th Cir. 2009)).  Even if Plaintiffs adequately plead that Defendants violated RICO, however, the claim will fail if Plaintiffs have not "1) sustained an injury to business or property 2) that was caused by [the] RICO violation."  *Gomez v. Wells Fargo Bank, N.A.*, 676 F.3d 655, 660 (8th Cir. 2012) (quoting *Asa-Brandt, Inc. v. ADM Inv. Servs., Inc.*, 344 F.3d 738, 752 (8th Cir. 2003)); *see also* 18 U.S.C. § 1964(c) (authorizing a civil action by "[a]ny person injured in his business or property *by reason of* a violation" (emphasis added)).  Section 2 of the Sherman Antitrust Act makes it unlawful to "monopolize, or attempt to monopolize . . . any part of the trade or commerce among the several States."  15 U.S.C. § 2.  To plead a violation, Plaintiffs must plausibly allege that Mylan (1) "possessed monopoly power in the relevant market" and (2) "willfully acquired or maintained this monopoly power by anticompetitive conduct as opposed to gaining that power as a result 'of a superior product, business acumen, or historical accident.'"  *Inline Packaging, LLC v. Graphic Packaging Int'l, LLC*, 962 F.3d 1015, 1024 (8th Cir. 2020) (quoting *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1060 (8th Cir. 2000)); *see United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966).  Plaintiffs must also plausibly allege an "antitrust injury," which is an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes [the] defendants' acts

unlawful." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990).  It is not enough for Plaintiffs to prove an injury that is "causally related to an antitrust violation"; the injury must also be "attributable to an anti-competitive aspect of the practice under scrutiny." *Id.*; *see Blue Shield of Va. v. McCready*, 457 U.S. 465, 482 (1982).

Consider causation first.  Because it is a shared element of Plaintiffs' RICO and antitrust claims, Plaintiffs cannot establish predominance in the Rule 23(b)(3) sense as to either claim without common proof of causation.  *See Waldrup v. Countrywide Fin. Corp.*, Nos. 2:13-cv-08833-CAS (AGRx) and 2:16-cv-04166-CAS (AGRx), 2018 WL 799156, at *11 (C.D. Cal. Feb. 6, 2018) ("Tailored to the predominance inquiry, the question [in a civil RICO case] is whether the causal link between defendants' actions and the class's injuries can be established by common proof."); *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 934 F.3d 619, 623 (D.C. Cir. 2019) ("To establish liability under section 4, each plaintiff must prove not only an antitrust violation, but also an injury to its business or property and a causal relation between the two.  Without common proof of injury and causation, section 4 plaintiffs cannot establish predominance."); *In re Aluminum*, 336 F.R.D. at 45 (recognizing that antitrust plaintiffs cannot establish predominance without common proof of causation).

Framed in this case's facts, the Rule 23(b)(3) causation-related questions are (1) whether Plaintiffs have identified a causal link between the alleged bribery-and-kickback scheme and proposed class members' injuries, and (2) whether the identified causal link can be established by the same proof for each would-be class member.  Plaintiffs have not answered either question in a way that shows or explains how Rule 23(b)(3)'s

36

predominance requirement has been met with respect to the causation element of Plaintiffs'

RICO and antitrust claims.

(1) Plaintiffs' answer to the first question depends on a change of the case's theory.

In their opening class-certification brief, Plaintiffs did not address causation directly.  *See*

ECF No. 680 at 25–31.  Plaintiffs addressed causation in their reply brief.  There,

responding to Defendants' arguments that causation could not be shown through common

evidence, Plaintiffs argued:

> Contrary to Defendants' repeated mischaracterization of
> Plaintiffs' case – "bribes in the form of rebates causing the
> WAC price to increase" – Plaintiffs instead allege that the
> bribery in this case *was* Mylan's dramatic WAC price
> increases.  Defendants' predicate offenses did not "cause" the
> WAC price to increase; the predicate violation *was* the WAC
> price increase.  This is a complete response to Defendants'
> professed confusion about causation.

ECF No. 718 at 19–20 (footnote omitted); *see id.* at 20 ("Here, the Class was harmed by

the bribery represented by the EpiPen WAC price increase.  The harm and the predicate

act are co-extensive.").  The suggestion that this case is based on a theory that EpiPen's

wholesale price alone was the "bribery" is at odds with the operative pleading, prior

opinions' descriptions of Plaintiffs' theory, and the concept's generic meaning.

The operative First Amended Complaint repeatedly alleges that the "bribes" for

purposes of Plaintiffs' claims were Mylan's payments to the PBM Defendants, not the

wholesale price increase.  The Amended Complaint alleges, for example:

> Mylan paid *increased rebates and fees* to large PBMs in
> exchange for favorable (if not exclusive) formulary placement.
> . . .   PBMs kept a significant amount of the payments for
> themselves and could be coopted by such payments.  [] Mylan

> gave *these improper bribes and kickbacks* to the Defendant PBMs not only to maintain EpiPen's formulary status, but also to exclude or restrict Auvi-Q and/or the authorized generic form of Adrenaclick from various formularies.

ECF No. 271 ¶¶ 117–18 (emphasis added).  Variations of this allegation are repeated many times throughout the Amended Complaint.[10]  The Amended Complaint also alleges

---

[10]     *See, e.g.*, ECF No. 271 ¶ 5 ("Over the last several years, Mylan has made payments to the Defendant PBMs (including rebates, incentives, administrative fees, data fees, and other payments) in exchange for favorable (if not exclusive) formulary treatment for its EpiPen products."); ¶ 106 ("The Defendant PBMs' interest and benefit in favoring high-priced drugs and large price increases (contrary to their clients' interests) makes them ripe targets to be bribed by brand manufacturers such as Mylan who pay kickbacks (*i.e.*, rebates that flow into the Defendant PBMs' coffers and not to the clients) to gain the ability to raise list prices without being penalized by the PBMs."); ¶ 122 ("As alleged above, the bribes were set as a percentage of EpiPen volume purchases based on EpiPen list prices.  As EpiPen's list prices increased, so did the dollar-value of the bribes to the Defendant PBMs."); ¶ 165 ("As part of and to accomplish the common purpose of the respective Mylan-PBM EpiPen Pricing Enterprises, Mylan systematically paid bribes and kickbacks — falsely labeled as rebates, administrative fees and/or other monies — to the Defendant PBMs in exchange for exclusive and/or favorable formulary placement."); ¶ 186(e) (alleging Mylan participated in RICO enterprises by "[p]roviding bribes and kickbacks, labeled as rebates, administrative fees and or other monies, to induce the Defendant PBMs to place Mylan's EpiPens in a favorable position on the formularies that were designed, implemented and/or administered by the Defendant PBMs"); ¶ 187(a) (alleging PBM Defendants participated in RICO enterprises by "[s]oliciting and/or obtaining bribes and kickbacks (labeled as rebates, administrative fees, and/or other monies) in exchange for placing Mylan's EpiPens in a favorable (exclusive or preferred) position on the PBMs' formularies"); ¶ 192 (alleging Defendants violated New Jersey bribery laws when "Mylan conferred benefits on the Defendant PBMs, which the PBMs solicited and/or accepted, in excess of $75,000 as consideration for knowingly violating (or agreeing to violate) their duties of fidelity to their various clients (and/or the participants and beneficiaries therein) through the rebate and administrative fee negotiations and formulary decisions and recommendations alleged above."); ¶ 242 ("Defendants have falsely and misleadingly described the bribes and kickbacks to the Defendant PBMs (in the form of rebates, administrative fees and/or other monies) as 'discounts'— which have been publicly represented as lowering drug costs — when, in fact, the bribes and kickbacks are for formulary placement, which enabled Mylan to sell EpiPen at inflated prices.").

repeatedly that the bribes caused—or at least were distinct from—EpiPen's wholesale price

increases.  The Amended Complaint alleges, for example:

> Mylan's bribes and kickbacks (and accompanying fraud in concealing that its list price increases were part and parcel of the bribes and kickbacks) *enabled and caused tremendous EpiPen list price increases* . . . ."

*Id.*  ¶ 10 (emphasis added).    Again, the pleading includes many variations of this

allegation.[11]  It is true that some of the Amended Complaint's allegations describe Mylan's

---

[11]      *See, e.g.*, ECF No. 217 ¶ 1 ("Plaintiffs bring this action . . . to recover overcharges due to Mylan's and the Defendant PBMs' illegal conduct which led to the artificial inflation of the list prices for EpiPen."); ¶ 45 ("Mylan's use of bribes and kickbacks for favorable formulary status has reduced (if not eliminated) any pressures on it to lower its prices and/or curb its price increases.  The result has been rampant, unchecked price increases for EpiPen products that are the direct result of Mylan's bribery and kickback scheme . . . ."); ¶ 101 ("Because so much of the rebates and fees flow into the Defendant PBMs' coffers (rather than being paid to their clients), the Defendant PBMs benefit from higher WAC prices because they result in higher rebate and fee payments that they keep for themselves . . . ."); at 58 ("After Using Bribes And Kickbacks To Eliminate Defendant PBMs' Incentives To Curb Mylan's Pricing Power, Mylan Aggressively Raised EpiPen Prices"); ¶ 120 ("Having paid bribes and kickbacks to the Defendant PBMs and other PBMs for formulary placement for its EpiPen products, and being freed from the threat of formulary exclusion, Mylan no longer faced the threat that the Defendant PBMs would penalize it by shifting sales to competing EAI products if Mylan raised its prices too high.  Thus, Mylan no longer faced the price-disciplining effects from competing EAI products, and it had carte blanche to raise EpiPen list prices.  Mylan aggressively increased EpiPen prices . . . ."); *id.* ("Mylan aggressively increased EpiPen prices far beyond what it would have (and could have) done absent the scheme, in order to: (a) shift the cost of its bribes and kickbacks to direct purchasers, such as Plaintiffs (and Class members), and (b) earn increased profits by raising its prices beyond simply the amount of the bribes."); ¶ 128 ("Because EpiPen's brand prices have not fallen since 2016, the price increases caused by the bribes remain embedded in Mylan's brand EpiPen prices."); *id.* ("[T]he price of Mylan's authorized generic product has been (and continues to be) inflated by the price increases enabled by Mylan's illegal payments to the PBMs."); ¶ 129 ("Mylan's bribes and kickbacks caused not only the artificial list price inflation for Mylan's branded EpiPen products, but also for Mylan's 'authorized generic' EpiPen products . . . ."); ¶ 239 ("Defendant PBMs have duties of fidelity and honesty, and/or fiduciary duties, to not misuse their negotiating powers in a manner that is contrary to, and harmful to, their clients'

EpiPen wholesale price increases as essential to the bribery scheme.  *See, e.g.*, *id.* ¶¶ 116, 141, 178, 249, and 290.  In view of the Amended Complaint overall, it would be a mistake to construe these allegations (or any other of the Amended Complaint's allegations) as saying that Mylan's EpiPen wholesale price increases alone were the bribes on which Plaintiffs' claims depend.

The various orders entered in this case have understood the Amended Complaint to claim that the bribery-and-kickback scheme depended on showing that Mylan paid the PBM Defendants additional amounts in consideration for the PBM Defendants' agreements to maintain the EpiPen's preferred formulary status, to exclude competing products, and to accede to EpiPen price increases to which the PBM Defendants would otherwise have objected.  This understanding of Plaintiffs' theory was described in some detail in the order denying Defendants' initial Rule 12(b)(6) motions.  *In re: EpiPen Direct Purchaser Litig.*, 2021 WL 147166, at *3–4.  This description included the following:

> If the PBMs had abided by industry standards, Plaintiffs seem to say, then there would have been nothing unlawful about these increased payments.  After all, PBMs are supposed to negotiate rebates on their clients' behalf in exchange for favorable formulary status.  What made the scheme unlawful, according to Plaintiffs, was that the PBM Defendants abandoned any effort to use their clout to control the EpiPen's price.  This alleged abdication ran counter to the promises that the PBM Defendants had made in marketing materials and other public statements to protect their clients' interests.  And it led to "aggressive[]" price increases on the EpiPen.  At the end of 2012, the list price was below $240; by May 2016, it was $609.  Despite these price increases, Mylan was able to

---

interests.  It is contrary to these duties for a PBM to use its negotiating power to receive rebates, administrative fees, and other monies by inducing manufacturers to increase list prices of EpiPen, which price increases are detrimental to the Defendant PBMs' clients.").

maintain a stable market share because of the EpiPen's favorable formulary status.

The resulting EpiPen price increases benefitted the PBM Defendants, too. This is because the rebates and administrative fees that they received were generally calculated as a percentage of the EpiPen's WAC. So as the list prices increased, so did the amounts that the PBM Defendants received from Mylan. And whereas PBMs had historically passed savings like these on to their clients, the PBM Defendants began to keep more of the increased fees for themselves. Mylan, in turn, was able to use its list-price increases to recoup the costs of its increasing payments to the PBMs. Even after accounting for the costs of its alleged bribes, Mylan's operating profit per EpiPen device increased 148% between 2012 and 2016. This cycle of mutual benefit allowed both Mylan and the PBM Defendants to maintain or increase their profits and, according to Plaintiffs, resulted in EpiPen prices that were "artificially inflated." Plaintiffs, as drug wholesalers who pay the list price for EpiPens, were left to bear the burden.

*Id.* at *4. This description made clear that, in my understanding of the case, Plaintiffs'

bribery theory depends on Mylan's action-influencing payments to the PBM Defendants,

not merely Mylan's price increases. Plaintiffs have not objected to this description of their

claims or sought to clarify their theory in any way prior to the class-certification briefing.

Nor have they sought to amend their operative pleading to reflect this shift.

It is difficult to understand how a mere price increase might be a bribe. Prices go

up for many reasons. According to the generic definition, a bribe is "[a] price, reward, gift

or favor given or promised with a view to pervert the judgment of or influence the action

of a person in a position of trust." *Bribe*, *Black's Law Dictionary* (11th ed. 2019); *see id.*

*Bribery* ("The corrupt payment, receipt, or solicitation of a private favor for official

action."). These same core concepts are reflected in the various bribery statutes Plaintiffs

rely on to show RICO predicate acts. *See In re: EpiPen Direct Purchaser Litig.*, 2023 WL 2860858, at *4–11. Saying that a mere price increase is a bribe omits reference to the judgment-perverting or improper-action-influencing considerations that define the concept.

To summarize, Plaintiffs say that the causal link between the alleged bribery-and-kickback scheme and proposed class members' injuries is Mylan's wholesale price increases and nothing more. For reasons just explained, this is not an accurate characterization of the bribery theory underlying Plaintiffs' claims. It would be a mistake to allow Plaintiffs to recharacterize their theory at this stage. Regardless, Plaintiffs haven't asked for that. Plaintiffs therefore must answer the Rule 23(b)(3) causation question—that is, whether causation can be established by common proof—by reference to their theory that the bribes Mylan paid the PBM Defendants caused Plaintiffs' harms.

(2) Plaintiffs have not attempted this showing. Dr. Singer did not opine regarding causation; he was not asked to. *See* ECF No. 695-2 at 43:18–44:8 ("In [] most garden-variety antitrust cases, my job is to causally connect the challenged conduct with a price effect. That's what I am typically asked to do. Here because of the unique nature of this case and the RICO claim, the higher price is part of the challenged conduct. So I don't [] have that assignment that [] I often have which is to create a causal nexus between the conduct and inflated prices."); *see id.* at 44:16–45:4 (explaining that he "t[ook] the challenged conduct as a given and assume[d] that part of the challenged conduct was the inflated WAC prices themselves" and then compared that to "a but-for world [where] the WAC prices had not accelerated at that pace"). Dr. Singer's assumption that "the

challenged conduct was the inflated WAC prices themselves" seems the same thing as assuming causation. Because Dr. Singer did not attempt to determine why EpiPen's wholesale price increased, he did not take the next step and identify a method that might permit a class-wide causation showing at trial. Plaintiffs identify no other record evidence that might answer this question.

This is not a case where an obvious method or plain evidence shows that causation may be established by class-wide proof. Defendants have identified several factors (other than Plaintiffs' case theory) that may have caused EpiPen's wholesale price to increase. They point, for example, to individual agreements between would-be class members and Mylan. *See* ECF No. 697 at 41–42. They also point to a separate putative class action in which Plaintiffs are proposed members alleging that EpiPen's wholesale price was too high during the same period covered here because Mylan and Pfizer prevented a competing generic EpiPen from entering the market sooner. *See KPH Healthcare Servs., Inc. v. Mylan N.V.*, No. 20-2065-DDC-TJJ, 2022 WL 3153687, at *2 (D. Kan. Aug. 8, 2022). In other words, the market Plaintiffs confront is busy and complex. It includes multiple participants, agreements, and other pricing-relevant factors. These factors won't necessarily defeat certification provided a plaintiff is able to identify a method of showing causation on a class-wide basis. But Plaintiffs haven't done that here.[12]

---

[12]    There is another predominance problem that also raises superiority concerns. At least four putative class members are or were clients of, and are bound by contracts with, PBM Defendants. *See, e.g.*, ECF No. 698-28 (contract between PBM Express Scripts, Inc. and putative class member AmerisourceBergen); ECF No. 698-29 (contract between PBM Express Scripts and putative class member Henry Schein, Inc.); ECF No. 698-30 (contract between PBM Express Scripts and putative class member Princeton University); ECF No.

698-32 (contract between PBM Medco Health Solutions, Inc. and putative class member Wal-Mart Stores, Inc.); ECF No. 704-18 (contract between PBM Catamaran PBM Services, LLC and putative class member Princeton University).  These contracts include terms that raise individualized issues.  For example, the contracts disclaim fiduciary duties owed by PBM Defendants.  *See, e.g.*, ECF No. 698-28 at 13 (PBM/AmerisourceBergen contract stating AmerisourceBergen "acknowledges and agrees that, except for the limited purpose set forth in Section 2.3(c) neither it nor the Plan intends for [PBM Express Scripts] to be a fiduciary (as defined under ERISA or state law) of the Plan,"); ECF No. 698-29 at 24–25 (PBM/Henry Schein contract agreeing Henry Schein agrees and acknowledges the PBM is not a fiduciary and it will not name the PBM as a "plan fiduciary"); ECF No. 698-32 at 8 (PBM/Wal-Mart contract stating Wal-Mart will not "name or represent that PBM is a 'plan administrator' or 'fiduciary'").  This matters because some of the state bribery statutes Plaintiffs invoke as RICO predicates apply only when the duty exists.  The contracts also include terms governing dispute resolution, forum selection, and limitation of liability.  *See, e.g.*, ECF No. 698-28 at 15–17 (PBM/AmerisourceBergen contract including limitation-of-liability, indemnification, and choice-of-law terms, and stating that "[a]ny controversy or claim arising out of or relating to this Agreement . . . shall be determined by a court of competent jurisdiction located in Philadelphia, Pennsylvania."); ECF No. 698-32 at 28–37 (PBM/Wal-Mart contract containing indemnification, choice-of-law, and mediation terms); ECF No. 704-18 at 16–19 (PBM/Princeton contract containing indemnification, limitation-of-liability, and dispute-resolution terms).  Four may not be a large number in a class of forty-six members.  But it's not small, either.  Here, four class members amounts to almost ten percent of the proposed class.  Regardless, the contractual issues Defendants justifiably will raise as to these class members will require individualized attention, and the time necessary to resolve those questions will no doubt detract from the efficiencies gained through class treatment.  For their part, Plaintiffs argue that an integration clause in each contract makes the contracts inapplicable to their claims in this case.  ECF No. 718 at 23.  This seems incorrect.  Though the contracts may contain clauses limiting the contracts to their subject matter, the subject matter often includes formulary administration.  *See, e.g.*, ECF No. 698-28 at 2 (PBM/AmerisourceBergen contract defining the "PBM Services" subject to the agreement to include formulary administration); ECF No. 698-29 at 16 (PBM/Henry Schein contract providing for formulary development/placement); ECF No. 698-32 at 19 (PMB/Wal-Mart contract listing formulary administration as one of the PBM's duties).  This action arises from Defendants' alleged misuse of formulary placements.  *See* ECF No. 271 ¶ 3 ("This action arises out of a scheme by Mylan to maintain and/or increase the volume and dollar amount of its EpiPen sales by paying bribes and kickbacks to the Defendant PBMs . . . in exchange for[] favorable placement of Mylan's EpiPens on the PBMs' formularies."); ¶ 117 ("Mylan paid increased rebates and fees to large PBMs in exchange for favorable (if not exclusive) formulary placement.").  Contracts regarding formulary placement seem important to this case.  Regardless, determining the integration clauses' applicability or meaning represents another individualized determination that would detract from class-wide issues.

\*

Plaintiffs have not affirmatively demonstrated that the class is so numerous that joinder of all members is impracticable under Rule 23(a)(1), that the representative parties will adequately protect the interests of the class under 23(a)(4), or that questions of law or fact common to class members predominate over any questions affecting only individual members under 23(b)(3).  For these reasons, Plaintiffs' class-certification motion will be denied.

## ORDER

Based on the foregoing, and on all the files, records, and proceedings herein, **IT IS ORDERED THAT**:

1.     Plaintiffs' Corrected Motion for Class Certification [ECF No. 691] is **DENIED**.

2.     Defendants' Motion to Exclude the Expert Opinions of Hal J. Singer, Ph.D. [ECF No. 700] is **DENIED as moot**.

Dated: July 1, 2024                                 s/ Eric C. Tostrud
                                                    Eric C. Tostrud
                                                    United States District Court

45